ERIC A. SEITZ
ATTORNEY AT LAW
A LAW CORPORATION

ERIC A. SEITZ          1412
GINA SZETO-WONG   10515
JONATHAN M.F. LOO 10874
KEVIN YOLKEN         10987
820 Mililani Street, Suite 502
Honolulu, Hawai'i 96813
Telephone:  (808) 533-7434
E-Mail:      eseitzatty@yahoo.com
             szetogina@gmail.com
             jloo33138@yahoo.com
             kevinyolken@gmail.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| BRENON NASH; WAYNE J. ANCHETA; FRANCISCO ALVARADO; ROBERT WALSH; DUANE BERTLEMANN; ANTHONY CHATMAN; DUSTIN SNEDEKER-ABADILLA; KUUIPO KALANI; BELLA CARVALHO; TEARON PACHECHO-FERNANDEZ; JUANITA GRAMMER, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br>     vs.<br><br>STATE OF HAWAI'I, DEPARTMENT OF PUBLIC SAFETY; DAVID  Y. IGE, Individually;  JOSH GREEN, | CIVIL No. <u>21-00268 JAO-KJM</u><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF and DECLARATORY JUDGMENT; CERTIFICATE OF SERVICE** |

Individually;  NOLAN ESPINDA,
Individually; MAX N. OTANI,
Individually; and  DOES  1-50,

               Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT FOR
## INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

Plaintiffs  BRENON  NASH;  FRANCISCO  ALVARADO;  WAYNE  J. ANCHETA;  ROBERT  WALSH;  DUANE  BERTLEMANN;  ANTHONY CHATMAN; DUSTIN SNEDEKER-ABADILLA; KUUIPO KALANI; BELLA CARVALHO; TEARON PACHECHO-FERNANDEZ; JUANITA GRAMMER (hereinafter, collectively "Plaintiffs") individually and on behalf of the proposed Class of all other persons similarly situated, by and through their undersigned attorneys, allege as follows:

## INTRODUCTION

1.     Over half of the individuals in Defendant State of Hawaiʻi, Department of Public Safety (hereinafter "DPS") custody have contracted COVID-19.  *See* State of Hawaiʻi, Dep't of Public Safety, *PSD Coronavirus Information and Resources*, https://dps.hawaii.gov/blog /2020/03/17/coronavirus-covid-19-information-and-resources/ (last visited June 8, 2021) (2,100 DPS residents out of approximately 4,000 have contracted COVID-19).

2.     Six out of the nine correctional facilities that house DPS pre-trial detainees and convicted prisoners have experienced uncontrolled outbreaks of COVID-19 resulting in at least nine deaths.  *Id.*

3.     All indications are that these numbers will continue to rise unchecked absent urgent intervention.  *See* Kevin Dayton, *Questions Raised Over COVID Outbreak at Maui Jail*, Honolulu Civil Beat (March 18, 2021) https://www.civilbeat.org/2021/03/questions-raised-over-covid-outbreak-at-maui-jail/.

4.     Defendants have failed in their responsibilities under the law, the U.S. Constitution, and their own regulations to safeguard DPS residents and staff from contracting COVID-19.

5.     Defendant DPS operates and manages eight jails and prisons in Hawaiʻi (hereinafter collectively, "DPS correctional facilities").  The Saguaro Correctional Center (hereinafter "Saguaro") in Eloy, Arizona houses approximately 1,000 Hawaiʻi convicted inmates.

6.     DPS correctional facilities and Saguaro incarcerate approximately 4,000 Hawaiʻi pre-trial detainees and convicted prisoners (hereinafter "residents").

7.     DPS residents are entirely dependent on Defendants for protection against COVID-19.

8.      Defendants have failed to implement most, if not all, of the precautions public health experts have issued to prevent the spread of COVID-19 in DPS correctional facilities.   *See* Ctrs. for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in CORRECTIONAL AND DETENTION FACILITIES (CDC GUIDANCE) (Feb. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correctiondetention/guidance-correctional-detention.html.

9.      Defendants' actions and inactions have facilitated the spread of COVID-19 among residents and correctional staff.

10.     For example, after housing 40-60 pretrial detainees at Hilo Community Correctional Center ("HCCC") in a single room (hereinafter, the "Fishbowl") approximately 30 feet by 30 feet, 137 pretrial detainees and 18 DPS staff at HCCC tested positive for COVID-19 in a span of two weeks in May and June 2021.

11.     Because there is no toilet or running water in the Fishbowl or other areas at HCCC that house detainees, detainees are forced to urinate and sometimes defecate in their "cell."

12.     Residents with no symptoms of COVID-19 or who have tested negative for COVID-19 are routinely housed or "quarantined" in the same cell as other incarcerated individuals who have symptoms of COVID-19 or have tested positive for the virus.

4

13.     Residents who have tested negative for COVID-19 are forced into cells formerly occupied by residents who have tested positive for COVID-19, without cleaning or properly sanitizing these cells.

14.     Defendants fail to respond to, or delay their response to, residents' health complaints and to residents exhibiting COVID-like symptoms.

15.     Mask-wearing is haphazardly enforced.  Efforts to regularly disinfect common surfaces and maintain personal hygiene are difficult and inadequate.

16.     Individuals incarcerated in DPS correctional facilities cannot isolate and have no ability to maintain safe social distance.  While lining up for their meals, for example, residents are routinely pressed against one another.

17.     Defendants lack adequate staff and other resources to test, diagnose, and trace the source of COVID-19 infections in the facilities they operate thereby exposing inmates, staff, and members of the community at large to unacceptable risks that the infection will spread and endanger the well-being of thousands, if not tens of thousands, of persons.

18.     DPS correctional facilities are not closed off from the communities around them.  Every day, custody, medical, and support staff who have direct contact with inmates and detainees enter and leave the facilities on a daily basis.

19.     DPS correctional facilities see regular turnover of residents who leave and return for court hearings and leave upon transfer or release.  For these reasons,

an outbreak at a DPS correctional facility can spread easily to the surrounding community.

20.     Continued outbreaks of COVID-19 within DPS correctional facilities will not only directly harm those individuals who work or reside at the facilities, but also will divert finite medical resources from the Hawaiʻi community, leading to further state-wide public health harms.

21.     Hospital resources in Hawaiʻi are limited and are not equipped to handle increases in the number of people who contract COVID-19.

22.     Deaths have occurred in certain regions of the country where the need for specialized beds and ventilators outpaced hospital capacity.

23.     The pandemic is not over.  Although some DPS residents and staff have been vaccinated, vaccination has not been shown to prevent asymptomatic infection and transmission of the virus.

24.     Defendants must have an effective plan to educate and encourage the individuals in its custody, as well as its staff, to accept vaccination.

25.     Even with vaccination, it will be a significant period of time before DPS correctional facilities can safely abandon the critically important preventative measures against COVID-19 at which Defendants have so far failed.

26.     In addition, more contagious strains of the virus have recently emerged.

27.     Only a multi-pronged approach, which includes vaccination, routine and effectively implemented testing, masking, sanitation, and proper use of isolation and quarantine, can keep the residents and workers at DPS correctional facilities from being exposed to the same risks and harms.

28.     The steps Defendants have taken to date are manifestly inadequate in the face of the ongoing outbreaks of COVID-19 inside DPS correctional facilities.

29.     Accordingly, Plaintiffs bring this action on behalf of themselves and all those similarly situated.

30.     Plaintiffs seek to represent a class of all DPS inmates and pre-trial detainees who have contracted COVID-19 as a result of their incarceration in DPS correctional facilities.

31.     Plaintiffs seek all necessary steps to safeguard the health of those remaining in DPS correctional facilities, including implementing the public health measures needed to prevent further COVID-19 outbreaks within its facilities.

## **NATURE OF ACTION**

32.     This is a class action lawsuit seeking injunctive relief and declaratory judgment from the Defendants for their knowing, deliberate, and willful acts and omissions that have exposed and are continuing to expose Plaintiffs and members of the proposed Classes to a serious and potentially fatal illness.

33.     This action arises out of Defendants' unconstitutional and disgraceful treatment of inmates and detainees at risk for, exposed to, and/or diagnosed and suffering from COVID-19 in jails and prisons operated and/or utilized by Defendants.

## JURISDICTION AND VENUE

34.     This court has original jurisdiction to hear this matter pursuant to 28 U.S.C. Sections 1331 and 1343, *inter alia*.  Any and all state law claims contained herein are part of the same case or controversy giving rise to the federal law claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

35.     Venue is proper in the United States District Court for the District of Hawai'i pursuant to 28 U.S.C. Section 1391 as all Defendants to the litigation reside in the state of Hawai'i, and all actions and/or omissions giving rise to the claim occurred and continue to occur in the State of Hawai'i.

## PARTIES

36.     Plaintiff BRENON NASH (hereinafter "Mr. Nash") is and has been incarcerated at Oahu Community Correctional Center (hereinafter "OCCC") and is and has been a resident of the State of Hawai'i at all times pertinent hereto.

37.     Plaintiff FRANCISCO ALVARADO (hereinafter "Mr. Alvarado") is and has been incarcerated at Kulani Correctional Facility (hereinafter "Kulani").

