ERIC A. SEITZ
ATTORNEY AT LAW
A LAW CORPORATION

ERIC A. SEITZ            1412
GINA SZETO-WONG   10515
JONATHAN M.F. LOO 10874
KEVIN YOLKEN           10987
820 Mililani Street, Suite 502
Honolulu, Hawai'i 96813
Telephone:  (808) 533-7434
E-Mail:      eseitzatty@yahoo.com
               szetogina@gmail.com
               jloo33138@yahoo.com
               kevinyolken@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANTHONY CHATMAN, FRANCISCO ALVARADO, ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>     vs.<br><br>MAX N. OTANI, Director of State of Hawai'i, Department of Public Safety, in his official capacity,<br><br>              Defendant. | CIVIL No. 21-00268 JAO-KJM<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT<br><br><br><br>Judge:   Hon. Jill A. Otake<br><br>Trial:    None |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR
INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT**

Plaintiffs ANTHONY CHATMAN, FRANCISCO ALVARADO, TYNDALE MOBLEY, ZACHARY GRANADOS, and JOSEPH DEGUAIR, (hereinafter, collectively "Plaintiffs") individually and on behalf of the proposed Class of all other persons similarly situated, by and through their undersigned attorneys, allege as follows:

**INTRODUCTION**

1.      Over half of the individuals in State of Hawai'i, Department of Public Safety (hereinafter "DPS") custody have contracted COVID-19.  *See* State of Hawai'i, Dep't of Public Safety, *PSD Coronavirus Information and Resources*, https://dps.hawaii.gov/blog      /2020/03/17/coronavirus-covid-19-information-and-resources/ (last visited June 18, 2021) (1,511 DPS residents out of approximately 2,948 have contracted COVID-19).

2.      Five out of the eight correctional facilities that house DPS pretrial detainees and convicted prisoners have experienced uncontrolled outbreaks of COVID-19 resulting in at least seven deaths.  *Id.*

3.      All indications are that these numbers will continue to rise unchecked absent urgent intervention.  *See* Kevin Dayton, *Questions Raised Over COVID Outbreak at Maui Jail*, Honolulu Civil Beat (March 18, 2021)

2

https://www.civilbeat.org/2021/03/questions-raised-over-covid-outbreak-at-maui-jail/.

4.     Indeed, there is an outbreak of COVID-19 in progress at Hilo Community Correctional Center (hereinafter "HCCC"), a DPS correctional facility in Hilo, Hawaiʻi.

5.     After housing 40 to 60 pretrial detainees in a single room approximately 30 feet by 30 feet (the "Fishbowl"), 228 pretrial detainees and 20 DPS staff at HCCC tested positive for COVID-19 in a span of three weeks in May and June 2021.

6.     Because there is no toilet or running water in the Fishbowl or other areas at HCCC that house detainees, detainees are forced to urinate and sometimes defecate in their cell.

7.     On or around June 18, 2021, during the peak of the outbreak when there were still approximately 103 active cases of COVID-19 at HCCC, DPS began transferring HCCC detainees to other DPS correctional facilities, including Halawa Correctional Facility ("Halawa"), Women's Community Correctional Center ("WCCC"), and Kulani Correctional Facility ("Kulani").

8.     DPS has failed in its responsibility under the law, the U.S. Constitution, and its own regulations to safeguard DPS residents and staff from contracting COVID-19.

9.     DPS operates and manages eight jails and prisons in Hawaiʻi (collectively, "DPS correctional facilities").  The Saguaro Correctional Center ("Saguaro") in Eloy, Arizona houses approximately 1,000 Hawaiʻi convicted inmates.

10.     DPS correctional facilities in Hawaiʻi incarcerate approximately 3,000 pretrial detainees and convicted prisoners ("residents").

11.     DPS residents are entirely dependent on Defendant for protection against COVID-19.

12.     Defendant has failed to implement most, if not all, of the precautions public health experts have issued to prevent the spread of COVID-19 in DPS correctional facilities.  *See* Ctrs. for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in CORRECTIONAL AND DETENTION FACILITIES (CDC GUIDANCE) (Feb. 19, 2021), https://www.cdc.gov/coronavirus/2019ncov/community/correction detention/guidance-correctional-detention.html.

13.     Defendant's actions and inactions have facilitated the spread of COVID-19 among residents and correctional staff.

14.     Residents with no symptoms of COVID-19 or who have tested negative for COVID-19 are routinely housed or "quarantined" in the same cell as other

incarcerated individuals who have symptoms of COVID-19 or have tested positive for the virus.

15.     Residents who have tested negative for COVID-19 are forced into cells formerly occupied by residents who have tested positive for COVID-19, without cleaning or properly sanitizing these cells.

16.     Defendant fails to respond to, or delays response to, residents' health complaints and to residents exhibiting COVID-like symptoms.

17.     Mask-wearing is haphazardly enforced.  Efforts to regularly disinfect common surfaces and maintain personal hygiene are difficult and inadequate.

18.     Individuals incarcerated in DPS correctional facilities cannot isolate and have no ability to maintain safe social distance.  While lining up for their meals, for example, residents are routinely pressed against one another.

19.     DPS lacks adequate staff and other resources to test, diagnose, and trace the source of COVID-19 infections in the facilities they operate thereby exposing inmates, staff, and members of the community at large to unacceptable risks that the infection will spread and endanger the well-being of thousands, if not tens of thousands, of persons.

20.     DPS correctional facilities are not closed off from the communities around them.  Every day, custody, medical, and support staff who have direct contact with inmates and detainees enter and leave the facilities on a daily basis.

21.    DPS correctional facilities see regular turnover of residents who leave and return for court hearings and leave upon transfer or release.  For these reasons, an outbreak at a DPS correctional facility can spread easily to the surrounding community.

22.    Continued outbreaks of COVID-19 within DPS correctional facilities will not only directly harm those individuals who work or reside at the facilities, but also will divert finite medical resources from the Hawaiʻi community, leading to further state-wide public health harms.

23.    Hospital resources in Hawaiʻi are limited and are not equipped to handle increases in the number of people who contract COVID-19.

24.    Deaths have occurred in certain regions of the country where the need for specialized beds and ventilators outpaced hospital capacity.

25.    The pandemic is not over.  Although some DPS residents and staff have been vaccinated, vaccination has not been shown to prevent asymptomatic infection and transmission of the virus.

26.    Defendant has failed to implement a plan to educate and encourage the individuals in his custody, as well as its staff, to accept vaccination.

27.    Even with vaccination, it will be a significant period of time before DPS correctional facilities can safely abandon the critically important preventative measures against COVID-19 at which Defendant has so far failed.

6

28.     In addition, more contagious strains of the virus have recently emerged.

29.     Only a multi-pronged approach, which includes vaccination, routine and effectively implemented testing, masking, sanitation, and proper use of isolation and quarantine, can keep the residents and workers at DPS correctional facilities from being exposed to the same risks and harms.

30.     The steps Defendant has taken to date are manifestly inadequate in the face of the ongoing outbreaks of COVID-19 inside DPS correctional facilities.

31.     Accordingly, Plaintiffs bring this action on behalf of themselves and all those similarly situated.

32.     Plaintiffs seek to represent a class of all DPS inmates and pretrial detainees who have contracted COVID-19 as a result of their incarceration in DPS correctional facilities.

33.     Plaintiffs seek all necessary steps to safeguard the health of those remaining in DPS correctional facilities, including implementing the public health measures needed to prevent further COVID-19 outbreaks within its facilities.

## **NATURE OF ACTION**

34.     This is a class action lawsuit seeking injunctive relief and declaratory judgment from DPS for its knowing, deliberate, and willful acts and omissions that have exposed and are continuing to expose Plaintiffs and members of the proposed Classes to a serious and potentially fatal illness.

7

35.    This action arises out of Defendant's unconstitutional and disgraceful treatment of inmates and detainees at risk for, exposed to, and/or diagnosed and suffering from COVID-19 in jails and prisons operated and/or utilized by Defendant.

