CLARE E. CONNORS          7936
Attorney General of Hawaii

CARON M. INAGAKI         3835
KENDALL J. MOSER         6515
SKYLER G. CRUZ           9551
Deputy Attorneys General
Department of the Attorney
  General, State of Hawaii
425 Queen Street
Honolulu, Hawaii  96813
Telephone:  (808) 586-1494
Facsimile:   (808) 586-1369
Email:  Caron.M.Inagaki@hawaii.gov
        Kendall.J.Moser@hawaii.gov
        Skyler.G.Cruz@hawaii.gov

Attorneys for Defendants
STATE OF HAWAII, DEPARTMENT OF
PUBLIC SAFETY; DAVID Y. IGE; JOSH
GREEN; NOLAN ESPINDA; MAX N. OTANI

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BRENON NASH; ROBERT GIBSON; CHAUNCY HATA; GARTH COLEMAN; WAYNE J. ANCHETA; FRANCISCO ALVARADO; ROBERT WALSH; JONATHAN CARTER; and DUANE BERTLEMANN; individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>STATE OF HAWAII, | CIVIL NO. CV 21-00268 JAO-KJM<br><br>DEFENDANTS STATE OF HAWAII, DEPARTMENT OF PUBLIC SAFETY, DAVID Y. IGE, JOSH GREEN, NOLAN ESPINDA, AND MAX N. OTANI'S MEMORANDUM IN OPPOSITION PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER; DECLARATION OF GAVIN TAKENAKA; DECLARATION OF<br>     (*caption continued on next page*) |

831211_1.DOC

DEPARTMENT OF PUBLIC
SAFETY; DAVID Y. IGE,
Individually; JOSH GREEN,
Individually; NOLAN ESPINDA,
Individually; MAX N. OTANI,
Individually; and DOES 1-50,

          Defendants.

TOMMY JOHNSON; DECLARATION
OF CRAMER L. MAHOE;
DECLARATION OF SCOTT
HARRINGTON; DECLARATION OF
SEAN ORNELLAS; DECLARATION
OF WANDA CRAIG;
DECLARATION OF ERIC TANAKA;
DECLARATION OF DEBORAH
TAYLOR; DECLARATION OF
FRANCIS SEQUEIRA;
DECLARATION OF NEAL
WAGATSUMA; DECLARATION OF
STEPHANIE HIGA; EXHIBITS "A" –
"D"; CERTIFICATE OF
COMPLIANCE; CERTIFICATE OF
SERVICE

ECF No. 6

Judge:  Honorable Jill A. Otake

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.   BACKGROUND .............................................................................................3

III.  STATEMENT OF FACTS ..............................................................................5

      A.    PSD Has Been Proactive and Vigilant in Addressing
            COVID-19 ...........................................................................................5

            1.    Screening ...................................................................................7

            2.    Quarantine and Medical Isolation .............................................7

            3.    Medical Care .............................................................................8

            4.    Sanitation and Hygiene .............................................................8

            5.    Social Distancing ......................................................................8

            6.    Personal Protective Equipment .................................................9

            7.    Education and Information ........................................................9

            8.    Testing .....................................................................................10

            9.    Vaccination ..............................................................................11

      B.    The HCCC COVID-19 Outbreak ......................................................11

      C.    The Conditions at HCCC ..................................................................14

            1.    The Holding Areas (*i.e.* "Dog Cages") ..................................14

            2.    The Multi-Purpose Room (*i.e.* "Fishbowl") ............................15

            3.    Social Distancing ....................................................................16

            4.    Inmate Education .....................................................................16

|  |  | 5. | PPE and Sanitization Products | 16 |
|  |  | 6. | Communication of COVID-19 Protocols | 17 |
| IV. | LEGAL STANDARD |  |  | 18 |
| V. | ARGUMENT |  |  | 19 |
|  | A. | Plaintiffs Have Not Shown a Likelihood of Success on the Merits of Their Claims or "Serious Questions" Going to the Merits | | 19 |
|  |  | 1. | The Fourteenth Amendment | 20 |
|  |  | 2. | The Eighth Amendment | 26 |
|  | B. | Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief | | 32 |
|  | C. | The Balance of Equities and Public Interest Weigh in Defendants' Favor | | 33 |
| VI. | CONCLUSION |  |  | 35 |

## TABLE OF AUTHORITIES

<u>CASES</u>

<u>All. for the Wild Rockies v. Cottrell</u>,
   632 F.3d 1127 (9th Cir. 2011) ....................................................................18, 19

<u>Anderson v. United States</u>,
   612 F.2d 1112 (9th Cir. 1979) ............................................................................19

<u>Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris</u>,
   729 F.3d 937, 944 (9th Cir. 2013) ......................................................................32

<u>Avendano v. Asher</u>,
   No. C20-0700JLR-MLP,
   2020 WL 7427058 (W.D. Wash. Dec. 18, 2020) ..............................................25

<u>Bannister v. Ige</u>,
   No. CV 20-00305 JAO-RT,
   2020 WL 4209225 (D. Haw. July 22, 2020) ................................................32, 33

<u>Bell v. Wolfish</u>,
   441 U.S. 520 (1979).............................................................................................20

<u>Booth v. Newsom</u>,
   No. 2:20-CV-1562 AC P,
   2020 WL 6741730 (E.D. Cal. Nov. 17, 2020),
   <u>report and recommendation adopted</u>,
   No. 220CV1562JAMACP,
   2020 WL 7632211 (E.D. Cal. Dec. 22, 2020) ....................................................28

<u>California by & through Becerra v. Azar</u>,
   950 F.3d 1067 (9th Cir. 2020) ............................................................................26

<u>Cameron v. Bouchard</u>,
   No. 20-cv-10949,
   2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) ............................................30, 31

Cameron v. Bouchard,
    No. 20-3547,
    2020 WL 3100187 (6th Cir. June 11, 2020)......................................................31

Caribbean Marine Servs. Co. v. Baldrige,
    844 F.2d 668 (9th Cir. 1988) ............................................................................33

Castillo v. Barr,
    449 F. Supp. 3d 915 (C.D. Cal. 2020) ..............................................................31

Castro v. County of Los Angeles,
    833 F.3d 1060 (9th Cir. 2016) ..........................................................................21

Chunn v. Edge,
    20-cv-1590 (RPK) (RLM),
    2020 WL 3055669 (E.D.N.Y. June 9, 2020)..............................................29, 30

Criswell v. Boudreaux,
    No. 120CV01048DADSAB,
    2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) ....................................................31

Criswell v. Boudreaux,
    No. 120CV01048DADSAB,
    2020 WL 7646405 (E.D. Cal. Dec. 23, 2020) .......................................22, 25, 31

Earth Island Inst. v. Carlton,
    626 F.3d 462 (9th Cir. 2010) ............................................................................18

Estelle v. Gamble,
    429 U.S. 97 (1976)............................................................................................27

Farmer v. Brennan,
    511 U.S. 825 (1994).....................................................................................26, 29

Garcia v. Google, Inc.,
    786 F.3d 733 (9th Cir. 2015) ............................................................................19

Gay v. California,
    No. 2:20-cv-1276 AC P,
    2020 WL 3839805 (E.D. Cal. July 8, 2020)......................................................24

Gordon v. County of Orange,
    888 F.3d 1118 (9th Cir. 2018) ............................................................21

Gouveia v. Jackie M.,
    No. CV 20-00342 JAO-RT,
    2021 WL 900553 (D. Haw. Mar. 9, 2021) .......................................26

