# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTHONY CHATMAN, FRANCISCO ALVARADO, ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>MAX N. OTANI, Director of State of Hawaiʻi, Department of Public Safety, in his official capacity,<br><br>    Defendant. | CIVIL NO. 21-00268 JAO-KJM<br><br>ORDER (1) GRANTING PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER |

## ORDER (1) GRANTING PLAINTIFFS' MOTION FOR PROVISIONAL CLASS CERTIFICATION AND (2) GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

This putative class action concerns the alleged conditions in Hawaii's prisons and jails that have contributed to multiple COVID-19 outbreaks. Plaintiffs Anthony Chatman ("Chatman"), Francisco Alvarado ("Alvarado"), Zachary Granados ("Granados"), Tyndale Mobley ("Mobley"), and Joseph Deguair ("Deguair") (collectively, "Plaintiffs") contend that the Department of Public Safety ("DPS"), headed by Defendant Max Otani ("Defendant"), has mishandled

the pandemic and failed to implement its Pandemic Response Plan ("Response Plan") in violation of their Eighth and Fourteenth Amendment rights. Plaintiffs seek provisional class certification and request a temporary restraining order and preliminary injunction; namely, the appointment of a special master to oversee the development and implementation of Plaintiffs' proposed response plan. For the following reasons, the Court GRANTS Plaintiffs' Motion for Provisional Class Certification ("Class Certification Motion"), ECF No. 20, and GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order ("Injunction Motion"). ECF No. 6.

Defendant is ORDERED to immediately implement and *adhere* to DPS's Response Plan at all eight DPS facilities and comply with the specific conditions outlined herein.

## BACKGROUND

### I.     Factual History[1]

Hawaii's state prisons and jails have been plagued by COVID-19 outbreaks at five of its eight facilities, resulting in the infection of more than 50% of the inmate population (1,532 inmates out of a population of approximately 3,000) and 272 DPS staff, and seven deaths. ECF No. 18 ("SAC") ¶¶ 1–2, 113–14; *see also*

---

[1]  The facts are from the Second Amended Class Action Complaint for Injunctive Relief and Declaratory Judgment ("SAC"), unless otherwise indicated.

http://dps.hawaii.gov/blog/2020/03/17/coronavirus-covid-19-information-and-resources/ (last visited July 13, 2021).

The first outbreak occurred at Oahu Community Correctional Center ("OCCC") in August 2020, and to date, OCCC has had 452 cases of COVID-19. SAC ¶ 102.

In November 2020, Waiawa Correctional Facility ("Waiawa") experienced an outbreak, causing 90% of the inmate population to contract COVID-19. *Id.* ¶ 103. During the outbreak, dirty clothes from Waiawa were laundered at Halawa Correctional Facility ("Halawa") by inmates and staff, and Halawa staff were forced to work at Waiawa due to staff shortages there. *Id.* ¶ 104. These practices resulted in an outbreak at Halawa, where 544 inmates became infected and seven died from COVID-19. *Id.* ¶ 105.

In March 2021, an outbreak at Maui Community Correctional Center ("MCCC") resulted in 100 inmate COVID-19 infections, which represents one-third of MCCC's inmate population. *Id.* ¶ 106.

The most recent outbreak occurred at Hawaiʻi[2] Community Correctional Center ("HCCC"), beginning in late May 2021. *Id.* ¶ 107. Within three weeks,

---

[2] Plaintiffs misidentify this as Hilo Correctional Community Center. SAC ¶ 4.

two-thirds of the inmate population contracted COVID-19.  *Id.*  Twenty DPS staff and 228 pretrial detainees tested positive for COVID-19 during this period.[3]  *Id.* ¶ 5.  Plaintiffs attribute this rapid and extensive spread to the allegedly unsanitary conditions in holding areas at HCCC, most notably a room known as the "fishbowl."  *Id.*  The fishbowl is approximately 31.5 feet by 35.3 feet[4] and 40 to 60 pretrial detainees have been housed there, with no toilet or running water, causing detainees to urinate and sometimes defecate in the room.  *Id.* ¶¶ 5–6; ECF No. 22-2 ¶ 38.

### A.     Plaintiffs

Plaintiffs are currently incarcerated or detained at DPS correctional facilities in Hawaiʻi.

### 1.     Anthony Chatman

Chatman has been incarcerated at Halawa since July 2019.  SAC ¶ 123. While Chatman was housed in module 4A-2 in December 2020, two inmates who tested positive for COVID-19 were placed in his quad, then-designated a COVID-negative quad, and allowed to mingle with other inmates in the quad without masks.  *Id.* ¶¶ 124, 127–28.  Nearly all inmates in the quad tested positive for

---

[3]  Defendant does not dispute these figures.

[4]  The SAC identifies the dimensions as 30 feet by 30 feet.  SAC ¶ 5.

COVID-19 shortly thereafter, including Chatman's roommate. *Id.* ¶ 129.

Chatman's roommate nevertheless remained in their cell, and Chatman then

contracted COVID-19. *Id.* ¶¶ 130–31. He too stayed in the cell, "sick as a dog,"

without receiving meaningful medical treatment. *Id.* ¶ 131. Chatman claims that

upon his departure from his cell, it was not cleaned before the next occupant

moved in. *Id.* ¶ 132.

Chatman filed a grievance after contracting COVID-19 and appealed each

denial to exhaust his administrative remedies. *Id.* ¶¶ 133–34. Despite the COVID-

19 outbreak at Halawa, Chatman has yet to see any social distancing practices —

during recreation and dining, or in the common areas and cells — and reports that

60 people eat shoulder to shoulder in an approximately 400 square foot room. *Id.*

¶¶ 135–36.

## 2. Francisco Alvarado

Alvarado, a 52 year old inmate with lupus, was previously incarcerated at

Halawa from 2019 to March 2021, and is currently incarcerated at Kulani

Correctional Facility ("Kulani"). *Id.* ¶¶ 137–40. At Halawa, Alvarado was a

module clerk who prepared paperwork for inmates' movement within the facility

and delivered meals to cells. *Id.* ¶ 141. He witnessed inmates remaining in their

cells after testing positive for COVID-19, comingling of COVID-positive inmates

with asymptomatic inmates, and transfer of asymptomatic inmates into unsanitized

cells previously occupied by COVID-positive inmates. *Id.* ¶ 142. During meal deliveries, Alvarado was exposed to COVID-positive inmates, who were not forced to wear masks, through "open screen" cell doors. *Id.* ¶ 143.

When Alvarado contracted COVID-19 in December 2020, he requested medical assistance but received little to none. *Id.* ¶¶ 144, 146. His underlying medical condition caused him to sustain serious damage to his kidneys. *Id.* ¶ 145. Alvarado filed a grievance regarding the conditions that caused him to contract COVID-19 but he never received a response. *Id.* ¶¶ 146, 148–49. He was initially informed that the COVID-19 outbreak created a backlog of grievances and was instructed to file another grievance. *Id.* ¶ 150. However, between January and March 2021, he was repeatedly told that no grievance forms were available. *Id.* ¶¶ 151–53.

### 3. Joseph Deguair

Deguair, an asthmatic, has been incarcerated at HCCC since December 4, 2020. *Id.* ¶¶ 154–55. Before the May 2021 COVID-19 outbreak at HCCC, Deguair noticed an absence of mitigation efforts to prevent the spread of COVID-19. *Id.* ¶ 157. For example, he reports seeing symptomatic detainees housed with those who had not been tested for COVID-19, and social interaction between COVID-positive detainees and the general population during recreation time. *Id.* ¶¶ 157–59.

Due to these conditions, Deguair requested an inmate grievance form almost every day during the last two weeks of May to file a grievance.  *Id.* ¶ 160. Multiple Adult Corrections Officers ("ACOs") told Deguair there were no forms and that he could not file a grievance.  *Id.* ¶¶ 161–62.  Since testing positive for COVID-19 on June 1, 2020, Deguair has requested a grievance form daily, only to be told none were available.  *Id.* ¶¶ 163–64.  ACOs told Deguair that there was nothing they could do to help him obtain a form or file a grievance.  *Id.* ¶¶ 165, 167.  Even when he attempted to file a grievance by phone, he was told during the call that he could not file a grievance and would have to wait.  ECF No. ¶ 166.

### 4.    **Tyndale Mobley**

Mobley received a COVID-19 vaccine prior to his incarceration at HCCC. *Id.* ¶¶ 168, 170.  COVID-positive inmates were initially contained within the main HCCC building, though staff moved freely without masks between the main building and the unit housing Mobley.  *Id.* ¶¶ 172–73.  Mobley once confronted a guard who returned from the main building without a mask, and she responded that she did not want or need to wear a mask.  *Id.* ¶ 174.  This guard contracted COVID-19.  *Id.* ¶ 174.b.

At the beginning of June 2021, two inmates with COVID-19 were housed in Mobley's cell block.  *Id.* ¶ 175.  Two additional COVID-positive inmates were moved into the cell block and the four infected inmates were instructed to stay on

the opposite end of the room from the non-infected inmates. *Id.* ¶ 176. Nearly all the inmates in the cell block then contracted COVID-19. *Id.* ¶ 177. Mobley and the COVID-positive inmates shared restroom facilities and he saw no efforts by staff to sanitize the facilities. *Id.* ¶¶ 178–79.

Mobley attempted to file grievances every day starting in late May or early June 2021, but the guards said they had no grievance forms and that there was no way to file a grievance. *Id.* ¶¶ 180–82, 184–85. Mobley was diagnosed with COVID-19 on June 6, 2021. *Id.* ¶ 183.

### 5. Zachary Granados

Granados has been incarcerated at Waiawa since August 2020. *Id.* ¶ 186. In November 2020, certain inmates housed in Waiawa's building 9 displayed COVID-19 symptoms. *Id.* ¶ 188. Upon testing positive in the medical unit, they returned to building 9, where nearly every inmate later contracted COVID-19. *Id.* ¶ 188.a–c. Around the same time, inmate kitchen workers contracted COVID-19 so Granados, along with other inmates from building 10, filled in for the COVID-positive kitchen workers. *Id.* ¶¶ 187, 189.a. The kitchen was not sanitized before the building 10 inmates stepped in, and four days later, one of those inmates tested positive for COVID-19. *Id.* ¶ 189.b–c.

Guards in building 9 wore "hazardous materials" suits because building 9 housed the COVID-positive inmates. *Id.* ¶ 190. Granados saw the guards wear these suits into building 10 to conduct head counts. *Id.* ¶ 191.

Approximately 30 COVID-positive inmates were transferred to building 10 from other buildings in mid-November 2020, after which Granados contracted COVID-19. *Id.* ¶¶ 192–93. Granados was bedridden for one week as a result. *Id.* ¶ 194.

In early December 2020, Granados filed a grievance regarding Waiawa's conditions, followed by appeals after receiving responses. *Id.* ¶¶ 195–96.