8

Mr. Alvarado is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

38.     Plaintiff WAYNE J. ANCHETA (hereinafter "Mr. Ancheta") is and has been incarcerated at Halawa Correctional Facility (hereinafter "Halawa").  Mr. Ancheta is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

39.     Plaintiff ROBERT WALSH (hereinafter "Mr. Walsh") is and has been incarcerated at Maui Community Correctional Center (hereinafter "MCCC").  Mr. Walsh is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

40.     Plaintiff DUANE BERTLEMANN (hereinafter "Mr. Bertlemann") is and has been incarcerated at Waiawa Correctional Facility (hereinafter "Waiawa").  Mr. Bertlemann is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

41.     Plaintiff ANTHONY CHATMAN (hereinafter "Mr. Chatman") is and has been incarcerated at Halawa.  Mr. Chatman is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

42.     Plaintiff DUSTIN SNEDEKER-ABADILLA (hereinafter "Mr. Snedeker-Abadilla") is and has been incarcerated at Hawaii Community Correctional Center (hereinafter "HCCC").  Mr. Snedeker-Abadilla is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

9

43.    Plaintiff KUUIPO KALANI (hereinafter "Ms. Kalani") is and has been incarcerated at HCCC.  Ms. Kalani is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

44.    Plaintiff BELLA CARVALHO (hereinafter "Ms. Carvalho") is and has been incarcerated at HCCC.  Ms. Carvalho is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

45.    Plaintiff TEARON PACHECO-FERNANDEZ (hereinafter "Ms. Pacheco-Fernandez") is and has been incarcerated at HCCC.  Ms. Pacheco-Fernandez is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

46.    Plaintiff JUANITA GRAMMER (hereinafter "Ms. Grammer") is and has been incarcerated at HCCC.  Ms. Grammer is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

47.    Defendant DPS is a public entity, duly organized and existing under the laws of the State of Hawaiʻi.  DPS operates and manages: HCCC, Kauai Community Correctional Center (hereinafter "KCCC"), MCCC, OCCC, Halawa, Waiawa, Kulani, and the Women's Community Correctional Center (hereinafter "WCCC").

48.    Pursuant to the laws of the State of Hawaiʻi DPS is authorized and required to establish and adhere to procedures and policies to ensure the physical, emotional, medical, and mental health and safety of residents under its jurisdiction.

49.    DPS also is required to hire, supervise, and train its employees to ensure that they carry out the policies and procedures of DPS and preserve the safety of prisoners incarcerated in all correctional facilities in the State of Hawai'i.

50.    At all times relevant to the facts and claims set forth in this Complaint, DPS was and is responsible for the acts and/or omissions and the policies, procedures, and practices of its officers, managers, employees, and/or agents.

51.    Defendant DAVID Y. IGE (hereinafter "Defendant Ige") is and has been the Governor of the State of Hawai'i with responsibility for the direction and supervision of all state governmental functions including the operation of state correctional facilities and institutions.  Defendant Ige is and has been a resident of the State of Hawai'i at all times pertinent hereto.  Defendant Ige is sued in his individual capacity.

52.    Defendant JOSH GREEN ("Defendant Green") is and has been the Lieutenant Governor of the State of Hawai''i with assigned responsibilities for the creation, development, and implementation of policies and practices to prevent, contain, and treat outbreaks of the COVID-19 virus in the State of Hawai'i including, specifically, in state correctional facilities and institutions.  Defendant Green is and has been a resident of the State of Hawai'i at all times pertinent hereto.  Defendant Green is sued in his individual capacity.

53.     Defendant NOLAN ESPINDA ("Defendant Espinda") was the Director of the State of Hawaiʻi Department of Public Safety ("DPS") and is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.  While Defendant Espinda was Director of DPS, he was responsible for the actions and/or inactions of its officers, managers, employees and/or agents.  Defendant Espinda is sued in his individual capacity.

54.     Defendant MAX N. OTANI (hereinafter "Defendant Otani") is the Director of DPS and is and has been a resident of the State of Hawaiʻ at all times pertinent hereto.  As Director of DPS, Defendant Otani has at all relevant times been responsible for the actions and/or inactions of its officers, managers, employees and/or agents.  Defendant Otani is sued in his individual capacity.

55.     DOES 1-50 (hereinafter, "Doe Defendants") are individuals whose true identities and capacities are as yet unknown to the Plaintiffs and their counsel, despite diligent inquiry and investigation, and who are responsible in some manner for the occurrences and Plaintiffs' injuries, as herein alleged.  The true names and capacities of Doe Defendants will be substituted as they become known.  Plaintiffs are informed and believe, and thereupon allege, that at all times herein mentioned, Doe Defendants were the agents, servants, and/or employees of each of the other Defendants and/or Doe Defendants and were acting with the permission and consent and within the course and scope of said agency and employment.  For purposes of

this Complaint, DPS policymakers, administrators, and/or persons with supervisory or decision-making authority regarding the issues that are the subject of this Complaint are designated as DOES 1-10.  DOES 11-50 are DPS employees without supervisory or decision-making authority who may be liable on the Complaint but who have not yet been discovered and named.  DOES 1-50 are sued herein in their individual capacities.

## FACTUAL ALLEGATIONS

**A.    COVID-19 Poses a Significant Risk of Illness, Injury, and Death**

56.    COVID-19 is now the leading cause of death in the United States.  *See* Cynthia Cox and Krutika Amin*, COVID-19 Is The Number One Cause of Death In The U.S. In Early 2021*, Health System Tracker (February 22, 2021) https://www.healthsystemtracker.org/brief/covid-19-is-the-number-one-cause-of-death-in-the-u-s-in-early-2021/.

57.    As of June 8, 2021, worldwide there were over 174 million reported COVID-19 cases and 3.7 million confirmed deaths.  In the United States, six hundred million individuals have died from COVID-19.  In Hawaiʻi, there have been over 35,400 confirmed or probable cases of COVID-19 and 502 deaths.

58.    Approximately 20 percent of COVID-19 cases will have severe or life-threatening illness and up to two to three percent of patients will die.

13

59.     The arrival of COVID-19 vaccines does not mean that the pandemic is over.

60.     Vaccine resistance and hesitancy are impinging on public health efforts to quell COVID-19 by immunization.  But epidemiologists agree that 70 - 80% of the United States population must have immunity to achieve herd immunity.  *See* Donald G. McNeil, Jr., How Much Herd Immunity is Enough? N.Y. Times (Dec. 24,   2020),   https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html.

61.     In addition, the virus continues to mutate.   An important new development in the evolution of the COVID-19 pandemic has been the emergence of the B.1.1.7 mutant in the United Kingdom that is now believed to be the dominant strain across the United States.  *See* Denise Chow, *U.K. Coronavirus Variant Is Now The Dominant Strain In The U.S., CDC* Says, NBC News, (April 7, 2021), https://www.nbcnews.com/science/science-news/uk-coronavirus-variant-now-dominant-strain-us-rcna606.

62.     Both laboratory testing and epidemiologic data strongly indicate greater transmissibility of this agent compared to the original form of the COVID-19 virus. Recent estimates project that 80% vaccination or greater is required for herd immunity against this mutant.  *Id.*   When this might occur is unknown and unpredictable.

63.    The Centers for Disease Control and Prevention (hereinafter "CDC") has estimated that 60% of COVID-19 infections come from asymptomatic patients. *See* Daily Briefing, *How Much Is Asymptomatic Spread Driving COVID-19? Here's What The Evidence Says*, (January 11, 2021), https://www.advisory.com/dailybriefing/2021/01/11/asymptomaticspread#:~:text= Overall%2C%20the%20model%20predicted,showed%20symptoms%20at%20all. Consequently, the familiar measures to limit the spread of the virus (social distancing; quarantining after potential exposure; using personal protective equipment; avoidance of large groups and of indoor gatherings; and practicing vigilant hygiene) will continue to be essential for the foreseeable future to stem transmission of COVID-19.

64.    Although older people and people with certain pre-existing conditions are the most vulnerable to serious illness or death from the virus, even younger people may suffer serious cases of COVID-19 or die.

65.    A recent study by the Journal of the American Medical Association reported 12,000 excess deaths among the young (defined as adults ages 25 to 44) in the U.S. in the period from March through the end of July 2020—a trend that was continuing into the fall and winter.  *See* Jeremy Samuel Faust, Harlan M. Krumholz and Rochelle P. Walensky, *People Thought COVID-19 Was Relatively Harmless for*

*Younger Adults. They Were Wrong*. N.Y. Times (Dec. 16, 2020), https://www.nytimes.com/2020/12/16/opinion/covid-deaths-young-adults.html.

66.     The study also reported that in some regions, "COVID-19 appears to have temporarily rivalled or surpassed the usual leading cause of death among US adults ages 25-44." *Id.*

67.     As the pandemic has continued, there have been more reports of long-term, sometimes disabling effects of the disease.

68.     The CDC reports fatigue, chest and joint pain, and shortness of breath among "common" long-term symptoms; others are intermittent fever, heart palpitations, depression, and difficulty with thinking and concentration. *See* Ctrs. For Disease Control and Prevention, COVID-19, Long-Term Effects of COVID-19, updated (Nov. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html.

69.     There are graver long-term effects as well, including inflammation of the heart muscle (myocarditis), lung function abnormalities, and acute kidney injury. *Id.*

70.     These long-term effects are not unusual or confined to the elderly or ill. As of September 2020, a series of medical studies had already reported that substantial numbers of COVID-19 sufferers had long-term symptoms, including one-quarter of the patients aged 18 to 34 years old. *See* Rita Rubin, As Their

Numbers Grow, COVID-19 "Long Haulers" Stump Experts, JAMA 324(14) (Sept. 23, 2020) https://jamanetwork.com/Journals/jama/fullarticle/2771111.

**B.    Incarcerated Individuals and Corrections Staff Are Particularly Vulnerable to COVID-19**

71.    People in environments with confined spaces such as correctional facilities, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in jails and prisons across the country.  *See* Cheryl Corley, The COVID-19 Struggle in Chicago's Cook County Jail, NPR (Apr. 13, 2020), https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagoscook-county-jail; *see also, Virus outbreak in Ohio prisons highlights risk at US lockups*, Boston Herald, April 21, 2020 (last visited April 21, 2020), https://www.bostonherald.com/2020/04/21/virusoutbreak-in-ohio-prisons-highlights-risk-at-us-lockups/.