## JURISDICTION AND VENUE

36.    This court has original jurisdiction to hear this matter pursuant to 28 U.S.C. Sections 1331 and 1343, *inter alia*.  Any and all state law claims contained herein are part of the same case or controversy giving rise to the federal law claims and therefore fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

37.    Venue is proper in the United States District Court for the District of Hawaiʻi pursuant to 28 U.S.C. Section 1391 as all Defendant to the litigation reside in the state of Hawaiʻi, and all actions and/or omissions giving rise to the claim occurred and continue to occur in the State of Hawaiʻi.

## PARTIES

38.    Plaintiff ANTHONY CHATMAN ("Mr. Chatman") is and has been incarcerated at Halawa Correctional Facility.  Mr. Chatman is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

39.    Plaintiff FRANCISCO ALVARADO ("Mr. Alvarado") is and has been incarcerated at Kulani Correctional Facility.  Mr. Alvarado is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

40.     Plaintiff ZACHARY GRANADOS ("Mr. Granados") is and has been incarcerated at Waiawa Correctional Facility ("Waiawa").  Mr. Granados is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

41.     Plaintiff TYNDALE MOBLEY ("Mr. Mobley") is and has been incarcerated at HCCC.  Mr. Mobley is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

42.     Plaintiff JOSEPH DEGUAIR ("Mr. Deguair") is and has been incarcerated at HCCC.  Mr. Deguair is and has been a resident of the State of Hawaiʻi at all times pertinent hereto.

43.     Defendant DPS is a public entity, duly organized and existing under the laws of the State of Hawaiʻi.  DPS operates and manages: HCCC, Kauai Community Correctional Center ("KCCC"), Maui Community Correctional Center ("MCCC"), Oahu Community Correctional Center ("OCCC"), Halawa, Waiawa, Kulani, and the Women's Community Correctional Center ("WCCC").

44.     Pursuant to the laws of the State of Hawaiʻi DPS is authorized and required to establish and adhere to procedures and policies to ensure the physical, emotional, medical, and mental health and safety of residents under its jurisdiction.

45.     DPS also is required to hire, supervise, and train its employees to ensure that they carry out the policies and procedures of DPS and preserve the safety of prisoners incarcerated in all correctional facilities in the State of Hawaiʻi.

46.    At all times relevant to the facts and claims set forth in this Complaint, Defendant was and is responsible for the acts and/or omissions and the policies, procedures, and practices of its officers, managers, employees, and/or agents.

47.    Defendant MAX N. OTANI (hereinafter "Defendant Otani") is the Director of DPS and is and has been a resident of the State of Hawai'i at all times pertinent hereto.  As Director of DPS, Defendant Otani has at all relevant times been responsible for the actions and/or inactions of its officers, managers, employees and/or agents.  Defendant Otani is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.    COVID-19 Poses a Significant Risk of Illness, Injury, and Death

48.    COVID-19 is now the leading cause of death in the United States.  *See* Cynthia Cox and Krutika Amin, *COVID-19 Is The Number One Cause of Death In The U.S. In Early 2021*, Health System Tracker (February 22, 2021) https://www.healthsystemtracker.org/brief/covid-19-is-the-number-one-cause-of-death-in-the-u-s-in-early-2021/.

49.    As of June 8, 2021, worldwide there were over 174 million reported COVID-19 cases and 3.7 million confirmed deaths.  In the United States, six hundred million individuals have died from COVID-19.  In Hawai'i, there have been over 35,400 confirmed or probable cases of COVID-19 and 502 deaths.

50.     Approximately 20 percent of COVID-19 cases will have severe or life-threatening illness and up to two to three percent of patients will die.

51.     The arrival of COVID-19 vaccines does not mean that the pandemic is over.

52.     Vaccine resistance and hesitancy are impinging on public health efforts to quell COVID-19 by immunization.  Epidemiologists agree that 70 - 80% of the United States population must have immunity to achieve herd immunity.  *See* Donald G. McNeil, Jr., How Much Herd Immunity is Enough? N.Y. Times (Dec. 24, 2020), https://www.nytimes.com/2020/12/24/health/herd-immunity-covid-coronavirus.html.

53.     In addition, the virus continues to mutate.   An important new development in the evolution of the COVID-19 pandemic has been the emergence of the B.1.1.7 mutant in the United Kingdom that is now believed to be the dominant strain across the United States.  *See* Denise Chow, *U.K. Coronavirus Variant Is Now The Dominant Strain In The U.S., CDC* Says, NBC News, (April 7, 2021), https://www.nbcnews.com/science/science-news/uk-coronavirus-variant-now-dominant-strain-us-rcna606.

54.     Both laboratory testing and epidemiologic data strongly indicate greater transmissibility of this agent compared to the original form of the COVID-19 virus.  Recent estimates project that 80% vaccination or greater is required for herd

immunity against this mutant. *Id.* When this might occur is unknown and unpredictable.

55. The Centers for Disease Control and Prevention (hereinafter "CDC") has estimated that 60% of COVID-19 infections come from asymptomatic patients. *See* Daily Briefing, *How Much Is Asymptomatic Spread Driving COVID-19? Here's What The Evidence Says*, (January 11, 2021), https://www.advisory.com/dailybriefing/2021/01/11/asymptomaticspread#:~:text= Overall%2C%20the%20model%20predicted,showed%20symptoms%20at%20all. Consequently, the familiar measures to limit the spread of the virus (social distancing; quarantining after potential exposure; using personal protective equipment; avoidance of large groups and of indoor gatherings; and practicing vigilant hygiene) will continue to be essential for the foreseeable future to stem transmission of COVID-19.

56. Although older people and people with certain pre-existing conditions are the most vulnerable to serious illness or death from the virus, even younger people may suffer serious cases of COVID-19 or die.

57. A recent study by the Journal of the American Medical Association reported 12,000 excess deaths among the young (defined as adults ages 25 to 44) in the U.S. in the period from March through the end of July 2020—a trend that was continuing into the fall and winter. *See* Jeremy Samuel Faust, Harlan M. Krumholz

12

and Rochelle P. Walensky, *People Thought COVID-19 Was Relatively Harmless for Younger Adults. They Were Wrong*. N.Y. Times (Dec. 16, 2020), https://www.nytimes.com/2020/12/16/opinion/covid-deaths-young-adults.html.

58.    The study also reported that in some regions, "COVID-19 appears to have temporarily rivalled or surpassed the usual leading cause of death among US adults ages 25-44." *Id.*

59.    As the pandemic has continued, there have been more reports of long-term, sometimes disabling effects of the disease.

60.    The CDC reports fatigue, chest and joint pain, and shortness of breath among "common" long-term symptoms; others are intermittent fever, heart palpitations, depression, and difficulty with thinking and concentration. *See* Ctrs. For Disease Control and Prevention, COVID-19, Long-Term Effects of COVID-19, updated (Nov. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html.

61.    There are graver long-term effects as well, including inflammation of the heart muscle (myocarditis), lung function abnormalities, and acute kidney injury. *Id.*

62.    These long-term effects are not unusual or confined to the elderly or ill. As of September 2020, a series of medical studies had already reported that substantial numbers of COVID-19 sufferers had long-term symptoms, including

one-quarter of the patients aged 18 to 34 years old.  *See* Rita Rubin, As Their

Numbers Grow, COVID-19 "Long Haulers" Stump Experts, JAMA 324(14) (Sept.

23, 2020) https://jamanetwork.com/Journals/jama/fullarticle/2771111.

**B.     Incarcerated Individuals and Corrections Staff Are Particularly Vulnerable to COVID-19**

63.     People in environments with confined spaces such as correctional

facilities, where people live, eat, and sleep in close proximity, face increased danger

of contracting COVID-19, as already evidenced by the rapid spread of the virus in

jails and prisons across the country.  *See* Cheryl Corley, The COVID-19 Struggle in

Chicago's          Cook          County          Jail,          NPR          (Apr.          13,          2020),

https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-

chicagoscook-county-jail; *see also, Virus outbreak in Ohio prisons highlights risk*

*at US lockups*, Boston Herald, April 21, 2020 (last visited April 21, 2020),

https://www.bostonherald.com/2020/04/21/virusoutbreak-in-ohio-prisons-

highlights-risk-at-us-lockups/.

64.     Congregate settings such as jails and prisons enable rapid spread of

infectious diseases that are transmitted person to person, especially those passed by

droplets through coughing and sneezing.