Hsiao v. Stewart,
    No. CV 18-00502 JAO-KJM,
    2021 WL 1113641 (D. Haw. Mar. 23, 2021) ....................................18

Ingraham v. Wright,
    430 U.S. 651 (1977)...........................................................................26

Kealoha v. Espinda,
    No. CV 20-00323 JAO-RT,
    2020 WL 5602837 (D. Haw. Sept. 18, 2020)..............................19, 35

Kingsley v. Hendrickson,
    135 S. Ct. 2466 (2015)........................................................................20

Lopez v. Smith,
    203 F.3d 1122 (9th Cir. 2000) ......................................................26, 27

Lucero-Gonzalez v. Kline,
    No. CV-20-00901-PHX-DJH (DMF),
    2020 WL 2987002 (D. Ariz. June 2, 2020) .......................................25

Maney v. Brown,
    464 F. Supp. 3d 1191 (D. Or. 2020) ..............................28, 29, 30, 34

Mays v. Dart,
    453 F. Supp. 3d 1074 (N.D. Ill. 2020).................................................30

Nelson v. Shinn,
    No. CV2100040PHXDJHJZB,
    2021 WL 2018961 (D. Ariz. May 4, 2021),
    report and recommendation adopted,
    No. CV-21-00040-PHX-DJH,
    2021 WL 2012696 (D. Ariz. May 20, 2021).......................................21

Plata v. Newsom,
    445 F. Supp. 3d 557 (N.D. Cal. 2020) ........................................................27, 30

Ramos v. Wolf,
    975 F.3d 872 (9th Cir. 2020) ..............................................................................19

Roman v. Wolf,
    977 F.3d 935 (9th Cir. 2020) .......................................................................33, 34

Smith v. H.C.F. Med. Unit D.P.S.,
    No. CV 19-00600 JAO-KJM,
    2020 WL 734468 (D. Haw. Feb. 13, 2020) ......................................................18

Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,
    240 F.3d 832 (9th Cir. 2001) .............................................................................18

Swain v. Junior,
    958 F.3d 1081 (11th Cir. 2020) ..............................................................29, 30, 33

Ulep v. Dep't of Pub. Safety,
    No. CV 20-00532 JAO-KJM,
    2020 WL 7322723 (D. Haw. Dec. 11, 2020) .....................................................24

Valentine v. Collier,
    956 F.3d 797 (5th Cir. 2020) .............................................................................29

Williams v. Dirkse,
    No. 121CV00047BAMPC,
    2021 WL 2227636 (E.D. Cal. June 2, 2021) .....................................................22

Wilson v. Williams,
    961 F.3d 829 (6th Cir. 2020) .......................................................................29, 34

Winter v. Natural Resources Defense Council, Inc.,
    555 U.S. 7, 129 S.Ct. 365 (2008)................................................18, 25, 26, 32, 33

Wragg v. Ortiz,
    462 F. Supp. 3d. 476 (D. N.J. 2020)...................................................................30

THE UNITED STATES CONSTITUTION

The Eighth Amendment .................................................... 4, 20, 26, 27, 28, 29, 31, 32

The Fifth Amendment ................................................................................31

The Fourteenth Amendment .......................................... 4, 20, 21, 22, 24, 25, 27, 31

FEDERAL STATUTES

28 U.S.C. § 1915A(a) ................................................................................22

DEFENDANTS STATE OF HAWAII, DEPARTMENT OF PUBLIC SAFETY, DAVID Y. IGE, JOSH GREEN, NOLAN ESPINDA, AND MAX N. OTANI'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR <u>PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER</u>

Defendants State of Hawaii, Department of Public Safety, David Y. Ige, Josh Green, Nolan Espinda, and Max N. Otani (collectively, "Defendants"), by and through their attorneys, Clare E. Connors, Attorney General of Hawaii, and Caron M. Inagaki, Kendall J. Moser, and Skyler G. Cruz, Deputy Attorneys General, submit this Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order ("Motion"), filed on June 9, 2021. ECF No. 6.

I.   <u>INTRODUCTION</u>

In this lawsuit, which is styled as a class action, Plaintiffs claim that the State of Hawaii ("State") is failing to protect inmates throughout the prison system from the risk of contracting COVID-19.  Plaintiffs are current and former inmates from various state correctional facilities.  Defendants are the State of Hawaii Department of Public Safety ("PSD"), as well as Governor David Ige, Lieutenant Governor Josh Green, and the former and current PSD Directors, Nolan Espinda and Max Otani, respectively, each of whom is sued in their individual capacities.

Plaintiffs seek a preliminary injunction appointing a "Special Master to ensure PSD correctional facilities come into compliance with public health guidelines."  ECF No. 6-1, PageID #147.  As discussed herein, a preliminary

injunction should not issue because Plaintiffs have failed to satisfy the necessary requirements for injunctive relief.  Moreover, the appointment of a special master is simply unnecessary because PSD already has in place a Pandemic Response Plan ("PRP") that was prepared in collaboration with the State Department of Health ("DOH"), comports with the Centers for Disease Control and Prevention's ("CDC") guidelines, and is reviewed and updated regularly as the CDC guidelines and scientific information evolve.  It is also unnecessary because PSD already has a comprehensive plan to educate and promote COVID-19 vaccination for all State inmates and PSD staff.

While Plaintiffs contend that the recent COVID-19 outbreak at the Hawaii Community Correctional Center ("HCCC") also supports their request for preliminary injunctive relief, the measures PSD has taken since the onset of the outbreak to contain the spread of COVID-19 at HCCC and to address the conditions that may have contributed to the outbreak demonstrate that emergency injunctive relief is unwarranted.  These efforts include the transfer of inmates from HCCC to other State correctional facilities and collaborating with the Judiciary to identify inmates at the HCCC who qualify for release so that HCCC can discontinue use of HCCC's multi-purpose room (*i.e.* "fishbowl") and holding areas (*i.e.* "dog cages") as inmate housing.  HCCC inmates are not being housed under the

conditions that they claim violated their constitutional rights and HCCC now has more space to medically isolate, quarantine, and cohort inmates.

PSD is well-aware of the challenges it faces with respect to ensuring the health and safety of the State's inmates in the face of the COVID-19 pandemic, from overcrowding at some facilities to resistance by many inmates to receiving a COVID-19 vaccination.   However, PSD has been proactive and vigilant in addressing and overcoming these challenges and it is in the best position to continue to do so.   Thus, this Court should find that the grounds required for preliminary injunctive relief have not been met and deny Plaintiffs' Motion.

II.   BACKGROUND

Defendants removed this lawsuit from the Circuit Court of the First Circuit, State of Hawaii on June 8, 2021.  ECF No. 1.  On June 9, 2021, Plaintiffs filed a First Amended Complaint for Injunctive Relief and Declaratory Judgment.   ECF No. 5.  That same day, Plaintiffs filed the instant Motion.  ECF No. 6.  On June 17, 2021, the Court permitted Plaintiffs to file a supplement to their Motion ("Supplement"), which was filed on June 18, 2021.  ECF Nos. 13, 14.  On June 22, 2021, Plaintiffs filed their Second Amended Complaint for Injunctive Relief and Declaratory Judgment ("SAC"), which is the operative pleading.  ECF No. 18.