## B. DPS's Management of COVID-19

In addition to the facilities housing Plaintiffs, DPS operates and manages Kauai Community Correctional Center ("KCCC"), MCCC, OCCC, and the Women's Community Correctional Center ("WCCC"). *Id.* ¶ 43. Plaintiffs allege that Defendant has mishandled and failed to manage outbreaks at its facilities notwithstanding its Response Plan, which has been in place since March 2020. *Id.* ¶ 83. In particular, Plaintiffs identify the following deficiencies: (1) housing up to 60 residents/detainees in a single room; (2) failure to provide adequate water; (3) failure to provide sanitary living conditions or proper hygiene; (4) failure to separate COVID-positive inmates; (5) failure to properly quarantine new intakes; (6) failure to communicate with DPS staff and inmates regarding proper COVID-

19 protocols; (7) failure to protect elderly and medically vulnerable inmates; (8) failure to allow adequate social distancing; (9) failure to provide personal protective equipment or enforce proper mask wearing; and (10) failure to consistently or adequately evaluate, monitor, and treat inmates with COVID-19 symptoms. *Id.* ¶¶ 92–122.

Plaintiffs propose the following classes and subclasses:

> **Post-Conviction Class**: All present and future sentenced prisoners incarcerated in a Hawai'i prison.
>
> Post-Conviction Medical Subclass: Includes all present and future Post-Conviction Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC. *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.
>
> **Pretrial Class**: All present and future pretrial detainees incarcerated in a Hawai'i jail.
>
> Pretrial Medical Subclass: Includes all present and future Pretrial Class members whose medical condition renders them especially vulnerable to COVID-19 as determined by guidelines promulgated by the CDC. *See* U.S. Centers for Disease Control and Prevention, *People Who Are At Higher Risk* (last viewed June 9, 2021) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

*Id.* ¶ 198.

## II.    Procedural History

Plaintiffs initiated this action on April 28, 2021, in the Circuit Court of the First Circuit, State of Hawaiʻi.  ECF No. 1-1.  On June 8, 2021, Defendants and the other originally named defendants removed the action.  ECF No. 1.  Plaintiffs immediately filed a First Amended Class Action Complaint for Injunctive Relief and Declaratory Judgment ("FAC") and the Injunction Motion.  ECF Nos. 5–6.

On June 18, 2021, Plaintiffs filed a Supplement to the Injunction Motion. ECF No. 14.

On June 22, 2021, Plaintiffs filed the SAC pursuant to a stipulation entered into by the parties and approved by Magistrate Judge Kenneth J. Mansfield.  ECF Nos. 17–18.  The SAC asserts three causes of action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2241:  unconstitutional punishment in violation of the Fourteenth Amendment (Count One), unconstitutional conditions of confinement in violation of the Fourteenth Amendment (Count Two), and unconstitutional conditions of confinement in violation of the Eighth Amendment (Count Three).  SAC ¶¶ 209–44.  The first claim applies to the pretrial subclass, the second claim applies to the pretrial class, and the third claim applies to the post-conviction subclass.  *Id.* at 53, 57, 59.

Plaintiffs request injunctive relief to require Defendant to implement the following response plan ("Proposed Response Plan"):

a. Physically distance all residents from one another and staff within DPS correctional facilities, which imposes at least six feet of distance between individuals at all times;

b. Provide all residents in DPS custody sanitary living conditions (*i.e.*, ensure regular access to a working toilet, sink, and drinking water);

c. Identify residents who may be high-risk for COVID-19 complications, in accordance with guidelines from the CDC, and prioritize these individuals for medical isolation or housing in single cells;

d. On a daily basis, thoroughly and professionally disinfect and sanitize the DPS correctional facilities;

e. Provide hygiene supplies that are not watered down, including supplies to wash hands and disinfect common areas, to inmates at all times and free of charge;

f. Implement policies and procedures requiring that common areas be disinfected between uses;

g. Provide adequate personal protection equipment and sanitizer, including but not limited to masks, to all staff members and residents (and ensure that these materials are replaced at least every third day);

h. Implement a testing procedure to identify residents who are possibly carrying COVID-19, including testing to identify asymptomatic carriers and those with one or more symptoms of COVID-19;

i. Implement a quarantine and isolation procedure that is in line with CDC guidelines for all individuals exposed to COVID-19 and new intakes to DPS correctional facilities;

j. Take particularly heightened precautions with respect to food handling and delivery, such as ensuring that people who come into contact with food are not displaying any potential

symptoms of COVID-19, have not recently been in contact with people displaying potential symptoms of COVID-19, and people who come into contact with food wear appropriate personal protective equipment at all times when in contact with food;

k. Provide regular, accurate, up-to-date educational and informational memorandum to DPS staff and inmates regarding the status of how COVID-19 is affecting the facility, including what measures employees and inmates must take in the event of an outbreak;

l. Develop comprehensive plans to educate and promote COVID-19 vaccination for all DPS residents and staff and ensure residents are provided regular access to vaccines; []

m. Prohibit DPS employees from restricting access to inmate grievance forms or from preventing the submission of grievances, and prohibit retaliation against any DPS employee or inmate for making complaints or filing grievances regarding conditions or practices in DPS facilities that promote the spread of COVID-19[; and]

n. In accordance with CDC guidelines, ensure that medical isolation of inmates with COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice. This includes making efforts—where feasible—to provide similar access to radio, TV, reading materials, personal property, and the commissary as would be available in regular housing units.

*Id.* at 61–64.

Plaintiffs pray for certification of the proposed classes and subclasses, entry of judgment declaring Defendant's practices and actions violated the Constitution, entry of an order requiring Defendant to execute the Proposed Response Plan,

appointment of a special master to oversee the development and implementation of the Proposed Response Plan, and attorneys' fees and costs. *Id.* at 65.

Defendant filed his Opposition and Plaintiffs filed their Reply to the Injunction Motion on June 23 and 25, 2021, respectively. ECF Nos. 22, 26. On June 28, 2021, Defendant filed his Opposition to the Class Certification Motion. ECF No. 28. Plaintiffs filed their Reply on July 1, 2021. ECF No. 29.

The Court held a hearing on the Injunction Motion and Class Certification Motion on July 8, 2021. ECF No. 35.

## LEGAL STANDARDS

### I. Class Certification

Provisional class certification may be granted for the purposes of preliminary injunction proceedings. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020) (citation omitted). "Class actions are 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 784 (9th Cir. 2021) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). As such, Federal Rule of Civil Procedure ("FRCP") 23 "imposes 'stringent requirements' for class certification." *Id.* (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013)). "The party seeking class certification has the burden of affirmatively demonstrating that the class meets the

requirements of Federal Rule of Civil Procedure 23." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (citation omitted). "[T]he failure of any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975) (citation omitted). A party requesting class certification must *first* satisfy FRCP 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements.[5] *See Olean*, 993 F.3d at 784 (citing *Leyva v. Medline Indus.*, 716 F.3d 510, 512 (9th Cir. 2013); Fed. R. Civ. P. 23(a)).

If all four of these prerequisites are met, Plaintiffs must then "satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33. Pertinent here, the Court can certify an FRCP 23(b)(2) class if "the party

---

[5] FRCP 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

"When considering whether to certify a class, it is imperative that district courts 'take a close look at whether common questions predominate over individual ones'" and "perform a 'rigorous analysis' to determine whether this exacting burden has been met before certifying a class."  *Olean*, 993 F.3d at 784 (citations omitted).  "Courts must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits."  *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).  However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  Such inquiries "may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* (citations omitted).

## II.     Temporary Restraining Order/Preliminary Injunction

The standards governing temporary restraining orders ("TRO") and preliminary injunctions are "substantially identical."  *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (citation omitted); *see Kaiser Found. Health*

*Plan, Inc. v. Queen's Med. Ctr., Inc.*, 423 F. Supp. 3d 947, 951 n.1 (D. Haw. 2019).

FRCP 65(a) allows courts to issue preliminary injunctions. "[The] purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (alterations in original) (internal quotation marks and citation omitted).

To obtain preliminary injunctive relief, a plaintiff must establish: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Where, as here, the government is a party, the last two factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

Mandatory injunctions ordering affirmative action by a defendant, go "well beyond simply maintaining the status quo . . . [and are] particularly disfavored." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.

1979), *as amended* (1980)).[6]  Mandatory injunctions, are "subject to a higher

standard than prohibitory injunctions," but "are permissible when 'extreme or very

serious damage will result' that is not 'capable of compensation in damages,' and

the merits of the case are not 'doubtful.'"  *Hernandez v. Sessions*, 872 F.3d 976,

999 (9th Cir. 2017) (citation omitted).  "The court's finding of a strong likelihood

that plaintiffs would succeed on the merits of their claims also evidences a

conclusion that the law and facts clearly favor plaintiffs, meeting the requirement

for issuance of a mandatory preliminary injunction."  *Katie A., ex rel. Ludin v. Los

Angeles County*, 481 F.3d 1150, 1157 (9th Cir. 2007) (citation omitted).

District courts should exercise caution in issuing injunctive orders and avoid

becoming "enmeshed in the minutiae of prison operations."  *Farmer v. Brennan*,

511 U.S. 825, 846–47 (1994) (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

Where appropriate, courts may exercise their discretion "by giving prison officials

time to rectify the situation before issuing an injunction."  *Id.* at 847.

## DISCUSSION

## I.     Class Certification

Plaintiffs request provisional certification of their proposed classes and

subclasses for the purposes of their requested preliminary injunctive relief and ask

---

[6]  In contrast, a "prohibitory injunction prohibits a party from taking action and 'preserves the status quo pending a determination of the action on the merits.'" *Marlyn Nutraceuticals*, 571 F.3d at 878–79 (brackets and citations omitted).

that they be appointed as class representative and that their counsel be appointed as class counsel. ECF No. 20-1 at 7, 8. They argue that class certification is appropriate because they satisfy the requirements set forth in FRCP 23(a) and 23(b)(2). *Id.* at 13. Defendant challenges certification for lack of commonality and typicality,[7] and he also contends that certification pursuant to FRCP 23(b)(2) is inappropriate.[8] ECF No. 28 at 10, 15–16. The Court begins with FRCP 23(a)'s prerequisites.

## A.     FRCP 23(a)

### 1.     Numerosity

Numerosity is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This requirement mandates an "examination of the specific facts of each case and imposes no absolute

---

[7] Defendant does not oppose numerosity or commonality at this time but reserves the right to do so in response to any future motion for class certification. ECF No. 28 at 10 n.2.