72.    Congregate settings such as jails and prisons enable rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing.

73.    When people must share bathrooms, showers, and other common areas, the opportunities for transmission are even greater.

74.    When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing.

75.    When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.  For many in jail or prison, social distancing is a physical impossibility.  Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets.

76.    The Defendants, for example, incarcerate pre-trial and convicted prisoners in overcrowded housing facilities with insufficient and inadequate space and capabilities of maintaining distances, quarantining, preventing, and treating COVID-19.

77.    HCCC is 74% overcapacity.  *See* DPS Website, *Department of Public Safety Weekly Population Report*, (June 7, 2021) https://dps.hawaii.gov/wp-content/uploads/2021/06/Pop-Reports-Weekly-2021-06-07.pdf.

78.    Incarcerated individuals have high rates of disabilities, including the disabilities that create particular risk factors for COVID-19 complications and death. *See* Jennifer Bronson et al., *Special Report: Disabilities Among Jail and Prison Inmates*, 2011-12, U.S. Dept. of Justice Bureau of Prison Statistics (Dec. 2015) available at https://www.bjs.gov/content/pub/pdf/dpji1112.pdf.

79.    Moreover, the ability of incarcerated people to adopt preventative measures is completely subject to the dictates of correctional officials who control the housing, schedules, sanitary supplies, and nearly every other aspect of their lives.

Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and contracting infectious diseases.

80.     As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities.  Hot water, soap, and paper towels are often in limited supply.  Inmates themselves, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies.  *See See, e.g*., Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (Apr. 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people).  This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.

81.     Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases, so an outbreak in a prison or jail could overwhelm local hospitals.

82.     And as correctional staff enter and leave the facility, they may carry the virus with them.

83.     Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are

less able to engage in social distancing and because of the shortage of personal protective equipment.

84.   Numerous public health experts have all strongly cautioned that people booked into and held in correctional facilities are likely to face serious, even grave harm due to the outbreak of COVID-19. *See* Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF; *see also,* Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo; *see also,* Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington   Assoc.   of   Sheriffs   &   Police   Chiefs   (Mar.   5,   2020), https://cutt.ly/EtRSm4R; *see also,* Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HealthAffairs (Mar. 10, 2020), https://cutt.ly/QtRSYNA; *see also,* Anne C. Spaulding, MD MPDH, Coronavirus COVID-19 and the Correctional Jail, Emory Center   for   the   Health   of   Incarcerated   Persons   (Mar.   9,   2020), http://www.chip.sph.emory.edu/documents/For%20Correctional%20Facility%20L eadership_2020.pdf; *see also,* Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk; Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus*

*Impact on Prisons*, The Guardian (Mar. 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

85.     The CDC is a federal agency that is part of the U.S. Department of Health and Human Services.

86.     The CDC serves as the national agency for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States.

87.     The CDC is responsible for controlling the introduction and spread of infectious diseases and provides consultation and assistance to other nations and international agencies to assist in improving their disease prevention and control, environmental health, and health promotion activities.  It also provides program expertise and assistance in responding to Federal, State, local, and private organizations on matters related to disease prevention and control activities.  *See* Centers for Disease Control and Prevention, Mission Statement, https://www.cdc.gov/about/organization/cio-orgcharts/pdfs/CDCfs-508.pdf     (last visited Apr. 14, 2021).

88.     Because of the extraordinary danger that COVID-19 will spread in jails and prisons, the CDC issued specific guidance for dealing with correctional and

detention facilities on March 23, 2020.  *See supra,* CDC, Interim Guidance.  The most recent guidance was published on February 19, 2021.  *Id.*

89.    The CDC acknowledges that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."  In light of these concerns, the guidance recommends that detention facilities "explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak."

90.    The CDC guidance further recommends that correctional and detention facilities:

a. Test and quarantine individuals (in single cells for 14 days) preparing for release, transfer to another facility, or entrance into the general population of a correctional facility;

b. Adopt social distancing strategies to increase space between individuals, including rearranging bunking to ensure that beds are at a minimum six feet apart in all directions, increasing space in lines and waiting areas, staggering meals and rearranging seating during meals

so that detainees are sitting on only one side of the table and are separated with adequate space;

c.  Medically isolate confirmed and suspected cases and quarantine of contacts;

d.  Ensure that medical isolation for COVID-19 is *operationally* distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice.  For example:

 i.  Ensure that individuals under medical isolation receive regular visits from medical staff (to perform medical evaluation and treatment) and have access to mental health services.

 ii.  If a facility is not able to provide regular medical evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

 iii.  Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.

 iv.  Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

      v.   Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

e. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19.

f. Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

g. Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

h. Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or

disposable paper towels for hand-washing, and tissues (providing no-touch trash receptacles for disposal) and thoroughly and frequently clean and disinfect all areas where individuals with confirmed or suspected COVID-19 spend time; and

i. Implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and "ensure adequate supplies to support intensified cleaning and disinfection practices." *Id.*

## C.   Defendants Have Mishandled and Will Continue to Mishandle the COVID-19 Pandemic

91.    Defendants have predictably failed to contain the COVID-19 outbreaks at its correctional facilities despite having a COVID-19 mitigation plan in place since March 17, 2020. *See* DPS, *Pandemic Response Plan COVID-19*, (updated May 28, 2021)          https://dps.hawaii.gov/wp-content/uploads/2020/03/PSD-Pandemic-Response-Plan-Revised-May-2021.pdf ("The virus is spreading very easily and sustainably between people… symptoms reported – rang[e] from mild symptoms to *severe illness.*").

92.    DPS's Response Plan outlines specific directives and recommendations to prevent the spread of COVID-19 in its facilities. *Id.*  These include: quarantining inmates prior to admission and transfer, suspending inmate transfers or movement unless absolutely necessary, providing PPE to staff and inmates, performing regular

COVID testing, implementing social distancing requirements, and conducting proper and frequent sanitation throughout the facility. *Id.*

93.    In its plan, DPS acknowledged that there were "long-standing, pervasive, well-documented" risks from failing to address COVID-19. *Farmer*, 511 U.S. at 842; *see also* PSD Coronavirus Information and Resources, https://dps.hawaii.gov/blog/category/featured/ (first posted on March 17, 2020).

94.    In April and May 2020, in response to orders from the Supreme Court of Hawai'i and lower courts, the Defendants released approximately three hundred inmates from Hawai'i jails and prisons to bring the inmate populations closer to capacity and thereby alleviate the risks if the virus were to be found; however, with new and additional admissions the numbers of inmates in state jails and prisons rose and by July, 2020, returned to former levels, well over capacity.

95.    Despite their own clear instructions, DPS failed to implement their Response Plan.

96.    DPS continued to deny Plaintiffs basic preventive measures such as enough space to sleep or exist more than six feet away from another person, access to medical attention, sanitary living conditions, water, regular access to the bathroom, or clean drinking cups.

97.    DPS did not provide the people in its custody with the space, soap, sanitizer, and cleaning supplies necessary to allow staff and inmates to remain safe.

98.    DPS did not provide timely and adequate medical care to identify, isolate, and treat people who develop symptoms.

99.    Specifically, DPS:

100.   **Continued to house up to 60 residents in a single room.**

    a.   DPS staff at HCCC houses up to 60 detainees in a single room.

    b.   Other HCCC detainees are placed in chain-linked dog cages and other small, enclosed spaces where they sleep shoulder to shoulder.

    c.   At Waiawa, DPS places 40-60 inmates in a room called the "Pavilion" for four to six hours a day.

101.   **Failed to provide adequate water.**

    a.   There is no toilet or running water in many of the areas that house detainees at HCCC.

    b.   Although DPS staff sometimes voluntarily place a jug of water in these areas, DPS staff have been reprimanded for doing so.

    c.   When HCCC detainees request clean drinking water, their requests are frequently denied.

//

//

//

102. **Failed to provide sanitary living conditions or allow proper hygiene.**

   a. Because there is no bathroom in many of the areas that house detainees at HCCC, detainees frequently urinate in their drinking cups or defecate in their "cells."

   b. Feces has been left in these areas for up to three days.

   c. The toilet which the detainees in the Fishbowl use is six feet away from the Fishbowl. Because this toilet overflows on a daily basis, there is a strong smell of human feces and urine in and around the Fishbowl.

   d. DPS staff have observed rats and mice throughout the HCCC facility, including in areas where detainees are held.

   e. At Halawa, after COVID-positive residents are transferred from their cell, the cell is not sanitized or cleaned before the new occupant moves in.

   f. The Fishbowl, which houses sick, COVID-positive detainees, is not regularly cleaned or sanitized.

   g. Common use areas and items such as telephones and drinking fountains are not cleaned or sanitized regularly.

103. **Failed to separate inmates with positive test results.**

    a.  Inmates with obvious COVID-19 symptoms and positive test results remain in their housing wards with non-infected inmates.

    b.  In August 2020, following reports that kitchen and food line inmates had tested positive for COVID-19, for example, positive test results for COVID-19 were found in all nineteen modules at OCCC so that it was not possible to separate infected inmates from inmates who still had not tested positive.

    c.  After testing positive for COVID-19, an inmate at Halawa was moved to the second floor of his module ("Quad 2") at a time when no one in Quad 2 had tested positive for the virus. Eventually, nearly every inmate in Quad 2 tested positive for COVID-19.

    d.  Due to overcrowding and mismanagement at HCCC, COVID-positive inmates are mixed with COVID-negative inmates in the Fishbowl, Dog Cages, Visitor's Rooms, Video Conference Rooms, and cells.

    e.  COVID-positive detainees and employees working in the kitchen at HCCC were preparing and distributing food to detainees during the peak of the outbreak.

    f.  At Wainuenue, an open dorm area at HCCC, four COVID-positive detainees who are known to be COVID-positive are being housed in the same room as 13 other COVID-negative detainees.

    g.  Plaintiff Carvalho was COVID-positive at the time she was placed in the cell with Plaintiffs Kalani, Pacheco-Fernandez, and Grammer.

    h.  Staff at HCCC report that DPS is unable to meaningfully segregate COVID-19 positive inmates from others.