65.     When people must share bathrooms, showers, and other common areas,

the opportunities for transmission are even greater.

66.     When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing.

67.     When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.  For many in jail or prison, social distancing is a physical impossibility.  Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets.

68.     The Defendant, for example, incarcerates pretrial and convicted prisoners in overcrowded housing facilities with insufficient and inadequate space and capabilities of maintaining distances, quarantining, preventing, and treating COVID-19.

69.     HCCC is 74% overcapacity.  *See* DPS Website, *Department of Public Safety Weekly Population Report*, (June 7, 2021) https://dps.hawaii.gov/wp-content/uploads/2021/06/Pop-Reports-Weekly-2021-06-07.pdf.

70.     Incarcerated individuals have high rates of disabilities, including the disabilities that create particular risk factors for COVID-19 complications and death. *See* Jennifer Bronson et al., *Special Report: Disabilities Among Jail and Prison Inmates*, 2011-12, U.S. Dept. of Justice Bureau of Prison Statistics (Dec. 2015) available at https://www.bjs.gov/content/pub/pdf/dpji1112.pdf.

71.     Moreover, the ability of incarcerated people to adopt preventative measures is completely subject to the dictates of correctional officials who control the housing, schedules, sanitary supplies, and nearly every other aspect of their lives. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and contracting infectious diseases.

72.     As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities.  Hot water, soap, and paper towels are often in limited supply.  Inmates themselves, rather than professional cleaners, are responsible for cleaning the facilities and often are not given appropriate supplies.  *See See, e.g.*, Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (Apr. 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people).  This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.

73.     Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases, so an outbreak in a prison or jail could overwhelm local hospitals.

74.     And as correctional staff enter and leave the facility, they may carry the virus with them.

75.    Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment.

76.    Numerous public health experts have all strongly cautioned that people booked into and held in correctional facilities are likely to face serious, even grave harm due to the outbreak of COVID-19.  *See* Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF; *see also,* Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo; *see also,* Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R; *see also,* Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HealthAffairs (Mar. 10, 2020), https://cutt.ly/QtRSYNA; *see also,* Anne C. Spaulding, MD MPDH, Coronavirus COVID-19 and the Correctional Jail, Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020), http://www.chip.sph.emory.edu/documents/For%20Correctional%20Facility%20Leadership_2020.pdf; *see also,* Madison Pauly, *To Arrest the Spread of Coronavirus,*

17

*Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk; Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (Mar. 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

77.   The Center for Disease Control and Prevention (hereinafter "CDC") is a federal agency that is part of the U.S. Department of Health and Human Services.

78.   The CDC serves as the national agency for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States.

79.   The CDC is responsible for controlling the introduction and spread of infectious diseases and provides consultation and assistance to other nations and international agencies to assist in improving their disease prevention and control, environmental health, and health promotion activities.  It also provides program expertise and assistance in responding to Federal, State, local, and private organizations on matters related to disease prevention and control activities.  *See* Centers for Disease Control and Prevention, Mission Statement, https://www.cdc.gov/about/organization/cio-orgcharts/pdfs/CDCfs-508.pdf   (last visited Apr. 14, 2021).

80.     Because of the extraordinary danger that COVID-19 will spread in jails and prisons, the CDC issued specific guidance for dealing with correctional and detention facilities on March 23, 2020.  *See supra,* CDC, Interim Guidance.  The most recent guidance was published on February 19, 2021.  *Id.*

81.     The CDC acknowledges that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."  In light of these concerns, the guidance recommends that detention facilities "explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak."

82.     The CDC guidance further recommends that correctional and detention facilities:

a.  Test and quarantine individuals (in single cells for 14 days) preparing for release, transfer to another facility, or entrance into the general population of a correctional facility;

b.  Adopt social distancing strategies to increase space between individuals, including rearranging bunking to ensure that beds are at a minimum six feet apart in all directions, increasing space in lines and

waiting areas, staggering meals and rearranging seating during meals so that detainees are sitting on only one side of the table and are separated with adequate space;

c.  Medically isolate confirmed and suspected cases and quarantine of contacts;

d.  Ensure that medical isolation for COVID-19 is *operationally* distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice.  For example:

i.   Ensure that individuals under medical isolation receive regular visits from medical staff (to perform medical evaluation and treatment) and have access to mental health services.

ii.  If a facility is not able to provide regular medical evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital.

iii. Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.

       iv.   Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

       v.   Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

e. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19.

f. Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;

g. Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and

recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;

h.  Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or disposable paper towels for hand-washing, and tissues (providing no-touch trash receptacles for disposal) and thoroughly and frequently clean and disinfect all areas where individuals with confirmed or suspected COVID-19 spend time; and

i.  Implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and "ensure adequate supplies to support intensified cleaning and disinfection practices."  *Id.*

## C.  Defendant Has Mishandled and Will Continue to Mishandle the COVID-19 Pandemic

83.  Defendant has failed to contain the COVID-19 outbreaks at its correctional facilities despite having a COVID-19 mitigation plan in place since March 17, 2020.  *See* DPS, *Pandemic Response Plan COVID-19*, (updated May 28, 2021) https://dps.hawaii.gov/wp-content/uploads/2020/03/PSD-Pandemic-Response-Plan-Revised-May-2021.pdf ("The virus is spreading very easily and sustainably between people… symptoms reported – rang[e] from mild symptoms to *severe illness.*").

22

84.     DPS's Response Plan outlines specific directives and recommendations to prevent the spread of COVID-19 in its facilities. *Id.* These include: quarantining inmates prior to admission and transfer, suspending inmate transfers or movement unless absolutely necessary, providing PPE to staff and inmates, performing regular COVID testing, implementing social distancing requirements, and conducting proper and frequent sanitation throughout the facility. *Id.*

85.     In its plan, DPS acknowledged that there were "long-standing, pervasive, well-documented" risks from failing to address COVID-19. *Farmer*, 511 U.S. at 842; *see also* PSD Coronavirus Information and Resources, https://dps.hawaii.gov/blog/category/featured/ (first posted on March 17, 2020).

86.     In April and May 2020, in response to orders from the Supreme Court of Hawai'i and lower courts, the DPS released approximately three hundred inmates from Hawai'i jails and prisons to bring the inmate populations closer to capacity and thereby alleviate the risks if the virus were to be found; however, with new and additional admissions the numbers of inmates in state jails and prisons rose and by July, 2020, returned to former levels, well over capacity.

87.     Despite their own clear instructions, DPS failed to implement its Response Plan.

88.     DPS continued to deny Plaintiffs basic preventive measures such as enough space to sleep or exist more than six feet away from another person, access

23

to medical attention, sanitary living conditions, water, regular access to the bathroom, or clean drinking cups.

89.    DPS did not provide the people in its custody with the space, soap, sanitizer, and cleaning supplies necessary to allow staff and inmates to remain safe.

90.    DPS did not provide timely and adequate medical care to identify, isolate, and treat people who develop symptoms.

91.    Specifically, DPS:

92.    **Continued to house up to 60 residents in a single room.**

   a.  DPS staff at HCCC houses up to 60 detainees in a single room.

   b.  Other HCCC detainees are placed in chain-linked dog cages and other small, enclosed spaces where they sleep shoulder to shoulder.

   c.  At Waiawa, DPS places 40-60 inmates in a room called the "Pavilion" for four to six hours a day.

   d.  At MCCC and Kulani, 40-50 residents are housed in open dorms with beds one and a half feet to two feet from one another that are fixed to the ground.

93.    **Failed to provide adequate water.**

   a.  There is no toilet or running water in many of the areas that house detainees at HCCC.

24

    b.  Although DPS staff sometimes voluntarily place a jug of water in these areas, DPS staff have been reprimanded for doing so.

    c.  When HCCC detainees request clean drinking water, their requests are frequently denied.