In the SAC, Plaintiffs generally allege that PSD has failed to implement precautions to prevent the spread of COVID-19 in the State's correctional

facilities, which they claim has facilitated the spread of COVID-19 amongst inmates and correctional staff.  Plaintiffs further allege that, as a result of these purported failures, the conditions of confinement at the State's correctional facilities put them at risk of being exposed to and contracting COVID-19. Plaintiffs' SAC includes three causes of action, which allege that PSD is violating Plaintiffs rights to due process and to be free from cruel and unusual punishment under the Eighth and/or Fourteenth Amendments to the United States Constitution. As relief, Plaintiffs request certification of the proposed class, declaratory and injunctive relief, and their reasonable attorneys' fees.  ECF No. 18.

Plaintiffs claim that preliminary injunctive relief is necessary because, as they contend, PSD violates its COVID-19 policies.  ECF No. 6-1, PageID ## 151-58.  Plaintiffs' Motion requests "the appointment of a Special Master to create and implement a COVID-19 response plan."  ECF No. 6-1, PageID #174.  In their Supplement, Plaintiffs also ask this Court to enter an injunction directing Defendants to take specific measures at its facilities, including mandating 6 feet of distance between all individuals at PSD facilities at all times, providing PSD inmates with sanitary living conditions, providing hygiene supplies that are not watered down, and developing comprehensive plans to educate and promote COVID-19 vaccinations, among other things.  ECF No. 14-1.

III.   STATEMENT OF FACTS

A.   PSD Has Been Proactive and Vigilant in Addressing COVID-19

On January 30, 2020, the World Health Organization ("WHO") declared a global health emergency as the outbreak of a novel coronavirus that originated in China was confirmed to be spreading throughout the world, including in the United States.[1]  The next day, on January 31, 2020, the United States Secretary of Health and Human Services declared that the outbreak of COVID-19, the respiratory illness caused by the novel coronavirus that would come to be known as SARS-CoV-2, was a public health emergency.[2]  On March 11, 2020, the WHO announced that COVID-19 had become a pandemic.[3]

After becoming aware of COVID-19 cases in the United States, PSD quickly took action to address COVID-19.  See Declaration of Gavin Takenaka, dated June 22, 2021 ("Takenaka Decl."), ¶ 6.   On March 23, 2020, PSD adopted a comprehensive, department-wide PRP consistent with the CDC's COVID-19 guidelines in order to prevent, contain, and control the spread of COVID-19 at the State's correctional facilities.   See Declaration of Tommy Johnson ("Johnson

---

[1] https://www.nytimes.com/2020/01/30/health/coronavirus-world-health-organization.html?searchResultPosition=10 (last visited June 23, 2021).

[2] https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited June 23, 2021).

[3] https://www.nytimes.com/2020/03/11/health/coronavirus-pandemic-who.html?searchResultPosition=6 (last visited June 23, 2021).

Decl."), dated June 22, 2021, ¶ 8; Takenaka Decl., ¶ 8.  The PRP is constantly reviewed and has been updated on several occasions as CDC guidelines and information have evolved.  See Declaration of Stephanie Higa ("Higa Decl."), dated June 22, 2021, ¶ 4; Johnson Decl., ¶ 11; Takenaka Decl., ¶ 8.

In addition to PSD' department-wide PRP, each of PSD's eight individual facilities has a pandemic response plan that is tailored to the individual space and unique challenges of each facility, and the needs of the population and staff. Johnson Decl., ¶ 9.  All eight PSD facilities are implementing the PRPs tailored to their facilities, which include numerous measures to prevent, contain, and control the spread of COVID-19 at those facilities.  See Declaration of Eric Tanaka ("Tanaka Decl."), dated June 22, 2021, ¶¶ 6-19; Declaration of Deborah M. Taylor ("Taylor Decl."), dated June 22, 2021, ¶¶ 5-17; Declaration of Francis X. Sequeira ("Sequeira Decl."), dated June 22, 2021, ¶¶ 6-18; Declaration of Neal Wagatsuma ("Wagatsuma Decl."), dated June 22, 2021, ¶¶ 6-17; Declaration of Sean K. Ornellas ("Ornellas Decl."), dated June 22, 2021, ¶¶ 6-19; Declaration of Wanda Craig ("Craig Decl."), dated June 22, 2021, ¶¶ 6-20; Declaration of Scott Harrington ("Harrington Decl."), dated June 22, 2021, ¶¶ 6-20; Declaration of Cramer L. Mahoe ("Mahoe Decl."), dated June 22, 2021, ¶ 6; Higa Decl., ¶ 7.

The measures implemented at PSD's facilities, as provided under the PRPs, are summarized as follows:

1.     <u>Screening</u>

All State facilities have implemented screening procedures for inmates, staff and visitors consistent with CDC guidance.  Takenaka Decl., ¶ 14.  All new inmate intakes are screened by medical staff for symptoms of infection and risk factors for COVID-19, such as travel history, recent medical history, history of exposure to COVID-19, and any signs of infection.  <u>Id.</u> at ¶ 16; Johnson Decl., ¶ 14.  Staff, visitors, vendors and volunteers are also screened for COVID-19 symptoms, using a screening survey and no-touch temperature check prior to entry into the facility.  Takenaka Decl., ¶ 15; <u>see</u> <u>also</u> Taylor Decl., ¶ 12; Tanaka Decl., ¶ 13; Sequeira Decl., ¶ 13; Wagatsuma Decl., ¶ 12; Harrington Decl., ¶ 15; Ornellas Decl., ¶¶ 8-9; Craig Decl., ¶ 8; Higa Decl., ¶ 9.

2.     <u>Quarantine and Medical Isolation</u>

PSD utilizes medical isolation and quarantine strategies to contain and control the spread of COVID-19.  Takenaka Decl., ¶ 28.  Each PSD facility has housing units designated for quarantine and medical isolation.  Taylor Decl., ¶ 13; Tanaka Decl., ¶ 14; Sequeira Decl., ¶ 14; Wagatsuma Decl., ¶ 13; Harrington Decl., ¶ 16; Ornellas Decl., ¶ 10; Craig Decl., ¶ 10; Higa Decl., ¶¶ 15-16.  Intake quarantine strategies may be adjusted for each facility depending on the facility's space and security concerns as allowed under CDC guidance.  Johnson Decl., ¶ 15.

### 3.   Medical Care

Medical staff conducts health assessments for inmates in quarantine at least once daily, and twice daily for inmates in medical isolation.  Takenaka Decl., ¶ 34; Johnson Decl., ¶ 26.  Within 14 days of admission, medical staff conducts medical assessments, which includes the identification of older adults and inmates with certain medical conditions that may place an individual at increased risk for severe illness from COVID-19.  Takenaka Decl., ¶ 18.

### 4.   Sanitization and Hygiene

Inmates are provided with soap and towels in restrooms and cells.  Johnson Decl., ¶ 20.  Facilities maintain an enhanced cleaning supply and inmates are provided with cleaning supplies and gloves to sanitize personal areas.  High touch surfaces are sanitized daily.  Disinfecting and cleaning is done daily on each watch. Taylor Decl., ¶ 8; Tanaka Decl., ¶ 9; Sequeira Decl., ¶ 9; Wagatsuma Decl., ¶ 8; Harrington Decl., ¶¶ 10-11; Ornellas Decl., ¶ 14; Craig Decl., ¶ 15.