[8] Defendant further argues that the Class Certification Motion should be denied because the Injunction Motion is tethered to the FAC and is therefore moot. ECF No. 28 at 7 n.1. But it is unclear how the mooting of the Injunction Motion would necessitate denial of the Class Certification Motion, which was filed *after* the SAC to correspond with the allegations in the SAC. ECF No. 13 ("Plaintiffs are directed to file their motion for provisional class certification after filing their second amended complaint to ensure that the request pertains to the operative pleading."); ECF No. 12. Although class certification is sought concurrently with the Injunction Motion to obtain class-wide relief, class certification can be decided independently of the present request for injunctive relief.

limitations." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980). "[A]s a general rule, classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *Handloser v. HCL Techs. Ltd.*, Case No. 19-CV-01242-LHK, 2021 WL 879802, at *5 (N.D. Cal. Mar. 9, 2021) (internal quotation marks and citation omitted).

This requirement — uncontested by Defendant — is easily satisfied, as there are nearly 3,000 residents housed at DPS facilities, *see* ECF No. 20-1 at 14, and the joinder of these class members would be impracticable. Plaintiffs have therefore satisfied the numerosity requirement.

## 2. Commonality

Commonality ensures that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). FRCP 23(a)(2) is permissively construed. *See Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. 338). It requires class members' claims to "'depend upon a common contention' and that the 'common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d

1150, 1153 (9th Cir. 2016) (quoting *Wal-Mart*, 564 U.S. at 350). Critical to

certification "is not the raising of common questions—even in droves—but rather,

the capacity of a class-wide proceeding to generate common *answers* apt to drive

the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (internal quotation

marks and citation omitted). "The existence of shared legal issues with divergent

factual predicates is sufficient[.]" *Staton*, 327 F.3d at 953 (internal quotation

marks and citation omitted). Therefore, "[s]o long as there is 'even a single

common question,' a would-be class can satisfy the commonality requirement of

Rule 23(a)(2)." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (some internal

quotation marks and citations omitted).

　　　Defendant challenges commonality on the basis that Plaintiffs are subject to

different policies applicable at their respective facilities and that their allegations

regarding a failure to implement policies will require fact-intensive inquiries.[9]

ECF No. 28 at 12–14. Plaintiffs acknowledge that they have different custody

---

[9] To support this argument, Defendant submits declarations from the warden at each DPS facility. Ironically, the wardens' declarations reflect the adoption of nearly identical policies across facilities. ECF Nos. 28-2 to 28-9 (taking the pandemic seriously; educating inmates and staff about COVID-19, vaccinations, sanitation, and hygiene; implementing enhanced cleaning schedule, social distancing measures; suspending family and friend visitations; screening for COVID-19 upon admission; identifying housing units for quarantine and medical isolation; providing cloth masks, encouraging mask wearing for inmates, and requiring mask wearing for staff; maintaining adequate supply of PPE; testing protocols for COVID-19; and offering COVID-19 testing and vaccines at intake).

statuses and are housed at multiple facilities with differing policies. ECF No. 20-1 at 18. But they argue that commonality is nevertheless satisfied because they share a common set of facts and core questions of law: (1) they are confined at DPS correctional facilities and are therefore subject to the same policies, procedures, and customs that resulted in more than 1,500 inmates/detainees contracting COVID-19; (2) they are unable to adhere to social distancing practices, per the instruction of public health officials, due to the common conditions of confinement provided by DPS; (3) they are subject to the same conditions that actively promote the spread of COVID-19; (4) whether conditions at DPS facilities create a substantial risk that those in custody will be infected with COVID-19; (5) whether conditions at DPS facilities create a substantial risk that those infected with COVID-19 will face serious illness, long-term physical damage, or death; (6) did Defendant know, or should he have known, of this risk; and (7) is Defendant acting with deliberate indifference of this risk. *Id.* at 20–21.

Central to this lawsuit is Defendant's alleged failure to comply with its Response Plan, and the resulting harm to DPS inmates/detainees. "[N]umerous courts have concluded that the commonality requirement can be satisfied by proof of the existence of systemic policies and practices that allegedly expose inmates to a substantial risk of harm." *See Parsons*, 754 F.3d at 681 (citations omitted). The infrastructure or population variations among the DPS correctional facilities are of

no consequence where, as here, there are many questions of fact and law common to the class that are capable of class-wide resolution.  *See id.* at 678 ("The putative class and subclass members thus all set forth numerous common contentions whose truth or falsity can be determined in one stroke:  whether the specified statewide policies and practices to which they are all subjected by ADC expose them to a substantial risk of harm." (citation omitted)).  Consequently, the Court concludes that Plaintiffs satisfy FRCP 23(a)(2).

### 3.  Typicality

Typicality requires "the claims or defenses of the representative parties [to be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotation marks and citation omitted).  Typicality is a permissive requirement so representative claims need not be substantially identical; they are "typical" as long as "they are reasonably coextensive with those of absent class members."  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (internal quotation marks and citation omitted).  "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the

named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Id.* (some internal quotation marks and citation omitted).

Plaintiffs argue that they satisfy this requirement because their claims are typical of the classes and subclasses they represent; they are individuals incarcerated or detained at DPS facilities who face a substantial risk of contracting COVID-19 if measures are not immediately implemented and their claims concern Defendant's alleged failure to effectuate adequate health measures in response to COVID-19.  ECF No. 20-1 at 22.  Defendant counters that Plaintiffs have also failed to demonstrate typicality because DPS operates multiple facilities across four islands, each managed by its own warden, with different physical configurations, housing styles, classes and types of inmates, and capacity levels. ECF No. 28 at 14.  In short, Defendant contends that Plaintiffs cannot satisfy typicality because they "are not subject to the same confinement under the same allegedly unconstitutional conditions caused by the same entity."  *Id.* at 15.  The Court is not persuaded.

Defendant fails to apply the relevant standard.  Typicality merely requires that representative claims are reasonably coextensive with absent class members' claims, which they are here.  Considering the relevant measures — whether other class members have experienced the same or similar injury, whether the alleged conduct is not unique to the named plaintiffs, and whether other class members

have suffered injury as a result of the same course of conduct — Plaintiffs satisfy typicality.  The unnamed class members have experienced the same or similar injuries by the same alleged course of conduct.  Defendant's alleged failure to implement and follow COVID-19 procedures has resulted in outbreaks within the facilities and a substantial risk of contracting COVID-19.  That is, Plaintiffs' injuries "arose 'from the same event or practice or course of conduct that gave rise to the claims of other class members and his claims were based on the same legal theory.'"  *Ramirez v. TransUnion LLC*, 951 F.3d 1008, 1033 (9th Cir. 2020) (brackets and citations omitted), *rev'd on other grounds*, No. 20-297, 594 U.S. __, 141 S. Ct. 2190 (2021).  Thus, Plaintiffs satisfy the typicality requirement.

### 4.    Adequacy of Representation

FRCP 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The Court must "carefully scrutinize the adequacy of representation in all class actions."  *Rutledge*, 511 F.2d at 673 (internal quotation marks and citation omitted); *see also Daly v. Harris*, 209 F.R.D. 180, 196 (D. Haw. 2002) (citing *id.*).  The purpose of the adequacy of representation requirement is to ensure that absent class members are "afforded adequate representation before entry of a judgment which binds them."  *Hanlon*, 150 F.3d at 1020 (citation omitted).  Two inquiries determine whether representation will be fair and adequate:  (1) whether "the named plaintiffs and

their counsel have any conflicts of interest with other class members" and (2) whether "the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class." *Id.* (citation omitted).

Plaintiffs submit that they do not have any conflicts with the unnamed class members, they share a common interest in receiving adequate protection against COVID-19, the requested relief would benefit all class members equally, and they will vigorously prosecute the interests of the class through qualified counsel. ECF No. 20-1 at 23. Plaintiffs also argue that their counsel have extensive experience litigating complex class actions and civil rights litigation, including cases regarding unconstitutional corrections systems, and will zealously advocate on behalf of Plaintiffs and the class members. *Id.* at 23–24. In his Opposition, Defendant did not refute Plaintiffs' or counsel's ability to adequately represent the classes. The Court concludes that Plaintiffs and their counsel do not have conflicts with other class members and that they will vigorously prosecute the classes' interests, as they have to date.

Because Plaintiffs have satisfied FRCP 23(a)'s prerequisites, the Court now turns to FRCP 23(b)(2).

## B.     FRCP 23(b)(2)

Plaintiffs request certification of an injunctive relief class. FRCP 23(b)(2) authorizes a court to certify an injunctive relief class when "the party opposing the

class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "[O]nly where the primary relief sought is declaratory or injunctive" is class certification appropriate under FRCP 23(b)(2).  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011) (internal quotation marks and citation omitted).  "The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Wal-Mart*, 564 U.S. at 360 (citation omitted).  Plaintiffs can satisfy FRCP 23(b)(2) if "class members complain of a pattern or practice that is generally applicable to the class as a whole."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010) (internal quotation marks and citations omitted).

Plaintiffs argue that certification of FRCP 23(b)(2) classes is appropriate because they request the same uniform relief due to DPS's failure to mitigate the spread of COVID-19 in its facilities and an injunction would accord the same relief to all class members.  ECF No. 20-1 at 25.  Defendant contends that the requested injunctive relief is not amenable to certification under FRCP 23(b)(2) due to the variation in the implementation between facilities of DPS's otherwise uniform

Response Plan, attributable to the facilities' configurations, security levels, and populations. ECF No. 28 at 16.

Here, Plaintiffs challenge the conditions of their confinement under the Eighth and Fourteenth Amendments and Defendant's failure to mitigate the spread of COVID-19 in DPS facilities. They seek injunctive relief requiring Defendant to implement protocols and adhere to procedures to prevent COVID-19 transmission. ECF No. 14-1 at 2–4. This relief conforms with FRCP 23(b)(2). *See Parsons*, 754 F.3d at 688–89. Contrary to Defendant's assertion that an injunctive class cannot be certified because of the differences between facilities, the class members are allegedly suffering the same or similar injury that can be alleviated for all by uniform changes in and/or adherence to DPS policies and practices statewide. *See id.* at 689 (citations omitted). Accordingly, Plaintiffs have satisfied FRCP 23(b)(2).

### C. Breadth of Class Definitions

Defendant also argues that Plaintiffs' class definitions are overbroad because other cases certifying classes did not involve classes of inmates at all correctional facilities within a given state, and the classes should not include vaccinated inmates or those who recovered from COVID-19. ECF No. 28 at 16–19. These arguments are without merit.