104.  **Failed to properly quarantine new intakes into the facility.**

    a.  DPS facilities do not observe the standard 14-day quarantine period or require inmates to take a COVID-19 test, failures that endanger both the newly admitted inmates and the longer-term residents.

    b.  While DPS staff regularly use the term "quarantine" to describe the placement of residents in a cell or room before or after their transfer into a facility, these "quarantine" procedures are done in contravention of CDC guidelines.

    c.  During a DPS "quarantine" for example, inmates are housed with other inmates in the same cell whose COVID-status is unknown.

    d.  DPS routinely breaks the "quarantine" by introducing new inmates from other facilities into these cells in the middle of the "quarantine" period.

105.  **Failed To Communicate With DPS Staff And Inmates Over Proper COVID-19 Protocols**

    a.  DPS staff at HCCC have not received any memos or guidance regarding how to handle the current COVID-19 outbreak at its facility.

    b.  Because DPS staff at OCCC were forced to work in close proximity with COVID-positive inmates without their knowledge, increasing numbers of DPS staff members were calling in sick or using personal leave to avoid placing their lives and the lives of their family members in danger.

    c.  This has caused the prisons and jails to be grossly short-staffed, and employees are working double and triple shifts under stressful and dangerous conditions.

    d.  Because DPS administration does not disclose to DPS staff where COVID-positive inmates are being held, contact tracing is impossible.

e. This failure to conduct proper contact tracing results in DPS staff being exposed to positive inmates, who then go on to infect other individuals in the community or at the facility.

f. Isaac Nihoa (hereinafter "Mr. Nihoa"), an adult corrections officer (hereinafter "ACO") at HCCC was assigned to watch five inmates in the kitchen during a fire at the facility.

g. No one had informed Mr. Nihoa about the inmates' COVID-status.

h. After 30 minutes of watching these five inmates, the inmates disclosed to Mr. Nihoa that they had all tested positive for COVID-19.

i. Three days later, and after spending one day at work, Mr. Nihoa tested positive for COVID-19.

106. **Failed to identify and protect older inmates and those who are otherwise medically vulnerable.**

a. DPS makes little to no effort to identify individuals at higher risk for severe complications from COVID-19.

b. For example, former DPS inmate Jason Cummings (hereinafter "Mr. Cummings") is a 60-year-old diabetic with hypertension.

c. Mr. Cummings was not isolated or identified as high-risk for COVID-19 complications.

d. After contracting COVID-19, Mr. Cummings was placed on a ventilator and nearly died.

e. Plaintiff Snedeker-Abadilla is asthmatic, a condition that makes him high risk for serious COVID-19 complications — but was housed with others positive for COVID-19.

f. Although Plaintiff Alvarado has lupus he was not identified as high risk for COVID complications nor was he provided with any medical care after he contracted COVID-19.

g. No inmate or DPS staff person reports a screening process upon intake or at any other point that would allow DPS to segregate all persons who are at higher risk for complications from the virus.

h. Absent knowledge of which inmates are at higher risk, DPS cannot possibly make appropriate accommodations to ensure those inmates are protected from infection.

107. **Failed to allow adequate social distancing.**

a. DPS correctional facilities are over-crowded. *See* Toni Schwartz, Governor of the State of Hawaii website, February 5, 2021, https://governor.hawaii.gov/newsroom/psd-news-release-maui-community-correctional-center-covid-19-testing-update/ ("COVID-19 has created a tremendous amount of strain on our overcrowded facilities").

b. HCCC, for example, is 74% overcapacity. *See*, DPS Website, Department of Public Safety Weekly Population Report, (June 7, 2021) https://dps.hawaii.gov/wp-content/uploads/2021/06/Pop-Reports-Weekly-2021-06-07.pdf. ("368 inmates currently detained at HCCC, design capacity 206")

c. In February 2021, DPS Director Max Otani acknowledged that DPS facilities are overcrowded, making it difficult to mitigate the spread of COVID-19. *See* Toni Schwartz, Governor of the State of Hawaii website, (February 5, 2021), https://governor.hawaii.gov/newsroom/psd-news-release-maui-community-correctional-center-covid-19-testing-update/.

d. Many pre-trial detainees at HCCC live in rooms of approximately 10-60 people, others sleep only a few feet away from others in open dorms.

e. At Waiawa, 40-60 inmates are placed in one room, approximately 25 feet by 35 feet for 4-6 hours.

f. At Kulani, inmates live in open dorms.

g. The beds at Halawa are two to three feet apart and there are no social distancing requirements in the facility.

h. At Halawa: (1) four inmates are housed together in small cells, 8 feet by 10 feet and (2) socialize in the common areas without masks and without social distancing requirements.

34

    i.  In the chow hall at nearly every DPS facility where residents eat, tables are a couple feet apart and people eat shoulder to shoulder.

    j.  DPS does not encourage social distancing but, even if it did, social distancing is impossible under these conditions, making it even more important to enforce mask wearing.

108.  **Failed to provide personal protective gear or enforce proper mask wearing.**

    a.  Protective gear and supplies are not widely or consistently distributed or used.

    b.  Early in the pandemic, DPS staff at HCCC were prohibited from wearing N95 masks that they had purchased.

    c.  DPS does not regularly enforce proper mask wearing.

    d.  Many inmates and staff are frequently seen without masks or wearing masks improperly (e.g., without covering their nose) throughout the facility.

109.  **Failed to consistently or adequately evaluate, monitor, and treat those experiencing COVID-19 symptoms.**

    a.  Inmates experiencing symptoms commonly associated with COVID-19 are frequently not evaluated and are left unmonitored by the DPS staff.

b. Medical checks are rare, even when an inmate is symptomatic. Treatment is basically non-existent.

c. COVID-positive inmates have to affirmatively seek out medical attention and, even then, sometimes do not receive a response or any attention for weeks.

d. Plaintiff Alvarado, who has lupus, tested positive for COVID-19 in December 2020, and has been experiencing symptoms since then.

e. Mr. Alvarado was denied medical assistance after multiple requests for medication and monitoring.  No one actively monitored his health or asked about his symptoms.

110. As a result of the above conditions, in August 2020, cases at OCCC quickly went from a handful to 452 to date, and it is estimated that many more persons were infected but were never tested.

111. Two months later, in November, 2020, as a result of Defendants' continued failure to implement its COVID-19 mitigation plan, another outbreak of COVID-19 spread throughout the Waiawa facility.  Ninety percent of the inmate population there contracted COVID-19.

112. During the outbreak at Waiawa: (1) inmates and staff at Halawa laundered the dirty clothes from Waiawa and (2) staff from Halawa were ordered to work at Waiawa because of the staff shortage there during the peak of the outbreak.

113.   As a result of sharing staff between Waiawa and Halawa during the outbreak at Waiawa in November 2020, a COVID-19 outbreak occurred at Halawa in December 2020, resulting in seven inmate deaths and 544 inmates contracting COVID-19.   This outbreak represents the second largest infection cluster in the Hawai'i correctional system.

114.   Nearly 100 inmates contracted COVID-19 after an outbreak occurred at MCCC in March, 2021.   This number represents a third of all incarcerated individuals who are housed at MCCC.

115.   Because so many detainees at HCCC are housed together in unsanitary rooms at HCCC, after a few detainees contracted COVID-19 in late May 2021, within two weeks, nearly half of the detainees at HCCC tested positive for the virus.

116.   Persons entering and leaving Hawai'i's jails and prisons carry infections and/or a risk of infections into the community without any accountability, supervision, or assistance.

117.   Because of the COVID-19 breakouts, detainees have had their trials delayed and their communications with and access to counsel and their families have been cut off entirely.

118.   Residents in DPS custody are without any means to protect themselves in the affected prisons and jails.

119.    Plaintiffs and the affected inmates and staff and their counsel made numerous pleas and efforts to obtain help to address and alleviate the threatening and growing crisis in the prisons and jails without significant response from any of the Defendants who appeared to be entirely inept and/or uncaring.

120.    The Defendants made conscious, knowing, and deliberate decisions to ignore the experts' warnings and recommendations because they believed, as Defendant Green infamously remarked on April 8, 2020, "prison is safer than Costco."

121.    As a result, there are now over 2,100 positive COVID-19 cases at DPS correctional facilities among a population of approximately 4,000; nearly the same number of cases as the "Big Island" of Hawai'i County, Hawai'i with a population of over 200,000.

122.    Two hundred sixty four (264) DPS staff have contracted COVID-19.

123.    These numbers will continue to rise without the Court's involvement. Indeed, in response to the outbreak at HCCC, DPS has ordered Kulani guards to report to HCCC to support the few DPS staff that are still working there.

124.    Because of the above-described conditions, guards at Kulani will invariably get sick and return to Kulani where they will infect DPS staff and inmates.

125.    Plaintiffs are informed and believe, and thereupon allege, that Defendants breached their duties to provide sufficient precautions, protection,

separation, quarantine, testing, treatment, and care to prevent the spread of COVID-19 inside and outside Hawaiʻi prisons and jails thereby endangering the well-being and lives of inmates, staff, and members of the larger community.