94.  **Failed to provide sanitary living conditions or allow proper hygiene.**

    a.  Because there is no bathroom in many of the areas that house detainees at HCCC, detainees frequently urinate in their drinking cups or defecate in their "cells."

    b.  Feces have been left in these areas for up to three days.

    c.  The toilet which the detainees in the Fishbowl use is six feet away from the Fishbowl. Because this toilet overflows on a daily basis, there is a strong smell of human feces and urine in and around the Fishbowl.

    d.  DPS staff have observed rats, cockroaches, and mice throughout the HCCC facility, including in areas where detainees are held.

    e.  At Halawa and Waiawa, after COVID-positive residents are transferred from their cell, the cell is not sanitized or cleaned before the new occupant moves in.

f.  The Fishbowl at HCCC, which houses sick, COVID-positive detainees, is not regularly cleaned or sanitized.

g.  Common use areas and items such as telephones and drinking fountains are not cleaned or sanitized regularly.

95.  **Failed to separate inmates with positive test results.**

a.  Inmates with obvious COVID-19 symptoms and positive test results remain in their housing wards with non-infected inmates.

b.  In August 2020, following reports that kitchen and food line inmates had tested positive for COVID-19, for example, positive test results for COVID-19 were found in all nineteen modules at OCCC so that it was not possible to separate infected inmates from inmates who still had not tested positive.

c.  After testing positive for COVID-19, an inmate at Halawa was moved to the second floor of his module ("Quad 2") at a time when no one in Quad 2 had tested positive for the virus.  Eventually, nearly every inmate in Quad 2 tested positive for COVID-19.

d.  Due to overcrowding and mismanagement at HCCC, COVID-positive inmates are mixed with COVID-negative inmates in the Fishbowl, Dog Cages, Visitor's Rooms, Video Conference Rooms, and cells.

26

e.  At Waiawa, DPS moved 30 COVID-positive individuals into a module with no known or suspected cases of COVID-19.

f.  COVID-positive detainees and employees working in the kitchen at HCCC and Waiawa were preparing and distributing food to detainees during the peak of the outbreak.

g.  At MCCC, detainees report that COVID-positive inmates were placed with COVID-negative inmates.

h.  At Wainuenue, an open dorm area at HCCC, four COVID-positive detainees who are known to be COVID-positive are being housed in the same room as 13 other COVID-negative detainees.

i.  Staff at HCCC report that DPS is unable to meaningfully segregate COVID-19 positive inmates from others.

96.  **Failed to properly quarantine new intakes into the facility.**

a.  DPS facilities do not observe the standard 14-day quarantine period or require inmates to take a COVID-19 test, failures that endanger both the newly admitted inmates and the longer-term residents.

b.  While DPS staff regularly use the term "quarantine" to describe the placement of residents in a cell or room before or after their transfer into a facility, these "quarantine" procedures are done in contravention of CDC guidelines.

c. During a DPS "quarantine" for example, inmates are housed with other inmates in the same cell whose COVID-status is unknown.

d. DPS routinely breaks the "quarantine" by introducing new inmates from other facilities into these cells in the middle of the "quarantine" period.

97. **Failed To Communicate With DPS Staff And Inmates Over Proper COVID-19 Protocols**

a. DPS staff at HCCC have not received any memos or guidance regarding how to handle the current COVID-19 outbreak at its facility.

b. Because DPS staff at OCCC were forced to work in close proximity with COVID-positive inmates without their knowledge, increasing numbers of DPS staff members were calling in sick or using personal leave to avoid placing their lives and the lives of their family members in danger.

c. This has caused the prisons and jails to be grossly short-staffed, and employees are working double and triple shifts under stressful and dangerous conditions.

d. Because DPS administration does not disclose to DPS staff where COVID-positive inmates are being held, contact tracing is impossible.

e. This failure to conduct proper contact tracing results in DPS staff being exposed to positive inmates, who then go on to infect other individuals in the community or at the facility.

f. Isaac Nihoa ("Mr. Nihoa"), an adult corrections officer ("ACO") at HCCC was assigned to watch five inmates in the kitchen during a fire at the facility.

g. No one informed Mr. Nihoa about the inmates' COVID-status.

h. After 30 minutes of watching these five inmates, the inmates disclosed to Mr. Nihoa that they had all tested positive for COVID-19.

i. Three days later, and after spending one day at work, Mr. Nihoa tested positive for COVID-19.

98. **Failed to identify and protect older inmates and those who are otherwise medically vulnerable.**

a. DPS makes little to no effort to identify individuals at higher risk for severe complications from COVID-19.

b. For example, former DPS inmate Jason Cummings ("Mr. Cummings") is a 60-year-old diabetic with hypertension.

c. Mr. Cummings was not isolated or identified as high-risk for COVID-19 complications.

d.  After contracting COVID-19, Mr. Cummings was placed on a ventilator and nearly died.

e.  Plaintiff Deguair an asthmatic, was not identified as high risk for COVID complications.

f.  Although Plaintiff Alvarado has lupus he was not identified as high risk for COVID complications nor was he provided with any medical care after he contracted COVID-19.

g.  No inmate or DPS staff person reports a screening process upon intake or at any other point that would allow DPS to segregate all persons who are at higher risk for complications from the virus.

h.  Absent knowledge of which inmates are at higher risk, DPS cannot possibly make appropriate accommodations to ensure those inmates are protected from infection.

99.  **Failed to allow adequate social distancing.**

a.  DPS correctional facilities are over-crowded. *See* Toni Schwartz, Governor of the State of Hawaii website, February 5, 2021, https://governor.hawaii.gov/newsroom/psd-news-release-maui-community-correctional-center-covid-19-testing-update/ ("COVID-19 has created a tremendous amount of strain on our overcrowded facilities").

b. HCCC, for example, is 74% overcapacity. *See*, DPS Website, Department of Public Safety Weekly Population Report, (June 7, 2021) https://dps.hawaii.gov/wp-content/uploads/2021/06/Pop-Reports-Weekly-2021-06-07.pdf. ("368 inmates currently detained at HCCC, design capacity 206")

c. In February 2021, DPS Director Max Otani acknowledged that DPS facilities are overcrowded, making it difficult to mitigate the spread of COVID-19. *See* Toni Schwartz, Governor of the State of Hawaii website, (February 5, 2021), https://governor.hawaii.gov/newsroom/psd-news-release-maui-community-correctional-center-covid-19-testing-update/.

d. Many pretrial detainees at HCCC live in rooms of approximately 10-60 people, others sleep only a few feet away from others in open dorms.

e. At Waiawa, 40-60 inmates are placed in one room, approximately 25 feet by 35 feet for 4-6 hours.

f. At Kulani inmates live in open dorms of 40-50 people, where the beds are one and a half feet apart and fixed to the ground;

g. The beds at Halawa are two to three feet apart and there are no social distancing requirements in the facility.

h.  At Halawa: (1) four inmates are housed together in small cells, 8 feet by 10 feet and (2) socialize in the common areas without masks and without social distancing requirements.

i.  In the chow hall at nearly every DPS facility where residents eat, tables are a couple feet apart and people eat shoulder to shoulder.

j.  DPS does not encourage social distancing but, even if it did, social distancing is impossible under these conditions, making it even more important to enforce mask wearing.

100.  **Failed to provide personal protective gear or enforce proper mask wearing.**

a.  Protective gear and supplies are not widely or consistently distributed or used.

b.  Early in the pandemic, DPS staff at HCCC were prohibited from wearing N95 masks that they had purchased.

c.  DPS does not regularly enforce proper mask wearing.

d.  Many inmates and staff are frequently seen without masks or wearing masks improperly (e.g., without covering their nose) throughout the facility.

101. **Failed to consistently or adequately evaluate, monitor, and treat those experiencing COVID-19 symptoms.**

    a. Inmates experiencing symptoms commonly associated with COVID-19 are frequently not evaluated and are left unmonitored by the DPS staff.

    b. Medical checks are rare, even when an inmate is symptomatic. Treatment is basically non-existent.

    c. COVID-positive inmates have to affirmatively seek out medical attention and, even then, sometimes do not receive a response or any attention for weeks.

    d. Plaintiff Alvarado, who has lupus, tested positive for COVID-19 in December 2020, and has been experiencing symptoms since then.

    e. Mr. Alvarado was denied medical assistance after multiple requests for medication and monitoring.  No one actively monitored his health or asked about his symptoms.

102. As a result of the above conditions, in August 2020, cases at OCCC quickly went from a handful to 452 to date, and it is estimated that many more persons were infected but were never tested.