### 5.   Social Distancing

Social distancing strategies are also an integral component of PSD's COVID-19 plans.  Social distancing strategies, which are adapted for each facility, include minimizing inmate movements and transports, suspending certain programs, suspending in-person visits, restructuring recreation and meals, arranging bunks so inmates sleep head to foot, staggering pill lines, administering

medication at modules, and spaced seating in common areas.  Johnson Decl., ¶ 23; Taylor Decl., ¶ 10; Tanaka Decl., ¶ 11; Sequeira Decl., ¶ 11; Wagatsuma Decl., ¶ 10; Harrington Decl., ¶ 13; Ornellas Decl., ¶ 16; Craig Decl., ¶ 17.

6.    Personal Protective Equipment

Inmates are provided with two or four cloth masks (additional masks are provided on request) and soap and towels in restrooms and cells.  Johnson Decl., ¶¶ 17, 20; Taylor Decl., ¶ 14; Tanaka Decl., ¶ 15; Sequeira Decl., ¶ 15; Wagatsuma Decl., ¶ 14; Harrington Decl., ¶ 17; Ornellas Decl., ¶ 12; Craig Decl., ¶ 12. Inmates can keep one mask while the other can be laundered during daily free laundry service provided.  Johnson Decl., ¶ 17.

To protect the health and safety of inmates and staff, staff are required to wear masks at all times unless excused for medical reasons or due to operational requirements, and additional personal protective equipment ("PPE") is provided for staff use in certain tasks, such as entering a quarantine unit.  Staff is reminded to always wear masks, and if necessary, those that refuse to do so without valid reasons can be written up and face appropriate disciplinary action.  Johnson Decl. ¶¶ 18-19, 21.

7.    Education and Information

At intake, all inmates are required to watch a ten-minute COVID-19 educational video that includes instruction on infection prevention measures and

detailed handwashing procedures.  Johnson Decl., ¶ 16; Takenaka Decl., ¶ 11.  At each facility, inmate and staff are educated on sanitation and hygiene and CDC educational and informational posters are posted.  Id.; Taylor Decl., ¶ 7; Tanaka Decl., ¶ 8; Sequeira Decl., ¶ 8; Wagatsuma Decl., ¶ 7, 9; Harrington Decl., ¶ 9; Ornellas Decl., ¶ 11; Craig Decl., ¶ 11; Higa Decl., ¶ 8.  Inmate education regarding COVID-19 is also reinforced during every inmate encounter with medical staff.  Takenaka Decl., ¶ 11.

### 8.   Testing

Testing of inmates for COVID-19 is continuously being conducted at all facilities.  Takenaka Decl., ¶ 25. PSD has not only implemented COVID-19 testing as recommended by the CDC, it has expanded COVID-19 testing into seven additional categories, including pre-medical procedure testing, pre-release testing, broad-based testing, and surveillance testing of randomly selected inmates.  Takenaka Decl., ¶ 20.  As of June 21, 2021, a total of 16,662 tests were administered to inmates at all eight facilities, of which 1,554 test results were positive, of which 1,474 inmates recovered.  Id. at ¶ 25.  There are 66 active COVID-19 cases at all State facilities.  HCCC and HCF are the only facilities with active cases.  The 9 active cases at HCF is comprised of inmates recently transferred from HCCC who are in medical isolation.  Harrington Decl., ¶ 21.  There are no active cases at all other facilities.  Takenaka Decl., ¶ 26.

9.    <u>Vaccination</u>

Vaccinations are offered and readily available to all inmates.  Inmates are continuously educated about vaccinations.  Vaccination informational and educational posters have been distributed and posted in all facilities.  Sign-up sheets are posted in each housing unit.  Vaccination clinics are scheduled based on sign-ups and vaccine supply.  Presently, there is no shortage of vaccine supply at all facilities.  Takenaka Decl., ¶ 35.

Since January 2021, 2,260 inmates have received either the single dose vaccine or the second dose of the two-dose series vaccine.  On June 21, 2021, the Health Care Division conducted a point-in-time study of the current vaccination status among inmates at correctional facilities statewide.  The total population count was 2,929.  The study showed 1,588 inmates were fully vaccinated, 210 inmates were in the process of becoming fully vaccinated, 1,126 inmates refused to be vaccinated, and 5 inmates could not receive the vaccine due to medical contraindications.  <u>Id.</u> at ¶ 36.

B.    <u>The HCCC COVID-19 Outbreak</u>

PSD has been proactive in addressing the current COVID-19 outbreak at HCCC.  Immediately after the first two cases were confirmed on May 23, 2021, HCCC implemented its pandemic response plan.  Mahoe Decl., ¶6; Johnson Decl., ¶ 29.  HCCC's Warden, Cramer Mahoe now holds daily meeting and/or calls with

the HCCC Chief of Security and other section leaders within the facility to address the COVID-19 outbreak, in addition to his regular monthly staff meetings. Mahoe Decl., ¶¶ 5-6.

Warden Mahoe promptly communicated the challenges HCCC faced in dealing with the COVID-19 outbreak to PSD' Institutional Division Administrator Michael Hoffman and PSD' Deputy Director of Corrections Tommy Johnson, which included the large number of inmates, limiting housing facilities, limited staff, and a low rate of inmate vaccinations. Mahoe Decl., ¶ 7. Deputy Director Johnson then dispatched Mr. Hoffman to HCCC to assess the facility's response and report back to Director Otani and Deputy Director Johnson. Johnson Decl., ¶ 30. Mr. Hoffman has continued to travel to Hawaii Island twice a week to assess the situation at HCCC and report to Deputy Director Johnson. Id. Deputy Director Johnson has also traveled to HCCC, most recently on June 19, 2021, to tour the facility and confirm that HCCC is implementing its PRP to the extent possible without compromising facility security. Id. at ¶ 31. Deputy Director Johnson observed that overcrowding at HCCC made it difficult to segregate inmates in strict accordance with CDC guidance and that cohorting was further complicated due to gang-related security concerns and widespread refusal by many inmates to be tested for COVID-19. Id. at ¶ 33; Mahoe Decl., ¶ 8.

To address these issues, PSD took measures to reduce the inmate population at HCCC.   Mahoe Decl., ¶ 9.   This included reaching out to the Chief Administrative Judge for the State of Hawaii Third Circuit Court to take measures to limit the incoming pretrial detainee population, which resulted in a reduction of the flow of inmates into the facility by 60%.  Johnson Decl., ¶ 34.  PSD has also assisted efforts to identify inmates who may be eligible for early release.  Id. at ¶ 35.  To address staffing shortages, PSD has temporarily assigned Adult Corrections Officers from other facilities to augment HCCC staff.  Id. at ¶ 40.

Importantly, PSD is making efforts to transfer inmates to other facilities in order to increase the facility's capacity to quarantine and isolate inmates and maintain social distancing.  Johnson Decl., ¶ 36.  Since the cluster at HCCC was reported on May 23 2021, 8 inmates have been transferred to Kulani Correctional Facility; 28 inmates have been transferred to HCF.  Id. at ¶ 38.  This enabled HCCC to transfer dozens of inmates out of the multi-purpose room.  As of June 22, 2021, approximately 14 inmates are being housed in the multipurpose room (i.e. "fishbowl").  Mahoe Decl., ¶ 24.   PSD plans to transfer another 13 to 16 inmates from HCCC to the HCF within the next 3 to 5 days.  Johnson Decl., ¶ 38.