Defendant's effort to draw a distinction based on geographic proximity or number of facilities affected is misplaced and disregards pertinent facts, such as class size and the impracticability of joinder when class members are geographically separated across counties. In fact, the cases relied upon by Defendant, *see* ECF No. 28 at 17, support certification here. *See*, *e.g.*, *Roman v. Wolf*, ED CV 20-00768 TJH (PVCx), 2020 WL 3869729, at \*2, \*4 (C.D. Cal. Apr. 23, 2020) (provisionally certifying class covering 1,370 detainees at Adelanto Immigration and Customs Enforcement Processing Center); *Ahlman v. Barnes*, 445 F. Supp. 3d 671, 684–85 (C.D. Cal. 2020) ("*Ahlman I*") (noting that there are 3,047 individuals incarcerated at the Orange County Jail and estimating that "both the Pre-Trial and Post-Conviction classes likely have over 1,000 individuals" and "about 1,200 inmates will be members of the Disability Subclass and at least 1,200 will be members of the Medically-Vulnerable Subclass"); *Gayle v. Meade*, __ F. Supp. 3d __, 2020 WL 3041326, at \*13 (S.D. Fla. June 6, 2020) ("*Gayle I*") ("Petitioners are filing on behalf of a putative class of approximately 1400 individuals. In addition to the large number of members here, the class is also geographically dispersed across different counties in South Florida—detainees are being held in three ICE detention centers. The size and geographical diversity of the class renders joinder of all members impracticable." (citation omitted)).

Class certification in these cases did not turn on the number of facilities affected, nor did they prohibit certification of a classes implicating all facilities within a state. The number of inmates affected here is similar to classes certified by other courts, whether at one facility or multiple facilities. Moreover, the geographic separation across multiple islands, coupled with the inmates' frequent transfer between facilities, demonstrate that joinder is particularly impractical.[10] The class definitions in other cases where certification was granted were also equally as broad as Plaintiffs' proposed definitions. *See Roman v. Wolf*, 977 F.3d 935, 944 (9th Cir. 2020) ("We further hold that the district court did not err by provisionally certifying a class of all Adelanto detainees. The alleged due process violations exposed *all* Adelanto detainees to an unnecessary risk of harm, not only those who are uniquely vulnerable to COVID-19 or who are not subject to mandatory detention."); *Criswell v. Boudreaux*, No. 1:20-cv-01048-DAD-SAB, 2020 WL 5235675, at *5, *12, *15 (E.D. Cal. Sept. 2, 2020) (provisionally certifying a class of "all people who are now, or in the future will be, incarcerated in Tulare County Jails," with approximately 1,086 people then incarcerated at three facilities); *Parsons*, 754 F.3d at 678 (affirming a "class of 'all prisoners who are

---

[10] *See Gayle I*, 2020 WL 3041326, at *13 (identifying "geographic diversity of the class members" as one of the factors to consider in deciding "whether joinder of all members is practicable in view of the numerosity of the class").

now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC'").

The Court already rejected Defendant's argument that the differences between facilities precludes certification and is again unpersuaded by Defendant's contention that these differences render the class definitions unworkable. Regardless of the facilities' distinctions, *all* class members would obtain relief from the issuance of the proposed injunction. *See Parsons*, 754 F.3d at 689 ("[C]onsidering the nature and contours of the relief sought by the plaintiffs, the district court did not abuse its discretion in concluding that a single injunction and declaratory judgment could provide relief to each member of the proposed class and subclass." (footnote omitted)).

The Court also declines to exclude vaccinated inmates and those who previously contracted COVID-19 from the proposed classes and subclasses.[11] Medical and scientific data continue to evolve, with conflicting information about the length of protective immunity following COVID-19 infection and the efficacy

---

[11] The Response Plan treats vaccinated individuals the same as unvaccinated individuals for the purposes of quarantine following exposure to someone with suspected or confirmed COVID-19, citing the "turnover of inmates, higher risk of transmission, and challenges in maintaining recommended physical distancing in correctional settings[.]" ECF No. 22-12 at 45. This undercuts Defendant's request to exclude vaccinated inmates.

of vaccines against the new variants.[12]  For the purposes of provisional class certification and preliminary injunctive relief, the Court certifies the classes proposed by Plaintiffs.  If circumstances change during the course of litigation, the parties may request modification of the class definitions.

Having met FRCP 23(a)'s and 23(b)(2)'s requirements, Plaintiffs are entitled to provisional class certification.

## II.  TRO/Preliminary Injunction[13]

### A.  *Winter* Factors

The Court now turns to the *Winter* factors to determine whether Plaintiffs are entitled to a preliminary injunction.  Plaintiffs urge the Court to review their requested injunction as prohibitory, not mandatory, because they are requesting maintenance of the status quo, defined by Defendant as DPS facilities

---

[12]  To illustrate, at least one Plaintiff contracted COVID-19 post vaccination.  ECF No. 26-10 ("Mobley Decl.") ¶¶ 3, 15.

[13]  Defendant's supposition that the Injunction Motion was mooted by the filing of the SAC, asserted for the first time in opposition to the Class Certification Motion, ECF No. 28 at 7 n.1, is unavailing.  In assessing the Injunction Motion, the Court evaluates the causes of action and relief requested in the SAC, which are substantially similar to the FAC.  So Defendant's reliance on *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc), is misdirected.  Given the expedited nature of the request, judicial economy would not be served by ordering Plaintiffs to file a renewed Injunction Motion, especially when Defendant submitted his opposition *after* Plaintiffs filed the SAC and had an opportunity to challenge a preliminary injunction based on the allegations therein.

implementing the Response Plan.  ECF No. 26-1 at 11–12.  Insofar as Plaintiffs

claim that DPS is not complying with its Response Plan, and they request the

appointment of a special master to develop and implement their Proposed

Response Plan, they arguably seek a mandatory injunction, *i.e.*, an order requiring

Defendant to take certain action.  *See Marlyn Nutraceuticals*, 571 F.3d at 879

(citation omitted).  Even though DPS claims it is compliant, the problematic

conditions identified by Plaintiff would not change if the status quo is merely

maintained, and Plaintiffs would not obtain the relief they desire.  *See Hernandez*,

872 F.3d at 999 ("Mandatory injunctions are most likely to be appropriate when

'the status quo . . . is exactly what will inflict the irreparable injury upon

complainant.'" (alteration in original) (citation omitted)).  Assuming without

deciding that the requested injunction is mandatory, Plaintiffs meet the

corresponding stringent standard for the reasons discussed below.[14]  And because

---

[14]  The Ninth Circuit recognizes that its "approach to preliminary injunctions, with
separate standards for prohibitory and mandatory injunctions, is controversial," and
has faced widespread criticism.  *Hernandez*, 872 F.3d at 997.  Other district courts
in the Ninth Circuit that addressed similar requests for preliminary injunctive relief
have applied the heighted mandatory injunction standard.  *See*, *e.g.*, *Maney v.
Brown*, Case No. 6:20-cv-00570-SB, __ F.3d __, 2021 WL 354384, at *10–16 (D.
Or. Feb. 2, 2021) ("*Maney II*"); *Alcantara v. Archambeault*, No. 20cv0756 DMS
(AHG), __ F.3d __, 2020 WL 2315777, at *7 n.5 (S.D. Cal. May 1, 2020); *Doe v.
Barr*, Case No. 20-cv-02263-RMI, 2020 WL 1984266, at *3–6 (N.D. Cal. Apr. 27,
2020).

they satisfy this standard, they would easily meet the more lenient "sliding scale" standard also employed by the Ninth Circuit.[15]

## 1. Likelihood of Success on the Merits[16]

Plaintiffs contend that they are likely to succeed on their claims because the harm from COVID-19 is sufficiently serious and DPS recognizes the seriousness, but it nevertheless continues to violate its own policies. ECF No. 6-1 at 21–28. Defendant argues that Plaintiffs have not shown a likelihood of success on the merits or that there are serious questions going to the merits because he has proactively adopted and implemented measures to prevent and control the spread of COVID-19 in DPS facilities. ECF No. 22 at 29.

### a. Deliberate Indifference

Plaintiffs challenge the conditions of their confinement under the Eighth and

---

[15] Under the "sliding scale" approach to preliminary injunctions, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). The issuance of a preliminary injunction may be appropriate when there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

[16] Defendant does not challenge Plaintiffs' exhaustion of administrative remedies under the Prison Litigation Reform Act ("PLRA"). *See* 42 U.S.C. § 1997e(a).

Fourteenth Amendments. "Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or," in the case of pretrial detainees, "under the Fourteenth Amendment's Due Process Clause." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (citation omitted). The Eighth Amendment imposes duties on prison officials, "who must provide humane conditions of confinement" such as "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care" and "tak[ing] reasonable measures to guarantee the safety of the inmates[.]" *Farmer*, 511 U.S. at 832–33 (internal quotation marks and citations omitted). "[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) (citations omitted).

Both clauses require a plaintiff to "show that the prison officials acted with 'deliberate indifference.'" *Castro*, 833 F.3d at 1068. Deliberate indifference requires a showing that "prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety" and that there was no "'reasonable' justification for the deprivation, in spite of that risk." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 837, 844) (footnotes omitted). This requires a state of mind derived from criminal recklessness; that is, "the official must both be aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *see also Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009).

To succeed on an Eighth Amendment claim, a plaintiff must "'objectively show that he was deprived of something "sufficiently serious," and 'make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety.'" *Thomas*, 611 F.3d at 1150 (quoting *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009)). Establishing a Fourteenth Amendment violation is less burdensome as a plaintiff need only a show objective deliberate indifference, not subjective deliberate indifference. *See Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

### i. Objective Deliberate Indifference

The Ninth Circuit applies the following test in evaluating objective deliberate indifference:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125.  The third element requires the defendant's conduct to be objectively unreasonable, which turns on the facts and circumstances of each case.  *See id.* (citation omitted).  An individual is not deprived of life, liberty, or property under the Fourteenth Amendment based on a "mere lack of due care by a state official." *Id.* (internal quotation marks and citation omitted).  Consequently, a plaintiff "must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'"  *Id.* (footnote and citation omitted).  This standard dispenses of the need to prove "subjective elements about the officer's actual awareness of the level of risk." *Id.* n.4. (citation omitted).  Applying this standard, Plaintiffs have shown a strong likelihood of success on their Fourteenth Amendment claim and the objective prong of their Eighth Amendment claim.

At this point in the pandemic, the seriousness and transmissibility of COVID-19 is well established, and it has proven uniquely problematic for prisons and other detention facilities.  DPS is no exception, having experienced outbreaks at more than half of its facilities and inmate COVID-19 infections exceeding 50%. If the conditions described in the declarations submitted by Plaintiffs continue, the risk of harm to all inmates is undeniable.  The Court therefore focuses on whether Defendant has done or is doing enough to reasonably keep inmates healthy and safe.