126.   Plaintiffs are informed and believe, and thereupon allege, that as a direct and proximate result of the foregoing the prisons' staff is and has been greatly depleted and is unable to properly care for and ensure the safety, well-being, and rights of the inmates within their custody and control.

127.   Defendants have failed to take the necessary steps to address the severe risks faced by Plaintiffs and the proposed Classes.

128.   Defendants are responsible for the conditions that enable rapid spread of the virus within DPS correctional facilities, whose populations remain well above design capacity and which has large numbers of residents packed into dormitory housing.

129.   Defendants' failures not only endanger people incarcerated at DPS correctional facilities, they put their staff, their family members, local health care workers, and the broader community at risk.

**Plaintiff Brenon Nash**

130.   Mr. Nash is a pretrial detainee who is and has been confined at OCCC since November, 2019, awaiting trial.

131.   Mr. Nash was assigned to a kitchen work line where he worked in close proximity with a staff worker who tested positive for COVID-19.

132.   After being exposed to the staff worker with COVID-19 Mr. Nash waited for two days for his test results in the same module in which he had been living and undoubtedly exposed other inmates and staff to the virus due to the close living conditions and virtual absence of precautions including masks and other protective equipment.

133.   After having difficulty learning of his COVID-19 test results, Mr. Nash finally was informed and only then was removed to a living space where he is housed with other inmates who tested positive and are sick.

134.   Upon information and belie, Mr. Nash is currently locked down twenty-four hours in his module with no programs or services, inadequate food, and no access to family, visitors, or his counsel.

**Francisco Alvarado**

135.   Plaintiff Mr. Alvarado was confined as a convicted prisoner at Halawa from 2019 until March 2021.

136.   Mr. Alvarado is 52 years old.

137.   Mr. Alvarado is currently incarcerated at Kulani Correctional Facility.

138.   Upon information and belief, Mr. Alvarado was diagnosed with Lupus several years ago.

139.   While Mr. Alvarado was incarcerated at Halawa, he was a module clerk.   As a module clerk, Mr. Alvarado performed the required paperwork for transferring and moving inmates within the facility and delivered meals to inmates' cells.

140.   As a module clerk, Mr. Alvarado observed that: (1) inmates remained in their cells after they test positive for COVID-19; (2) COVID-positive inmates were housed with inmates who were not displaying symptoms of COVID-19; and (3) inmates who were not displaying COVID-19 symptoms were transferred into cells formerly occupied by residents who had tested positive for COVID-19, without sanitizing those cells.

141.   When Mr. Alvarado delivered meals to COVID-positive inmates, DPS staff did not order these inmates to put their face masks on even though these cells had "open screen" doors.

142.   After Mr. Alvarado contracted COVID-19, Defendants provided little to no medical care to him even though Mr. Alvarado repeatedly requested medical assistance.   Because of Mr. Alvarado's underlying medical condition, Mr. Alvarado sustained serious, potentially permanent damage to his kidneys as a result of contracting COVID-19.

//

//

**Wayne J. Ancheta**

143.  Plaintiff Ancheta is and has been confined as a convicted prisoner at Halawa since 2018.

144.  During the Fall of 2020, Mr. Ancheta worked in the Halawa laundry room as a clothes washer.

145.  In or around November 2020, when Waiawa was experiencing a COVID-19 outbreak, Waiawa was: (1) transferring inmates from its facility to Halawa and (2) sending laundry from its inmates to Halawa to be cleaned.

146.  Some of the Waiawa inmates who were transferred to Halawa were positive for COVID-19 and mixed into the general population at Halawa.

147.  At this time, DPS did not enforce social distancing or provide Halawa inmates hand-sanitizer.

148.  Halawa staff did not consistently wear masks at the facility or consistently enforce mask-wearing among the inmate population.

149.  In or around November and December, 2020, DPS staff transferred several COVID-positive inmates into Mr. Ancheta's module.  DPS staff did not consistently order these inmates to wear masks or require these COVID-positive inmates to be socially distant from other inmates in the module.

150.  Several days after the COVID-positive inmates were admitted to Mr. Ancheta's module, Mr. Ancheta developed COVID-like symptoms.

151.   From the time Mr. Ancheta first developed COVID-like symptoms to the time he received his positive test results, Mr. Ancheta remained housed in the same cell in his module.

152.   After contracting COVID-19, Mr. Ancheta spoke to Dr. Tresch, a physician at Halawa.  Dr. Tresch stated to Mr. Ancheta, "it would be easier if everyone [at Halawa] gets COVID so that we can go on with the process of getting herd immunity."  When Mr. Ancheta replied that DPS should not put COVID-negative inmates with COVID-positive inmates, Dr. Tresch responded, "that's the idea."

**Robert Walsh**

153.   Plaintiff Walsh is and has been confined as a pre-trial detainee at MCCC since December 2020.

154.   When Mr. Walsh first arrived at MCCC, COVID-19 testing was optional.

155.   In early January 2021, DPS transferred several new detainees into Mr. Walsh's module.  A few days after their transfer, many of these new detainees tested positive for COVID-19.  These COVID-positive detainees remained in their cell, in the same module as Mr. Walsh, for two weeks after testing positive for the virus.

156.   During this time, Mr. Walsh was held in an approximately 10 feet by 10 feet cell with three other detainees.  Mr. Walsh was held in this cell 20 hours a day, seven days a week.

157.   In or around February 2021, Mr. Walsh tested positive for COVID-19. After testing positive for COVID-19, DPS staff did not transfer Mr. Walsh out of his module.

158.   While COVID-positive, Mr. Walsh, an asthmatic, complained of breathing but DPS staff ignored his requests for medical assistance.

**Duane Bertlemann**

159.   Plaintiff Bertlemann is and has been incarcerated at Waiawa since January 21, 2021.

160.   Mr. Bertlemann was incarcerated at Halawa from 2019 to January 21, 2021.

161.   Mr. Bertlemann was diagnosed with asthma several years ago.

162.   From the Fall of 2020 until January 21, 2021, Halawa staff routinely housed COVID-positive inmates with inmates who had tested negative for COVID-19 or who were not displaying COVID-19 symptoms.

163.   In December of 2020, Halawa staff housed Mr. Bertlemann, who was COVID-negative at the time, in an open-air module with COVID-positive inmates.

164.   DPS did not consistently enforce mask-wearing at Halawa while inmates, including COVID-positive inmates, were in their cells with other inmates.

165.   COVID-positive inmates were allowed out of their cell to socialize in a common room with COVID-negative inmates.  Most of the inmates in this common room, including the COVID-positive inmates, did not wear masks.

166.   Mr. Bertlemann showered in the same bathroom and shower stalls that COVID-positive inmates showered in.

167.   On December 9, 2020, Mr. Bertlemann tested positive for COVID-19. From the time Mr. Bertlemann first developed COVID-like symptoms to the time he received his positive test results, Mr. Bertlemann remained housed in the same cell in his module.

168.   After Mr. Bertlemann tested positive for COVID-19, he remained in his cell for another three weeks.  After Mr. Bertlemann was transferred to another quad within the same module, DPS staff did not clean or sanitize the cell he occupied while he was COVID-positive.

169.   On January 21, 2021, DPS transferred Mr. Bertlemann to Waiawa.

170.   According to Mr. Bertlemann, other than a loosely enforced masking requirement, conditions at Waiawa are they same as they were at Halawa prior to the pandemic.

**Dustin Snedeker-Abadilla**

171.   Mr. Snedeker-Abadilla has been incarcerated at HCCC since March 3, 2021.

172.   Mr. Snedeker-Abadilla was diagnosed with severe asthma as an infant and regularly uses an asthma machine to help him breathe.

173.   Mr. Snedeker-Abadilla takes medication regularly to control symptoms related to his asthma.

174.   During his incarceration at HCCC, Mr. Snedeker-Abadilla: (1) did not receive his asthma medication and (2) was not identified or isolated as high-risk for COVID complications.

175.   Mr. Snedeker-Abadilla received his first COVID-19 vaccination shot on May 20, 2021.

176.   Mr. Snedeker-Abadilla was not tested or screened for COVID-19 before he was admitted to HCCC.

177.   When Mr. Snedeker-Abadilla entered the facility, he observed that there were women sitting in dog cages, four feet by seven feet, in the intake area.

178.   After being processed into the facility, Mr. Snedeker-Abadilla was immediately placed in a room called the Fishbowl.  Mr. Snedeker-Abadilla was held there until June 5, 2021.

179.     Although DPS staff informed Mr. Snedeker-Abadilla that he was being placed in "quarantine" in the Fishbowl at admission, there were 40-50 other detainees in the Fishbowl at that time and new detainees were admitted every day.

180.     After two or three detainees in the Fishbowl tested positive for COVID-19, in late May 2021, everyone in the Fishbowl got tested for COVID-19.

181.     All of the detainees remained in the Fishbowl while they waited for their results.

182.     After May 29, 2021, nearly everyone in the Fishbowl, including Mr. Snedeker-Abadilla, tested positive for COVID-19.

183.     After Mr. Snedeker-Abadilla contracted COVID-19, he did not receive any medical treatment.

184.     In the Fishbowl, people were suffering from COVID-related symptoms including coughing, difficulty breathing, and chest pains.

185.     Mr. Snedeker-Abadilla heard detainees in the Fishbowl ask for medical assistance because of their COVID symptoms, but assistance rarely came.

186.     Upon information and belief, one detainee was sent to the hospital.

187.     The medical unit came into the Fishbowl only a few times a day.

188.     When the medical unit entered the Fishbowl, they performed very quick temperature checks on a few of the detainees and then left.