103. Two months later, in November, 2020, as a result of Defendant's continued failure to implement its COVID-19 mitigation plan, another outbreak of

COVID-19 spread throughout the Waiawa facility.  Ninety percent of the inmate population there contracted COVID-19.

104.   During the outbreak at Waiawa: (1) inmates and staff at Halawa laundered the dirty clothes from Waiawa and (2) staff from Halawa were ordered to work at Waiawa because of the staff shortage there during the peak of the outbreak.

105.   As a result of sharing staff between Waiawa and Halawa during the outbreak at Waiawa in November 2020, a COVID-19 outbreak occurred at Halawa in December 2020, resulting in seven inmate deaths and 544 inmates contracting COVID-19.  This outbreak represents the largest infection cluster in the Hawai'i correctional system.

106.   Nearly 100 inmates contracted COVID-19 after an outbreak occurred at MCCC in March, 2021.  This number represents a third of all incarcerated individuals who are housed at MCCC.

107.   Because so many detainees at HCCC are housed together in unsanitary rooms at HCCC, after a few detainees contracted COVID-19 in late May 2021, within three weeks, two-thirds of the jail population at HCCC tested positive for the virus.

108.   Persons entering and leaving Hawai'i's jails and prisons carry infections and/or a risk of infections into the community without any accountability, supervision, or assistance.

109.   Because of the COVID-19 breakouts, detainees have had their trials delayed and their communications with and access to counsel and their families have been cut off entirely.

110.   Residents in DPS custody are without any means to protect themselves in the affected prisons and jails.

111.    Plaintiffs and the affected inmates and staff and their counsel made numerous pleas and efforts to obtain help to address and alleviate the threatening and growing crisis in the prisons and jails without significant response from any of the Defendant who appeared to be entirely inept and/or uncaring.

112.     DPS made conscious, knowing, and deliberate decisions to ignore the experts' warnings and recommendations because it believed, as Defendant Green infamously remarked on April 8, 2020, "prison is safer than Costco."

113.   As a result, over 1,535 residents in DPS custody have tested positive for COVID-19 among a population of approximately 3,000.

114.   Two hundred sixty-seven (267) DPS staff have contracted COVID-19.

115.   These numbers will continue to rise without the Court's involvement.

116.   Indeed, at the peak of the outbreak at HCCC, DPS has ordered the transfer of detainees from HCCC to Kulani, Halawa, and WCCC.

117.   These detainees, some of whom have tested positive for COVID-19, will likely infect the staff and inmates at the facility that they are transferred to.

35

118.    Plaintiffs are informed and believe, and thereupon allege, that Defendant breached, and continue to breach its duties to provide sufficient precautions, protection, separation, quarantine, testing, treatment, and care to prevent the spread of COVID-19 inside and outside Hawaiʻi prisons and jails thereby endangering the well-being and lives of inmates, staff, and members of the larger community.

119.    Plaintiffs are informed and believe, and thereupon allege, that as a direct and proximate result of the foregoing the correctional staff is and has been greatly depleted and is unable to properly care for and ensure the safety, well-being, and rights of the inmates within their custody and control.

120.    Defendant has failed to take the necessary steps to address the severe risks faced by Plaintiffs and the proposed Classes.

121.    Defendant is responsible for the conditions that enable rapid spread of the virus within DPS correctional facilities, whose populations remain well above design capacity and which has large numbers of residents packed into dormitory housing.

122.    Defendant's failures not only endanger people incarcerated at DPS correctional facilities; DPS staff, their family members, local health care workers, and the broader community are at risk.

**Anthony Chatman**

123.   Mr. Chatman is and has been incarcerated at Halawa since July 2019.

124.   In December 2020, Mr. Chatman was housed in module 4A-2.

125.   Although the guards at Halawa used the term "quarantine" to describe the movement of new inmates into a module, these new inmates are placed in open air modules with other inmates where there is frequent interaction.

126.   New intakes, for example, were transferred into Mr. Chatman's open air module where they were allowed to socialize with other inmates.

127.   Around December 2020, two inmates who tested positive for COVID-19 were moved into Mr. Chatman's quad, which was considered a COVID-negative quad at the time.

128.   The two COVID-positive inmates were allowed out of their cells to play board games with the other inmates in the quad without masks.

129.   Soon after the two COVID-positive inmates were moved in Mr. Chatman's quad, nearly everyone in Mr. Chatman's quad tested positive for COVID-19, including Mr. Chatman's roommate.

130.   After Mr. Chatman's roommate tested positive for COVID-19, Mr. Chatman's roommate was not transferred out of Mr. Chatman's cell.

131.   After Mr. Chatman contracted COVID-19, he also remained in his cell, "sick as a dog," but did not receive any meaningful medical treatment.

132.   After Mr. Chatman was moved out of the cell he was housed in while he had COVID-19, he observed that DPS did not clean or sanitize his cell before the next occupant moved in.

133.   Soon after Mr. Chatman contracted COVID-19, he filed an inmate grievance at Halawa to complain of the conditions at the prison that caused him to get sick.

134.   Each time DPS denied Mr. Chatman's grievances, Mr. Chatman appealed the decision until he exhausted his administrative remedies.

135.   Since the outbreak at Halawa, Mr. Chatman has observed that there are still no social distancing requirements at the facility, including at recreation time, at mealtime, in the quad common area, or in his cells.

136.   At the Chow Hall, for example, there are 60 people shoulder to shoulder, eating in a room approximately 20 feet by 20 feet.

**Francisco Alvarado**

137.   Mr. Alvarado is currently incarcerated at Kulani and has been since March 2021.

138.   Mr. Alvarado was confined as a convicted prisoner at Halawa from 2019 until March 2021.

139.   Mr. Alvarado is 52 years old.

140.   Mr. Alvarado was diagnosed with Lupus several years ago.

141.   While Mr. Alvarado was incarcerated at Halawa, he was a module clerk.  As a module clerk, Mr. Alvarado performed the required paperwork for transferring and moving inmates within the facility and delivered meals to inmates' cells.

142.   As a module clerk, Mr. Alvarado observed that: (1) inmates remained in their cells after they test positive for COVID-19; (2) COVID-positive inmates were housed with inmates who were not displaying symptoms of COVID-19; and (3) inmates who were not displaying COVID-19 symptoms were transferred into cells formerly occupied by residents who had tested positive for COVID-19, without sanitizing those cells.

143.   When Mr. Alvarado delivered meals to COVID-positive inmates, DPS staff did not order these inmates to put their face masks on even though these cells had "open screen" doors.

144.   After Mr. Alvarado contracted COVID-19, Defendant provided little to no medical care to him even though Mr. Alvarado repeatedly requested medical assistance.

145.   Because of Mr. Alvarado's underlying medical condition, Mr. Alvarado sustained serious, potentially permanent damage to his kidneys as a result of contracting COVID-19.

146.   Several days after testing positive for COVID-19, at the end of December 2020, Mr. Alvarado submitted an inmate grievance to complain of the conditions at Halawa that caused him to contract the virus.

147.   Mr. Alvarado placed his grievance form in the Inmate Grievance Specialist's mailbox.

148.   A few weeks later, in January 2021, Mr. Alvarado still had not received a response or acknowledgement of his grievance.

149.   As a result, around mid-January 2021, Mr. Alvarado asked Sergeant (hereinafter, "Sgt.") Sugai why DPS had not responded to his grievance.

150.   Sgt. Sugai informed Mr. Alvarado that the COVID-19 outbreak at the facility was causing a backlog of grievances and therefore many inmates were not getting a response.  He instructed Mr. Alvarado to file another grievance.

151.   When Mr. Alvarado asked for another grievance form, per Sgt. Sugai's instructions, he was informed by a guard that there were no grievance forms available.

152.   Mr. Alvarado inquired several more times in January, February, and March 2021, for grievance forms but was consistently told that the facility did not have any grievance forms available.

153.   In March 2021, prior to his transfer to Kulani, Mr. Alvarado asked guard "Cione" (pronounced "CEE-O-NEE") for a grievance form but guard Cione informed Mr. Alvardo that there were still no grievance forms available.

**Joseph Deguair**

154.   Mr. Deguair is and has been incarcerated at HCCC since December 4, 2020.

155.   Mr. Deguair was diagnosed with asthma several years ago.

156.   In mid-May, Mr. Deguair tested negative for COVID-19.

157.   Prior to the HCCC outbreak at the end of May, Mr. Deguair observed a lack of mitigation efforts to prevent the spread of COVID-19.