In coordination with the DOH and National Guard, broad-based testing of the entire facility is ongoing.  As of June 21, 2021, three rounds of testing have been completed and a total of 672 tests have been conducted.  Broad-based testing

will continue in collaboration with DOH.  Higa Decl., ¶ 24.  A total of 167 inmates who tested positive have recovered.  Id. at ¶ 25.  Vaccination clinics are being held four times a week, specifically on Tuesdays through Fridays. Since the start of the HCCC outbreak, 65 inmates have been vaccinated.  Id. ¶ 27.

C.    The Conditions at HCCC

1.    The Holding Areas (*i.e.* "Dog Cages")

HCCC utilizes an indoor space next to the intake area to hold new inmates while they are being in-processed that is divided into several holding areas separated by chain-link fencing.  Mahoe Decl., ¶ 11.  New inmates are typically placed in this area for a few hours before they can be processed and assigned to a housing unit.  Id. at ¶ 12.  Inmates are not tested for COVID-19 before they are placed in the holding area, but once the intake process is complete, inmates are placed in 10-day intake quarantine to the extent that space, staffing, and security conditions allow.  Id. at ¶ 13.  Inmates in the holding area have controlled access to a bathroom in a nearby hallway and guards ensure they are provided with drinking water.  Id. at ¶ 15.  Inmates were occasionally placed in the holding area overnight due to limited housing space.  Id. at ¶ 14.  However, Deputy Director Tommy Johnson recently issued a directive on June 10, 2021 that inmates are not to be placed in the holding area overnight, which is now being enforced at HCCC.  Id.

2.      The Multi-Purpose Room (*i.e.* "Fishbowl")

HCCC often does not have sufficient physical space or facilities to completely quarantine new inmates for 10 days.  As an intermediate measure, HCCC had designated a multi-purpose room (*i.e.* "fishbowl") to hold new inmates where they could be monitored for COVID-19 symptoms and separated from the rest of the inmate population.  Mahoe Decl., ¶ 16.  Inmates in the multi-purpose room had controlled access to two toilets in an adjoining restroom.  Those toilets feed into the same sewer line as toilets in inmate cells in the same complex.  This line often becomes clogged due to inmates flushing improper items down their cell toilets or purposefully trying to clog the line.  Id. at ¶ 18.  As a result, HCCC maintenance staff is constantly unclogging toilets and the sewer line in this area. The bathroom is also regularly cleaned by workline inmates.  Additionally, cleaning supplies such as sanitizing spray are placed in the bathroom for inmates to use while cleaning the toilet after every use.  The multi-purpose room itself is cleaned every day by workline inmates and  inmates housed in the multi-purpose room are given supplies to clean the area themselves.  Id. at ¶ 19.  Inmates held in the multi-purpose room were not denied access to bathrooms; they were given regular access to toilet facilities.  Id. at ¶ 20.  Fresh drinking water is also readily-available to inmates in the multi-purpose room.  A large water jug is filled with water and ice at every meal, which can be replenished upon request.  Id. at ¶ 23.

### 3.   Social Distancing

Pursuant to HCCC's pandemic response plan, inmates are grouped together depending on their COVID-19 status.  There is insufficient space or staffing in the facility to maintain six feet of physical space around inmates while at the same time ensuring adequate security.  Groups that perform recreation time together, however, are cohorted according to their COVID-19 status so that the risk of widespread transmission in the facility is mitigated.  Mahoe Decl., ¶ 25.

### 4.   Inmate Education

HCCC Inmates are educated about the COVID-19 virus by viewing an educational video and through CDC educational and information posters that have been posted throughout the facility.  HCCC Health care staff also regularly educate inmates about COVID-19 and vaccination at medical and mental health visits, pill-pass, informational discussions, and other individual in-contact visits with inmates.  Higa Decl., ¶ 8. Inmates are encouraged and educated about COVID-19 vaccinations through informational fliers, posters, and counseling sessions with HCCC health care staff.  Medical and mental health staff are also available to address any questions and concerns.  Higa Decl., ¶ 21.

### 5.   PPE and Sanitization Products

All HCCC staff who come into contact with inmates were issued face shields, cloth masks, and N-95 masks (after the staff were medically-cleared, fitted,

and trained). Mahoe Decl., ¶ 26. Staff is constantly reminded to wear their masks. Id. at ¶ 28. The Warden makes an announcement over the radio at every shift change, makes spot checks of the facility, and admonish staff when necessary. Id. Staff have been directed to wear N-95 masks under certain conditions, such as when coming into close contact with inmates who have an active COVID-19, and only after the staff member has been trained on proper N-95 mask wearing and procedures. Id. at ¶¶ 29, 30. However, N-95 masks are in short supply and need not be worn by staff that do not come into close contact with inmates. Id. at ¶ 31.

Inmates are not given improperly "watered down" cleaning solutions. The cleaning solution used by inmates, "Husky 800 Neutral Disinfectant Cleaner", arrives at HCCC in concentrated form. Per the manufacturer's instructions, the concentrated cleaner must be diluted with water before use. Id. at ¶ 32. HCCC dilutes the cleaner at the ratio of two ounces of concentrate per one gallon of water per the manufacturer's instructions. HCCC also uses bleach at a ratio of one part bleach to 10 parts water. Id.

### 6.   Communication of COVID-19 Protocols

Every module within HCCC contains a copy of the facility's pandemic response plan. All ACOs are required to familiarize themselves with the plan. In particular, lieutenant watch commanders and ACO sergeants are responsible for

understanding the plan and for ensuring that their subordinate ACOs also understand the plan.  Mahoe Decl., ¶ 33.

## IV.   LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24, 129 S.Ct. 365 (2008).  Plaintiffs seeking a preliminary injunction "face a difficult task in proving that they are entitled to this 'extraordinary remedy.'"  Earth Island Inst. v. Carlton, 626 F.3d 462, 469 (9th Cir. 2010).  To succeed, a plaintiff must establish: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest.  Winter, 555 U.S. at 20.  "The standards for granting a TRO and a preliminary injunction are identical."  Smith v. H.C.F. Med. Unit D.P.S., No. CV 19-00600 JAO-KJM, 2020 WL 734468, at *3 (D. Haw. Feb. 13, 2020) (citing Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001)).

"The Ninth Circuit also employs a 'sliding scale' approach to preliminary injunctions, under which 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'"  Hsiao v. Stewart, No. CV 18-00502 JAO-KJM, 2021 WL 1113641, at *3 (D. Haw. Mar. 23, 2021) (quoting All. for the Wild Rockies v. Cottrell, 632

F.3d 1127, 1131 (9th Cir. 2011)).   Under this "serious questions" standard, the preliminary injunction factors are weighed "on a sliding scale, such that where there are only 'serious questions going to the merits'—that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." Id. (quoting Ramos v. Wolf, 975 F.3d 872, 887–88 (9th Cir. 2020).

Injunctions that command a defendant to perform an affirmative act (*i.e.* a mandatory injunction), as opposed to refraining from action, are particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party.   Anderson v. United States, 612 F.2d 1112, 1114 (9th Cir. 1979). "Mandatory injunctions are 'subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party,' or 'extreme or very serious damage will result.'" Kealoha v. Espinda, No. CV 20-00323 JAO-RT, 2020 WL 5602837, at *3 (D. Haw. Sept. 18, 2020) (citation omitted); see also Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015).