The parties offer somewhat differing accounts of the conditions at DPS facilities.[17]  Defendant submits declarations from each DPS facility's warden – Cramer Mahoe ("Mahoe"), Scott Harrington ("Harrington"), Sean Ornellas ("Ornellas"), Wanda Craig ("Craig"), Eric Tanaka ("Tanaka"), Deborah Taylor ("Taylor"), Francis Sequeira ("Sequeira"), and Neal Wagatsuma ("Wagatsuma"); the Deputy Director for DPS's Corrections Division – Tommy Johnson ("Johnson"); DPS's Corrections Health Care Administrator – Gavin Takenaka ("Takenaka"); and an Advanced Practice Registered Nurse and Section Health Care Administrator for HCCC – Stephanie Higa ("Higa"), that uniformly recite provisions from the Response Plan, while Plaintiffs share personal reports from inmates *and DPS staff* at different facilities.  In other words, Defendant conveys what *should* happen at DPS facilities and Plaintiffs reveal what *is* occurring or has occurred at the facilities.

The wardens' declarations contain boilerplate language indicating that their facilities have adopted the same or substantially similar policies, which are also

_____

[17]  At the hearing, defense counsel argued that Plaintiffs failed to submit any declarations concerning KCCC and WCCC and that those facilities would therefore inappropriately be subject to an injunction.  The Court is unconvinced. Inmates are frequently moved between facilities, so outbreaks are a system-wide concern.  KCCC and WCCC should not be exempt from the injunction, as the injunction would order relief contemplated by the Response Plan, and all facilities are subject to the Response Plan.

consistent with the general DPS policies identified by Johnson, Takenaka, and Higa. *See* ECF Nos. 22-1 ("Takenaka Decl."); 22-2 ("Johnson Decl."); 22-3 ("Mahoe Decl."); 22-4 ("Harrington Decl."); 22-5 ("Ornellas Decl."); 22-6 ("Craig Decl."); 22-7 ("Tanaka Decl."); 22-8 ("Taylor Decl."); 22-9 ("Sequeira Decl."); 22-10 ("Wagatsuma Decl."); 22-11 ("Higa Decl."). But the mere existence of policies is of little value if implementation and compliance are lacking.

The declarations Plaintiffs submitted offer on-the-ground descriptions of what is actually happening at the facilities. And the reality is that the inmates have no motivation to fabricate (they are not seeking release nor money damages), while DPS staff have a *disincentive* to raise these issues concerning their employer in such a public forum. Therefore, the Court finds credible the declarations Plaintiffs submitted. This is not to say that the declarations supplied by Defendant are incredible; rather, as detailed below, the declarations Plaintiffs submitted were more compelling due to their specificity and direct perspective.

In a nutshell, Defendant defends his COVID-19 response by claiming that DPS has proactively and vigilantly addressed COVID-19, beginning with the adoption of a department-wide Response Plan on March 23, 2020 — consistent with CDC guidelines that has been updated to reflect evolving CDC guidance — and a pandemic response plan tailored to each DPS facility, based on space, unique challenges, and population and staff needs. ECF No. 22 at 14–15; Johnson Decl.

¶¶ 8–9.  According to Defendant, the following measures have been implemented at DPS facilities:  screening, quarantine and medical isolation, medical care, sanitation and hygiene, social distancing, personal protective equipment ("PPE"), education and information, testing, and vaccination.  ECF No. 22 at 15–20.

*Screening and Testing*:  Defendant claims that all facilities have screening procedures for inmates, staff, and visitors — new inmates are screened by medical staff for COVID-19 symptoms and risk factors while staff, visitors, volunteers, and vendors are screened for symptoms through surveys and temperature checks prior to entry.  ECF No. 22 at 16; Takenaka Decl. ¶¶ 15–16; Johnson Decl. ¶¶ 13–14; Harrington Decl. ¶ 15; Ornellas Decl. ¶¶ 8–9; Craig Decl. ¶ 8; Tanaka Decl. ¶ 13; Taylor Decl. ¶ 12; Sequeira Decl. ¶ 13; Wagatsuma Decl. ¶ 12; Higa Decl. ¶ 9.  At HCCC, existing inmates are also supposedly screened through self-reporting, temperature and symptom checks for those in quarantine units, medical assessments for older inmates and those with certain medical conditions, and upon departure and return to the facility.  Higa Decl. ¶¶ 10–12.

Defendant also represents that COVID testing is continuously conducted at all DPS facilities and that DPS performs diagnostic and screening testing and has expanded non-exposure asymptomatic screening testing to:  (1) broad-based testing; (2) new admission and day 14 routine intake quarantine testing; (3) pre-medical procedure testing; (4) pre-release testing for inmates entering community

40

programs; (5) pre-flight testing for inmates transferred to another facility; and (6) surveillance testing of randomly selected inmates. Takenaka Decl. ¶¶ 19–20, 25.

Plaintiffs paint a different picture, providing declarations from inmates and staff averring that not all new inmates are screened or tested for COVID-19, nor are all inmates tested before transferring to another facility. ECF No. 6-4 (Decl. of Lisa O. Jobes ("Jobes Decl.")) ¶ 6.g; ECF No. 6-6 (Decl. of Ryan Tabar ("Tabar Decl.")) ¶ 6.b; ECF No. 6-7 (Decl. of Marie Ahuna ("Ahuna Decl.")) ¶ 5.f; ECF No. 6-10 (Decl. of Isaac Nihoa ("Nihoa Decl.")) ¶ 11; ECF No. 6-13 ("Alvarado Decl. I") ¶¶ 10–11; ECF No. 6-15 (Decl. of Dustin Snedeker-Abadilla ("Snedeker-Abadilla Decl. I")) ¶ 6; ECF No. 26-7 (Decl. of William Napeahi ("Napeahi Decl.")) ¶ 9; ECF No. 26-8 (Decl. of Pokahea Lipe ("Lipe Decl.")) ¶ 6; ECF No. 26-16 (Decl. of Todd Bertilacci ("Bertilacci Decl.")) ¶ 8; ECF No. 26-17 ("Snedeker-Abadilla Decl. II") ¶¶ 7–9. Mahoe, HCCC's Warden, admits that inmates are not tested upon arrival and are placed in a holding area separated by chain-link fences — dubbed the "dog cages" — to be later screened by healthcare staff.[18] Mahoe Decl. ¶¶ 11–13.

---

[18] The Court is troubled by the allegation that the HCCC administration fails to inform staff when COVID-positive inmates are in close proximity. Rosete-Arellano Decl. ¶ 12 (learning from DPS guards that COVID-positive inmates were being held in the dog cages and in the hallway); Jobes Decl. ¶ 9 (learning from a detainee in the dog cages that other detainees in the dog cages had COVID-19); Nihoa Decl. ¶ 4 (learning from the inmates he was supervising that they had

(continued . . .)

***Quarantine and Medical Isolation***:  Defendant represents that DPS employs medical and isolation strategies to contain and control COVID-19 transmission and that each facility has units designated for quarantine and medical isolation.  ECF No. 22 at 16; Harrington Decl. ¶ 16; Ornellas Decl. ¶ 10; Craig Decl. ¶ 10; Tanaka Decl. ¶ 14; Taylor Decl. ¶ 13; Sequeira Decl. ¶ 14; Wagatsuma Decl. ¶ 13; Johnson Decl. ¶¶ 25–26.  Defendant also offers the caveat that exceptions are sometimes necessary due to space and security concerns.  Johnson Decl. ¶¶ 15, 27.

Plaintiffs describe a "quarantine" process that involves mixing multiple inmates with unknown COVID statuses in the HCCC dog cages, the fishbowl, or a visitor's room, and introducing new inmates into those spaces daily.  ECF No. 6-1 at 14–15; Jobes Decl. ¶¶ 6.h–i, 7; Nihoa Decl. ¶ 13; Snedeker-Abadilla Decl. I ¶ 10; Lipe Decl. ¶ 9.  This is consistent with Mahoe's admission that HCCC frequently lacks the physical space to completely quarantine new inmates for ten days and instead places them in the fishbowl, a multi-purpose room, to monitor them for COVID-19 symptoms and to separate them from the inmate population.  Mahoe Decl. ¶ 16.  And while all incoming inmates are purportedly screened for COVID-19 symptoms and exposure upon arrival at the facilities, *see* Takenaka

_____

(. . . continued)
COVID-19 and testing positive for COVID-19 a few days later).  While DPS staff are not parties to this action and the Court is not factoring this into Plaintiffs' likelihood of success, the alleged lack of notification illustrates another symptom of the indifference.

Decl. ¶ 16, at the hearing, Defendant's counsel admitted that the intake process at HCCC  — which precedes any testing and involves the housing of numerous inmates in confined spaces — can take several hours.

Plaintiffs also report multiple instances of DPS mixing COVID-positive and/or symptomatic inmates with COVID-negative inmates, which resulted in clusters of COVID-19 infections at different facilities.  ECF No. 6-1 at 13–14; ECF No. 26-6 ("Deguair Decl.") ¶¶ 7, 9, 13; Napeahi Decl. ¶¶ 6–8, 11–12, 15–21, 25; Lipe Decl. ¶¶ 16–20, 29–30; ECF No. 26-9 ("Chatman Decl.") ¶ 6; ECF No. 26-10 ("Mobley Decl.") ¶¶ 8–11, 15–16; ECF No. 26-11 (Decl. of Tyson Olivera-Wamar ("Olivera-Wamar Decl.")) ¶¶ 7–19; ECF No. 26-12 ("Granados Decl.") ¶¶ 9–10; ECF No. 26-15 (Decl. of Nicholas Hall ("Hall Decl.")) ¶¶ 8–18; Bertilacci Decl. ¶¶ 9–10, 14–17; ECF No. 6-14 (Decl. of Jeffrey Parent ("Parent Decl.")) ¶ 13.

***Living Conditions/Social Distancing***:  Defendant asserts that DPS has implemented social distancing strategies, adapted for each facility, including limitation of transports and movements, suspension of visitation and certain programs, restructured recreation and meals, bunk rearrangement so inmates sleep head to foot, staggered pill lines, medication administration at modules, and spaced seating in common areas.[19]  ECF No. 22 at 17–18; Harrington Decl. ¶¶ 13–14;

---

[19]  Defendant accuses Plaintiffs of failing to submit evidence showing that social distancing is supported by medical evidence, *see* ECF No. 22 at 43, while

(continued . . .)

Ornellas Decl. ¶¶ 15–16; Craig Decl. ¶¶ 16–17; Tanaka Decl. ¶¶ 11–12; Taylor Decl. ¶¶ 10–11; Sequeira Decl. ¶¶ 11–12; Wagatsuma Decl. ¶¶ 10–11; Johnson Decl. ¶ 23.