189.     Mr. Snedeker-Abadilla has seen that the most sick detainees did not get enough care for their symptoms.

190.     If the bathroom near the Fishbowl is broken, COVID-positive detainees used the bathroom in the units where there were no COVID-19 cases.

191.     On or around June 5, 2021, Mr. Snedeker-Abadilla was placed on suicide watch in the dog cages in the intake area with four other men.

**Kuuipo Kalani**

192.   Ms. Kalani has been incarcerated at HCCC since October 2020.

193.   Ms. Kalani is general population custody.

194.   When Ms. Kalani first arrived at HCCC she was held in dog cages for one week in the intake area.

195.   At that time, Ms. Kalani witnessed other detainees in the dog cages urinate and defecate on themselves because their requests to use the bathroom were denied.

196.   At some point during Ms. Kalani's period of incarceration at HCCC, Ms. Kalani was transferred to Cell 24.  At that time, Ms. Pacheco-Fernandez and Ms. Grammer were in Cell 24.

197.   Because the cell was only designed for two people, Ms. Kalani currently sleeps on the floor of her cell where there is a strong smell of urine and feces.

198.   On or around May 27, 2021, Ms. Kalani tested negative for COVID-19.

199.   After May 27, 2021, Plaintiff Bella Carvalho was transferred into Ms. Kalani's cell.

200.   Ms. Carvalho told Ms. Kalani, Ms. Pacheco-Fernandez, and Ms. Grammer that she informed DPS staff prior to her placement in that cell that she had tested positive for COVID-19.

201.   A few days later, Ms. Kalani tested positive for COVID-19.

202.   Since Ms. Kalani tested positive for COVID-19, she has not received any medical treatment for her symptoms.

**Bella Carvalho**

203.   Ms. Carvalho is currently housed in a cell with Ms. Pachecho-Fernandez, Ms. Kalani, and Ms. Grammer.

204.   Ms. Carvalho is general population custody.

205.   When Ms. Carvalho was first admitted to HCCC, she did not have COVID-19.

206.   Upon admission at HCCC, Ms. Carvalho was placed in a cell with other detainees.  In this cell, detainees regularly urinated and defecated in the cell.  At one point, there was feces in this cell from three different people.

207.   Ms. Carvalho was also housed in the dog cages in the intake area at HCCC.

208.   Ms. Carvalho observed that detainees would urinate and defecate in the dog cages.  Sometimes the feces would not be cleaned for an entire day.

209.   In the areas at HCCC where Ms. Carvalho was housed where there was no toilet or running water, detainees would only be allowed to use the bathroom three times a day.

210.   Sometimes, DPS staff only let detainees use the bathroom two times a day.

211.   Before Ms. Carvalho was transferred into the cell with Ms. Pacheco-Fernandez, Ms. Grammer and Ms. Kalani, she tested positive for COVID-19.

212.   Ms. Carvalho did not know why she was transferred into the same cell as inmates who did not have COVID-19.

**Tearon Pacheco-Fernandez**

213.   Ms. Pacheco-Fernandez is currently housed in a cell with Ms. Carvalho, Ms. Kalani, and Ms. Grammer.

214.   Ms. Pacheco-Fernandez is general population custody.

215.   Prior to her current placement, Ms. Pacheco-Fernandez was housed in the dog cages in the intake care, the Visitor's Room, and Cell 25 ("Toilet-less Cells").  Those areas do not have running water or a toilet.

216.   For that reason, in the Toilet-less cells, Ms. Pacheco-Fernandez observed detainees defecate and urinate on themselves.

217.   When detainees are thirsty in the Toilet-less cells, their requests for water are frequently denied.

218.   Ms. Pacheco-Fernandez was in a cell where the feces was left for two days.  She was transferred to the dog cages before DPS staff cleaned and removed the feces.

219.   Ms. Pacheco-Fernandez has also been housed with inmates with serious mental illnesses.

**Juanita Grammer**

220.   Ms. Grammer was admitted to HCCC as a maximum-custody detainee in November 2020.

221.   Ms. Grammer is currently housed in a cell with Ms. Carvalho, Ms. Kalani, and Ms. Pacheco-Fernandez at HCCC.

222.   Prior to her current placement, Ms. Grammer was housed in the Toilet-less Cells.

223.   When Ms. Grammer was placed in the dog cages, she was placed with inmates with severe mental health issues and suicidal inmates.

224.   In one of the areas Ms. Grammer was housed in, the prior occupant smeared feces on the cell wall.  The feces was not cleaned until DPS staff provided Ms. Grammer and her cellmates with cleaning supplies two to three days later.

225.   Several days after Ms. Carvalho was transferred into Ms. Grammer's current cell, Ms. Grammer contracted COVID-19.

### D.   Actions and Inactions of Individual Defendants

226.   As Governor and Lieutenant Governor of Hawaiʻi, Defendants Ige and Green have decision-making authority over the operations at Hawaiʻi's eight correctional facilities.

227.   Both Ige and Green were made aware of the outbreaks at DPS correctional facilities beginning in August 2020 up to the present.

228.   Defendant Green recently articulated his role in preventing the spread of COVID-19 at DPS correctional facilities, "[Inmates and DPS staff] are counting on *us* to protect them, so we can't be the ones who spread the virus to them," Green said. *See* Sophie Cocke, *Most Hawaii Inmates Refusing to Get Covid-19 Vaccination*, (June 1, 2021) https://www.staradvertiser.com/2021/06/01/hawaii-news/most-hawaii-inmates-refusing-to-get-covid-19-vaccination/.

229.   In public statements, both Ige and Green have acknowledged that DPS correctional facilities are overcrowded making social distancing and therefore protection from COVID-19 impossible.

230.   Despite their knowledge of the repeated outbreaks at DPS correctional facilities, instead of changing course, Defendants Ige and Green became more resolute in their support for DPS.

231.   During the peak of the COVID-19 outbreak at HCCC, for example, Defendant Ige praised DPS's handling of the outbreak at HCCC.

232.   As Director and former Director of the DPS, Defendants Espinda and Otani are directly responsible for the day-to-day operations at each DPS correctional facility.

233.   With their approval and under their direction, DPS correctional facilities continued to operate in the same fashion as they operated prior to the pandemic.

234.   As a result, DPS staff continued to violate their own COVID-19 protocols placing the health and safety of inmates and staff at risk.

## **CLASS ALLEGATIONS**

235.   Plaintiffs bring this action individually and in their representative capacities on behalf of all others similarly situated pursuant to Fed. R. Civ. P. Rule 23.   This action satisfies all requirements of Rule 23: numerosity, commonality, typicality, fair and adequate representation, and predominance and superiority.

236.   The proposed Class members consist of two Classes, each Class has one subclass as follows:

**Post-Conviction Class:** All sentenced prisoners incarcerated in a Hawai'i prison.

Post-Conviction Medical Subclass: Includes all Post-Conviction Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC. *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

**Pre-Trial Class**: All pre-trial detainees incarcerated in a Hawai'i jail.

Pre-Trial Medical Subclass: Includes all Pre-Trial Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC. *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

237.   The proposed Class and Subclass definitions may be amended by the Plaintiffs prior to certification by the Court if such amendment is deemed necessary or appropriate, including the addition of additional subclasses.

## CLASS ACTION REQUIREMENTS

### Numerosity: Fed. R. Civ. P. 23(a)(1)

238.   The proposed members of Plaintiffs' Class are so numerous that joinder of all the members is impossible.  The proposed Class consists of thousands of

inmates and pre-trial detainees who are incarcerated in a Hawai'i jail or prison and are thereby at continued risk and exposure to COVID-19.

239.    Regardless of their vaccination status, all individuals at each facility are at risk of a COVID-19 outbreak due to the lack of protocols regarding unvaccinated staff and inmates, the increasing risk of possible re-infection, and the emergence of new variants that may be vaccine-resistant.

Commonality: Fed. R. Civ. P. 23(a)(2)

240.    There are significant issues of law and fact in this case that are common to the proposed Class as a whole, and central to resolution of the core issues in this matter.  The nature and scope of the proposed Class claims expose the gravity of the Defendants' disregard for the safety and well-being of its residents.  Moreover, a class action proceeding will best equip the Court with the information necessary to grasp the fundamental problems within the Department.  Class litigation is the superior method to manage such comprehensive claims and will afford a large number of similarly harmed persons the ability to pursue this action in circumstances where individual claims are minimal, thus promoting economic efficiency and promoting a fair and judicially efficient resolution of the issues.  Without such litigation, Defendants have no incentive to reverse the current course of deliberate inaction and neglect of responsibility, thereby causing continued and intolerable harm to DPS residents.

241.   Some questions of law and fact that are common to the proposed Classes include whether Defendants:

    a.   Failed to identify and prevent the risks of COVID-19 to the health and well-being of inmates and detainees;

    b.   Have been deliberately indifferent to the resulting harm and risk of harm to inmates and detainees;

    c.   Failed to exercise reasonable care or otherwise take reasonable precautions to prevent exposure and illness to inmates and detainees;

    d.   Failed to properly quarantine inmates and detainees who were or may have been exposed to COVID-19;

    e.   Housed exposed and/or tested residents with other residents who had not exhibited symptoms and/or been tested;

    f.   Failed to provide safety equipment or to reasonably separate residents exposed, tested, and/or diagnosed with COVID-19;

    g.   Locked residents in seclusion after diagnosis with COVID-19 with no follow-up treatment or care, inadequate food, and no ability to communicate with their families or counsel;

    h.   Allowed inmates and detainees to enter and leave the facilities without

adequate screening and/or precautions; and

i.   Exposed and required staff to work in proximity to inmates who
already had demonstrated symptoms.