158.   Detainees displaying COVID-19 symptoms, for example, were housed with detainees who had not been tested for COVID-19.

159.   After detainees tested positive for COVID-19, these detainees were allowed to socially interact with the general population during recreation time.

160.   As a result of the above-described conditions, Mr. Deguair requested an inmate grievance form nearly every day during the last two weeks of May so that he could file a grievance regarding the conditions at HCCC.

161.   When Mr. Deguair requested the form to file a grievance from the ACO on duty Mr. Deguair was told that no forms were available and that he could not file a grievance.

41

162.   Mr. Deguair was specifically told that he could not file a grievance by ACO Borges and by ACO Kazowski.

163.   On June 1, 2021, Mr. Deguair tested positive for COVID-19.

164.   On a daily basis, since June 1, 2021, Mr. Deguair has requested an inmate grievance form from the guards at HCCC.  Each time, Mr. Deguair was told that there were no grievance forms available.

165.   On one occasion, an ACO informed Mr. Deguair that the person responsible for accepting grievances had quit and that there was nothing they could do to help him with obtaining the grievance form or filing a grievance through another mechanism.

166.   On another occasion, one of the ACO's provided Mr. Deguair with a phone number to call to file a grievance.  Mr. Deguair spoke with the individual who answered and was told he would just have to wait and call back another time.

    a.  Mr. Deguair called this phone number a second time and spoke with the same individual and informed that person that he needed the grievance form immediately.

    b.  That individual's response was that there were no grievance forms and that he could not file a grievance, and that he would just have to wait.

167.   On June 16, 2021, while speaking on the phone with an attorney, Mr. Deguair requested a grievance form from ACO Kazowski.  ACO Kazowski responded that he could not provide Mr. Deguair with a grievance form.

**Tyndale Mobley**

168.   Mr. Mobley is currently incarcerated at HCCC.

169.   At the time of Mr. Mobley's initial incarceration, he had not tested positive for COVID-19.

170.   Prior to Mr. Mobley's incarceration, he was eligible for, and did receive, a COVID-19 vaccine.

171.   When the outbreak of positive COVID-19 cases began at HCCC, Mr. Mobley was very concerned for his safety and the safety of others because he regularly observed a lack of adherence to any COVID-19 prevention efforts.

172.   Initially the positive COVID-19 cases were confined to the main building where Mr. Mobley was not housed.

173.   Mr. Mobley observed staff freely walking between the main building and the unit where Mr. Mobley was housed without wearing a mask.

174.   On one occasion Mr. Mobley confronted a guard about not wearing a mask when she returned from the main building where COVID-19 positive inmates were housed.

   a. This guard told Mr. Mobley that she did not want to wear one and did not need to.

   b. Later Mr. Mobley discovered that this guard contracted COVID-19 and he feared that she had spread COVID-19 to the unit where Mr. Mobley was housed.

175.   At the beginning of June 2021, there were two inmates that had tested positive for COVID-19 in Mr. Mobley's cell block.

176.   Rather than isolate the positive inmates from the rest of the detainees, DPS instead moved in two more inmates that were positive for COVID-19, and then instructed those four inmates to remain on the other side of the room from the rest of the population that had not tested positive.

177.   Shortly after the four COVID-19 positive inmates were housed in Mr. Mobley's cell block, virtually every other inmate in that cell block also tested positive for COVID-19.

178.   Mr. Mobley showered and used the toilet in the same bathroom as the positive inmates.

179.   Mr. Mobley has observed no effort from the staff at HCCC to sanitize the facilities in a manner that would mitigate the spread of COVID-19.

180.   Beginning in late May 2021 or early June 2021, Mr. Mobley requested an inmate grievance form every day from the guards on duty.

44

181.  Mr. Mobley was repeatedly told that they did not have any grievance forms and there was no ability for him to file a grievance regarding the conditions at HCCC that was facilitating the spread of COVID-19 throughout the facility.

182.  In early June 2021, Sgt. Ahuna and ACO Kiocho told Mr. Mobley that no grievance forms were available.

183.  On June 6, 2021, Mr. Mobley received a positive test result indicating that he had contracted COVID-19.

184.  On June 6, 2021, Mr. Mobley again requested a grievance form, but he was again told there were no forms.

185.  When Mr. Mobley requested to file a grievance some other way, he was told there was no other way.

**Zachary Granados**

186.  Mr. Granados is and has been incarcerated at Waiawa since August 2020.

187.  In November 2020, Mr. Granados was housed in building 10A.

188.  Around this time, some inmates housed in building nine were displaying symptoms of COVID-19.

      a.  These inmates were sent to the medical unit where they waited for their COVID-19 test results.

    b.   After they tested positive for COVID-19, these inmates were sent back to building nine.

    c.   Soon thereafter, nearly every inmate in building nine tested positive for the virus.

189.   Around the same time, the inmate kitchen workers tested positive for COVID-19.

    a.   As a result, several inmates in building nine including Mr. Granados (hereinafter, "Building 10 kitchen inmates") were asked to take the place of the COVID-positive kitchen workers.

    b.   Before the Building 10 kitchen inmates started working in the kitchen, DPS did not sanitize the kitchen area.

    c.   Four days after the Building 10 kitchen inmates started working in the kitchen, one of the Building 10 kitchen inmates tested positive for COVID-19.

    d.   This COVID-positive inmate was transferred to building nine where they were housing all of the COVID-positive inmates.

190.   Because all of the COVID-positive inmates were in building nine, guards working in building nine were provided "hazardous materials" suits.

46

191.   Mr. Granados would frequently see these guards, wearing the same suits they were wearing while in building nine, enter building 10 to perform a head count.

192.   In mid-November 2020, DPS transferred approximately 30 inmates from buildings four, five, and six who had tested positive for COVID-19, into Mr. Granados's building.

193.   Soon thereafter, Mr. Granados tested positive for COVID-19.

194.   As a result of contracting COVID-19, Mr. Granados was bed-ridden for one week.

195.   In early December 2020, Mr. Granados filed an inmate grievance complaining about the conditions at Waiawa that facilitated the spread of COVID-19 in the facility that were still present at the time he filed the grievance.

196.   Mr. Granados appealed the facility's response regarding his grievance at each step within five days after receiving a response, until Mr. Granados exhausted his administrative remedies.

## CLASS ALLEGATIONS

197.   Plaintiffs bring this action individually and in their representative capacities on behalf of all others similarly situated pursuant to Fed. R. Civ. P. Rule 23.  This action satisfies all requirements of Rule 23: numerosity, commonality, typicality, fair and adequate representation, and predominance and superiority.

198.   The proposed Class members consist of two Classes, each Class has one subclass as follows:

> **Post-Conviction Class:** All present and future sentenced prisoners incarcerated in a Hawaiʻi prison.
>
> Post-Conviction Medical Subclass:  Includes all present and future Post-Conviction Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC. *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
>
> **Pretrial Class**: All present and future pretrial detainees incarcerated in a Hawaiʻi jail.
>
> Pretrial Medical Subclass:  Includes all present and future Pretrial Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC.  *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

199.   The proposed Class and Subclass definitions may be amended by the Plaintiffs prior to certification by the Court if such amendment is deemed necessary or appropriate, including the addition of additional subclasses.

## CLASS ACTION REQUIREMENTS

### Numerosity: Fed. R. Civ. P. 23(a)(1)

200.   The proposed members of Plaintiffs' Class are so numerous that joinder of all the members is impossible.  The proposed Class consists of thousands of inmates and pretrial detainees who are presently incarcerated in a Hawai'i jail or prison, or who will be in the future, and are thereby at continued risk and exposure to COVID-19.

201.   Regardless of their vaccination status, all individuals at each facility are at risk of a COVID-19 outbreak due to the lack of protocols regarding unvaccinated staff and inmates, the increasing risk of possible re-infection, and the emergence of new variants that may be vaccine-resistant.