V.   ARGUMENT

   A.   Plaintiffs Have Not Shown a Likelihood of Success on the Merits of their Claims or "Serious Questions" Going to the Merits

Plaintiffs contend that Defendants have failed to implement precautions to prevent the spread of COVID-19 in the State's correctional facilities, which they

claim has facilitated the spread of COVID-19 amongst inmates and correctional staff.  Plaintiffs further allege that, as a result of these purported failures, the conditions of confinement at the State's correctional facilities put them at risk of being exposed to and contracting COVID-19, which is a violation of their rights under Eighth and/or Fourteenth Amendments to the United States Constitution.

As discussed below, Defendants have been proactive in adopting and implementing measures to prevent and control the spread of COVID-19 at the State's correctional facilities and in responding to COVID-19 outbreaks, including the recent outbreak at HCCC.  Plaintiffs have not shown a likelihood of success on the merits of their claims or that there are "serious questions" going to the merits and, for that reason alone, Plaintiffs' request for injunctive relief should be denied.

1.    The Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from punishment prior to an adjudication of guilt.  See Bell v. Wolfish, 441 U.S. 520, 534-35 (1979).  A pretrial detainee's conditions of confinement violate the Fourteenth Amendment if they amount to "punishment" in that the conditions are not reasonably related to a legitimate governmental objective or are excessive in relation to the legitimate governmental objective.  Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473-74 (2015).  A pretrial detainee must show "objective deliberate indifference" in order to succeed on a Fourteenth Amendment

claim.  Gordon v. County of Orange, 888 F.3d 1118, 1125 (9th Cir. 2018).

The Ninth Circuit has established a four-part test to determine objective deliberate indifference:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Gordon, 888 F.3d at 1125.  "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case."  Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016).

In the time since the onset of the COVID-19 pandemic, several courts have applied the Ninth Circuit's four-part test in analyzing whether conditions of confinement violated detainees' Fourteenth Amendment rights.[4]  In some of these cases, courts analyzed whether the plaintiffs had demonstrated a likelihood of success on the merits in ruling on motions for a preliminary injunction and/or

---

[4] Courts have generally analyzed claims that regarding inmates' risk of exposure to COVID-19 as challenging the conditions of confinement, rather than inadequate medical care.  See, e.g., Nelson v. Shinn, No. CV2100040PHXDJHJZB, 2021 WL 2018961, at *2 (D. Ariz. May 4, 2021), report and recommendation adopted, No. CV-21-00040-PHX-DJH, 2021 WL 2012696 (D. Ariz. May 20, 2021).

temporary restraining order.  See, e.g., Criswell v. Boudreaux, No. 120CV01048DADSAB, 2020 WL 7646405 (E.D. Cal. Dec. 23, 2020).  In other cases, courts analyzed the Fourteenth Amendment claims as part of the statutory screening that is required under 28 U.S.C. § 1915A(a).  See, e.g., Williams v. Dirkse, No. 121CV00047BAMPC, 2021 WL 2227636 (E.D. Cal. June 2, 2021).

What these cases teach is that the objective deliberate difference analysis turns on whether the officials' actions were objectively reasonable in addressing the risk posed by COVID-19 based on the information and knowledge available at the time and taking into consideration security and spacing constraints.  Objective deliberate indifference is not to be measured by whether officials were successful in averting the risk of COVID-19.  See Williams, 2021 WL 2227636, at *9 ("The key inquiry is not whether Defendants perfectly responded, complied with every CDC guideline, or whether their efforts ultimately averted the risk; instead, the key inquiry is whether they "responded reasonably to the risk.'"); Criswell, 2020 WL 7646405, at *18 ("The question is about what defendant has done to date, and whether those actions were objectively reasonable.").

In this case, the measures Defendants have taken to protect inmates from the risk of COVID-19 were objectively reasonable and demonstrate that they have been anything but indifferent to that risk.  Defendants recognized the risk that COVID-19 presented to its staff and incarcerated population as the virus began

spreading in the U.S. in early 2020.  Takenaka Decl., ¶ 6.  Even before COVID-19 was declared a pandemic, PSD began educating medical staff regarding the novel coronavirus and implemented measures to prevent the virus from entering its facilities, such as screening and no-touch temperature checks for all entrants.  Id. at ¶ 7.  PSD adopted its PRP on March 23, 2020 and has updated the plan several times to comport with CDC guidelines and scientific information.  Higa Decl., ¶ 4; Johnson Decl., ¶ 11; Takenaka Decl., ¶ 8.  As provided in the PRP, all PSD facilities conduct screening, temperature checks, provide masks, PPE, and sanitization and hygiene products, employ quarantine, cohorting, and medical isolation strategies, implement social distancing wherever feasible, conduct testing, provide inmate and staff education, and offer and encourage staff and inmates to receive the COVID-19 vaccines.  See Exhibit "A".  Indeed, courts have found that similar measures taken by corrections and detainment officials demonstrated that they did not disregard the risk of COVID-19.  See, e.g., Williams, 2021 WL 2227636, at *9 ("Plaintiff details the many measures implemented in order to protect the inmates from the risks of contracting COVID-19, including quarantine, isolation, masks, testing, reducing the jail population. Even if the response has been inadequate and an outbreak occurred, Defendants have not disregarded a known risk or failed to take any steps to address the risk.").

Plaintiffs have submitted declarations from inmates housed at HCCC, HCF, and WCF, as well as current and former staff at HCCC, which they claim show a failure to implement and enforce PSD's pandemic plans and policies at those facilities.  According to these declarants, this includes failures to separate inmates with positive COVID-19 test results from non-infected inmates at HCF and at HCCC, properly quarantine in intakes at HCCC, identify and protect older and medically vulnerable inmates and allow for adequate social distancing at HCF, WCF, and HCCC, and to enforce proper mask wearing by inmates and staff at WCF and HCCC.  ECF No. 6-1, PageID ## 151-58.  Defendants dispute these claims and have submitted declarations made by the wardens of these facilities that either contradict these claims or explain the conditions under which permissible deviation from CDC guidelines was required.  See generally Mahoe Decl.; Ornellas Decl.; Harrington Decl.  Moreover, much of what Plaintiffs claim are Fourteenth Amendment violations simply are not.  For example, an inability to socially distance from other detainees does not state a cognizable Fourteenth Amendment claim.  Ulep v. Dep't of Pub. Safety, No. CV 20-00532 JAO-KJM, 2020 WL 7322723, at *3 (D. Haw. Dec. 11, 2020) (citing Gay v. California, No. 2:20-cv-1276 AC P, 2020 WL 3839805, at *3 (E.D. Cal. July 8, 2020)).

Yet, even if this Court were to find that Plaintiffs' evidence is credible, occasional lapses in compliance by PSD staff is not evidence of objective

deliberate indifference on the part of prison officials.  <u>See</u>, <u>e.g.</u>, <u>Criswell</u>, 2020 WL 7646405, at *20 (noting that although there was undisputed evidence that the sheriff's "intake and observation policies were not followed," the court concluded that "these occurrences, whether they be due to mistake or carelessness, do not rise to the level of reckless disregard."); <u>Avendano v. Asher</u>, No. C20-0700JLR-MLP, 2020 WL 7427058, at *9 (W.D. Wash. Dec. 18, 2020) ("it appears Respondents have implemented intentional procedures, including the requirement for staff to wear masks, to prevent the spread of COVID-19.  The court cannot find at this time that reports of some individuals' failure to follow procedures render Respondents' measures unreasonable or make the conditions as NWIPC so unsafe as to constitute a violation of Petitioners' constitutional rights."); <u>Lucero-Gonzalez v. Kline</u>, No. CV-20-00901-PHX-DJH (DMF), 2020 WL 2987002, at *10 (D. Ariz. June 2, 2020) ("Although there may be instances in which Defendants' policies have not been *followed* — such as lack of cleaning supplies or inconsistent cleaning, or where the detainees themselves do not practice social distancing or wear their masks — this does not reflect that the policies *themselves* are objectively insufficient.") (emphasis in original).