Meanwhile, Plaintiffs describe eating shoulder-to-shoulder in the chow halls and indicate that inmates are regularly packed into small spaces — 40 to 60 inmates in the fishbowl, which measures 31.5 feet by 35.3 feet,[20] where they sleep on thin mats on the floor three to six inches apart; up to seven inmates in the dog cages, which measure five feet by ten feet; up to ten inmates in the visitor's room at HCCC, which is ten feet by twelve feet; 40 to 60 inmates in a 25-foot-by-35-foot room at Waiawa called the "pavilion." Jobes Decl. ¶ 8; Ahuna Decl. ¶ 5.h–i; Tabar Decl. ¶ 7.a; Parent Decl. ¶ 21; Snedeker-Abadilla Decl. I ¶¶ 8, 12. The dog cages, fishbowl, and visitor's room do not have bathrooms or running water, so inmates housed there have restricted access to restrooms and water. Because guards often deny inmates' restroom and water requests, inmates are forced to urinate on

_____

(. . . continued)
simultaneously claiming that DPS facilities are social distancing to the extent possible, submitting declarations from Johnson and the wardens attesting that they have implemented social distancing practices, and emphasizing that an inability to social distance does not amount to deliberate indifference. *See id.* at 39.

[20] *See* Johnson Decl. ¶ 38.

themselves, on walls, or in cups. And constant toilet clogging and overflow in the adjacent restroom causes the fishbowl to smell like urine and feces.[21] Jobes Decl. ¶ 8; Tabar Decl. ¶¶ 7–8; ECF No. 6-8 (Decl. of Erin Loredo ("Loredo Decl.")) ¶¶ 10, 12–17; Snedeker-Abadilla Decl. I ¶¶ 15–17, 19–26. Inmates are unable to wash their hands in these holding areas and they are not provided with cleaning products. Snedeker-Abadilla Decl. I ¶ 30; Tabar Decl. ¶ 7.p. Staff have also observed mice and rats in the area, as well as other parts of HCCC. Rosete-Arellano Decl. ¶ 9; Loredo Decl. ¶ 19.

Mahoe represents that ACOs "do their best" to provide water to inmates in the dog cages but may not be able to readily allow restroom access depending on circumstances. Mahoe Decl. ¶ 15. He refutes allegations that inmates in the fishbowl are denied restroom access or water, stating that a water jug is filled during every meal and upon request. *Id.* ¶ 20. It is unclear if this is mere policy or actual practice because staff claims that Mahoe has not performed a walk-through of the facility since he started working at HCCC, despite DPS policy that the warden should do two daily walk-throughs to ensure compliance with protocols. Jobes Decl. ¶¶ 12–13.

---

[21] These conditions are alarming, with or without COVID-19. "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (citations omitted).

HCCC started moving inmates from the fishbowl to other housing units, and Johnson issued a directive that inmates may not stay overnight in the dog cages. Johnson Decl. ¶ 39; Mahoe Decl. ¶ 24.  At the hearing, Plaintiffs' counsel argued that the new housing accommodations are equally unsuitable because not only are they smaller and proportionately as overcrowded as the fishbowl, they similarly have no running water or toilets.

*Mask Wearing/PPE*:  Defendant argues that staff are always required to wear masks unless medically or operationally excepted and that PPE is provided for certain tasks like entering quarantine or isolation units, transporting inmates, and interacting with an individual with suspected or confirmed COVID-19. Defendant also supplies inmates and staff with multiple cloth masks that can be laundered.  ECF No. 22 at 18; Johnson Decl. ¶¶ 17, 18, 21.  According to Plaintiffs, mask wearing is inconsistent at best with minimal enforcement, if at all, and masks and PPE are not necessarily provided to staff.  Ahuna Decl. ¶¶ 8–9; Rosete-Arellano Decl. ¶ 15; Loredo Decl. ¶ 8; Nihoa Decl. ¶ 4.b–c; Alvarado Decl. I ¶ 7.e, g.

*Cleaning Supplies and Protocols*:  According to Defendant, inmates are provided with soap and towels in restrooms and cells; additional are supplied at the inmates' request, and towels are laundered twice daily.  ECF No. 22 at 17; Johnson Decl. ¶ 20.  Defendant also represents that the facilities maintain an enhanced

cleaning schedule for housing units; transportation vans are sanitized daily; high touch areas are cleaned and sanitized daily; common areas and housing are disinfected and cleaned daily; staff disinfects their work areas; and inmates receive cleaning supplies and gloves to clean their personal areas.  ECF No. 22 at 17; Tanaka Decl. ¶ 9; Taylor Decl. ¶ 8; Sequeira Decl. ¶ 9; Wagatsuma Decl. ¶ 8; Harrington Decl. ¶ 10; Ornellas Decl. ¶ 14; Craig Decl. ¶ 15.

The declarations submitted by Plaintiffs suggest otherwise.  Plaintiffs, other inmates, and staff claim that inmates do not receive cleaning supplies; hand sanitizer and wipes are unavailable in housing units; soap must be purchased with commissary money; cleaning is left to the inmates' discretion; when provided, cleaning products are watered down; and cells housing COVID-positive inmates are not cleaned before new occupants move in.  Chatman Decl. ¶ 18; ECF No. 26-13 ("Alvarado Decl. II") ¶ 4.g,i–j; Snedeker-Abadilla Decl. I ¶¶ 27, 30; Parent Decl. ¶¶ 6.b–c, 15, 20.b; Ahuna Decl. ¶ 11; Loredo Decl. ¶ 9 (indicating that she was not provided with cleaning supplies for her office at HCCC).

*Identification of Older and Medically Vulnerable Inmates*:  Defendant explains that medical staff conducts assessments within 14 days of admission, including the identification of older adults and inmates with medical conditions that put them at an increased risk of severe illness from COVID-19.  Takenaka Decl. ¶ 18.  Both staff and inmates indicate that no assessments occur, and inmates

with medical conditions have not been isolated or identified as high risk, which resulted in COVID-19 infections and hospitalization. Nihoa Decl. ¶ 10; Alvarado Decl. I. ¶ 8; ECF No. 6-9 (Decl. of Jason Cummings ("Cummings Decl.")) ¶¶ 7–13; *cf.* Snedeker-Abadilla Decl. I ¶¶ 10–11, 31–34 (explaining that he was held in the fishbowl for months, and was initially told it was for "quarantine" even though he was housed with 40 to 50 other males and new detainees were added daily).

The evidence before the Court demonstrates that Defendant has not taken reasonable available measures to abate the risks caused by the foregoing conditions, knowing full well — based on multiple prior outbreaks — that serious consequences and harm would result to the inmates. And Plaintiffs have suffered injuries as a result. *See Roman*, 977 F.3d at 943 ("The Government was aware of the risks these conditions posed, especially in light of high-profile outbreaks at other carceral facilities that had already occurred at the time, and yet had not remedied the conditions. Its inadequate response reflected a reckless disregard for detainee safety."). Defendant did not submit persuasive evidence contradicting the detailed accounts of Plaintiffs, inmates, and DPS staff showing a failure to implement and/or comply with the Response Plan. The declarations relied upon by Defendant offer summaries of provisions in the Response Plan without specific examples of compliance. Johnson provides some details about measures taken to address the HCCC outbreak and Mahoe responds to certain allegations concerning

the fishbowl, dog cages, PPE, cleaning supplies, communications, and social distancing during recreation time. However, they too were couched in generalities.

Policies are meaningless if they are not followed. Although Defendant attempts to characterize the failures identified by Plaintiffs as "occasional lapses in compliance by PSD staff," *see* ECF No. 22 at 33, many of the failures — such as the cramped housing of inmates in the fishbowl at HCCC or the need for inmates to urinate in cups due to a lack of access to toilets — are more than simple lapses and demonstrate objective deliberate indifference. Consequently, there is a strong likelihood that Plaintiffs will prevail on the merits of their Fourteenth Amendment claim and satisfy the objective prong of their Eighth Amendment Claim.

### ii. Subjective Deliberate Indifference

This subjective standard applicable to Eighth Amendment claims requires an official to "know[] of and disregard[] an excessive risk to inmate health or safety." *Gordon*, 888 F.3d at 1125 n.4. (internal quotation marks and citation omitted). Thus, the Court must determine if Plaintiffs will be able to establish that Defendant is aware of, but is disregarding, an excessive risk to Plaintiffs' health or safety by failing to take measures to prevent or mitigate the spread of COVID-19 in DPS facilities.

Defendant cannot reasonably claim ignorance of the seriousness of COVID-19 at this stage in the pandemic, nor the consequences that could result from a

failure to take necessary steps to prevent transmission in DPS facilities. Approximately 1,575 inmates and 240 correctional staff have contracted COVID-19, and seven inmates died. *See* https://dps.hawaii.gov/blog/2020/03/17/ coronavirus-covid-19-information-and-resources/ (last visited July 13, 2021). Prisoners have tested positive for COVID-19 at 17.4 times the rate in Hawaiʻi overall and have died at 5.1 times the rate. *See* https://www.themarshallproject. org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last visited July 13, 2021). Halawa, MCCC, OCCC, Waiawa, and HCCC already experienced outbreaks and given DPS's alleged current *practices* (not policies), others are inevitable. Despite this knowledge, it appears that Defendant continues to disregard the excessive risk to inmate health and safety. The inmate populations are in constant flux and the arrival of new inmates presents an ongoing threat of exposure to new sources of infection, especially if new inmates are not properly screened, tested, or quarantined. Many of the concerning facts outlined in the preceding section support a finding of subjective deliberate indifference because they evince Defendant's knowing disregard of excessive risk to inmate health and safety. However, the recent transfer of inmates best exemplifies this disregard, and here, shows that there is a strong likelihood that Plaintiffs will establish subjective deliberate indifference.

In an effort to alleviate overcrowding at HCCC during the middle of a COVID-19 outbreak, Defendant chartered private flights to transport dozens of inmates to facilities on Oahu. Johnson Decl. ¶ 36; ECF 26-14. Notwithstanding Defendant's public statement that only inmates who were medically cleared of COVID-19 were considered for transfer, *see* ECF No. 26-14, inmates who were symptomatic and untested, or had yet to receive test results, were among those transferred. Hall Decl. ¶¶ 9–11; Bertilacci Decl. ¶ 8; Snedeker-Abadilla Decl. II ¶ 7; Napeahi Decl. ¶¶ 9, 11–12; Olivera-Wamar Decl. ¶¶ 7, 9–12, 14. Many of these inmates informed staff that they felt ill. Hall Decl. ¶ 12; Napeahi Decl. ¶ 13; Olivera-Wamar Decl. ¶¶ 8, 13. At least nine of these inmates tested positive for COVID-19 at Halawa. ECF No. 26-1 at 6. Inmates from HCCC were grouped with inmates from other facilities while they awaited their COVID-19 test results. Hall Decl. ¶¶ 14–15; Bertilacci Decl. ¶ 9; Olivera-Wamar Decl. ¶¶ 15–16; Napeahi Decl. ¶¶ 15–17. COVID-positive and COVID-negative inmates are housed in the same open-air modules, share common spaces and devices, and are able to shake hands through the bars of their cells. Olivera-Wamar Decl. ¶¶ 15, 19; Bertilacci Decl. ¶¶ 9–10, 13–17; Hall Decl. ¶ 14; Napeahi Decl. ¶¶ 20, 23, 25. One of the COVID-positive transferees has requested, but not received, medical treatment for his symptoms. Napeahi Decl. ¶ 24.