242.   The questions of law and fact are common questions which are capable
of class-wide resolution, and central to every proposed Class member is the
Defendants' failure to provide for the safety and well-being of inmates and
detainees.

<u>Typicality: Fed. R. Civ. P. 23(a)(3)</u>

243.   The claims of the representative Plaintiffs are typical of the claims of
the proposed Class.  Plaintiffs and all other members of the proposed Class have
sustained or will sustain similar injuries arising out of and caused by Defendants'
policies, practices, procedures, and customs in violation of the law as alleged.
Because the claims of the representatives are typical of the proposed Class as a
whole, the absent Class members will be protected in a manner that is both economic
and efficient.

<u>Adequacy: Fed. R. Civ. P. 23(a)(4)</u>

244.   The representative parties will fairly and adequately protect the
interests of the proposed Class.  Plaintiffs have suffered adverse consequences as a
direct result of the Defendants' inaction with respect to the needs of inmates and
detainees and are committed to vigorously pursuing all available legal remedies.  All

Class representatives have a strong desire to see that corrective action is taken in an effort to prevent future harm to themselves, and other inmates and detainees. Similarly, Plaintiffs' counsel have extensive experience, are firmly resolved to protecting the rights and interests of clients, and will zealously pursue this matter on behalf of the proposed Class.  To the best of counsel's knowledge, neither counsel nor the representative Plaintiffs have any conflicts of interest with other proposed Class members that would prevent or interfere in any way with counsel's representation of the proposed Class or the claims asserted and relief sought herein.

<u>Fed. R. Civ. P. 23(b)(2)</u>

245.   The Defendants, having been presented with innumerable opportunities to protect the inmate population and detainees, have refused to act on behalf of the named Class.  Such inaction applies generally to the entire proposed Class as a whole.

<u>Fed. R. Civ. P. 23(b)(1)(A) and (B)</u>

246.   The questions of law and fact regarding the Defendants' repeated and deliberate indifference towards the safety and well-being of inmates and detainees exposed to the risks of COVID-19 are the predominant questions driving this litigation.  The differing factual claims of individual Class members are not a roadblock to Class certification when the claims central to all proposed Class members predominate, and a Class-wide judicial solution is not only practical, but

remains the superior method for a fair and efficient resolution of the Plaintiffs' claims.  The primary interest of the proposed Class members is to see change in the Defendants' policies, procedures, and practices, and there is little interest to individually control separate actions.  Moreover, maintaining class status is preferable for achieving the desired results, and will not present any exceptional difficulties.

## FIRST CAUSE OF ACTION
**Unconstitutional Punishment in Violation of the Fourteenth Amendment of the U.S. Constitution**
42 U.S.C. Section 1983; 28 U.S.C. Section 2241
*Pre-Trial Subclass Against All Defendants*

247.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

248.   42 U.S.C. section 1983 (hereinafter, "Section 1983") provides that:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress .
> . .

249.   In a claim for injunctive relief, all of the Defendants to this claim are potentially liable under Section 1983.  *See Aged Hawaiians,* 78 Haw. at 192, 891 P.2d at 279.

250.   Plaintiffs are informed and believe, and thereupon allege, that the Defendants are acting herein under color of law in violation of rights afforded to Plaintiffs pursuant to 42 U.S.C. Section 1983.

251.   At the time of the relevant events, Plaintiffs Nash, Walsh, Snedeker-Abadilla, Kalani, Pacheco-Fernandez, Grammer, and Carvalho and members of the Pre-Trial Class had a clearly established right under the Fourteenth Amendment to be secure in their person from punishment.

252.   Under the Fourteenth Amendment, the due process protections to detainees are even greater than the protections due to those incarcerated after adjudication because pre-trial detainees are "entitled to more considerate treatment and conditions of confinement than criminal whose conditions of confinement are designed to punish."   *Youngberg*, 457 U.S. at 321-22.   Thus, the "Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'"   *Id.*   (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

253.   Objective deliberate indifference to the serious risk that COVID-19 poses to members of the Pre-Trial Subclass infringes on the protections guaranteed to them under the Fourteenth Amendment.   *See Helling*, 509 U.S. at 33-34.

254.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

255.   More than one year after the CDC first issued specific guidance for preventing the spread of COVID-19 within correctional and detention facilities, Defendants have failed to meaningfully modify and improve their infection prevention and mitigation procedures.   This failure has led to several major outbreaks of COVID-19 at DPS correctional facilities.

256.   The conditions at DPS correctional facilities pose substantial risks of serious harm to the members of the Pre-Trial Subclass and the Pre-Trial Medical Subclass, and Defendants' conduct as to this risk of harm is objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences. Defendants have failed to develop and implement effective policies and procedures for preventing and mitigating coronavirus transmission within DPS correctional facilities and have failed to implement and enforce those policies and procedures which they do have, to protect the Pre-Trial Subclass from known risks of serious harm, both physical and psychological.

257.   In addition, Defendants' months-long reliance on lockdowns, which have proved unable to stop the spread of COVID-19 through its correctional

facilities, have caused and will continue to cause depression, anxiety, and other damaging physical and psychological effects for the Pre-Trial Subclass.

258.   Defendants also fail to provide adequate care for those who have contracted COVID-19 while incarcerated at DPS correctional facilities.  In this as well, their conduct is objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences.

259.   As a result of Defendants' unconstitutional actions and inactions, members of the Pre-Trial Subclass are suffering irreparable injury.

260.   The Defendants have acted herein and/or refused to act knowingly, intentionally, maliciously, and with clear and obvious deliberate indifference and disregard to the risks and dangers to which they have exposed Plaintiffs and potentially tens of thousands of individuals in and outside its jails.

261.   As a direct and proximate result of the foregoing members of the Pre-Trial Subclass have been and will continue to be exposed to severe and even deadly risks and dangers associated with COVID-19 including pain, suffering, emotional distress, and potential long term and permanent conditions and disabilities.

262.   As a direct and proximate result of the foregoing pre-trial detainees in the Pre-Trial Subclass have suffered and are continuing to suffer the loss of their rights to due process in violation of the rights guaranteed to them by the Fourteenth Amendment to the United States Constitution.

263.    Plaintiffs have exhausted all available remedies and/or have no other remedies available to them to redress or provide the relief sought herein.

## SECOND CAUSE OF ACTION
### Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution
42 U.S.C. Section 1983/28 U.S.C. Section 2241
*Pre-Trial Class Against All Defendants*

264.    Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

265.    Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pre-trial custody.  *See Youngberg*, 457 U.S. at 315-16, 324.

266.    As part of the right to adequate medical care, the government must provide people held in pre-trial custody with reasonable safety and address serious medical needs that arise in jail, under the same objective deliberate indifference standard that applies to failure-to-protect claims brought by people held pre-trial. *Gordon*, 888 F.3d at 1125.

267.    Correctional officials thus have an affirmative obligation to protect persons in their custody from infectious disease.  Defendants may not wait until Plaintiffs or others test positive for the virus and an outbreak grows larger.  *See Farmer*, 511 U.S. at 833.

268.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

269.   Defendants have taken insufficient steps to comply with public health guidelines to manage the outbreak of COVID-19 and have not provided for the safety of the Pre-Trial Subclass.   Defendants' actions and inactions result in the confinement of members of the Pre-Trial Subclass in a jail where they do not have the capacity to test for, treat, manage, or prevent COVID-19 outbreaks, which violates the rights of the Pre-Trial Subclass to treatment and adequate medical care.

270.   Defendants have known of, or are presumed to have known of, the risks and dangers that COVID-19 poses to the Pre-Trial Subclass.   By failing to provide adequate protection from COVID-19, Defendants have shown and continue to show deliberate indifference to a substantial risk of serious harm and death.

271.   Accordingly, Defendants, as supervisors, direct participants, and policymakers for DPS correctional facilities have violated the rights of the Pre-Trial Subclass under the Fourteenth Amendment.

### THIRD CAUSE OF ACTION
**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**
42 U.S.C. Section 1983/28 U.S.C. Section 2241
*Post-Conviction Subclass Against All Defendants*

272.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

273.   At the time of the relevant events, Plaintiffs Bertlemann, Alvarado, Ancheta, and Chatman and members of the Post-Conviction Subclass had a clearly established right under the Eighth Amendment to the United States Constitution to protection from cruel and unusual punishment.   As part of this right, the Eighth Amendment guarantees convicted prisoners free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering … [t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition."  *Helling*, 509 U.S. at 33-34.

274.   The government violates the Eighth Amendment when it crowds prisoners into cells with others who have "infectious maladies" or otherwise exposes prisoners "to a serious communicable disease."  *Id.* at 33.  This is true "even though the possible infection might not affect all of those exposed."  *Id.*

275.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

276.   Deliberate indifference to the serious risk that COVID-19 poses to members of the Post-Conviction Subclass infringes on the Eighth Amendment's protection from cruel and unusual punishment.   Defendants violate this right by

subjecting members of the Post-Conviction Subclass to conditions of confinement that do not ensure their safety and health.

277.   Defendants have failed to comply with public health guidelines to prevent and manage the spread of COVID-19 at its correctional facilities.

278.   Defendants' actions and inactions result in the confinement of members of the Post-Conviction Subclass in prisons where they do not have the capacity to test for, treat, or manage COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

279.   Under DPS's current policies and practices, Plaintiffs and members of the Post-Conviction Subclass cannot take steps to protect themselves – such as social distancing, hand-washing, hygiene, or self-quarantining.  As a result, Plaintiffs and members of the Post-Conviction Subclass are at severe risk of contracting COVID-19.