### Commonality: Fed. R. Civ. P. 23(a)(2)

202.   There are significant issues of law and fact in this case that are common to the proposed Class as a whole, and central to resolution of the core issues in this matter.  The nature and scope of the proposed Class claims expose the gravity of the Defendant's disregard for the safety and well-being of its residents.  Moreover, a class action proceeding will best equip the Court with the information necessary to grasp the fundamental problems within the Department.  Class litigation is the superior method to manage such comprehensive claims and will afford a large number of similarly harmed persons the ability to pursue this action in circumstances

49

where individual claims are minimal, thus promoting economic efficiency and promoting a fair and judicially efficient resolution of the issues. Without such litigation, Defendant have no incentive to reverse the current course of deliberate inaction and neglect of responsibility, thereby causing continued and intolerable harm to DPS residents.

203.   Some questions of law and fact that are common to the proposed Classes include whether Defendant:

  a.   Failed to identify and prevent the risks of COVID-19 to the health and well-being of inmates and detainees;

  b.   Have been deliberately indifferent to the resulting harm and risk of harm to inmates and detainees;

  c.   Failed to exercise reasonable care or otherwise take reasonable precautions to prevent exposure and illness to inmates and detainees;

  d.   Failed to properly quarantine inmates and detainees who were or may have been exposed to COVID-19;

  e.   Housed exposed and/or tested residents with other residents who had not exhibited symptoms and/or been tested;

  f.   Failed to provide safety equipment or to reasonably separate residents exposed, tested, and/or diagnosed with COVID-19;

g.   Locked residents in seclusion after diagnosis with COVID-19 with no follow-up treatment or care, inadequate food, and no ability to communicate with their families or counsel;

h.   Allowed inmates and detainees to enter and leave the facilities without

adequate screening and/or precautions; and

i.   Exposed and required staff to work in proximity to inmates who already had demonstrated symptoms.

204.   The questions of law and fact are common questions which are capable of class-wide resolution, and central to every proposed Class member is the Defendant's failure to provide for the safety and well-being of inmates and detainees.

### Typicality: Fed. R. Civ. P. 23(a)(3)

205.   The claims of the representative Plaintiffs are typical of the claims of the proposed Class.  Plaintiffs and all other members of the proposed Class have sustained or will sustain similar injuries—and are continually exposed to the same risks—arising out of and caused by Defendant's policies, practices, procedures, and customs (or lack thereof) in violation of the law as alleged.  Because the claims of the representatives are typical of the proposed Class as a whole, the absent Class members will be protected in a manner that is both economic and efficient.

<u>Adequacy: Fed. R. Civ. P. 23(a)(4)</u>

206.  The representative parties will fairly and adequately protect the interests of the proposed Class.  Plaintiffs have suffered adverse consequences as a direct result of the Defendant's inaction with respect to the needs of inmates and detainees and are committed to vigorously pursuing all available legal remedies.  All Class representatives have a strong desire to see that corrective action is taken in an effort to prevent future harm to themselves, and other inmates and detainees. Similarly, Plaintiffs' counsel have extensive experience, are firmly resolved to protecting the rights and interests of clients, and will zealously pursue this matter on behalf of the proposed Class.  To the best of counsel's knowledge, neither counsel nor the representative Plaintiffs have any conflicts of interest with other proposed Class members that would prevent or interfere in any way with counsel's representation of the proposed Class or the claims asserted and relief sought herein.

<u>Fed. R. Civ. P. 23(b)(2)</u>

207.  The Defendant, having been presented with innumerable opportunities to protect the inmate population and detainees, has refused to act on behalf of the named Class.  Such inaction applies generally to the entire proposed Class as a whole.

<u>Fed. R. Civ. P. 23(b)(1)(A) and (B)</u>

208.   The questions of law and fact regarding the Defendant's repeated and deliberate indifference towards the safety and well-being of inmates and detainees exposed to the risks of COVID-19 are the predominant questions driving this litigation.   The differing factual claims of individual Class members are not a roadblock to Class certification when the claims central to all proposed Class members predominate, and a Class-wide judicial solution is not only practical, but remains the superior method for a fair and efficient resolution of the Plaintiffs' claims.  The primary interest of the proposed Class members is to see change in the Defendant's policies, procedures, and practices, and there is little interest to individually control separate actions.   Moreover, maintaining class status is preferable for achieving the desired results, and will not present any exceptional difficulties.

### FIRST CAUSE OF ACTION
**Unconstitutional Punishment in Violation of the Fourteenth Amendment of the U.S. Constitution**
42 U.S.C. Section 1983; 28 U.S.C. Section 2241
*Pretrial Subclass*

209.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

210.   42 U.S.C. section 1983 (hereinafter, "Section 1983") provides that:

> Every person, who under color of any statute, ordinance, regulation, custom, or usage of any state or territory or the

District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

211.   In a claim for injunctive relief, Defendant Otani is potentially liable under Section 1983.  *See, e.g., Papasan v. Allain,* 478 U.S. 265, 278 (1985) ("If the relief sought against a state official is prospective in nature, then the relief may be allowed regardless of the state's sovereign immunity."); *Green v. Mansour,* 474 U.S. 64, 68, (1985).

212.   Plaintiffs are informed and believe, and thereupon allege, that the Defendant is acting herein under color of law in violation of rights afforded to Plaintiffs pursuant to 42 U.S.C. Section 1983.

213.   At the time of the relevant events, Plaintiffs Deguair and Mobley and members of the Pretrial Class had a clearly established right under the Fourteenth Amendment to be secure in their person from punishment.

214.   Under the Fourteenth Amendment, the due process protections to detainees are even greater than the protections due to those incarcerated after adjudication because pretrial detainees are "entitled to more considerate treatment and conditions of confinement than criminal whose conditions of confinement are designed to punish." *Youngberg v. Romero*, 457 U.S. 307, 321-22 (1982).  Thus, the

"Fourteenth Amendment affords pretrial detainees protections 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

215.   Objective deliberate indifference to the serious risk that COVID-19 poses to members of the Pretrial Subclass infringes on the protections guaranteed to them under the Fourteenth Amendment.  *See Helling v. McKinney*, 509 U.S. 25, 33-34.

216.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

217.   More than one year after the CDC first issued specific guidance for preventing the spread of COVID-19 within correctional and detention facilities, Defendant has failed to meaningfully modify and improve its infection prevention and mitigation procedures.   This failure has led to several major outbreaks of COVID-19 at DPS correctional facilities.

218.   The conditions at DPS correctional facilities pose substantial risks of serious harm to the members of the Pretrial Subclass and the Pretrial Medical Subclass, and Defendant's conduct as to this risk of harm is objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences.

219.   Defendant has failed to develop and implement effective policies and procedures for preventing and mitigating coronavirus transmission within DPS correctional facilities and has failed to implement and enforce those policies and procedures which they do have, to protect the Pretrial Subclass from known risks of serious harm, both physical and psychological.

220.   In addition, Defendant's months-long reliance on lockdowns, which has proved unable to stop the spread of COVID-19 through its correctional facilities, has caused and will continue to cause depression, anxiety, and other damaging physical and psychological effects for the Pretrial Subclass.

221.   Defendant also fails to provide adequate care for those who have contracted COVID-19 while incarcerated at DPS correctional facilities.  In this as well, its conduct is objectively unreasonable and evidences purposeful, knowing, or reckless disregard of the consequences.

222.   As a result of Defendant's unconstitutional actions and inactions, members of the Pretrial Subclass are suffering irreparable injury.

223.   The Defendant has acted herein and/or refused to act knowingly, intentionally, maliciously, and with clear and obvious deliberate indifference and disregard to the risks and dangers to which they have exposed Plaintiffs and potentially tens of thousands of individuals in and outside its jails.

224.   As a direct and proximate result of the foregoing members of the Pretrial Subclass have been and will continue to be exposed to severe and even deadly risks and dangers associated with COVID-19 including pain, suffering, emotional distress, and potential long term and permanent conditions and disabilities.

225.   As a direct and proximate result of the foregoing pretrial detainees in the Pretrial Subclass have suffered and are continuing to suffer the loss of their rights to due process in violation of the rights guaranteed to them by the Fourteenth Amendment to the United States Constitution.

226.   Plaintiffs have exhausted all available remedies and/or have no other remedies available to them to redress or provide the relief sought herein.