Plaintiffs have failed to meet their high burden of demonstrating a likelihood of success on the merits of their Fourteenth Amendment claim.  Failure to satisfy this <u>Winter</u> factor is reason alone to deny Plaintiffs' request for injunctive relief.

See California by & through Becerra v. Azar, 950 F.3d 1067, 1083 (9th Cir. 2020) ("The first factor—likelihood of success on the merits—'is the most important' factor.").  Yet, even taking the remaining Winter factors into consideration, it is evident that the extraordinary relief Plaintiffs seek is inappropriate.

    2.  The Eighth Amendment

  The Eighth Amendment's protection against "cruel and unusual punishments" applies to convicted offenders serving their sentences in prison.  See Ingraham v. Wright, 430 U.S. 651, 668 (1977).  The Amendment requires prison officials to "provide humane conditions of confinement."  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  Prison officials have a duty to provide prisoners with the basic necessities of life, including adequate shelter, food, clothing, sanitation, medical care, and personal safety.  Id.

  "In general, a prison official violates the Eighth Amendment only when two requirements are satisfied: (1) the deprivation alleged must be, objectively, 'sufficiently serious,' and (2) the official must have acted with 'deliberate indifference' to inmate health or safety."  Gouveia v. Jackie M., No. CV 20-00342 JAO-RT, 2021 WL 900553, at *4 (D. Haw. Mar. 9, 2021) (citing Farmer, 511 U.S. at 834).  A deprivation is "sufficiently serious" only if a prison official's act or omission results in the denial of "the minimal civilized measure of life's necessities."  Lopez v. Smith, 203 F.3d 1122, 1132–33 (9th Cir. 2000).

"Deliberate indifference" requires that a prison official know of and disregard an excessive risk to the inmate. Id. at 837; Estelle v. Gamble, 429 U.S. 97, 104 (1976). The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. Farmer, 511 U.S. at 837. Essentially, the official must be "recklessly disregarding" a substantial risk of harm. Id. at 836.

An inmate must first establish that the alleged deprivation was objectively "sufficiently serious" in order to prevail on an Eighth Amendment claim.  As with Fourteenth Amendment claims, several courts analyzing the objective element of an Eighth Amendment claim have likewise held that the key inquiry is whether officials responded reasonably.  See, e.g., Plata v. Newsom, 445 F. Supp. 3d 557, 568 (N.D. Cal. 2020) ("the question before the Court is not what it thinks is the best possible solution [to the challenge COVID-19 presents in a prison setting]. Rather, the question is whether Defendants' actions to date are reasonable.").

As discussed in the preceding section, PSD's response to the COVID-19 has been objectively reasonable.  PSD not only adopted a PRP at the outset of the COVID-19 pandemic, they updated the PRP as information has changed.  The PRP provides for numerous measures to protect inmates from the threat of COVID-19, including screening and testing, education, sanitation, providing inmates and staff with PPE, and making vaccines available for all staff and inmates.  PSD also

marshaled personnel and directed resources to quell outbreaks when they have occurred, including the recent outbreak at HCCC, often in the face of staffing, spacing, and other challenges.  Indeed, the institutional constraints prison officials are required to address must be considered when evaluating whether the officials' response to the risk of COVID-19 was objectively reasonable.   See Booth v. Newsom, No. 2:20-CV-1562 AC P, 2020 WL 6741730, at *3 (E.D. Cal. Nov. 17, 2020), report and recommendation adopted, No. 220CV1562JAMACP, 2020 WL 7632211 (E.D. Cal. Dec. 22, 2020) ("both the current efforts of prison officials to reduce COVID-19 exposure to prisoners, and the institutional constraints in meeting specific goals, must be considered in assessing whether a defendant's response to the COVID-19 pandemic is objectively unreasonable.").   Plaintiffs have, therefore, failed to satisfy the first requirement necessary to show a likelihood of success on their Eighth Amendment claim.

Plaintiffs also have not satisfied the subjective deliberate indifference requirement.  Plaintiffs appear to argue that the fact that outbreaks have occurred at PSD' facilities is itself evidence that Defendants have acted with deliberate indifference.  In other words, Plaintiffs claim that even if there is no fault with Defendants' policies, Defendants' alleged failure to implement and enforce those policies lead to COVID-19 outbreaks.  However, the mere fact that outbreaks have occurred does not demonstrate deliberate indifference.  See Maney v. Brown, 464

F. Supp. 3d 1191, 1211 (D. Or. 2020) ("The issue before the Court is not whether ODOC's policies or implementation of those policies has been perfect. On the contrary, the Court must determine if Defendants have acted with indifference to the risks of COVID-19."); Farmer, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").   Many courts throughout the country that have evaluated Eighth Amendment claims stemming from COVID-19 have held similarly.[5]

Plaintiffs have supplied declarations purporting to attest to instances where the PRP has not been enforced or fully implemented at certain facilities.   However, instances of lapses by individuals in implementing COVID-19 policies is not proof of deliberate indifference.   Chunn v. Edge, 20-cv-1590 (RPK) (RLM), 2020 WL 3055669, at *23-*28 (E.D.N.Y. June 9, 2020) ("Shortfalls in the immediate implementation of guidelines this complex and resource-intensive do not suggest

---

[5] See, e.g., Wilson v. Williams, 961 F.3d 829, 841 (6th Cir. 2020) ("while the harm imposed by COVID-19 on inmates at Elkton ultimately [is] not averted, the [Bureau of Prisons] has responded reasonably to the risk and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights."); Valentine v. Collier, 956 F.3d 797, 802-03 (5th Cir. 2020) (plaintiffs lacked evidence of the defendants' "subjective deliberate indifference"); Swain v. Junior, 958 F.3d 1081, 1089 (11th Cir. 2020) ("Accepting, as the district court did, that the defendants adopted extensive safety measures such as increasing screening, providing protective equipment, adopting social distancing when possible, quarantining symptomatic inmates, and enhancing cleaning procedures, the defendants' actions likely do not amount to deliberate indifference.").

knowing disregard of a substantial risk of harm."); <u>Swain v. Junior</u>, 958 F.3d 1081, 1089 (11th Cir. 2020) (Even if social-distancing was "not uniformly enforced," there was "no finding that the defendants are ignoring or approving the alleged lapses in enforcement of social-distancing policies, so these lapses in enforcement do little to establish that the defendants were deliberately indifferent.").