This is problematic on multiple levels. Defendant knowingly (1) transported *symptomatic* inmates from a facility *with an active COVID-19 outbreak*, (2) who *told staff* they were ill, (3) who were *infected*, (4) but whose infections were unconfirmed due to *late or no testing*, (5) *on an airplane*, (6) to a facility with no active COVID-19 cases *that previously experienced an outbreak*, and (7) then housed those inmates *with COVID-negative inmates.* There is almost no clearer an example of complete disregard for the Response Plan and abandonment of precautionary measures to prevent the spread of COVID-19 between DPS facilities and islands.

Creating and successfully implementing a workable policy to mitigate the spread of COVID-19 in a carceral setting is an unenviable task. But Defendant has had ample time to do so and the prior outbreaks should have served as cautionary tales. The Court finds that Plaintiffs have demonstrated, through the foregoing facts, that they have a strong likelihood of success on their Eighth Amendment claim.

## 2. Irreparable Harm

Plaintiffs argue that they will suffer irreparable harm without an injunction because DPS's failure to meet public health standards places them at risk of serious infection and death. ECF No. 6-1 at 28. Defendant counters that Plaintiffs have

not presented evidence demonstrating that a COVID-19 outbreak is imminent or, were another outbreak possible, that it is likely. ECF No. 22 at 42.

"A plaintiff seeking preliminary relief must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (citation omitted). "At a minimum, a plaintiff seeking preliminary injunctive relief must demonstrate that it will be exposed to irreparable harm." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citation omitted). As a prerequisite to injunctive relief, "a plaintiff must *demonstrate* immediate threatened injury"; a speculative injury is not irreparable. *Id.* (citations omitted). "Irreparable harm is . . . harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citation omitted). "[A]n alleged constitutional infringement will often alone constitute irreparable harm," *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (internal quotation marks and citation omitted), but not if "the constitutional claim is too tenuous." *Goldie's Bookstore, Inc. v. Superior Court of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984).

The Court already determined that Plaintiffs are likely to succeed on the merits and "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In addition, Plaintiffs clearly

identify the irreparable harm they will suffer if conditions at DPS facilities persist. Comingling COVID-positive inmates with non-infected inmates, unsanitary living conditions, lack of social distancing, failure to provide PPE, failure to enforce mask wearing and proper usage, insufficient COVID-19 screening and testing, and lack of adequate medical care, increase Plaintiffs' risk of contracting COVID-19 and potentially suffering serious illness or death. *See Maney v. Brown*, 464 F. Supp. 3d 1191, 1216 (D. Or. 2020) ("*Maney I*") (citations omitted). Indeed, the Hawai'i Supreme Court determined that multiple DPS facilities are overcrowded and in light of the pandemic, "they have the potential to . . . place the inmates at risk of death or serious illness." *In re Individuals in Custody of State*, No. SCPW-20-0000509, 2020 WL 5015870, at *1 (Haw. Aug. 24, 2020) ("*In re Inmates II*") (discussing MCCC, HCCC, and KCCC); *see In re Individuals in Custody of State*, No. SCPW-20-0000509, 2020 WL 4873285, at *1 (Haw. Aug. 17, 2020) ("*In re Inmates I*") (discussing OCCC). And facilities remain overcrowded. *See* https://dps.hawaii.gov/wp-content/uploads/2021/07/Pop-Reports-Weekly-2021-07-05.pdf (last visited July 13, 2021). Accordingly, Plaintiffs have established that they are likely to suffer irreparable injury.

The Court rejects Defendant's assertion that this determination requires Plaintiffs to confirm the *imminence of a COVID-19 outbreak* at a DPS facility. ECF No. 22 at 42. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("We have

great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year.").  Plaintiffs' concerns about harm are not speculative for the reasons explained above.  As they currently exist, DPS's practices — exacerbated by the shared and confined spaces in carceral settings — are likely to cause irreparable harm because they present a considerable risk of exposure to COVID-19, with or without an outbreak.  *See Maney II*, __ F.3d at __, 2021 WL 354384, at *15; *Criswell*, 2020 WL 5235675, at *23–24; *Torres v. Milusnic*, 472 F. Supp. 3d 713, 740–41 (C.D. Cal. 2020); *Zepeda Rivas v. Jennings*, 445 F. Supp. 3d 36, 40 (N.D. Cal. 2020); *Kaur v. DHS*, Case No. 2:20-cv-03172-ODW (MRWx), 2020 WL 1939386, at *3 (C.D. Cal. Apr. 22, 2020).  And, in any case, "a remedy for unsafe conditions need not await a tragic event."  *Helling*, 509 U.S. at 33.

Regardless of whether another outbreak is imminent, the Court is unconvinced that DPS's recent efforts in the midst of this litigation have eliminated the *ongoing* harm to Plaintiffs.  On June 10, 2021 — one day after Plaintiffs filed the Injunction Motion and the same day the Court held a status conference on the matter — Johnson issued a directive that inmates are not to be placed in the dog cages overnight.  Mahoe Decl. ¶ 14.  Then, shortly before Defendant's opposition deadline, DPS began relocating inmates from the fishbowl

to other housing units at HCCC. *Id.* ¶ 24; Johnson Decl. ¶ 39. The timing of DPS's actions is suspect. And given Plaintiffs' counsel's allegation that DPS actually replicated these deficient housing conditions elsewhere in the facility, any improvement in conditions is debatable. Furthermore, improvements at HCCC do not remedy the many other dangers identified above that promote the spread of COVID-19 in DPS facilities. DPS's recent efforts to remediate egregious conditions — that should never have occurred in the first place — do not persuade the Court that DPS can and will successfully manage the pandemic moving forward. After all, the five severe outbreaks demonstrate otherwise. Based on DPS's record of handling of COVID-19 in its facilities, it is not unreasonable to assume that issues will persist and that future outbreaks are likely, driven in part by the inmates' inter-facility movement and constant introduction of new inmates into the facilities.

Defendant claims that DPS will be irreparably harmed if an injunction issues because the Court would assume administration over its facilities.[22] ECF No. 22 at 42 (citation omitted). Putting aside the fact that this is not the salient inquiry, the

---

[22] Defendant cites *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020), for this proposition. *Swain* concerned a motion for stay pending appeal of a preliminary injunction. *See id.* at 1085. Therefore, the defendants bore the burden of establishing that they would be irreparably harmed absent a stay. *See id.* at 1088, 1090. *Swain* has no application under this factor, as the Court considers whether Plaintiffs will suffer irreparable harm in the absence of an injunction, not whether an injunction will cause Defendant to suffer irreparable harm.

Court struggles to identify any harm to DPS, let alone irreparable harm, when the injunction would merely require DPS to do not only what it *should* be doing but what it claims it *has* been doing throughout the course of the pandemic. "Self-inflicted wounds are not irreparable injury." *Al Otro Lado*, 952 F.3d at 1008 (internal quotation marks, brackets, and citations omitted). "An injunction cannot cause irreparable harm when it requires a party to do nothing more than what it maintained, under oath, it was already doing of its own volition." *Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *3 (9th Cir. June 17, 2020) ("*Ahlman II*").

For these reasons, the Court finds that Plaintiffs have demonstrated that they will be irreparably harmed in the absence of an injunction.

### 3. Balance of Equities/Public Interest

Plaintiffs contend that the equities weigh in favor of protecting them, DPS staff, and the community from the spread of COVID-19, and that any burden to Defendant — economic or administrative — is relatively limited. ECF No. 6-1 at 30–33. Instead of addressing the applicable considerations, Defendant argues that Plaintiffs have failed to provide the necessary evidence entitling them to relief[23]

---

[23] Citing *Roman v. Wolf*, Defendant asserts that "an 'injunction should, to the extent possible, reflect the scientific evidence about COVID-19 presented to [a] district court' and 'should stem from medical evidence properly before the court.'" ECF No. 22 at 42–43 (alteration in original) (citing *Roman*, 977 F.3d at 946).

(continued . . .)

and that DPS already implemented the measures that Plaintiffs request. ECF No. 22 at 42–43. Defendant also argues that injunctive relief is disfavored because of federalism concerns and the policy against court interference with prison administration. *Id.* at 43–44.

In assessing whether Plaintiffs establish that the balance of equities tip in their favor, "the district court has a 'duty . . . to balance the interests of all parties and weigh the damage to each.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (alteration in original) (citation omitted). "When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that favor[s] [granting or] denying the preliminary injunction.'" *Id.* at 1138–39 (alterations in original) (citation omitted). When an injunction's impact "reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* at 1139 (citations omitted). "'The public interest inquiry primarily

---

(. . . continued)

These principles have no bearing on Plaintiffs' *entitlemen*t to injunctive relief. The *Roman* court affirmed the issuance of a preliminary injunction but vacated and remanded specific provisions of the injunction due to the drastic changes that occurred after its issuance. *See Roman*, 977 F.3d at 945. The above references to scientific and medical evidence were provided for the district court's consideration on remand. *Id.* at 946. They are not tied to the balancing of equities/public interest factor.

addresses impact on non-parties rather than parties.'" *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (citation omitted).  It also requires the Court to "'consider whether there exists some critical public interest that would be injured by the grant of preliminary relief.'"  *Cottrell*, 632 F.3d at 1138 (citation omitted).

Here, the equities tip sharply in Plaintiffs' favor because they face irreparable harm to their health and constitutional rights.  *See Castillo v. Barr*, 449 F. Supp. 3d 915, 923 (C.D. Cal. 2020).  The Court acknowledges that Defendant has a strong interest in the administration of DPS facilities, *see Woodford v. Ngo*, 548 U.S. 81, 94 (2006), and that "separation of powers concerns counsel a policy of judicial restraint."  *Turner v. Safley*, 482 U.S. 78, 85 (1987); *see also* 18 U.S.C. § 3626(a)(2) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity[.]").  And "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities."  *Turner*, 482 U.S. at 85 (citation omitted).  That said, Defendant "cannot suffer harm from an injunction that merely ends an unlawful practice . . . to avoid constitutional concerns," *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (citation and footnote omitted), particularly when Defendant claims it is already complying with its Response Plan.

59

Additionally, "while States and prisons retain discretion in how they respond to health emergencies, federal courts do have an obligation to ensure that prisons are not deliberately indifferent in the face of danger and death." *Valentine v. Collier*, 590 U.S. __, 140 S. Ct. 1598, 1599 (2020) (statement of Sotomayor, J., joined by Ginsburg, J.); *see Brown v. Plata*, 563 U.S. 493, 511 (2011) ("Courts nevertheless must not shrink from their obligation to 'enforce the constitutional rights of all "persons," including prisoners.'" (citation omitted)). "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown*, 563 U.S. at 511.