280.   Although Defendants have known of, or should have known of, the risks COVID-19 poses to members of the Post-Conviction Subclass, Defendants acted with deliberate indifference by failing to implement effective policies and procedures.   Defendants have thus shown and continue to show deliberate indifference to a substantial risk of serious harm.

281.   By operating DPS prisons without the capacity to test for, treat, or manage a COVID-19 outbreak, Defendants, as supervisors, direct participants, and

policy makers for DPS prisons have violated the rights of the Post-Conviction Subclass under the Eighth Amendment.

## FOURTH CAUSE OF ACTION
**Unconstitutional Punishment in Violation of the Hawaiʻi State Constitution**
Haw. Const. Art. I, Section 5
*Pre-Trial Subclass Against All Defendants*

282.   As a result of Defendants' actions, the Post-Conviction Subclass are suffering irreparable injury. Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

283.   At the time of the relevant events, Plaintiffs Nash, Walsh, Snedeker-Abadilla, Kulani, Pachecho-Fernandez, Grammer, Carvalho and members of the Pre-Trial Class had a clearly established right under Article I, Section 5 of the Hawaiʻi State Constitution (hereinafter, "Due Process Clause") to be secure in their person from punishment.

284.   Plaintiffs' claim against Defendant DPS is not barred by sovereign immunity. *See Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Haw. 192, 891 P.2d 279 (1995) (holding that "relief that is prospective in nature may be allowed regardless of state sovereign immunity").

285.   In a claim for injunctive relief, all of the Defendants to this claim are potentially liable under the Due Process Clause. *See Pele Def. Fund v. Paty*, 73 Haw. 578, 606, 837 P.2d 1247, 1264 (1992) (holding that the state and state officials may be sued for state constitutional violations in a lawsuit seeking injunctive relief).

67

286.   Plaintiffs are informed and believe, and thereupon allege, that the Defendants are acting herein under color of law in violation of rights afforded to Plaintiffs pursuant to the Due Process Clause.

287.   The due process protections to detainees are even greater than the protections due to those incarcerated after adjudication because pre-trial detainees are "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982).  Thus, protections for pretrial detainees are "at least as great as the [. . .] protections available to a convicted prisoner." *Id.* at 321-22.

288.   Objective deliberate indifference to the serious risk that COVID-19 poses to members of the Pre-Trial Class infringes on the protections guaranteed to them under the Due Process Clause.  *See Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).

289.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

290.   More than one year after the CDC first issued specific guidance for preventing the spread of COVID-19 within correctional and detention facilities, Defendants have failed to meaningfully modify and improve their infection

prevention and mitigation procedures.  Defendants' conduct as to this risk of harm is therefore objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences.

291.  Defendants' actions and inactions have created conditions at DPS correctional facilities which pose substantial risks of serious harm to the members of the Pre-Trial Subclass.   Defendants have failed to develop and implement effective policies and procedures for preventing and mitigating coronavirus transmission within DPS correctional facilities and have failed to implement and enforce those policies and procedures which they do have, to protect the Pre-Trial Subclass from known risks of serious harm, both physical and psychological.

292.  In addition, Defendants' months-long reliance on lockdowns, which have proved unable to stop the spread of COVID-19 through its correctional facilities, have caused and will continue to cause depression, anxiety, and other damaging physical and psychological effects for the Pre-Trial Subclass.

293.  Defendants also fail to provide adequate care for those who have contracted COVID-19 while incarcerated at DPS correctional facilities.  In this as well, their conduct is objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences.

294.  As a result of Defendants' unconstitutional actions and inactions, members of the Pre-Trial Subclass are suffering irreparable injury.

295.   The Defendants have acted herein and/or refused to act knowingly, intentionally, maliciously, and with clear and obvious deliberate indifference and disregard to the risks and dangers to which they have exposed Plaintiffs and potentially tens of thousands of individuals in and outside its correctional facilities.

296.   As a direct and proximate result of the foregoing members of the Pre-Trial Subclass have been and will continue to be exposed to severe and even deadly risks and dangers associated with COVID-19 including pain, suffering, emotional distress, and potential long term and permanent conditions and disabilities.

297.   As a direct and proximate result of the foregoing pre-trial detainees in the Pre-Trial Subclass have suffered and are continuing to suffer the loss of their rights to due process in violation of the rights guaranteed to them by the Due Process Clause.

298.   Plaintiffs have exhausted all available remedies and/or have no other remedies available to them to redress or provide the relief sought herein.

### FIFTH CAUSE OF ACTION
**Unconstitutional Conditions of Confinement in Violation of the Hawaiʻi State Constitution**
Haw. Const. Art. I, Section 5
*Pre-Trial Subclass Against All Defendants*

299.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

300.   Corrections officials are required to provide for the reasonable health and safety of persons in pre-trial custody. *See Youngberg*, 457 U.S. at 315-16, 324 (the state has an "unquestioned duty" to "provide adequate … medical care" for detained persons).

301.   As part of the right to adequate medical care, the government must provide people held in pre-trial custody with reasonable safety and address serious medical needs that arise in jail, under the same objective deliberate indifference standard that applies to failure-to-protect claims brought by people held pre-trial. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019).

302.   Correctional officials thus have an affirmative obligation to protect persons in their custody from infectious disease.  Defendants may not wait until Plaintiffs or others test positive for the virus and an outbreak grows larger.  *See Farmer v. Brennan*, 511 U.S. 825, 833 ("[H]aving stripped inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

303.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

304.   Defendants have taken insufficient steps to comply with public health guidelines to manage the outbreak of COVID-19 and have not provided for the safety of the Pre-Trial Subclass.   Defendants' actions and inactions result in the confinement of members of the Pre-Trial Subclass in a jail where they do not have the capacity to test for, treat, manage, or prevent COVID-19 outbreaks, which violates the rights of the Pre-Trial Subclass to treatment and adequate medical care.

305.   Defendants have known of, or are presumed to have known of, the risks and dangers that COVID-19 poses to the Pre-Trial Subclass.  By failing to provide adequate protection from COVID-19, Defendants have shown and continue to show deliberate indifference to a substantial risk of serious harm and death.

306.   Accordingly, Defendants, as supervisors, direct participants, and policymakers for DPS correctional facilities have violated the rights of the Pre-Trial Subclass under the Due Process Clause.

## SIXTH CAUSE OF ACTION
**Unconstitutional Conditions of Confinement in Violation of the Hawai'i State Constitution**
Haw. Const. Art. 1, Section 12
*Post-Conviction Subclass Against All Defendants*

307.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

308.   At the time of the relevant events, Plaintiffs Bertlemann, Alvarado, Chatman, and Ancheta and members of the Post-Conviction Subclass had a clearly

established right under Article 1, Section 12 of the Hawaiʻi State Constitution (hereinafter "Section 12") to protection from cruel and unusual punishment.  As part of this right, Section 12 guarantees convicted prisoners free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering …"  *Helling*, 509 U.S. at 33-34.

309.   The government violates Section 12 when it crowds prisoners into cells with others who have "infectious maladies" or otherwise exposes prisoners "to a serious communicable disease."  *Id.* at 33.  This is true "even though the possible infection might not affect all of those exposed."  *Id.*

310.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

311.   Deliberate indifference to the serious risk that COVID-19 poses to members of the Post-Conviction Subclass infringes on the protections from cruel and unusual punishment.  Defendants violate this right by subjecting members of the Post-Conviction Subclass to conditions of confinement that do not ensure their safety and health.

312.   Defendants have failed to comply with public health guidelines to prevent and manage the spread of COVID-19 at its correctional facilities.

313.   Defendants' actions and inactions result in the confinement of members of the Post-Conviction Subclass in prisons where they do not have the capacity to test for, treat, or manage COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

314.   Under DPS's current policies and practices, Plaintiffs and members of the Post-Conviction Subclass cannot take steps to protect themselves – such as social distancing, hand-washing, hygiene, or self-quarantining.  As a result, Plaintiffs and members of the Post-Conviction Subclass are at severe risk of contracting COVID-19.

315.   Although Defendants have known of, or should have known of, the risks COVID-19 poses to members of the Post-Conviction Subclass, Defendants acted with deliberate indifference by failing to implement effective policies and procedures.   Defendants have thus shown and continue to show deliberate indifference to a substantial risk of serious harm.

316.   By operating DPS prisons without the capacity to test for, treat, or manage a COVID-19 outbreak, Defendants, as supervisors, direct participants, and policy makers for DPS prisons have violated the rights of the Post-Conviction Subclass under Section 12 of the Hawaiʻi State Constitution.

317.   As a result of Defendants' actions, the Post-Conviction Subclass are suffering irreparable injury.

WHEREFORE, Plaintiffs pray for relief as follows:

1.      For certification of the proposed Class;

2.      For entry of Judgment declaring that Defendants' practices and actions created unconstitutional conditions of confinement and punishment which violate the Hawaiʻi and United States Constitutions;

3.      For entry of an Order requiring Defendants to create and implement a mitigation plan, overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

   a.   Specific mitigation efforts, consistent with CDC guidelines, to significantly reduce the risk of COVID-19 for all class members incarcerated in DPS correctional facilities;

   b.   An evaluation of whether DPS must release additional residents to be in compliance with CDC guidelines;

   c.   Comprehensive plans to educate and promote COVID-19 vaccination for all DPS residents and staff, in collaboration with local, state, and federal health officials.

4.      For reimbursement of Plaintiffs' costs including reasonable provision for their attorneys' fees;  and

5.      For such other relief as the Court may deem equitable and just.

DATED:      Honolulu, Hawaiʻi, June 9, 2021.

/s/ Gina Szeto-Wong
ERIC A. SEITZ
GINA SZETO-WONG
JONATHAN M.F. LOO
KEVIN YOLKEN

Attorneys for Plaintiffs