## SECOND CAUSE OF ACTION
**Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution**
42 U.S.C. Section 1983/28 U.S.C. Section 2241
*Pretrial Class*

227.   Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

228.   Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pretrial custody.  *See Youngberg v. Romeo*, 457 U.S. 307, 324 (1982).

229.   As part of the right to adequate medical care, the government must provide people held in pretrial custody with reasonable safety and address serious medical needs that arise in jail, under the same objective deliberate indifference standard that applies to failure-to-protect claims brought by people held pretrial.  *See Gordon v. Cnty. of Orange*, 888 F.3d, 1118, 1125 (9th Cir. 2018).

230.   Correctional officials thus have an affirmative obligation to protect persons in their custody from infectious disease.  Defendant may not wait until Plaintiffs or others test positive for the virus and an outbreak grows larger.  *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

231.   Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

232.   Defendant has taken insufficient steps to comply with public health guidelines to manage the outbreak of COVID-19 and have not provided for the safety of the Pretrial Subclass.  Defendant's actions and inactions result in the confinement of members of the Pretrial Subclass in a jail where they do not have the capacity to test for, treat, manage, or prevent COVID-19 outbreaks, which violates the rights of the Pretrial Subclass to treatment and adequate medical care.

233.   Defendant has known of the risks and dangers that COVID-19 poses to the Pretrial Subclass.  By failing to provide adequate protection from COVID-19,

Defendant has shown and continues to show deliberate indifference to a substantial risk of serious harm and death.

234.  Accordingly, Defendant, as a supervisor, direct participant, and policymaker for DPS correctional facilities has violated the rights of the Pretrial Subclass under the Fourteenth Amendment.

### THIRD CAUSE OF ACTION
### Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution
42 U.S.C. Section 1983/28 U.S.C. Section 2241
*Post-Conviction Subclass*

235.  Plaintiffs hereby incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

236.  At the time of the relevant events, Plaintiffs Alvarado, Chatman, and Granados and members of the Post-Conviction Subclass had a clearly established right under the Eighth Amendment to the United States Constitution to protection from cruel and unusual punishment.  As part of this right, the Eighth Amendment guarantees convicted prisoners free of "a condition of confinement that is sure or very likely to cause serious illness and needless suffering … [t]hat the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling*, 509 U.S. at 33-34.

237.  The government violates the Eighth Amendment when it crowds prisoners into cells with others who have "infectious maladies" or otherwise exposes

prisoners "to a serious communicable disease." *Id.* at 33.  This is true "even though the possible infection might not affect all of those exposed." *Id.*

238.  Any reasonable corrections official would know or should have known of these rights at the time of the complained conduct as they were clearly established at that time.

239.  Deliberate indifference to the serious risk that COVID-19 poses to members of the Post-Conviction Subclass infringes on the Eighth Amendment's protection from cruel and unusual punishment.  Defendant violates this right by subjecting members of the Post-Conviction Subclass to conditions of confinement that do not ensure their safety and health.

240.  Defendant has failed to comply with public health guidelines to prevent and manage the spread of COVID-19 at its correctional facilities.

241.  Defendant's actions and inactions result in the confinement of members of the Post-Conviction Subclass in prisons where they do not have the capacity to test for, treat, or manage COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

242.  Under DPS's current policies and practices, Plaintiffs and members of the Post-Conviction Subclass cannot take steps to protect themselves – such as social distancing, hand-washing, hygiene, or self-quarantining.  As a result, Plaintiffs and

members of the Post-Conviction Subclass are at severe risk of contracting COVID-19.

243.   Although Defendant has known of the risks COVID-19 poses to members of the Post-Conviction Subclass, Defendant acted with deliberate indifference by failing to implement effective policies and procedures.  Defendant has thus shown and continues to show deliberate indifference to a substantial risk of serious harm.

244.   By operating DPS prisons without the capacity to test for, treat, or manage a COVID-19 outbreak, Defendant, as a supervisor, direct participant, and policy maker for DPS prisons has violated the rights of the Post-Conviction Subclass under the Eighth Amendment.

## **INJUNCTIVE RELIEF**

Plaintiffs request the following injunctive relief (hereinafter the "Response Plan") requiring that Defendants:

    a.    Physically distance all residents from one another and staff within DPS correctional facilities, which imposes at least six feet of distance between individuals at all times;

    b.    Provide all residents in DPS custody sanitary living conditions (*i.e*., ensure regular access to a working toilet, sink, and drinking water);

c.   Identify residents who may be high-risk for COVID-19 complications, in accordance with guidelines from the CDC, and prioritize these individuals for medical isolation or housing in single cells;

d.   On a daily basis, thoroughly and professionally disinfect and sanitize the DPS correctional facilities;

e.   Provide hygiene supplies that are not watered down, including supplies to wash hands and disinfect common areas, to inmates at all times and free of charge;

f.   Implement policies and procedures requiring that common areas be disinfected between uses;

g.   Provide adequate personal protection equipment and sanitizer, including but not limited to masks, to all staff members and residents (and ensure that these materials are replaced at least every third day);

h.   Implement a testing procedure to identify residents who are possibly carrying COVID-19, including testing to identify asymptomatic carriers and those with one or more symptoms of COVID-19;

i.  Implement a quarantine and isolation procedure that is in line with CDC guidelines for all individuals exposed to COVID-19 and new intakes to DPS correctional facilities;

j.  Take particularly heightened precautions with respect to food handling and delivery, such as ensuring that people who come into contact with food are not displaying any potential symptoms of COVID-19, have not recently been in contact with people displaying potential symptoms of COVID-19, and people who come into contact with food wear appropriate personal protective equipment at all times when in contact with food;

k.  Provide regular, accurate, up-to-date educational and informational memorandum to DPS staff and inmates regarding the status of how COVID-19 is affecting the facility, including what measures employees and inmates must take in the event of an outbreak;

l.  Develop comprehensive plans to educate and promote COVID-19 vaccination for all DPS residents and staff and ensure residents are provided regular access to vaccines; and

m.  Prohibit DPS employees from restricting access to inmate grievance forms or from preventing the submission of

> grievances, and prohibit retaliation against any DPS employee or
> inmate for making complaints or filing grievances regarding
> conditions or practices in DPS facilities that promote the spread
> of COVID-19.
>
> n.   In accordance with CDC guidelines, ensure that medical
> isolation of inmates with COVID-19 is distinct from punitive
> solitary confinement of incarcerated/detained individuals, both
> in name and in practice. This includes making efforts—where
> feasible—to provide similar access to radio, TV, reading
> materials, personal property, and the commissary as would be
> available in regular housing units.

Pursuant to 18 U.S.C. section 3626(f)(1)(A), and Rule 53 of the Federal
Rules of Civil Procedure, Plaintiffs request the appointment of a Special Master to
oversee the development and implementation of the Response Plan.  *See* 18 U.S.C.
section 3626(f)(1)(A)("In any civil action in a Federal court with respect to prison
conditions, the court may appoint a Special Master who shall be disinterested and
objective and who will give due regard to the public safety, to conduct hearings on
the record and prepare proposed findings of fact."); *see also Brown v. Plata*, 563
U.S. 493 (2011); *Hook v. Arizona Dep't of Corrections*, 107 F.3d 1397 (9th Cir.
1997).  The Special Master should also be authorized to submit findings and

recommendations to the Court as he or she finds appropriate or by court order. *See* 18 U.S.C. section 3626(f)(1)(A).

WHEREFORE, Plaintiffs pray for relief as follows:

1.      For certification of the proposed Classes and subclasses;

2.      For entry of Judgment declaring that Defendant's practices and actions created unconstitutional conditions of confinement and punishment which violate the United States Constitution;

3.      For entry of an Order requiring Defendant to execute the Response Plan;

4.      For appointment of a Special Master to oversee the development and implementation of the Response Plan;

5.      For reimbursement of Plaintiffs' costs including reasonable provision for their attorneys' fees; and

6.      For such other relief as the Court may deem equitable and just.

DATED:      Honolulu, Hawai'i, June 21, 2021.

/s/ Gina Szeto-Wong
ERIC A. SEITZ
GINA SZETO-WONG
JONATHAN M.F. LOO
KEVIN YOLKEN

Attorneys for Plaintiffs