As several courts have recognized and the CDC itself acknowledges, conditions at correctional facilities often make it challenging, if not impossible, to fully comply with CDC guidelines.  <u>See</u>, <u>e.g.</u>, <u>Mays v. Dart</u>, 453 F. Supp. 3d 1074, 1095 (N.D. Ill. 2020) ("Though the existing situation likely increases the risk to detainees, the CDC's guidance expressly recognizes that complete social distancing may not be possible in the sleeping areas of a jail.").  In particular, several courts have found that providing less than 6 feet of social distancing is not evidence of deliberate indifference.[6]

The cases Plaintiffs rely on to contend that Defendants were deliberately indifferent are easily distinguished from this case.  In <u>Cameron v. Bouchard</u>, No. 20-cv-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020), the court found that plaintiffs were likely to succeed on the merits of their claim alleging that jail

---

[6] <u>See</u> <u>Plata</u>, 445 F. Supp. 3d at 563-64 (finding that where defendants did not implement social distancing, they were not deliberately indifferent because they "implemented several measures to promote increased physical distancing, including reducing the population"); <u>Maney</u>, 464 F. Supp. 3d at 1211; <u>Wragg v. Ortiz</u>, 462 F. Supp. 3d 476, 509 (D. N.J. 2020); <u>Swain</u>, 958 F.3d at 1089.

conditions violated their Eighth Amendment rights because the allegations reflected that the county had not "imposed even the most basic safety measures recommended by health experts, the Centers for Disease Control and Prevention, and Michigan's Governor to reduce the spread of COVID-19 in detention facilities." Moreover, the Sixth Circuit Court of Appeals later granted defendants' motion to stay the injunction finding that the plaintiffs were "unlikely to succeed on the merits of their Eighth and Fourteenth Amendment claims." Cameron, 818 F. App'x at 395–96. In Castillo v. Barr, 449 F. Supp. 3d 915, 922 (C.D. Cal. 2020), the court addressed claims brought at the outset of the pandemic in March 2020 by civil detainees alleging that conditions of confinement violated their Fifth Amendment finding they were "entitled to more considerate treatment than criminal detainees." And although the court in Criswell v. Boudreaux, No. 120CV01048DADSAB, 2020 WL 5235675 (E.D. Cal. Sept. 2, 2020) granted in part the plaintiffs' motion for temporary restraining order in September 2020, it found in December 2020 that plaintiffs were not entitled to injunctive relief because circumstances had since changed. Criswell, 2020 WL 7646405, at *18.

As discussed above, PSD's actions demonstrate that it understood the risk of harm that COVID-19 presented and that it responded reasonably to that risk, even though outbreaks have occurred. With respect to the COVID-19 outbreak at HCCC, PSD has worked to contain the outbreak and alleviate the overcrowding by

reducing the inmate population by way of transfers to other facilities, inmate releases, and coordinating the reduction of inmates into the facility in the first instance. Mahoe Decl., ¶ 9; Johnson Decl., ¶¶ 34-35, 40. Since June 10, 2021, inmates are no longer being housed in the holding cages (*i.e.* "dog cages) and, as of June 22, 2021, the multi-purpose room (*i.e.* "fishbowl") inmate population has been reduced to approximately 14 inmates, with the intention of discontinuing its use as a housing unit once additional inmates have been transferred from HCCC to other facilities. Mahoe Decl., ¶¶ 14, 24; Johnson Decl., ¶ 38. Further, inmates in the multi-purpose room have regular access to toilets, and are provided drinking water, PPE, and sanitization and hygiene products. Mahoe Decl., ¶ 18, 20, 23.

Plaintiffs have not shown a likelihood of success on the Eighth Amendment claim. As such, the Court should find that the relief Plaintiffs' seek is not warranted. See Garcia, 786 F.3d at 740 ("Because it is a threshold inquiry, when 'a plaintiff has failed to show the likelihood of success on the merits, we 'need not consider the remaining three [Winter elements].'") (quoting Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris, 729 F.3d 937, 944 (9th Cir. 2013)). Yet, even if the Court considers those factors, they weigh in Defendants' favor.

B. Plaintiffs Will Not Suffer Irreparable Harm in the Absence of Preliminary Relief

"At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." Bannister v. Ige, No. CV

20-00305 JAO-RT, 2020 WL 4209225, at *8 (D. Haw. July 22, 2020) (quoting

Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)

(citation omitted)).   "As a prerequisite to injunctive relief, 'a plaintiff must

*demonstrate* immediate threatened injury'; a speculative injury is not irreparable."

Id. (quoting Caribbean Marine, 844 F.2d at 674).

Importantly, Plaintiffs have not come forward with any evidence

demonstrating that a COVID-19 outbreak at any PSD facility is imminent.  Even if

the evidence offered by Plaintiffs was sufficient to show that a future COVID-19

outbreak is possible, it does not establish that it is likely.  As such, Plaintiffs have

failed to show that they will suffer irreparable harm in the absence of injunctive

relief because the mere possibility of irreparable harm is insufficient to satisfy the

requirements for injunctive relief.   Winter, 555 U.S. at 22.   Moreover, as the

Eleventh Circuit Court of Appeals found, an injunction that transfers to

administration of a correctional facility to a court, which is what Plaintiffs seek

here, "amounts to an irreparable harm."  Swain, 958 F.3d at 1090.

C.   The Balance of Equities/ Public Interest Weigh in Defendants' Favor[7]

The Ninth Circuit held that an "injunction should, to the extent possible,

reflect the scientific evidence about COVID-19 presented to [a] district court" and

"should stem from medical evidence properly before the court."  Roman v. Wolf,

[7] "When the government is a party, [the] last two factors merge."  Drakes Bay
Oyster Co. v. Jewell, 747 F.3d 1073, 1092 (9th Cir. 2014)

977 F.3d 935, 946 (9th Cir. 2020).  Plaintiffs have failed to provide this Court with the evidence necessary to order the relief Plaintiffs seek.  Further, PSD has already implemented many of the measures Plaintiffs are asking this Court to direct it to do.  PSD already, for instance, identifies "high risk" inmates, provides adequate PPE, including masks, and developed a comprehensive plan to vaccinate inmates and provide vaccine education.  Moreover, Plaintiffs have not submitted any evidence showing that additional measures, such as requiring six feet of social distancing between all individuals at all times, is supported by medical evidence.

The balance of equities and public interest weighs against ordering the injunctive relief Plaintiffs seek because it "would implicate important federalism and separation of powers concerns."  Maney, 464 F. Supp. 3d at 1217 (recognizing that the "ODOC is run by correctional experts with many years of experience and in-depth knowledge, and court involvement runs the risk of disrupting ODOC's current COVID-19 response.").  Indeed, in Roman, where the Ninth Circuit vacated an injunction order issued after a COVID-19 outbreak at an immigration detention center and remanded the case to the district court "to assess what relief current conditions may warrant," the Court cautioned the district court against "micromanag[ing]" and "wad[ing] into facility administration at a granular level beyond what is required to remedy the constitutional violation identified."  977 F.3d at 946; see also Wilson, 2021 WL 880397, at *4.  That is precisely the type of

relief Plaintiffs seek here. As this Court has observed, "[d]istrict courts should exercise caution in issuing injunctive orders and avoid becoming 'enmeshed in the minutiae of prison operations.'" Kealoha, No. CV 20-00323 JAO-RT, 2020 WL 5602837, at *3 (quoting Farmer, 511 U.S. at 846–47).

VI.    CONCLUSION

For all of these reasons, Defendants respectfully request that this Court deny Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order.

DATED:  Honolulu, Hawaii, June 23, 2021.

STATE OF HAWAII

CLARE E. CONNORS
Attorney General
State of Hawaii

/s/ Skyler G. Cruz
CARON M. INAGAKI
KENDALL J. MOSER
SKYLER G. CRUZ
Deputy Attorneys General

Attorney for Defendants
STATE OF HAWAII,
DEPARTMENT OF PUBLIC
SAFETY, DAVID Y. IGE, JOSH
GREEN, NOLAN ESPINDA, and
MAX N. OTANI