It is noteworthy that the injunctive relief requested and ordered here simply requires DPS to comply with its own policies. Defendant will not be burdened or harmed if DPS must do what he insists it is already doing. *See Ahlman II*, 2020 WL 3547960, at *3. Moreover, this mitigates federalism concerns and allows the Court to address alleged constitutional violations without becoming too "enmeshed in the minutiae of prison operations." *Bell*, 441 U.S. at 562.

The public interest would also be served by requiring DPS to adhere to policies it formulated, which are designed to limit the spread of COVID-19, especially when non-compliance causes the violation of constitutional rights. *See Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("[I]t is always in the public interest to prevent the violation of a party's

constitutional rights." (internal quotation marks and citation omitted)).  With inmate COVID-19 infections far exceeding the general rate in Hawaiʻi, and multiple severe outbreaks in DPS facilities throughout the course of the pandemic, Defendant has not adequately protected the health and safety of the inmates.  And the continued spread of COVID-19 in DPS facilities will impact DPS staff and other individuals who enter DPS facilities, along with their families and surrounding communities.  *See In re Inmates II*, 2020 WL 5015870, at *1 (recognizing the endangerment to "the lives and well-being of staff and service providers who work [at DPS facilities], their families, and members of the community at large").  These considerations support the issuance of a preliminary injunction.

In sum, Plaintiffs have demonstrated that there is a strong likelihood of success on the merits of their claims, that they will suffer irreparable injury if relief is not granted, and that the balance of hardships and public interest weigh heavily in their favor.

### B.  Scope of Injunctive Relief

Plaintiffs request the same injunctive relief in the Injunction Motion that they ultimately seek in this litigation — the appointment of a special master pursuant to 18 U.S.C. § 3626(f)(1)(A) to oversee the development and

implementation of their Proposed Response Plan.[24]  *Compare* SAC at 61–65 *with*

ECF No. 14-1 at 2–5.  It is typically improper "to grant the moving party the full

relief to which he might be entitled if successful at the conclusion of a trial.  This is

particularly true where the relief afforded, rather than preserving the status quo,

completely changes it."  *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804,

808–09 (9th Cir. 1963).  But even if the injunction here is mandatory, it is mild

because it merely requires Defendant to adhere to its Response Plan and employ

practices that comport with CDC guidelines.  *See Hernandez*, 872 F.3d at 999–

1000.

### 1.     Appointment of a Special Master

The PLRA authorizes the Court to appoint a special master in a civil

action regarding prison conditions (1) "who shall be disinterested and objective

and who will give due regard to the public safety, *to conduct hearings on the*

*record and prepare proposed findings of fact*" (2) "*during the remedial phase of*

*the action* only upon a finding that the remedial phase will be sufficiently complex

to warrant the appointment."  18 U.S.C. § 3626(f)(1)(A)–(B) (emphases added).

---

[24]  Plaintiffs initially requested an evaluation of whether inmates should be released to comply with CDC guidelines.  ECF No. 6-1 at 34.  At the time, the FAC was the operative pleading, and it also requested the same relief.  ECF No. 5 at 75.  The SAC does not request this relief, nor is it outlined in Plaintiffs' supplemental memorandum regarding the specific injunctive relief sought.  ECF No. 14.

Because this case is not in the remedial phase, appointment of a special master under § 3626(f) is improper. *See McCormick v. Roberts*, Civil Action No. 11-3130-MLB, 2012 WL 1448274, at *2 (D. Kan. Apr. 26, 2012) (denying motion to appoint special master pursuant to § 3626(f) because the case had yet to enter the remedial phase); *Roberts v. Mahoning County*, 495 F. Supp. 2d 713, 714 (N.D. Ohio 2006) (discussing work of special master appointed after a bench trial to assist the parties with a remedial phase aimed at achieving final resolution). Plaintiffs have not presented any cases, and the Court has found none, appointing a special master pursuant to § 3626(f) at the preliminary injunction phase in a civil case regarding prison conditions.

At the hearing, Plaintiffs requested that their request be considered pursuant to FRCP 53 instead of § 3626(f). The PLRA defines a "special master" as "any person appointed by a Federal court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court." 18 U.S.C. § 3626(g)(8). Therefore, the Court finds that even if it were to award relief under FRCP 53, it would still be subject to the constraints of § 3626(f).

Additional reasons support denial of the request at this time. Special masters are ordinarily appointed after liability is established or a consent decree or injunction issues, to assist courts with enforcement. *See*, *e.g.*, *Brown*, 563 U.S. at

511; *Balla v. Idaho State Bd. of Corr.*, No. 1:81-cv-1165-BLW, 2011 WL 108727, at *1–2 (D. Idaho Jan. 6, 2011); *Plata v. Schwarzenegger*, 603 F.3d 1088, 1097 (9th Cir. 2010); *Hook v. Ariz. Dep't of Corr.*, 107 F.3d 1397, 1399–400 (9th Cir. 1997).

Courts have *contemplated* the appointment of a special master in cases involving ICE facilities *when a defendant failed to comply with orders*. *See*, *e.g.*, *Roman v. Wolf*, ED CV 20-00768 TJH, 2020 WL 6107069, at *2 (C.D. Cal. Oct. 15, 2020); *Fraihat v. ICE*, Case No. EDCV 19-1546 JGB (SHKx), 2020 WL 6541994, at *13 (C.D. Cal. Oct. 7, 2020). Plaintiffs cite two cases in which special masters were appointed. However, the appointments followed ICE's pattern of non-compliance and the PLRA does not apply to civil detainees.[25] *See* ECF No. 26-19; *Gayle v. Meade*, Case No. 20-21553-Civ-COOKE/GOODMAN, 2020 WL 4047334, at *2 (S.D. Fla. July 17, 2020). The final case cited by Plaintiffs is a consent order addressing class certification and appointing a special master pursuant to FRCP 53. ECF No. 26-18.

None of the circumstances in these cases are present here. Accordingly, the Court denies Plaintiffs' request to appoint a special master. This does not foreclose the possibility that a special master or another person with a similarly contemplated role may be appointed in the future, if appropriate.

---

[25] *See Agyeman v. INS*, 296 F.3d 871, 886 (9th Cir. 2002).

## 2. Limitations on Relief

The PLRA also authorizes the Court to issue a preliminary injunction in a civil action regarding prison conditions. *See* 18 U.S.C. § 3626(a)(2). "[I]njunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." *Id.*; *see also Melendres v. Maricopa County*, 897 F.3d 1217, 1221 (9th Cir. 2018) ("We have long held that injunctive relief 'must be tailored to remedy the specific harm alleged.'" (some internal quotation marks and citation omitted)). Courts are required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief."[26] 18 U.S.C. § 3626(a)(2); *see also*

---

[26] Paragraph (1)(B) provides:

> The court shall not order any prospective relief that requires or permits a government official to exceed his or her authority under State or local law or otherwise violates State or local law, unless—
>
> > (i) Federal law requires such relief to be ordered in violation of State or local law;
> >
> > (ii) the relief is necessary to correct the violation of a Federal right; and
> >
> > (iii) no other relief will correct the violation of the Federal right.

18 U.S.C. § 3626(a)(1)(B).

*Maricopa County*, 897 F.3d at 1221 ("Federalism principles make tailoring particularly important where, as here, plaintiffs seek injunctive relief against a state or local government." (citation omitted)). District courts nevertheless retain "broad discretion to fashion injunctive relief" so long as the injunctive relief "is 'aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'" *Maricopa County*, 897 F.3d at 1221 (some internal quotation marks and citation omitted).

Preliminary injunctive relief automatically expires "90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." 18 U.S.C. § 3626(a)(2).

Although Plaintiffs' requested injunctive relief is largely appropriate, the Court has made necessary adjustments to ensure that the relief is narrowly tailored to correct the constitutional violations identified herein and is the least intrusive means to correct the harm to Plaintiffs. Based on the foregoing, the Court GRANTS the Injunction Motion and ORDERS Defendant to *fully comply* with the Response Plan,[27] focusing in particular on the following:

---

[27] To be clear, the Court is referring to the State of Hawaii Department of Public Safety Pandemic Response Plan COVID-19 (May 28, 2021 Revision). ECF No. 22-12. At the hearing, Plaintiffs' counsel conceded that she does not take issue

(continued . . .)

- Section 3.a (Good Health Habits).

- Section 3.b (Environmental Cleaning).

- Section 3.c (Social Distancing Measures).

- Section 3.d (Encourage the use of Masks and Other No-Contact Barriers).

- Section 6 (New Intake Screening).

- Section 8 (Personal Protective Equipment (PPE)).

- Section 10 (Medical Isolation/Cohorting (*Symptomatic Persons*)).

- Section 12 (Quarantine (*Asymptomatic Exposed Persons*)) – with an emphasis on the provisions concerning the (1) identification of inmates who are at increased risk for severe illness and (2) single cell and available housing prioritization of inmates with increased risk of severe illness from COVID-19.

- Section 13 (Surveillance for New Cases).

Defendant is further ORDERED to:

- Provide sanitary living conditions to all inmates in DPS custody, *i.e.*, regular access to a working toilet, sink, and drinking water.

- Prohibit DPS employees from restricting access to inmate grievance forms or from preventing the submission of grievances with respect to COVID-19 issues.

---

(. . . continued)
with the Response Plan itself, and indeed, the Court agrees that it is a rather comprehensive plan that addresses the proper management of COVID-19 at DPS facilities.

Oversight is hereby referred to Magistrate Judge Mansfield, who is authorized to address compliance with the preliminary injunction, engage in factfinding procedures he deems appropriate, and issue certified factual findings to the undersigned.  The parties are directed to attend status conferences with Magistrate Judge Mansfield once a month.  One week prior to each status conference, the parties shall file a joint status report.  If they are unable to do so, they shall file separate status reports.  The parties are directed to contact Magistrate Judge Mansfield's chambers to schedule the first status conference during the week of July 19, 2021.  The parties need not file a status report but should be prepared to discuss compliance with the injunction.

### C.    FRCP 65(c)

FRCP 65(c) permits a court to grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  While this language appears to be mandatory, "Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any.*'"  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (some internal quotation marks and citation omitted).  Based on the class composition and record before it, the Court waives the bond requirement.

**CONCLUSION**

In accordance with the foregoing, the Court HEREBY (1) GRANTS

Plaintiffs' Motion for Provisional Class Certification, ECF No. 20, and (2)

GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Preliminary

Injunction and Temporary Restraining Order. ECF No. 6.

IT IS SO ORDERED.

DATED:     Honolulu, Hawaiʻi, July 13, 2021.

Jill A. Otake
United States District Judge

Civil No. 21-00268 JAO-KJM, *Alvarado v. Otani*; ORDER (1) GRANTING PLAINTIFFS' MOTION FOR
PROVISIONAL CLASS CERTIFICATION AND (2) GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

69