ERIC A. SEITZ
ATTORNEY AT LAW
A LAW CORPORATION

ERIC A. SEITZ          1412
GINA SZETO-WONG   10515
KEVIN YOLKEN        10987
820 Mililani Street, Suite 502
Honolulu, Hawai'i 96813
Telephone:  (808) 533-7434
E-Mail:     eseitzatty@yahoo.com
            szetogina@gmail.com
            kevinyolken@gmail.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| ANTHONY CHATMAN, FRANCISCO ALVARADO, ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br>   vs.<br><br>MAX N. OTANI, Director of State of Hawai'i, Department of Public Safety, in his official capacity,<br><br>        Defendant. | CIVIL No. <u>21-00268 JAO-KJM</u><br><br>**PLAINTIFFS' FIRST RESPONSIVE STATUS REPORT TO DEFENDANT MAX N. OTANI'S STATUS REPORT NO. 1 REGARDING COMPLIANCE WITH THE PRELIMINARY INJUNCTION FILED ON JULY 13, 2021; EXHIBITS 1-52; DECLARATION OF GINA SZETO-WONG; CERTIFICATE OF SERVICE**<br><br><u>Status Conference:</u><br>Date:      August 16, 2021<br>Time:      09:00 am<br>Mag. Judge:  The Hon. Kenneth J. Mansfield |

|  | Judge: | The Hon. Jill A. Otake |
|---|---|---|

## PLAINTIFFS' FIRST RESPONSIVE STATUS REPORT

# TABLE OF CONTENTS

**I. Introduction** ............................................................................3

**II.  Defendant Is Not in Compliance with the Pandemic Response Plan**.........5

A.  Retaliation Against Kulani Correctional Facility Inmates from July 28, 2021, to the Present. ...............................................................5

B.  Unsanitary Living Conditions at OCCC and HCCC...................10

1.  HCCC ...............................................................................10

2.  DPS Staff Declare that Conditions at OCCC Are Unsanitary and Uninhabitable. ..................................................................14

C.  HCCC and Halawa Continue to Violate the Transport Policy......................15

1.  Transport of Halawa Inmates to Waiawa on July 30, 2021. ......................15

2.  Transport of HCCC Inmates to Halawa on July 27, 2021 ..........................16

D.  Many DPS Facilities Do Not Comply with the New Intake Screening, Testing, and Quarantine Policies.................................................19

1.  Halawa ...............................................................................20

2.  HCCC ................................................................................22

3.  OCCC ................................................................................27

4.  Waiawa ..............................................................................29

5.  Inadequate Quarantine Procedures at MCCC ...........................32

6.  Inadequate Contact Tracing and Isolation of Close Contacts at WCCC ....35

E.  Practices at Kulani, Halawa, Waiawa, MCCC, OCCC, and HCCC Violate the Surveillance for New Cases Policy .............................................36

1.  Halawa...............................................................................36

A.  Waiawa ..............................................................................38

B.  MCCC.................................................................................39

C.  OCCC ................................................................................40

D.  Kulani ................................................................................41

E. HCCC ....................................................................................42

F. Kulani, OCCC, and HCCC Are Not in Compliance with the Personal Protective Equipment ("PPE") Policy. ..............................................43

   1. OCCC ..............................................................................43

   2. HCCC ..............................................................................45

   3. Kulani ..............................................................................46

G. Most DPS Facilities Are Not in Compliance with the Environmental Cleaning Policy..........................................................................47

   1. Halawa ..............................................................................47

   2. Waiawa. ............................................................................48

   3. Kulani ..............................................................................49

   4. OCCC ..............................................................................50

   5. MCCC..............................................................................51

   6. WCCC ..............................................................................52

H. Nearly Every DPS Facility Fails to Provide Adequate Soap to .................53
Inmates in Violation of the Good Health Habits Policy........................53

I. Nearly Every DPS Facility Does Not Practice Social Distancing ................55

J. Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC Do Not Enforce the Mask Wearing Policy. ....................................................58

   1. Fees for Replacement Masks...............................................58

   2. Receiving Masks Upon Arrival and Free Replacement Masks ................59

   3. OCCC, Halawa, and HCCC Do Not Launder Inmate Masks ....................59

   4. Mask-Wearing Is Not Enforced at Kulani, OCCC, Waiawa, MCCC, Halawa, WCCC....................................................................59

K. Retaliation..............................................................................60

   1. Asking About the Long Term Effects of COVID-19 May Get a Kulani Inmate Sent Back To Halawa...............................................61

   2. A Halawa Inmate May Be Transferred to the COVID-Positive Quad as Punishment ......................................................................61

3. No Grievance Forms Available During Active Outbreak At MCCC, Halawa, and HCCC. ...........................................................62

L. OCCC and Kulani Do Not Train Their Staff on the DPS PRP in Violation of the Administrative/Coordination Policy. ...............................62

M. OCCC Violates the Employee Screening Policy. .......................................63

N. Most DPS Correctional Facilities Are Not in Compliance with the Continuous Quality Improvement Policy. ...............................................64

O. Miscellaneous COVID-19 Mitigation Issues ...............................................65

1. The Cost of Medical Treatment at WCCC...................................................65

2. Vaccinations and Counterfeit Vaccination Cards .......................................65

3. Some Kulani Inmates Have Not Had Video Visits with Family Members For Almost Two Years. ...............................................................66

III. Paragraphs E, F, and G of Order #1 ...........................................................66

iii

Plaintiffs ANTHONY CHATMAN, FRANCISCO ALVARADO,

ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, on

behalf of the Class (collectively hereinafter "Plaintiffs") by and through their

undersigned attorneys, hereby submit their First Responsive Status Report to the

Status Report of Defendant MAX N. OTANI, Director of State of Hawai'i,

Department of Public Safety, in his official capacity ("Defendant" or "DPS").

ECF No. 48.

## I.   Introduction

According to Defendant's Status Report, each DPS facility is in full

compliance with each section of the DPS Pandemic Response Plan ("PRP"), with a

few minor exceptions.  *See, generally* ECF No. 48.

As of August 9, 2021, there are outbreaks[1] of COVID-19 at Hawai'i

Community Correctional Center ("HCCC"), Halawa Correctional Facility

("Halawa"), Oahu Community Correctional Center ("OCCC"), and Maui

---

[1] Under the Centers for Disease Control and Prevention ("CDC") guidelines, "[a] single new case of SARS-CoV-2 infection in any correctional and detention center staff or incarcerated/detained person should be considered an outbreak." (distinguishing between an isolated case upon entry and those originating from within a facility).  Centers for Disease Control and Prevention, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities* https://www.cdc/gov/coronavirus/2019-ncov/community/correction-detention/testing.html (last accessed August 6, 2021).

Community Correctional Center ("MCCC").  *See* Exhibits 44-50 (Daily Reports from DPS).

At least 79 inmates in DPS custody and 15 staff have tested positive for COVID-19 in the Hawaii correctional system since this Court's Order #1 Regarding Oversight of the Preliminary Injunction was entered [ECF No. 42] ("Order #1").  *Id*.  There are approximately 50 COVID-positive inmates at Halawa, 22 COVID-positive inmates at MCCC, six COVID-positive inmates at HCCC, and three COVID-positive inmates at OCCC that we know of.  *Id.*

Plaintiffs note for the Court that the daily reports of positive COVID-19 cases Defendant has provided to Class Counsel are inconsistent with data published on the DPS COVID-19 Database on the DPS website.  As of August 9, 2021, the website has not reported the same number of COVID-positive inmates at MCCC or OCCC that counsel for Defendant has provided to Class Counsel.  *See* DPS Website, Public Safety Department COVID-19 Testing Data (last visited August 9, 2021), https://dps.hawaii.gov/blog/2020/03/17/coronavirus-covid-19-information-and-resources/.  Specifically, according to the DPS Daily Reports, there are three positive cases at OCCC and 22 positive cases at MCCC. According to the DPS website, however, only one inmate at OCCC and two inmates at MCCC are COVID-positive.  *See* Exhibit 53 (DPS COVID-19 Testing Data, dated August 6, 2021).

4

Thirteen of the 15 DPS staff who are COVID-positive work at MCCC.

After conferring with nearly 40 inmates from seven facilities and five DPS staff from OCCC and Kulani Correctional Facility ("Kulani"), Class Counsel concludes that DPS is not in full compliance with the DPS PRP.

Some of the areas of non-compliance include retaliation against inmates for speaking with Class Counsel about COVID-19 mitigation measures in DPS facilities; failures to adequately quarantine new arrivals; failures to surveille, test, and isolate inmates with COVID-19 symptoms; failures to adequately sanitize and clean each facility; failures to perform any screening prior to or after transport to another facility; failures to provide staff and inmates with proper PPE and cleaning supplies; and failures to enforce mask wearing and social distancing requirements.

As set forth below, HCCC continues to house inmates in the Fishbowl and other housing areas without running water or a toilet, with adequate access to the bathroom and drinking water.

Finally, Plaintiffs have not been able to obtain the names or contact information of any inmates at Kauai Community Correctional Center ("KCCC"). As discussed below, Class Counsel has yet to receive this information despite this Court's July 21, 2021, Order #1.  *See* ECF No. 42, Sections E and F.

## II.   Defendant Is Not in Compliance with the Pandemic Response Plan.

### A. Retaliation Against Kulani Correctional Facility Inmates from July 28, 2021, to the Present.

5

The Court's July 13, 2021, Preliminary Injunction Order against Defendant DPS ("Order") states that, "Defendant is ordered to … prohibit DPS employees from … preventing the submission of grievances with respect to COVID-19 issues."  DPS inmates, therefore, should not be prevented from raising issues related to any facilities' failure to come into compliance with its Pandemic Response Plan ("PRP").

On Wednesday, July 28, 2021, Class Counsel, Gina Szeto-Wong ("Ms. Szeto-Wong") and Kulani Correctional Facility ("Kulani") inmate and class member Christopher Valdez ("Mr. Valdez") spoke via telephone for approximately 30 minutes from 9:15 a.m. to 9:45 a.m. ("Call").  *See* Exhibit 1, Declaration of Christopher Valdez ("Valdez Decl.") at ¶ 19.

During the Call, Mr. Valdez provided information to Ms. Szeto-Wong regarding the various ways the Kulani facility is not in compliance with DPS's PRP.  *Id.*

At approximately 9:45 a.m., Mr. Valdez went back to work in the housing unit.  *Id.*  Approximately ten minutes after the Call, Mr. Valdez's supervisor, Mr. Mauka, approached Mr. Valdez while he was conversing with other inmates and stated to Mr. Valdez, "I just got a call.  Because of *your* call and the lawsuit you're involved in, we have to do a COVID class now at 1:45 pm."  *Id.* at 4(b); Exhibit 16, Declaration of Shaun Shine ("Shine Decl.") at ¶ 4.

6

Around 1:45 p.m. later that day, Kulani Warden Wanda Craig ("Warden Craig") asked 40 work line inmates to gather in the Programs building for an announcement. *See* Exhibit 15, Declaration of Plaintiff Francisco Alvarado ("Alvarado Decl.") at ¶ 6. According to Plaintiff Francisco Alvarado ("Mr. Alvarado"), Mr. Valdez, and Kulani inmate Shuan Shine ("Mr. Shine") who were all present at the meeting, Warden Craig was irate and made the following statements to the inmates:

> *"I don't want to be on the news being called a liar by one of you! I will stand up in court in front of any judge and tell them that you're all full of sh\*t. I'm no liar! I am doing what I can with the chemicals and keeping this facility clean.*
>
> *I'm showing you a video on COVID now so that you can sign the form and say that I did it.*
>
> *Eight people are leaving the facility soon and I'm not going to tell you who they are."*

*Id.* at ¶ 7; Valdez Decl. at ¶ 20; Shine Decl. at ¶ 5.

According to Francisco Alvarado, because of this meeting with the Warden some of the Kulani inmates are now reluctant to speak to Plaintiffs' counsel because they are afraid if they do so, they will be transferred to Halawa. *See* Alvarado Decl. at ¶ 9.

Five days after the July 28, 2021, announcement, Warden Craig cancelled a pre-arranged Skype call that would have enabled Mr. Valdez to see his family

during his grandfather's memorial service scheduled for August 7, 2021. *See* Valdez Decl. at ¶ 21.

On Sunday, August 1, 2021, Plaintiff Alvarado was six feet behind Warden Craig when she stated to a Captain, "*I'm gonna take away their chairs for talking sh\*t.*" Alvarado Decl. at ¶ 19. The staff then removed all the chairs from the open dorms. *Id.*

On August 2, 2021, Class Counsel, Ms. Szeto-Wong, and Counsel for Defendant, Skyler Cruz ("Mr. Cruz") conferred about the July 28, 2021, incident at Kulani. *See* Exhibit 52, Declaration of Gina Szeto-Wong ("Szeto-Wong Decl.") at ¶ 51.

On August 4, 2021, Mr. Cruz sent Ms. Szeto-Wong an email stating that, "Warden Craig has been instructed that the three inmates identified below [Francisco Alvarado, Christopher Valdez, and Shaun Shine] are to remain at Kulani Correctional Facility unless a determination is made that they present a security risk, which typically occurs only after a finding that an inmate is guilty for a major misconduct." *See* Exhibit 51.

Two days later, on Friday, August 6, 2021, a DPS guard approached Mr. Valdez and Mr. Shine. *See* Valdez Decl. at ¶ 22; Shine Decl. at ¶ 14. According to Mr. Valdez and Mr. Shine:

> The guard stated, "*What's up with the meeting with you and Alvarado?*"

We responded, "*What meeting?*"

The guard replied, "*I gotta ask you guys. I had a meeting with the Warden this morning and she asked me to ask you guys*."

Mr. Shine said, "*We talk every morning. We've known Alvarado for years, it's not like we just met*."

The guard continued, "*She just wants to know. We all had a meeting this morning and the Warden told us we can't move you guys. She told everyone, all the guards know*."

*Id.*

After our conversation, the guard immediately called the Warden. *See* Ex. 16, Shine Decl. at ¶ 22(h)-(j). Mr. Shine was a few feet from the guard when the guard made the call. *Id.* Mr. Shine overheard the guard state to the Warden, "*I asked them, maybe we'll talk later*." *Id.*

According to Mr. Valdez, at the dining hall a few hours later, many of the guards were staring at him and Mr. Shine. *See* Ex. 1, Valdez Decl. at ¶ 23. Mr. Valdez and Mr. Shine reported they do not feel safe. *Id*; Ex. 16, Shine Decl. at ¶ 22(k)-(n). Mr. Shine and Mr. Valdez are afraid if things escalate, they, including Mr. Alvarado, could be physically assaulted at the facility. *Id.*

These incidents raise two troubling concerns. First, if these allegations are true, the Warden is retaliating against inmates for speaking with Class Counsel about the Kulani Facility's compliance with its PRP. Second, Mr. Mauka's

comments suggest that Warden Craig is listening in on privileged attorney-client conversations.

This is not the first time Warden Craig has made public comments to inmates regarding grievances against the facility.  When Mr. Valdez first arrived at Kulani in March 2021, Warden Craig announced, *"I don't care if you file a grievance, grievances don't matter to me.  I will put you on the first flight to Halawa."*  Ex. 1, Valdez Decl. at ¶ 5.  According to Mr. Valdez, Warden Craig then stated that she just sent two inmates back to Halawa for filing grievances.  *Id.*

Kulani Sergeant Anthony Carvalho ("Sgt. Carvalho") agrees that it is common knowledge that Warden Craig retaliates against individuals for filing or making grievances against her or the facility.  *See* Exhibit 41, Declaration of Anthony Carvalho ("Carvalho Decl.") at ¶ 14.

## B. Unsanitary Living Conditions at OCCC and HCCC

In the Court's July 13, 2021, Preliminary Injunction Order ("July 13, 2021, Order") the Court ordered Defendant to "provide sanitary living conditions to all inmates in DPS custody, *i.e.*, regular access to a working toilet, sink, and drinking water."  *See* ECF No. 37 at 67.

### 1. HCCC

HCCC Warden Cramer Mahoe ("Warden Mahoe") reports that HCCC is in full compliance with the Court's order to provide all inmates with sanitary living

conditions and regular access to a working toilet, sink and drinking water.  *See*

ECF No. 48-1 at 35.

### a. Inmates In the Fishbowl and Other Housing Areas Continue to Be Deprived of Adequate Access to the Bathroom and Drinking Water

The HCCC continues to house up to 18 inmates in the Fishbowl for almost

16 hours a day, from 6:30 a.m. until 10 p.m.  *See* Exhibit 11, Declaration of Jesse

Mamac ("Mamac Decl.") at ¶¶ 7, 8; Exhibit 4, Declaration of Marco Castro

("Castro Decl.") ¶ 9, 10; Exhibit 32, Declaration of Jesse Rowe ("Rowe Decl.) ¶ 7;

Exhibit 31, Declaration of Pohakea Lipe ("Lipe Decl.") at ¶ 4, 5.  At 10 p.m., these

inmates are then transferred to the Multi-Purpose Floor ("MPF"), a room the same

size as the Fishbowl, with no running water and no toilet, until the next morning at

6:30 a.m.  *Id.*

Twenty-four hours a day, seven days a week, the inmates in the Fishbowl

and MPF, do not have regular access to a toilet or drinking water.  *Id.*  Inmates in

the Fishbowl continue to urinate in their drinking cups because guards do not grant

inmates' requests to use the bathroom.  *See* Ex. 4, Castro Decl. at ¶ 9; Ex. 11,

Mamac Decl. at ¶ 7.  Although water jugs are provided at various points

throughout the week, the water runs out quickly and inmates' requests for drinking

water are also frequently denied.  *See* Ex. 11, Mamac Decl. at ¶ 7; Ex. 4, Castro

Decl. at 9(f).

11

Nine to twelve inmates are held in the Visitors' Room, which is approximately 10 feet by 8 feet. *See* Ex. 4, Castro Decl. at ¶ 12. At the end of July, 2021, HCCC inmates heard inmates held in the Visitors' Room banging on the door for up to an hour to be let out to use the restroom. *See* Ex. 32, Rowe Decl. at ¶ 7. As recently as August 4, 2021, inmate janitors have observed urine in the drinking cups in the Visitors' Room because guards are not allowing them to use the bathroom on a regular basis. *See* Ex. 4, Castro Decl. at ¶ 12(a).

Five inmates are held on the floor of the G-unit Day Room which also does not have running water or a toilet. *See* Ex. 11, Mamac Decl. at ¶ 11. Inmates in this unit bang on the door to use the bathroom, but their requests are also frequently denied. *See* Ex. 32, Rowe Decl. at ¶ 7(e)-(f).

These conditions violate the Court's order to ensure that DPS provide all inmates with regular access to a working toilet, sink, and drinking water. *See* ECF No. 37 at 67.

### b. The G-Unit Is Unsanitary and Uninhabitable

The G-unit was engulfed in a fire in early June 2021. *See* Ex. 31, Lipe Decl. at ¶ 3(a). The walls, floors, toilets, sinks, and bunk beds are completely stained black with char and soot. *Id.* at 3(b)-(c). According to inmates, these cells smell like ash and smoke. *Id.*

There are no beds in the G-unit, so inmates housed in the G-unit sleep on the floor on thin mattresses. *Id.* at 3(e). Each G-unit cell is approximately 6 feet by 6 feet, and houses three to four inmates. *Id.* at 3.

HCCC inmate Marco Castro has Chronic Obstructive Pulmonary Disease ("COPD") and requires two prescription inhalers to treat his condition. *See* Ex. 4, Castro Decl. at ¶ 2. Since being housed in the G-unit Mr. Castro has increased difficulty breathing, as does his cellmate who also has respiratory disease. *Id.* at 6(h)-(i).

Mr. Castro, his cellmates, and the inmates who sleep on the floor of the G-unit Day Room, a small area in front of the G-unit cells, all sleep on wet mattresses. *Id.* at 6; Ex. 11, Mamac Decl. at ¶ 11. Mr. Castro and his cellmates sleep on wet mattresses because their toilet leaks water onto the floor of the cell where their mattresses are. *See* Ex. 4, Castro Decl. at ¶ 8. Mr. Mamac and the other G-unit Day Room inmates sleep on wet mattresses because their sleeping area is next to a shower stall that is shared with inmates in another unit and the shower water seeps onto the floor of the Day Room throughout the day. *See* Ex. 11, Mamac Decl. at ¶ 11. Mr. Mamac and Mr. Castro have asked for new mattresses, but guards told them they could not have new ones. *See* Ex. 4, Castro Decl. at ¶ 8; Ex. 11, Mamac Decl. at ¶ 11.

13

According to Pohakea Lipe, he and his cellmates eat all of their meals on the floor next to the toilet which is difficult and unhygienic because the floor is full of ash and soot.  *See* Ex. 31, Lipe Decl. at ¶ 3(g).

These conditions violate the Court's order to ensure that DPS provide all inmates with a sanitary living environment.

### 2. DPS Staff Declare that Conditions at OCCC Are Unsanitary and Uninhabitable.

According to OCCC Sergeant Paul Kyles ("Sgt. Kyles"), the housing modules at OCCC are not habitable or sanitary.  *See* Ex. 22, Kyles Decl. at ¶ 6(a)-(b).  Sgt. Kyles describes the module that he works in as, "like a third-world country."  *Id.*  Sgt. Kyles believes that the facility would benefit from a court-ordered inspection.  *Id.* at ¶ 5.

For the number of inmates housed in Annex Two at OCCC, for example, there is an insufficient number of working toilets, showers, and sinks.  *Id.* at ¶ 6(d)-(g).  Among other things: (1) the food trays at OCCC are not adequately cleaned or sanitized between use, *id.* at ¶ 16; (2) there are roaches all over, *see* Exhibit 5, Declaration of Christian-Johnson Kukahiko ("Kukahiko Decl.") at ¶ 13; (3) each floor is covered in mold and mildew and smells like "sweat, urine, and body odor," Kyles Decl. at ¶ 6; and the cleaning products that the facility provides are so severely watered down that many DPS staff at OCCC frequently purchase cleaning supplies for the facility, *see* Ex. 22, Kyles Decl. at ¶ 6(n)-(q).

14

These conditions violate the Court's order to ensure that DPS provide all inmates with a sanitary living environment.

### C.  HCCC and Halawa Continue to Violate the Transport Policy.

The Transport policy of the DPS's PRP states that,

> "Prior to transporting inmates … between other jurisdiction and facilities, procedures should be established to ensure screening is conducted by nursing.  Positive screens should remain at the sending facility until cleared by the provider."

DPS PRP at 35.

### 1.  Transport of Halawa Inmates to Waiawa on July 30, 2021.

According to Halawa Warden Scott Harrington ("Warden Harrington"), Halawa is in full compliance of the Transport policy of the DPS's PRP.  *See* ECF No. 48-2 at 22.

On July 30, 2021, Halawa transported 14-17 inmates to Waiawa.  *See* Exhibit 34, Declaration of Patrick Daniels ("Daniels Decl.") at ¶ 6; Exhibit 30, Declaration of Stanley Canio ("Canio Decl.") at ¶ 8-11.

According to former Halawa inmates Patrick Daniels ("Mr. Daniels") and Stanley Canio ("Mr. Canio"), who were transported to Waiawa from Halawa on July 30, 2021, they were not tested, screened, or quarantined at Halawa immediately prior to their transport to Waiawa.  *See* Ex. 34, Daniels Decl. at ¶ 6; Ex. 30, Canio Decl. at ¶ 6.  Mr. Canio has never contracted COVID-19 and has not been vaccinated.  *See* Canio Decl. at ¶¶ 2, 3.

Prior to the transport to Waiawa, Mr. Canio was feeling sick; he was coughing and had a sore throat. *Id*. at ¶ 8. When he arrived at Waiawa, Mr. Canio informed two different nurses at two separate times, he was not feeling well. *Id*. at ¶ at 8, 9. As of August 4, 2021, he has not been tested for COVID-19. *Id.* at 10.

### 2. Transport of HCCC Inmates to Halawa on July 27, 2021

According to HCCC Warden Cramer Mahoe ("Warden Mahoe"), HCCC is in full compliance with the Transport policy of the DPS PRP. *See* ECF No. 48-1 at 18, 10. In his status report, Warden Mahoe stated:

> Active outbreak, all transportation in and out of the facility has been shut down and currently under the DoH. Only inmates that have been allowed to be transported on the Con Air movements are inmates who have been with the facility for over 14-days and have passed the COVID-19 testing or the inmates that are post-positive with no further symptoms.

ECF No. 48-1 at 19.

On July 27, 2021, HCCC transported approximately 20 inmates to Halawa. *See* KHON2 Staff, Big Island inmates transferred to Oahu facility to alleviate overcrowding, KHON2, (July 27, 2021), https://www.khon2.com/local-news/big-island-inmates-transferred-to-oahu-facility-to-alleviate-overcrowding/. According to DPS, the only inmates considered for the transfer were those who have been vaccinated and/or tested negative for COVID-19, as well as those deemed medically cleared to travel. *Id.*

16

Prior to the flight to Halawa, former HCCC inmates Joey Caseres ("Mr. Caseres"), Bronson-Lee Oili ("Mr. Oili"), Seth Stellar ("Mr. Stellar"), Kalahikiola Kalili ("Mr. Kalili"), Chace Tam ("Mr. Tam"), and Albert Jardin, Jr. ("Mr. Jardin") (collectively, "HCCC Arrivals") were transported to Halawa on July 27, 2021.  *See* Exhibit 23, Declaration of Joey Caseres ("Caseres Decl.") at ¶ 6; Exhibit 24, Declaration of Chace Tam ("Tam Decl.") at ¶ 7; Exhibit 20, Declaration of Seth Stellar ("Stellar Decl.") at ¶ 5; Exhibit 14, Declaration of Bronson-Lee Oili ("Oili Decl.") at ¶ 6, *See* Exhibit 37, Declaration of Kalahikiola Kalili ("Kalili Decl.") at ¶ 7; Exhibit 35, Declaration of Albert Jardin, Jr. ("Jardin Decl.") at ¶ 6.

Prior to the flight, the HCCC Arrivals were not: (1) tested for COVID-19; (2) evaluated by a medical provider, or (3) asked any screening questions at HCCC.  *Id.*

Mr. Caseres has not been vaccinated and has never contracted COVID-19. *See* Ex. 23, Caseres Decl. at ¶ 6.  Prior to the flight Mr. Caseres was feeling sick; he had a runny nose, body aches and sinus problems.  *Id.*  He was also coughing. *Id.* at ¶ 6, Ex. 14, Oili Decl. at ¶ 6.  Several other former HCCC inmates reported that they observed that Mr. Caseres looked ill on the flight to Halawa.  *See* Ex. 14, Oili Decl. at ¶ 6; Ex. 20, Stellar Decl. at 6; Ex. 37, Kalili Decl. at ¶ 8.

Mr. Oili has not been vaccinated.  Oili Decl. at ¶ 2.  The day before and the day of the flight, Mr. Oili informed DPS staff that he had kidney stones and was in extreme pain.  *Id.* at ¶ 5.  DPS guards dismissed his concerns.  *Id.*

17

Mr. Stellar has not been vaccinated for COVID-19.  *See* Ex. 20, Stellar Decl. at ¶ 2.   Prior to the flight Mr. Stellar was feeling sick and fatigued; he had a runny nose, headache, and head congestion, he could not smell or taste.  *Id.* at ¶ 5.  Mr. Stellar was sitting across from Mr. Caseres on the flight to Halawa.  *Id.* at ¶ 6.

Mr. Tam has not been vaccinated for COVID-19.  *See* Ex. 24, Tam Decl. at ¶ 2.  Mr. Tam contracted COVID-19 in mid-June 2021.  *Id.* at ¶ 5.  Mr. Tam has never tested negative for COVID-19 since he first tested positive in June 2021.  *Id.* at ¶ 5.  Mr. Tam has experienced COVID-19 symptoms continuously since he tested positive in June 2021.  *Id.*  He last had a fever around July 20, 2021, the week before HCCC flew inmates to Halawa.  *Id.* at ¶ 6.  Prior to the flight, Mr. Tam was feeling sick and nauseous; he had a headache, a runny nose, and had difficulty breathing.  *Id.* at ¶ 7.  He also had a persistent cough.  *Id.*

Mr. Kalili contracted COVID-19 in mid-June 2021.  *See* Ex. 37, Kalili Decl. at ¶ 2.  Mr. Kalili has experienced COVID-19 symptoms continuously since he tested positive in June 2021.  *Id.* at ¶ 3.  Prior to the flight Mr. Kalili was not feeling well; he had an itchy throat, a runny nose, and body aches.  *Id.* at ¶ 7.

Because these inmates had symptoms that were dismissed prior to the flight to Halawa, they were transferred to Halawa in violation of the Transport policy.  The failure to screen and isolate the HCCC arrivals prior to their flight is a possible source of the current outbreak at Halawa that began one week after the transport.

### D. Many DPS Facilities Do Not Comply with the New Intake Screening, Testing, and Quarantine Policies

The New Intake Screening policy of the PRP states that when Facilities

process new arrivals into a facility,

> "[a]dditional questions should be asked regarding travel history and potential exposure to COVID-19. New inmates should be separated from the other inmates until the screening process is completed … If new intakes are identified with symptoms … place the inmate in a separate room, preferably with a toilet, while determining next steps.
>
> Implement routine intake quarantine (*i.e.*, quarantine all new admissions to the facility for 14 days before housing such inmates in the general population)."

DPS PRP at 29.

The Initial Management and Testing of SARS-CoV-2 policy of the PRP

states that, "[v]iral testing is recommended for inmates with signs or symptoms

consistent with COVID-19 and all close contacts of persons with SARS-CoV-2

infection." *Id.* at 29, 30.

The Quarantine policy of the PRP states that, "[i]nmates who are close

contacts of suspected or a confirmed COVID-19 case should be placed under

quarantine for 14 days … Do not add more inmates to an existing quarantined

cohort after the 14-day quarantine clock has started." *Id.* at 44.

The Quarantine policy also states that, "[f]acilities should maintain a system for the identification of inmates, with COVID-19, who are at increased risk for severe illness." *Id.*

### 1. Halawa

According to Warden Harrington, Halawa is in full compliance with DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies. *See* ECF No. 48-2 at 16, 17, 19, 30-33.

In his Status Report, Warden Harrington stated that, "[a]s a safety precaution to avoid the spread of Covid into the Facility, all inmates transferred in to HCF are placed in quarantine for 14 days." *Id.* at 17.

For the following reasons, Halawa is not in compliance with DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies.

### a. On July 27, 2021, New HCCC Arrivals Were Not Tested or Screened Upon Arrival to Halawa.

On the flight to Halawa from HCCC on July 27, 2021, at least five inmates from HCCC had COVID-like symptoms. *See* Ex. 23, Caseres Decl. at ¶ 6; Ex. 20, Stellar Decl. at ¶ 5; Ex. 24, Tam Decl. at ¶ 7; Ex. 37, Kalili Decl. at ¶ 7; Ex. 35, Jardin Decl. at ¶ 6.

None of these inmates were tested for COVID-19 or asked any screening questions upon arrival at Halawa. *See* Ex. 23, Caseres Decl. at ¶ 8; Ex. 20, Stellar Decl. at ¶ 8; Ex. 24, Tam Decl. at ¶ 9; Ex. 37, Kalili Decl. at ¶ 9; Ex. 35, Jardin

Decl. at ¶ 8.  Each was placed in the same open-air module as new arrivals from MCCC and used the same showers, phones, and cleaning devices as the former MCCC inmates.  *Id.*

The HCCC Arrivals were able to physically interact with one another and the new arrivals from MCCC by shaking hands through the bars and chit chatting for the half an hour they were let out of their cell.  *Id.*

This was not unusual.  Other Halawa inmates in "quarantine" were also able to physically interact with and use the same devices as other inmates in "quarantine" that came in on different days.  *See* Exhibit 10, Declaration of Eric Wash ("Eric Decl.") at ¶ 5; *See* Exhibit 25, Declaration of Glenn Keohokapu ("Glenn Decl.") at ¶ 7; Exhibit 26, Declaration of Kaipo McGuire ("Kaipo Decl.") at ¶ 6.  None of these devices, showers, or phones were cleaned between use.  *Id.*

These actions by DPS staff at Halawa violate the Intake Screening and Initial Management and Testing of COVID-19 policies.

### b.  New Arrivals at Halawa Quarantined For As Little As Six Days.

On July 26, 2021, several Halawa inmates from the "quarantine" quad were transferred into general population modules regardless of the number of days these inmates had been in quarantine.

Halawa inmates Glenn Keohokapu ("Mr. Glenn") and Kaipo McGuire ("Mr. Kaipo"), for example, entered the Halawa facility on July 20, 2021 and July 19,

2021, respectively.  *See* Ex. 25, Glenn Decl. at ¶ 6; Ex. 26, Kaipo Decl. at ¶ 8.  Mr. Glenn and Mr. Kaipo were only in quarantine for six and seven days, respectively, before they were released to the general population modules.  *Id.*

Some HCCC Arrivals were released from "quarantine" in Module One only nine days after their arrival to Halawa.  *See* Exhibit 42, Declaration of Alfred Keahilihau ("Alfred Decl.") at ¶ 9; Ex. 35, Jardin Decl. at ¶ 8(e).  According to Halawa inmate Alfred Keahilihau ("Mr. Alfred"), he was not screened or tested for COVID-19 prior to being transferred to a general population module even though he was coughing, had a runny nose and body aches.  *See* Ex. 42, Alfred Decl. at ¶ 9.

These actions are in violation of the New Intake Screening and Quarantine policies and are a likely cause of the steep rise in COVID-positive cases as of August 9, 2021.

## 2.  HCCC

According to Warden Mahoe, HCCC is in full compliance with DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies.  *See* ECF No. 48-1 at 13, 14, 15, 30-33.

In his Status Report regarding New Intake Screening, Warden Mahoe stated that, "[d]uring this initial period of processing, new admission inmates who are

identified as being positive for the COVID-19 virus is [sic] immediately separated and housed in the designated cell #23." *Id.* at 14.

In his Status Report regarding Quarantine procedures, Warden Mahoe stated that, "All other subjects were confirmed by our Health Care Unit that we are in full complaint [sic]." *Id.* at 29.

For the following reasons, HCCC is not in compliance with the DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies.

### a. The Fishbowl Is Improperly Used as the "Quarantine" Room at HCCC

New intakes cannot be properly quarantined in a single "open" room because there is no ability to physically separate an inmate who has been in quarantine for several days from an inmate who just arrived "off the street."

Each day, new arrivals to HCCC are placed in the Fishbowl to be "quarantined." *See* Ex. 4, Castro Decl. at ¶ 16. The Fishbowl is a room approximately 30-feet by 30-feet, with no running water or toilet. *See* ECF No. 6-4 at ¶ 6. (Declaration of Lisa Jobes, "Jobes Decl."). This means there are inmates in the Fishbowl who have been in "quarantine" for one day and inmates who have been in quarantine for several days, in violation of the DPS PRP quarantine procedures. DPS PRP at 44.

On July 19, 2021, Mr. Mamac, who was not vaccinated at the time and has never tested positive for COVID-19, was initially held in the dog cages with other

new arrivals in the intake area for several hours. *See* Ex. 11, Mamac Decl. at ¶ 3. The dog cages are approximately five feet by ten feet. *See* ECF No. 6-4, Jobes Decl. at ¶ 6(a).

After processing in the dog cages, Mr. Mamac was placed in the Fishbowl, where according to DPS staff, he was in "quarantine" for fourteen days. *See* Ex. 11, Mamac Decl. at ¶ 7. When Mr. Mamac was placed in the Fishbowl, there were already 15-18 inmates in the Fishbowl. *Id.* These 15-18 inmates in the Fishbowl were supposedly all in "quarantine" together even though the inmates arrived at the facility on different dates. *Id.*

Mr. Mamac and the other 15-18 "quarantined" inmates in the Fishbowl were held there from 6:30 a.m. until 10 p.m. *Id.* At 10 p.m. they were transferred to the Multipurpose Floor ("MPF") a room that is the same size as the Fishbowl, with no running water or toilet.

The use of the Fishbowl to "quarantine" new arrivals is improper, promotes the spread of COVID-19, and is in violation of DPS's PRP procedures for quarantine. *See* PRP at 43-48.

Sometimes, inmates from the general population are put into the Fishbowl quarantine room until DPS staff determine where those inmates should be transferred. According to the DPS PRP, "a person is considered a close contact if the person had direct physical contact with a suspected or confirmed COVID-19

cases." ECF No. 22-12 at 43. Viral testing and quarantine precautions should be taken for all close contacts. *Id.*

On July 26, 2021, general population inmate Mr. Rowe was placed in the Fishbowl for 15 minutes until DPS staff figured out where to put him. *See* Rowe Decl. at ¶ 7(b). No COVID-19 precautions were taken before or after Mr. Rowe was placed in the Fishbowl quarantine room to ensure Mr. Rowe did not contaminate the room or that Mr. Rowe was not exposed to a suspected COVID-19 case. *Id.* This practice can promote the spread of COVID-19 and is in violation of DPS's PRP. *See* PRP at 43-48.

### b. F&K "Quarantine" Cell

On July 21, 2021, Nicalos Kahele ("Mr. Kahele") arrived at HCCC as a new intake. *See* Exhibit 38, Declaration of Nicalos Kahele ("Kahele Decl.") at ¶ 2. Mr. Kahele has never contracted COVID-19. *Id.* at ¶ 3.

Mr. Kahele's "quarantine" period included: (a) four days with three general population inmates (*id.* at ¶ 4); then (b) four days with two new arrivals who had come to the facility before Mr. Kahele but on different dates from each other (*id.* at ¶ 5); then (c) a new arrival who had a cold, for an additional two days (*id.*). This ten-day "quarantine" period exposed Mr. Kahele to six HCCC inmates, including a new arrival with a cold, who arrived at HCCC at different times.

This "quarantine" procedure is in violation of the DPS PRP which explicitly states, "[d]o not add more inmates to an existing quarantined cohort after the 14-day quarantine clock has started."  DPS PRP at 44.

### c. HCCC Houses COVID-Positive Inmates With COVID-Negative Inmates

From July 22, 2021, until July 26, 2021, there were four inmates in a cell with bars in the G-unit.  *See* Ex. 4, Castro Decl. at ¶ 20.  Three of these inmates were COVID-positive and one was COVID-negative ("COVID-Exposed Inmate"). *Id.*  Housing a COVID-negative inmate with COVID-positive inmates is in violation of DPS PRP Quarantine procedures.  *See* DPS PRP at 43-48.

The COVID-Exposed Inmate became a "close contact"  after he was housed with the three COVID-positive inmates and should have been immediately quarantined.  *See* DPS PRP at 43.  Instead, four days later, on July 26, 2021, the three COVID-positive inmates were moved out of their cell ("Positive Cell") and transferred to another unit.  *See* Ex. 4, Castro Decl. at ¶ 20(d).  Immediately thereafter, three new general population, COVID-negative inmates were transferred into Positive Cell with COVID-Exposed Inmate, in violation of DPS's protocol.  *Id.* at ¶ 20(f).

While the three COVID-positive inmates were housed in Positive Cell, DPS housed five inmates in "quarantine" on the floor immediately in front of these COVID-positive inmates.  *See* Ex. 4, Castro Decl. at ¶ 20(c); Ex. 11, Mamac Decl.

26

at ¶ 8(b).  At least one of these inmates, Mr. Mamac, was not vaccinated at the time or post-COVID.  *See* Ex. 11, Mamac Decl. at ¶ 5.  Because Mr. Mamac was housed next to these COVID-positive inmates, Mr. Mamac was exposed to COVID-19 during his "quarantine" period.

These arrangements exposed inmates in "quarantine" to COVID-19, in violation of DPS PRP Quarantine procedures.  *See* DPS PRP at 43.

### 3.  OCCC

According to Warden Sequeria, OCCC is in full compliance with the DPS PRP with respect to the New Intake Screening, Initial Management and Testing, and Quarantine policies.  *See* ECF No. 48-5 at 16, 19, 30-32.

For the following reasons, OCCC is not in compliance.

### a.  General Population Inmates at OCCC Are Frequently Exposed to Inmates in Quarantine

According to DPS Sergeant Malia Anderson ("Sgt. Anderson") and Adult Corrections Officer ("ACO") Stephen Sholtis ("ACO Sholtis"), approximately three times a week, inmates (including inmates in "quarantine") must appear for their Arraignment and Plea ("A&P") hearings via video teleconference.  *See* Exhibit 40, Declaration of Malia Anderson ("Anderson Decl.") at ¶ 8; Exhibit 36, Declaration of Stephen Sholtis ("Sholtis Decl.") at ¶ 6.

From 7:30 am – 10 am, approximately 20 to 30 inmates from the "quarantine" module and the general population ("GP") modules are moved to a

20-foot by 20-foot room in Module Nine to wait for their A&P hearing.  *Id.*

Inmates in "quarantine" and GP inmates are packed into this small room and are

seated right next to each other while they wait their turn to appear by video

teleconference.  *Id.*  This means that an inmate who has been in quarantine for one

day (*i.e.*, right off the street) can be sitting right next to a general population inmate

for several hours.  *Id.*

On August 5, 2021, 10 inmates from five general population modules were

exposed to 16 inmates in "quarantine" while these inmates waited to appear for

their A&P hearings.  *See* Ex. 36, Sholtis Decl. at ¶ 7.  At this time, three inmates

from Module Two, one inmate from Module Three, one from Module Four, two

from Module Seventeen, three from Annex Two, and 16 inmates in "quarantine"

(Module 19) were seated next to each other shoulder to shoulder in Module Nine.

*Id.*

If the court does not need to see a particular inmate during one of these A&P

sessions, that inmate, including an inmate in "quarantine," will be sent back to

their housing module without an escort on a "pass".  *See* Ex. 40, Anderson Decl. at

¶ 10; Ex. 36, Sholtis Decl. at ¶ 9.  That means a "quarantined" inmate can walk

from Module Nine to the "Quarantine Module" without any supervision.  *Id.*

When GP and inmates in "quarantine" must appear in person at court, these

inmates are packed inside a van where they sit next to each other.  *See* Ex. 40,

Anderson Decl. at ¶ 12; Ex. 36, Sholtis Decl. at ¶ 10.  In this van, a general

population inmate may be sitting next to a "quarantined" inmate who just arrived

to the facility.  *Id.*

Each of these practices potentially exposes general population inmates to

COVID-19, defeats the purpose of quarantine, and violates the DPS PRP

Quarantine Procedures.

### b. Up to 10 New Arrivals at OCCC Are Held In a 10-Foot by 10-Foot "Holding Cell"

According to Sgt. Anderson, when new intakes are processed at the facility,

they are held in a 10-foot by 10-foot holding cell.  *See* Ex. 40, Anderson Decl. at ¶

19; Ex. 36, Sholtis Decl. at ¶ 19.  Sgt. Anderson has seen up to ten people in this

holding cell at one time.  *Id.*  There is no "official" contingency plan for where to

hold these inmates if one of them develops a fever or COVID-19 symptoms.  *See*

Ex. 40, Anderson Decl. at ¶ 19.

This practice is in violation of the DPS PRP New Intake Screening Policy

which states that "new inmates should be separated from the other inmates until the

screening process is completed."  DPS PRP at 29.

### 4. Waiawa

According to Waiawa Warden Sean Ornellas ("Warden Ornellas"), Waiawa

is in full compliance with the DPS PRP with respect to New Intake Screening,

Initial Management and Testing, and Quarantine policies.  *See* ECF No. 48-3 at 10, 12, 19-22.

In his Status Report regarding Initial Management and Testing, Warden Ornellas stated that, "[i]f an inmate is identified with COVID-19 symptoms, then immediately place a mask on the inmate (unless contraindicated) and have the inmate perform hand hygiene.  The patient is placed in isolation, which is a separate room with a toilet, shower, and sink.  *Id.* at 12.

For the following reasons, Waiawa is not in compliance with the DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies.

### a. New Arrivals from Halawa Are Not Quarantined Screened, or Tested for COVID-19.

On July 30, 2021, Halawa transported 14-17 inmates to Waiawa.  *See* Ex. 34, Daniels Decl. at ¶¶ 4, 5; Ex. 30, Canio Decl. at ¶¶ 4, 5.

According to former Halawa inmates Mr. Daniels and Mr. Canio who were transported to Waiawa on July 30, 2021, they were not tested, screened, or quarantined upon arrival at Waiawa.  *See* Ex. 34, Daniels Decl. at ¶ 6; Ex. 30, Canio Decl. at ¶ 6.

Mr. Canio has never contracted COVID-19 and has not been vaccinated. Canio Decl. at ¶¶ 2, 3.  Mr. Canio was experiencing COVID symptoms prior to and after his transport to Waiawa.  *Id.* at 8, 9.  On July 30, 2021, between 9 a.m. and 10 a.m., Mr. Canio informed a nurse at Waiawa that he was feeling ill but was told,

"Just wait it out and deal with it. ***If not, they might treat it as a COVID case.***" *Id.* at ¶ 8.  Mr. Canio was not tested for COVID-19 after his interaction with this nurse.  *Id.*

Mr. Canio and Mr. Daniels were immediately integrated into the general population at Waiawa in violation of the New Intake Screening and Routine Quarantine Procedures.  *See* DPS PRP at 29.  This violation is particularly egregious with respect to Mr. Canio, who was not tested or isolated after informing the nursing staff he was sick even though Mr. Canio has not been vaccinated and has never contracted COVID-19.

### b.  Failure to Contact Trace, Test, or Quarantine Inmates After Confirmed COVID Positive Guard Identified

On Wednesday, July 28, 2021, a guard at Waiawa tested positive for COVID-19 ("Positive Guard").  *See* Exhibit 12, Declaration of Stephen Rodriguez ("Rodriguez Decl.") at ¶ 5.  Positive Guard last worked on Sunday, July 25, 2021, in Building Five, among other areas.  *Id.*

Waiawa inmate Stephen Rodriguez ("Mr. Rodriguez") interacted with Positive Guard on Sunday, July 25, 2021.  *Id.*  Mr. Rodriguez was in close proximity to Positive Guard on that day.  *Id.*

Mr. Rodriguez was not tested or screened for COVID-19 since learning Positive Guard contracted the virus even though Mr. Rodriguez physically interacted with Positive Guard.  *Id.*  Mr. Rodriguez did not see or hear about any

other inmates in his building who also interacted with Positive Guard getting tested or screened for COVID-19. *Id.*

According to Mr. Rodriguez, there were at least 10 people in his building who had not been vaccinated at the time. *Id.* at ¶ 6.

Even though Mr. Rodriguez interacted with Positive Guard, DPS moved him and another inmate, who had not been vaccinated, from Building Five to Building Nine, another general population building. *Id.* at ¶ 7.

After Positive Guard was confirmed COVID positive, DPS should have conducted contact tracing of all close contacts to Positive Guard, including Mr. Rodriguez, and placed them in isolation. *See* DPS PRP at 44 ("Inmates who are close contacts of a suspected or confirmed case of COVID-19 should be placed in quarantine for 14 days."). Instead, DPS transferred two close contacts to another general population open dorm where there were no confirmed or suspected cases of COVID-19.

These actions violate the DPS PRP Quarantine Procedures, and potentially exposed all of the inmates in Building Nine to COVID-19.

### 5.  Inadequate Quarantine Procedures at MCCC

According to MCCC Warden Deborah Taylor ("Warden Taylor"), MCCC is in full compliance with the DPS PRP with respect to New Intake Screening, Initial

Management and Testing, and Quarantine policies.  *See* ECF No. 48-6 at 16, 17, 19-22.

In her Status Report regarding New Intake Screening, Warden Taylor stated that, "[u]pon admission, all inmates have masks on and are given additional masks."  *Id.* at 17, 19, 30-32.

For the following reasons, MCCC is not in compliance with the DPS PRP with respect to the New Intake Screening, Testing, and Quarantine policies.

The "quarantine" cells at MCCC are located in a general population module.  *See* Exhibit 28, Declaration of Coleadam Nolan ("Nolan Decl.") at ¶ 10.  That means when a door to a "quarantine" cell is opened, the door opens into a general population module.  *Id.*

MCCC inmate Coleadam Nolan ("Mr. Nolan") arrived at MCCC on July 16, 2021.  *See* Nolan Decl. at ¶ 2.  Mr. Nolan has not been vaccinated and has never contracted COVID-19.  *Id.* at ¶¶ 3, 4.

When Mr. Nolan first arrived at MCCC, he was immediately housed in Module A.  *Id.* at ¶ 6.  Mr. Nolan was in Module A with another inmate for two days.  *Id.*  On July 18, 2021, he was moved to Module B where he was put into a "quarantine" cell with three other inmates who had been in "quarantine" together for three days ("Module B Inmates").  *Id.*  Mr. Nolan and his three other cellmates were released from "quarantine" on July 24, 2021, six days later.  *Id.*  Mr. Nolan

was mask-less during his entire "quarantine" period because MCCC refused to provide him a mask until two weeks after his arrival.  *Id.* at ¶ 5.

During his 8-day quarantine, Mr. Nolan was mask-less and exposed to two separate groups of inmates who arrived to MCCC at different times, in violation of the DPS PRP Quarantine Procedures.

Mr. Nolan should not have been introduced into the Module B quarantine cell where three inmates had already been in quarantine together for three days. Mr. Nolan's introduction into the Module B quarantine cell could have infected the Module B Inmates.

Moreover, Mr. Nolan and the Module B Inmates should not have been released after only six days together.  If Mr. Nolan was asymptomatic COVID-positive, for example, the Module B inmates likely would not have developed symptoms in only six days.

In addition to these errors: (1) guards at MCCC physically interact with inmates in "quarantine" then walk throughout the facility performing other tasks, *id.* at ¶ 11; (2) inmates in "quarantine" use the same showers, microwaves, phones, hand railings, common tables, ukuleles, and mattresses as the general population inmates, *id.* at ¶ 12; (3) these items are not properly sanitized or cleaned between use, *id.*; and (4) inmates in "quarantine" share the same air vents and air conditioning unit as those inmates in the general population ("GP") units, *id.* at ¶

13; and (5) MCCC does not require masks to be worn in the quarantine cell, *id.* at ¶ 7.

These practices and conditions defeat the purpose of the quarantine and potentially expose inmates in the general population to COVID-19.

### 6.  Inadequate Contact Tracing and Isolation of Close Contacts at WCCC

According to WCCC Warden Eric Tanaka ("Warden Tanaka"), WCCC is in full compliance with the DPS PRP with respect to New Intake Screening, Initial Management and Testing, and Quarantine policies. *See* ECF No. 48-8 at 28, 29, 35, 53, 57.

At the end of July 2021, a WCCC guard contracted COVID ("Positive WCCC Guard").  *See* Exhibit 17, Declaration of Bella Carvalho ("Bella Decl.") at ¶ 18.  Many of the WCCC inmates, including Ms. Carvalho, physically interacted with Positive WCCC Guard when Positive WCCC Guard passed out store orders. *Id.*

Ms. Carvalho was not screened, tested, or isolated for COVID-19 after DPS reported that Positive WCCC Guard had tested positive for COVID.  *Id.*  Ms. Carvalho did not observe DPS staff screen, test, or isolate any WCCC inmates who interacted with COVID-positive guard after learning Positive WCCC Guard contracted the virus.  *Id.*

WCCC inmates, like Ms. Carvalho, who interacted with Positive WCCC Guard should have been tested, screened, and/or isolated depending on the level of interaction with Positive WCCC guard.  Because WCCC inmates were not, WCCC violated DPS PRP Quarantine and Testing policies.

### E.  Practices at Kulani, Halawa, Waiawa, MCCC, OCCC, and HCCC Violate the Surveillance for New Cases Policy

According to the DPS PRP Surveillance for New Cases policy, "[f]acilities should ensure that inmates receive medical evaluation and treatment at the first signs of COVID-19 symptoms.  The initial medical evaluation should determine whether a symptomatic individual is at increased risk for severe illness from COVID-19."  DPS PRP at 48.

#### 1.  Halawa

According to Warden Harrington, Halawa is in full compliance with the DPS PRP with respect to the Surveillance of New Cases policy.  *See* ECF No. 48-2 at 35.

In his Status Report, Warden Harrington stated that, "inmates and staff immediately report suspected cases of COVID-19." *Id.*

For the following reasons, Halawa is not in compliance with the DPS PRP with respect to the Surveillance of New Cases policy.

##### a.  Sick HCCC Arrivals Did Not Receive Medical Evaluation and Treatment At The First Signs of COVID-19 Symptoms

36

On July 27, 2021, upon arrival to Halawa from HCCC, at least six inmates from HCCC were suffering from COVID-like symptoms. *See* Ex. 23, Caseres Decl. at ¶¶ 7, 8; Ex. 14, Oili Decl. at ¶ 8; Ex. 20, Stellar Decl. at ¶ 8, Ex. 24, Tam Decl. at ¶ 9; Ex. 37, Kalili Decl. at ¶ 7; Ex. 35, Jardin Decl. at ¶ 6. None of these inmates were tested for COVID-19 or asked any screening questions upon arrival at Halawa. *Id.*

When a nurse at Halawa took Mr. Kalili's temperature, she stated, "Your temperature is high." Ex. 37, Kalili Decl. at ¶ 9(b). The nurse immediately moved onto the next inmate and did not ask Mr. Kalili any screening questions or test him for COVID-19. *Id.*

These actions, particularly with regard to Mr. Kalili, were in violation of the DPS PRP Surveillance of New Cases policy.

### b. Halawa Inmates Are Not Screened Or Evaluated When They Report Symptoms.

On July 29, 2021, former HCCC inmate Steven Jossy ("Mr. Jossy") informed a nurse that he had a sore throat and that he had limited taste and smell. The nurse responded, "that's normal," and walked away. *See* Ex. 7, Jossy Decl. at ¶ 14.

On August 2, 2021, Mr. Jossy overhead Halawa inmate Kealoha inform the nursing staff that he, Kealoha, had symptoms of COVID-19; he had no taste, no

smell, and he had muscle aches and pains. *Id.* at 15. The nurse responded that they would notify the medical staff. *Id.* The next day, on August 3, 2021, Mr. Jossy again overheard inmate Kealoha inform two different nurses that he, Keloha, had COVID symptoms. *Id.* The medical staff did not remove inmate Kealoha from the module until two days after Keaola made his initial complaint of COVID-19 symptoms. *Id.*

HCCC Arrivals Barry Cramer ("Mr. Cramer") and Mr. Keahilihau were only in quarantine for nine days when they were transferred to general population modules. *See* Keahilihau Decl. at ¶ 9; Exhibit 43, Declaration of Barry Cramer ("Cramer Decl.") at ¶ 9. Both had COVID-19 symptoms on the day of their transfer to GP modules on August 5, 2021. *Id.* Mr. Cramer reported his symptoms to two nurses but they both told him to "hold on." Cramer Decl. at ¶ 9(b). At the time, there were 22 active COVID cases in their module at Halawa. *See* Exhibit 49 (August 5, 2021, DPS Daily Report)

These actions show that inmates with COVID-19 symptoms, even those in a COVID-positive module, are denied the proper testing and care in violation of the Surveillance of New Cases policy.

**A. Waiawa**

According to Warden Ornellas, Waiawa is in full compliance with the DPS PRP with respect to the Surveillance of New Cases policy. *See* ECF No. 48-3 at 23.

Waiawa inmate, Mr. Canio, has never tested positive for COVID-19 and has not been vaccinated for COVID-19. *See* Canio Decl. at ¶¶ 2, 3. Upon arrival to Waiawa from Halawa on July 30, 2021, Mr. Canio informed two nurses at Waiawa on two separate occasions that he was feeling unwell; he was coughing and had a sore throat. *Id.* ¶¶ 7-9. Neither nurse tested him for COVID-19. *Id.* One nurse told him to "wait out and deal with it." *Id.* at ¶ 8. As of August 4, 2021, Mr. Canio had not been tested for COVID-19 since his arrival to Waiawa on July 30, 2021. *Id.* at ¶ 10.

These actions are in violation of the Surveillance of New Cases policy.

**B. MCCC**

According to Warden Taylor, MCCC is in full compliance with the DPS PRP with respect to the Surveillance of New Cases policy. *See* ECF No. 48-4 at 35.

MCCC inmate, Mr. Nolan, has never tested positive for COVID-19 and has not been vaccinated for COVID-19. *See* Nolan Decl. at ¶¶ 3, 4. On August 1, 2021, Mr. Nolan put in a medical request because he developed body aches and a

runny nose.  *Id.* at ¶18.  As of August 3, 2021, Mr. Nolan had not been seen by the medical unit.  *Id.*

On August 2, 2021, MCCC inmate Robert Walsh ("Mr. Walsh") informed MCCC Nurse Annett in Module B that he had not been feeling well and had developed flu-like symptoms.  *See* Robert Decl. at ¶ 11.  It took Mr. Walsh three days to be seen by the medical unit.  *Id.*

This failure to follow the Surveillance of New Cases policy, which required staff to immediately screen and/or test these two individuals, may have been a factor in the steep rise of new active cases of COVID-19 at MCCC.

### C. OCCC

According to Warden Sequeria, OCCC is in full compliance with the DPS PRP with respect to the Surveillance of New Cases policy.  *See* ECF No. 48-5 at 35.

According to inmates and staff at OCCC, inmates with flu or COVID-like symptoms must wait days sometimes weeks to a see a medical provider.

In Module 20, if one of the inmates informs OCCC ACO Tai Utoafili ("ACO Utoafili") that he or she has flu-like symptoms (*i.e.*, runny nose, headaches, body aches, sneezing, coughing, or red eyes) ACO Utoafili instructs them to sign the sick-call book, which they must sign prior to being seen by the medical unit. *See* Exhibit 39, Declaration of Tai Utoafili ("Tai Decl.") at ¶ 7.  If the inmate

appears seriously ill, ACO Utoafili will call the medical unit and ask if a provider can see the inmate immediately. *Id.* According to ACO Utoafili, the medical unit usually responds, "drink water, sign the book. I'll see (him or her) the next day." *Id.* ACO Utofili reports that this happens every day. *Id.* Inmates usually do not see the medical unit for two to four days. *Id.* Sgt. Kyles has had similar experiences. *See* Ex. 22, Kyles Decl. at ¶ 19.

According to OCCC inmate Christian-Johnson Kukahiko ("Ms. Kukahiko"), it can take up to two weeks to be seen by the medical unit after putting in a sick call request for cold or flu symptoms. *See* Ex. 5, Kukahiko Decl. at ¶ 10.

For the foregoing reasons, OCCC is not in compliance with the Surveillance New Cases policy.

### D. Kulani

According to Warden Craig, Kulani is in full compliance with the DPS PRP with respect to the Surveillance of New Cases policy. *See* ECF No. 48-7 at 35.

According to inmates, however, inmates with flu or COVID-like symptoms must wait days sometimes weeks to a see a medical provider.

On July 3, 2021, Plaintiff Alvarado made a sick call request to see a medical provider because he was coughing, had body aches and water eyes, and he was getting feverish at night. *See* Ex. 15, Alvarado Decl. at ¶ 16. Four to five days after Mr. Alvarado made the request, he received a response from the medical

unit which stated that he was scheduled to see a provider.  *Id.*  Plaintiff Alvarado did not see a medical provider until August 2, 2021, nearly three weeks after he submitted his sick call request.  *Id.* at ¶ 16(m).

According to Kulani inmate Shuan Shine, it is common knowledge that if an inmate makes a request to see a medical provider regardless of the symptoms, staff will inform the inmate to "drink water."  *See* Ex. 16, Shine Decl. at ¶ 11.

This failure to immediately assess, treat, and isolate inmates at Kulani who are experiencing cold and flu-like symptoms is in violation of the Surveillance New Cases policy.

### E.  HCCC

According to Warden Mahoe, HCCC is in full compliance with the DPS PRP Surveillance of New Cases policy.  *See* ECF No. 48-1 at 36.

According to inmates, however, inmates with flu or COVID-like symptoms are dismissed when they inform medical staff of these symptoms.  As discussed above, many of the HCCC inmates that flew to Halawa on July 27, 2021, had lingering symptoms of COVID-19.  For example, former HCCC inmate Albert Jardin, reported to a HCCC nurse on July 27, 2021, that he was not feeling well. *See* Exhibit 35, Declaration of Albert Jardin, Jr. ("Jardin Decl.") at ¶ 6(a)-(b).  The nurse replied, "Oh well, we can't do anything."  *Id.* at ¶ 6(c).

These actions are in violation of both the Surveillance New Cases policy and Transport policy which may have been a factor in the steep new rise of positive cases at Halawa.

### F. Kulani, OCCC, and HCCC Are Not in Compliance with the Personal Protective Equipment ("PPE") Policy.

According to DPS PRP PPE policy,

"The CDC recommends the following Personal Protective Equipment ("PPE") when an individual encounters a person with suspected or confirmed COVID-19: N95 Respirator, Surgical Mask, Eye Protection, Gloves, Gown/One-Piece Coverall.
…
PPE stations should include a dedicated trash can for disposal of used PPE, a hand washing station or access to alcohol-based hand sanitizer.
…
Ensure PPE is readily available when and where needed.
…
Develop contingency plans for PPE shortages during the COVID pandemic.
…
Other Supplies: … Ensure a sufficient supply of soap for each individual … Alcohol-based hand sanitizer, cleaning supplies, including EPA-registered disinfectants effective against SARS-CoV-2."

DPS PRP at 31-34.

### 1. OCCC

According to Warden Sequeira, OCCC is in full compliance with the PPE policy. *See* ECF No. 48-5 at 20.

According to several OCCC staff, however, OCCC is not.

43

According to Sgt. Anderson and ACO Utoafili, DPS staff are not provided enough masks during their work shifts.  *See* Ex. 40, Anderson Decl. at ¶ 15; Ex. 39, Tai Decl. at ¶ 8.  DPS provides the mental health module with 50 masks each week for 15 staff people who work in the module each day.  *Id.*  This number of masks will only last the mental health staff three days.  *Id.*  Sgt. Anderson has seen staff go three to four days without masks issued by the facility.  *Id.*

ACO Utoafili reports that OCCC does not provide enough gloves or face shields either.  *See* Ex. 39, Tai Decl. at ¶ 8.

On the weekends, the staff PPE is locked in an office.  *Id.*  Whatever PPE has not been used during the weekdays is all the PPE the weekend staff have to use.  *Id.*  During one weekend for example, there were only medium gloves, but many of the male guards cannot fit medium gloves.  *Id.*

Rovers are DPS staff who are not stationed at a particular location but perform tasks throughout the facility.  Guards regularly see rovers escort inmates in quarantine in just a cloth mask, even though PPE policy states that guards in contact with an inmate with suspected COVID-19 should be wearing an N95 mask, gown, gloves, and eye protection.  *See* Sholtis Decl. at ¶ 11; Tai Decl. at ¶ 9; DPS PRP at 31.

The cleaning solution that DPS staff provides to OCCC staff is so watered down that there is no way it can clean or destroy any germs, such as COVID-19.

44

*See* Ex. 40, Anderson Decl. at ¶ 18; Ex. 36, Sholtis Decl. at ¶ 14.  The cleaning solution is as transparent as water.  *Id.*  Sgt. Anderson, Sgt. Kyles, ACO Sholtis, and ACO Tai purchase Pinesol and Clorox and use it to clean their modules.  *See* Ex. 40, Anderson Decl. ¶ at 19; Ex. 22, Kyles Decl. at ¶ 6(q); Ex. 36, Sholtis Decl. at ¶ 14; Ex. 39, Tai Decl. at ¶ 10.

At OCCC, there is supposed to be one paramedical assistant ("PMA") for each mental health module.  *See* Anderson Decl. at ¶ 14.  The medical unit supervisor Kathy Kruger instructs the Module One PMA to go to the other general population modules *and* the quarantine module to take temperatures of the inmates in those modules.  *Id.*  The Module One PMA is not provided with a protective gown or N95 mask when she is in the quarantine module or general population modules taking inmates' temperatures.  *Id.*  After the PMA makes her rounds through the general population modules and "quarantine" module, she returns to the mental health module where she interacts with staff and inmates.  *Id.*

Each of these practices violates the PPE policy.

### 2.  HCCC

According to Warden Mahoe, HCCC is in full compliance with the PPE policy.  *See* ECF No. 48-1 at 16, 17.

Floor boys at HCCC act as janitors at the facility.  *See* Ex. 4, Castro Decl. at ¶ 6.  Floor boys must go into COVID-positive rooms when instructed.  *Id.* at ¶ 14.

At those times, even though there is a sign outside of the COVID-positive room that states, "a N95 mask, protective eye wear, a protective gown, and gloves should be worn upon entry," floor boys are only given a cloth mask and gloves. *Id.*

HCCC inmate Jesse Rowe was given one mask upon arrival. *See* Ex. 32, Rowe Decl. at ¶ 5. DPS staff gave Mr. Rowe a form ("Mask Form") to sign indicating that he was provided two masks upon arrival. *Id.* The Mask Form stated that it is eight dollars to replace a mask. *Id.*

Mr. Rowe lost his mask at some point during his incarceration at HCCC. *Id.* Each time Mr. Rowe has asked DPS staff for a mask, they have responded, "hold on." *Id.* To protect himself from COVID-19, Mr. Rowe puts his underwear on his face and uses it as a "mask." *Id.* According to Mr. Rowe, **approximately 20% of the HCCC inmates wear their underwear on their face because HCCC refuses to provide them with an additional mask.** *Id.*

For the foregoing reasons, HCCC is not in compliance with the PPE policy.

### 3. Kulani

According to Warden Craig, Kulani is in full compliance with the PPE policy. *See* ECF No. 48-7 at 20.

According to inmate janitors and staff, however, Kulani is not in compliance with the PPE policy.

46

Kulani Sgt. Carvalho reports that the facility does not provide staff with any masks.  *See* Ex. 41, Carvalho Decl. at ¶ 6.  Kulani inmate Shaun Shine has only been provided one mask at Kulani since the pandemic began.  *See* Ex. 16, Shine Decl. at ¶ 7.

These practices at Kulani violate the PPE policy.

### G. Most DPS Facilities Are Not in Compliance with the Environmental Cleaning Policy

The DPS PRP Environmental Cleaning policy states that facilities should:

Implement routine and intensified cleaning and disinfecting procedures in accordance with the CDC guidance.

Clean more frequently or disinfect (in addition to cleaning) in shared spaces if certain conditions apply that can increase the risk of infection from touching surfaces:

o High touch surfaces (These may include doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, computer equipment, handrails, elevator buttons, cell bars, etc.)

o Food service, Intake, Medical Unit,

o Low number of people wearing masks,

o Infrequent hand hygiene

If there has been a sick person or someone who tested positive for COVID-19 in the facility within the last 24 hours, then clean and disinfect the space.

DPS PRP at 16.

### 1. Halawa

47

According to Warden Harrington, Halawa is in full compliance with the Environment Cleaning policy.  *See* ECF No. 48-2 at 6.

For the following reasons, Halawa is not.

Mr. Napeahi was housed in the COVID-positive quad for four days.  *See* Ex. 33, Napeahi Decl. at ¶ 4.  Mr. Napeahi did not see high-touch surfaces, showers, or telephones cleaned and sanitized in the COVID-positive quad in Module One.  *Id.*

According to the HCCC Arrivals who were in "quarantine" from July 27, 2021 until August 5, 2021, they did not see the telephones, showers, railings, cell bars, door handles, doorknobs, or any other "high-touch" surfaces sanitized or cleaned during their time in quarantine, even though they shared these devices and surfaces with inmates who recently arrived from other facilities.  *See* Ex. 23, Caseres Decl. at ¶ 8, Ex. 20, Stellar Decl. at ¶ 8; Ex. 24, Tam Decl. at ¶ 9.

When inmates in quarantine are transferred into the general population modules, the cell which inmates in "quarantine" are transferred out of is not sanitized or cleaned before the next occupant moves in.  *See* Ex. 26, McGuire Decl. at ¶ 9.

These practices are in violation of the Environmental Cleaning policy and promote the spread of COVID-19 in the facility.

### 2.  Waiawa.

48

According to Warden Ornellas, Waiawa is in full compliance with the Environmental Cleaning policy. *See* ECF No. 48-3 at 3.

According to several Waiawa inmates, however, Waiawa is not.

At the end of July 2021, when a guard tested positive for COVID-19, inmates did not observe the areas where the guard last worked sanitized or cleaned after DPS learned that this guard tested positive. *See* Ex. 12, Rodriguez Decl. at ¶ 5.

Waiawa inmate Duane Bertlemann ("Mr. Bertlemann") reports that: (1) telephones are only cleaned once a week; (2) showers are disgusting and are not cleaned between use: (3) shower curtains contain mold on the bottom that rise as high as 2 feet; (4) the shower stalls have mold and mildew because they are not properly cleaned; (5) the meal tables are not adequately sanitized, *i.e.*, food stains and food crumbs are still on the trays from previous meal; (6) the chemical solution that staff provide to inmates is severely watered down; (7) the floors are dirty and are not wiped down properly; and (8) there is mold, mildew, and dead insects inside and on top of inmate mattresses. *See* Exhibit 18, Declaration of Duane Bertlemann ("Duane Decl.") at ¶ 17.

These practices demonstrate that Waiawa is not in full compliance with DPS's Environmental Cleaning policy.

### 3. Kulani

According to Warden Craig, Kulani is in full compliance with the Environmental Cleaning policy.  *See* ECF No. 48-7 at 6.

According to inmate janitors and staff, Kulani is not in compliance with the DPS Environmental Cleaning policy.

Kulani Sgt. Carvalho and a Kulani inmate janitor report that work line janitors are not given any instructions or guidance for how often or what to clean in the facility.  *See* Ex. 41, Carvalho Decl. at ¶ 10; Ex. 1, Valdez Decl. at ¶ 10.

As a result: (1) there is no consistent or regular sanitation performed at the facility; (2) high-touch surfaces are not cleaned or sanitized on a regular basis; (3) black mold is present throughout the facility as if "caked on", including inside the water jugs; and (4) showers are never cleaned because they are only "open" for five hours of the day and during this time 40 plus inmates must bathe leaving no time for cleaning.  *See* Ex. 1, Valdez Decl. at ¶ 9.

These failures to adequately clean and sanitize the facility can promote the spread of COVID-19, should COVID-19 enter the Kulani facility.

### 4.  OCCC

According to Warden Sequeira, OCCC is in full compliance with the Environmental Cleaning policy.  *See* ECF No. 48-5 at 20.

According to Sgt. Anderson, Sgt. Kyles, ACO Utoafili and ACO Sholtis, OCCC is not.

50

High-touch surfaces, phones, and showers are not cleaned or sanitized on a regular basis. *See* Ex. 22, Kyles Decl. at ¶ 6(n)-(q); Ex. 40, Anderson Decl. at ¶ 13; Ex. 36, Sholtis Decl. at ¶ 13. The chemicals that DPS provides to inmates and staff are limited in quantity and severely watered down. *See* Ex. 22, Kyles Decl. at ¶ 6(n)-(q); Ex. 40, Anderson Decl. at ¶ 18. They are not effective in preventing the spread of COVID-19. *Id.*

The kitchen staff at OCCC does not adequately sanitize the plates or the trays for inmate meals. *See* Ex. 22, Kyles Decl. at ¶ 16. The trays frequently have a smell of mold and rancid food. *Id.*

On their way to the medical unit, inmates in "quarantine" touch doorknobs, railings, and other high-touch surfaces. *See* Ex. 40, Anderson Decl. at ¶ 13. These devices and surfaces are not sanitized after these inmates touch these areas. *Id.* Once in the medical unit, inmates in "quarantine" touch the chairs, counters, tables, and devices. *Id.* After these inmates leave the medical unit, these surfaces and devices are not cleaned or sanitized. *Id.*

These practices promote the spread of COVID-19 and are in violation of the Environmental Cleaning policy.

### 5. MCCC

According to Warden Taylor, MCCC is in full compliance with the Environmental Cleaning policy. *See* ECF No. 48-4 at 6.

51

In her Status Report, Warden Taylor stated that, "inmate workline clean all areas throughout the facility during day and evening hours." *Id.*

For the following reasons, MCCC is not in compliance with the Environmental Cleaning policy.

According to MCCC inmate Mr. Walsh who was in the "inmate workline," he was not given any specific instructions regarding what to clean or how often to clean. *See* Ex. 29, Robert Decl. at ¶ 8.

Mattresses in "quarantine" cells are not cleaned or sanitized between use. *See* Ex. 28, Nolan Decl. at ¶ 8. Floor boys are not instructed to clean the "quarantine" cells after the previous occupant moves out or before the new arrivals are moved into those cells. *Id.* at ¶ 9; Robert Decl. at ¶ 7.

Inmates in quarantine and general population inmates use same showers, microwaves, phones, common tables, ukuleles, and mattresses as the general population inmates. *See* Robert Decl. at ¶ 5(d); Ex. 28, Nolan Decl. at ¶ 12. These items and areas are not regularly cleaned or sanitized between use. *Id.*

These actions violate the Environmental Cleaning policy and encourage the spread of COVID-19 at MCCC.

## 6. WCCC

According to Warden Tanaka, WCCC is in full compliance with the Environmental Cleaning policy. *See* ECF No. 48-8 at 9.

Inmates report that sanitation is not performed in the facility and that phones and other high-touch surfaces are not cleaned or sanitized.  *See* Ex. 17, Bella Decl. at ¶ 14.  The showers at WCCC are covered in mold and mildew.  *Id.*  The inmate mattresses are old and tattered; the inside is almost entirely covered in black mildew or mold.  *Id.*  The insides of the inmate pillows are completely black from mildew or dirt.  *Id.*

The cell bars at WCCC are molded and rusted and the mold and rust is blown into inmate housing modules where inmates breathe it in.  *Id.* at ¶ 16.

At the end of July 2021, after a WCCC guard tested positive for COVID, inmates did not see any of the places where Positive WCCC Guard worked being cleaned or sanitized.  *Id.* at ¶ 18.

These procedures are in violation of DPS's PRP Environmental Cleaning policy and could promote the spread of COVID-19 at WCCC.

### H.  Nearly Every DPS Facility Fails to Provide Adequate Soap to Inmates in Violation of the Good Health Habits Policy.

The DPS PRP "Good Health Habits" policy states that:

"Each facility should ensure that adequate supplies and facilities are available for handwashing for both inmates and employees … Provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas …".

DPS PRP at 15.

The Wardens of Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC declare that they are in full compliance with the Good Health Habits policy. *See* ECF Nos. 48-1 at 4; 48-8 at 5; 48-5 at 4; 48-4 at 4; 48-2 at 4; 48-7 at 4; 48-3 at 3. Specifically, each of these Wardens indicated that "hygiene supplies are provided and continually restocked." *Id.*

Inmates and staff at Kulani, OCCC, Waiawa, MCCC, Halawa, WCCC report that inmates do not receive free hygiene supplies if the inmate has money in their store account. *See* Ex. 2, Salas Decl. at ¶ 9 (Waiawa); Ex. 28, Nolan Decl. at ¶ 15 (MCCC); Ex. 7, Jossy Decl. at ¶ 11 (Halawa); Ex. 17, Bella Decl. at ¶ 13 (WCCC); Ex. 16, Shine Decl. at ¶ 6 (Kulani); Ex. 5, Kukahiko Decl. at ¶ 9 (OCCC).

These facilities provide indigent inmates a small bar of soap every 7-14 days, but this amount of soap does not last until the next time they are issued a bar of soap. *Id.* When inmates ask for another bar of soap, they are usually told to wait until the next week. *Id.* Practically, that means that indigent inmates are going days without washing their hands and bathing their bodies with any kind of soap.

Inmates and staff at Kulani, Halawa, HCCC, Waiawa, and OCCC have also reported that there is no soap in the inmate restrooms. *See* Ex. 19, McCray Decl. at ¶ 19 (Waiawa); Ex. 4, Castro Decl. at ¶ 17 (HCCC); Exhibit 27, Declaration of Anthony Chatman ("Chatman Decl.") at ¶ 7 (Halawa); Ex. 16, Shine Decl. at ¶ 6

54

(Kulani); Ex. 22, Kyles Decl. at ¶ 6(l) (OCCC).  This failure to provide soap in the inmate restrooms is particularly hard on indigent inmates who usually run out of their weekly free bar of soap before they are issued a new one.

As set forth above in the PPE section, staff at OCCC report that it is difficult for staff to obtain hygiene supplies such as hand sanitizer, hand soap, and cleaning supplies.  *See* Ex. 22, Kyles Decl. at ¶ 6(q); Ex. 40, Anderson Decl. at ¶ 15; Ex. 36, Sholtis Decl. at ¶ 14; Ex. 39, Tai Decl. at ¶ 8.

These customs at Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, and WCCC are in violation of the Good Health Habits policy and will promote the spread of COVID-19 in these facilities.

### I.  Nearly Every DPS Facility Does Not Practice Social Distancing

According to the DPS PRP Social Distancing Policy:

Social distancing or physical distancing, means keeping space between all individuals (ideally at least 6 feet) regardless of symptoms and decreasing the frequency of contact between individuals.  Various administrative measures should be implemented to lessen the chance of spreading the virus by reducing close contact between people.  Due to differences among correctional facilities, facility administration should discuss and implement social distancing measures specific for the individual facility, as allowable by physical plant limitations, security restrictions, and operational resources.  Examples of possible social distancing strategies for use at individual facilities include:

Common Areas:
o Enforce increased space between inmates in holding cells, lines, and waiting areas.
…

Housing:
o Arrange bunks so that inmates sleep head to foot.
o If space allows, reassign bunks to provide more space between inmates (ideally 6 feet or more in all directions).
o Minimize the number of inmates housed in the same room as much as possible.
o Minimize mixing inmates from different housing units (e.g., workline, program attendance).
o Conduct thorough cleaning and disinfection of living space when inmates leave.
…

Meals
o  Rearrange seating in dining hall to increase space between inmates (e.g., remove every other chair or use only one side of table).
o  Implement a rotational system among inmates for dining at the cafeteria.
…

Minimize Inmate Movement
o Avoid transferring inmates between living areas, when possible.

*See* DPS PRP at 18-21.

The Wardens of Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC baldly declare that they are in full compliance with the Social Distancing policy. *See* ECF Nos. 48-1 at 6, 7; 48-8 at 13; 48-5 at 8; 48-4 at 8; 48-2 at 8; 48-7 at 8; 48-3 at 6.

Although the Wardens at Halawa, HCCC, and MCCC indicated that their facilities are in full compliance with the Social Distancing policy, in the comments sections of their status report:

56

(1) MCCC Warden Taylor stated, "Social distancing is not an option due to inmate population and size."  ECF No. 48-4 at 4;

(2) HCCC Warden Mahoe stated, "For the most part, social distancing is not an option under these circumstances because of physical plant limitations and overcrowding."  ECF No. 48-1 at 6, 7; and

 (3) Halawa Warden Harrington stated, "[b]ecause of design, applying social distancing measures in the inmate population … the Facility design and overcrowding do not allow for social distancing in inmate dining rooms and housing units."  Warden Harrington also stated that "if social distancing was applied during meals" or "in the small day room areas," it would cause an outright disturbance.   ECF No. 48-2 at 8.

Plaintiffs note for the Court that as of this date, each of these facilities (MCCC, HCCC, and Halawa) has active cases of COVID-19, and two of them, Halawa and MCCC, are experiencing a steep rise in new COVID cases.

Inmates and staff at Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC report that social distancing does not take place in any parts of the facility. *See* Ex. 22, Kyles Decl. at ¶ 7 (OCCC); Ex. 9, Granados Decl. at ¶¶ 7, 10, 11 (Waiawa); Ex. 16, Shine Decl. at ¶ 9 (Kulani); Ex. 28, Nolan Decl. at ¶ 16 (MCCC); Ex. 27, Chatman Decl. at ¶¶ 8, 9 (Halawa); Ex. 17, Bella Decl. at ¶ 17.

Staff at Kulani and Waiawa have placed blue tape in various parts of their facilities, ostensibly to assist with social distancing.  *See* Ex. 16, Shine Decl. at ¶ 9 (Kulani); Ex. 9, Granados Decl. at ¶ 9(Waiawa).  Inmates at these facilities report, however, that DPS staff do not use it to enforce social distancing.  *Id.*

For these reasons, Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC are each in violation of Social Distancing policy.

**J.  Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC Do Not Enforce the Mask Wearing Policy.**

According to the section titled, Encourage the Use of Masks and Other No-Contact Barriers ("Mask-Wearing"), it states, "[e]ncourage inmates to use masks provided ***at no cost*** by the facility and launder the masks routinely."  DPS PRP at 20.

The Wardens of Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC declare that they are in full compliance with the Mask-Wearing policy.  *See* ECF Nos. 48-1 at 7, 8; 48-8 at 17, 18; 48-5 at 10; 48-4 at 10; 48-2 at 10; 48-7 at 10; 48-3 at 7.

Each of these Wardens indicated that their facility encourages inmates to use masks provided ***at no cost*** by the facility and launder the masks routinely.  *Id.*

For the following reasons, Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC have not complied with the Mask-Wearing requirement.

**1.  Fees for Replacement Masks**

Inmates from HCCC, Waiawa, and Halawa report that it costs between five to eight dollars for a replacement mask.  *See* Ex. 27, Chatman Decl. at ¶ 11 (Halawa); Ex. 18, Bertlemann Decl. at ¶ 13 (Waiawa); Ex. 32, Rowe Decl. at ¶ 5 (HCCC).

### 2.  Receiving Masks Upon Arrival and Free Replacement Masks

At MCCC, MCCC inmate Mr. Nolan did not receive a mask for two weeks after his arrival, and spent his 8-day "quarantine" period without a mask.  *See* Ex. 28, Nolan Decl. at ¶ 5.

As set forth above, because HCCC inmate Jesse Rowe cannot afford the eight-dollar mask replacement fee at HCCC, he is forced to wear his underwear on his face as a mask.  *See* Rowe Decl. at ¶ 5.

### 3.  OCCC, Halawa, and HCCC Do Not Launder Inmate Masks

According to Sgt. Kyles and Sgt. Anderson, DPS does not launder masks at OCCC.  *See* Ex. 22, Kyles Decl. at ¶ 15, Ex. 40, Anderson Decl. at ¶ 21.  Halawa does not launder inmate masks either.  *See* Ex. 27, Chatman Decl. at ¶ 11. According to HCCC inmate Albert Jardin, Jr., HCCC did not launder his mask, and no one informed him that the facility would.  *See* Ex. 35, Jardin Decl. at ¶ 5.

### 4.  Mask-Wearing Is Not Enforced at Kulani, OCCC, Waiawa, MCCC, Halawa, WCCC

Inmates and staff at Kulani, OCCC, Waiawa, MCCC, Halawa, WCCC report that mask-wearing is not enforced in their facility.

At the Kulani facility for example, only 2% of the inmate population wear masks at the facility according to Sgt. Carvalho.  *See* Ex. 41, Carvalho Decl. at ¶ 4.

According to Halawa inmate Drosstain Pua, no inmates wear masks in their module.  *See* Exhibit 13, Declaration of Drosstain Pua ("Pua Decl.") at ¶ 9. Halawa inmate Eric Walsh ("Mr. Eric") has seen floor boys wear masks only sporadically even though they work throughout the facility, including the quarantine modules.  *See* Exhibit 10, Declaration of Eric Walsh ("Eric Decl.") at ¶ 6.

OCCC inmates do not wear masks either because OCCC does not schedule enough staff to enforce the requirement.  *See* Ex. 22, Kyles Decl. at ¶ 8.

At WCCC, when an inmate asked a guard where her mask was, the guard responded, "It's invisible."  Ex. 17, Carvalho Decl. at ¶ 10.

At Waiawa, only 10% of inmates wear masks at the facility.  *See* Ex. 2, Salas Decl. at ¶ 8.

These failures to enforce the Mask-Wearing policy could encourage an outbreak of COVID-19 in these facilities.

### K.  Retaliation

As set forth above, the Court's Order states that, "Defendant is ordered to … prohibit DPS employees from … preventing the submission of grievances with respect to COVID-19 issues."

60

### 1.  Asking About the Long Term Effects of COVID-19 May Get a Kulani Inmate Sent Back To Halawa

On or around July 20, 2021, Plaintiff Alvarado asked Kulani Nurse Seminoa, "are people with lupus experiencing the same post-COVID symptoms that I'm experiencing?"  Ex. 15, Alvarado Decl. at ¶ 16(g)-(k).  According to Plaintiff Alvarado, Nurse Seminoa responded, "writing a request like that will get you sent back to Halawa.  Don't make sick call requests like that.  I'm recommending that they send you back and that you be seen by mental health.  I don't know how to respond to your questions."  *Id.* at ¶ 16(j).

It is unclear why a question about long-term COVID-19 symptoms would elicit that response.

### 2.  A Halawa Inmate May Be Transferred to the COVID-Positive Quad as Punishment

According to Halawa inmate William Napeahi, on August 2, 2021, he was placed into the COVID-positive quad at Halawa because of some confusion regarding whether he would take a temperature test.  *See* Ex. 23, Napeahi Decl. at ¶ 5.  Mr. Napeahi was not experiencing any COVID symptoms at the time and informed the staff, "I'm not COVID positive."  *Id.*  Staff moved him anyway.  *Id.*

Four days later, on August 6, 2021, at approximately 4 p.m., Mr. Napeahi asked Dr. Tresch why he was being housed in the COVID-positive quad since he was COVID-negative.  *Id.* at ¶ 13.  Dr. Tresch responded, "You're in here because

you harassed me, Napeahi!"  *Id.*  Mr. Napeahi responded, "So you put me in here

to punish me?"  According to Mr. Napeahi, Dr. Tresch then left the module.  *Id.*

If these allegations are true, the placement of inmates in the COVID-positive

quad as a form of punishment is both unethical and completely at odds with the

purpose of the DPS PRP which is to prevent the spread of COVID-19.

### 3.  No Grievance Forms Available During Active Outbreak At MCCC, Halawa, and HCCC.

According to MCCC inmate Mr. Walsh, as of August 3, 2021, there are no

grievance forms available at MCCC.  *See* Robert Decl. at ¶ 14.

According to Halawa inmate Drosstain Pua, each time Mr. Pua asks for a

grievance form he is told there are no grievance forms.  *See* Exhibit 13,

Declaration of Drosstain Pua ("Pua Decl.") at ¶¶ 11, 12.  The last time he asked

was on August 5, 2021.  *Id.*

### L.  OCCC and Kulani Do Not Train Their Staff on the DPS PRP in Violation of the Administrative/Coordination Policy.

According to the Administration/Coordination policy of the DPS PRP,

some of the steps Facilities should take to prepare for the possibility of COVID-19

in the Facilities are:

o  Train Staff on the facilities COVID-19 Pandemic Response Plan;
o  Consideration should be given to activating the Emergency Response Plan within the facility to coordinate response to a crisis; and
o  Review Personnel Policies and Practices.

*See* DPS PRP at 6, 7.

The Wardens at Halawa, OCCC, and Kulani indicated that their facilities are in full compliance with this policy.  *See* ECF Nos. 48-2 at 2; 48-7 at 2; 48-5 at 2.

OCCC Sgt. Anderson and OCCC ACO Sholtis have never attended and have never been asked to attend any trainings on: (1) the DPS Pandemic Response Plan; or (2) what to do in the event of any COVID-19 outbreak.  *See* Ex. 36, Sholtis Decl. at ¶ 17; Ex. 40, Anderson Decl. at ¶ 22.

ACO Carvalho has never attended any training at Kulani on DPS's Pandemic Response Plan.  *See* Ex. 41, Carvalho Decl. at ¶ 7.

For these reasons, Kulani and OCCC are not in full compliance with this section of the PRP.

**M.  OCCC Violates the Employee Screening Policy.**

DPS employees should be screened upon arrival to their facility using a COVID-19 Employee Screening form, which asks questions about COVID-19 symptoms and possible exposure to COVID-19.  *See* DPS PRP at 26.  Employees' temperature should also be taken prior to entering the facility.  *Id.* at 27.

Halawa and OCCC Wardens indicated that their facilities are in full compliance with this section.  *See* ECF No. 48-5 at 15; 48-2 at 15.

A few times a week, there is no one posted at the temperature screening desk at the entrance of OCCC.  *See* Ex. 40, Anderson Decl. at ¶ 23; Ex. 22, Kyles Decl.

at ¶¶ 17, 18.  At those times, employees can enter the facility without having their temperature checked and without being asked any screening questions.  *Id.*

These actions violate the Employee Screening Policy.

### N.  Most DPS Correctional Facilities Are Not in Compliance with the Continuous Quality Improvement Policy.

According to the PRP, "[p]eriodically and at the conclusion of the outbreak, the facility should review the implementation of the COVID-19 Pandemic Response Plan in the context of identifying what has worked well and what areas require improvement."  DPS PRP at 50.

The Wardens of Kulani, OCCC, Waiawa, MCCC, HCCC, Halawa, WCCC declare that they are in full compliance with the Continuous Quality Improvement policy.  *See* ECF Nos. 48-1 at 34; 48-8 at 68; 48-5 at 38; 48-4 at 38; 48-2 at 38; 48-7 at 38; 48-3 at 24.

According to Sgt. Kyles, there have not been any meaningful changes with respect to COVID mitigation policies at OCCC since the outbreak in August 2020 or since the Court issued its Order on July 13, 2021.  *See* Ex. 22, Kyles Decl. at ¶ 4, 20.

Inmates at Kulani, Halawa, HCCC, and WCCC consistently report that in terms of COVID-19 mitigation measures, they have not observed any meaningful changes or improvements over the last several months.  *See* Ex. 15, Alvarado Decl.

at ¶ 10 (Kulani); Ex. 8, Silva Decl. at ¶ 6 (Halawa); Ex. 4, Castro Decl. at ¶ 7 (HCCC); Ex. 17, Bella Decl. at ¶ 19 (WCCC).

## O. Miscellaneous COVID-19 Mitigation Issues

### 1. The Cost of Medical Treatment at WCCC

According to WCCC inmate Bella Carvalho, it costs three dollars for each visit with a medical provider at WCCC; even if it is something as small as getting a Band-Aid. *See* Bella Decl. at ¶¶ 21, 22. For indigent inmates with COVID symptoms, this fee is cost-prohibitive and prevents such inmates from reporting COVID-19 symptoms.

### 2. Vaccinations and Counterfeit Vaccination Cards

#### a. False Vaccination Cards at Halawa

According to Halawa inmate Justin Silva ("Mr. Silva"), while incarcerated at Halawa, he refused to take the COVID-19 vaccine. *See* Ex. 8, Silva at ¶ 4. Several months after Mr. Silva's refusal, Halawa issued him a vaccination card which indicated he had received the COVID-19 vaccine in March 2021. *Id.* at ¶ 5.

#### b. HCCC Not Offering Vaccine to Some Inmates

Former HCCC inmate Joey Caseres asked HCCC staff several times to get the COVID-19 vaccine, but each time he was told to wait. *See* Ex. 23, Caseres Decl. at ¶ 4. By the time DPS flew him to Halawa on July 27, 2021, Mr. Caseres had not been vaccinated. *Id.*

### 3. Some Kulani Inmates Have Not Had Video Visits with Family Members For Almost Two Years.

According to inmates at Kulani, they have not had any video visits with their family since arriving at Kulani. *See* Ex. 16, Shine Decl. at ¶ 12; Ex. 15, Alvarado Decl. at ¶ 19. Some Kulani inmates have not seen their loved ones via video for almost two years. *See* Ex. 16, Shine Decl. at ¶ 12.

## III. Paragraphs E, F, and G of Order #1

In Defendant's Status Report, Defendant stated that,

> "The Preliminary Injunction "authorized [Magistrate Judge Mansfield] to address compliance with the preliminary injunction, engage in factfinding procedures he deems appropriate, and issue certified factual findings to the [Court]." ECF No. 37 at 67.

> However, Paragraphs E, F, and G exceed the scope of this authority by directing Defendant to provide information that was not requested by Plaintiffs in connection with their motion for preliminary injunction, was not briefed by the parties, and was not directed by the District Court. Moreover, Defendant was not given adequate notice of this request or any opportunity to oppose it.

ECF No. 48 at 7.

Defendant requests that the Court eliminate provisions E, F, and G of the Magistrate Judge's Order #1 which require Defendant to provide Class Counsel with: 1) a list of all inmates who have contracted COVID-19; (2) current contact information for each inmate, and to update that contact information as necessary due to inmate movement or otherwise; (3) a daily update of new active inmate

COVID-19 cases, including each inmate's contact information.  *See* ECF No. 42 at

3, 4.  In the alternative, Defendant "would like to address the issue of whether

inmate consent is required prior to disclosure of the information required under

Paragraphs E, F, and G at the status conference."  ECF No. 48 at 10.

Plaintiffs acknowledge that inmates who have been released from DPS

facilities are not a part of the provisional class, and therefore consent is likely

required for these individuals.  The following discussion relates to every other

issue raised by Defendant with respect to Paragraphs E, F, and G of Order #1.

On July 13, 2021, the Court held that Plaintiffs satisfied the requirements for

class certification under Federal Rule of Civil Procedure ("FRCP") 23(a) and

23(b)(2) and granted Plaintiffs' motion for provisional class certification.  *See* ECF

No. 48 at 18-32.

As the Court is aware, a class action certified under FRCP 23(b)(2) is a

mandatory class action; putative class members are not entitled to notice or an

opportunity to opt out of the class.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

338, 361-62 (2011); *Roman v. Wolf*, No. 2020 WL 3869729, at *4 (C.D. Cal. Apr.

23, 2020).   In addition, a plaintiff who is a member of a class action for equitable

relief concerning prison conditions may not maintain an individual suit for

equitable relief arising from the same issues in the class action.  *See Crawford v.

Bell,* 599 F.2d 890, 892–93 (9th Cir. 1979).

Here, the District Court certified the class under FRCP 23(b)(2); none of the approximately 3,000 class members are allowed to opt out, and none can maintain an individual suit for equitable relief arising from DPS's failures to prevent the spread of COVID-19 in its facilities.  *See Dukes*, 564 U.S. at 361-62; *Crawford,* 599 F.2d at 892–93.  Plaintiffs' attorneys are Class Counsel for each of the 3,000 class members while the preliminary injunction is in effect.

As Defendant notes, the District Court authorized the Magistrate Judge to address compliance with the preliminary injunction.  Pursuant to this authorization, the Magistrate Judge issued Order #1, which included the specific paragraphs at issue here.  *See supra.*

With the exception of those inmates who have been released from custody, Class Counsel are entitled to the names, contact information, and COVID status of class members without class members' explicit consent.  Here, as authorized by the Court, Class Counsel represent all current inmates' interests with respect to COVID-19; consent with respect to their contact information and COVID-19 status is implicit in Class Counsel's "mandatory" representation of their interests with respect to COVID-19.

Moreover, the preliminary injunction here is temporary.  Class Counsel has a limited period of time to contact and confer with class members in a representative capacity.  Requesting consent from 3,000 class members could prevent Class

Counsel from speaking with numerous class members before the July 13, 2021, Order is lifted.

Without the names of the class members and their contact information, Class Counsel cannot determine who is in the class, communicate with class members to determine how they contracted COVID-19, or determine whether Defendant has rectified the conditions that caused class members to contract the virus.  Despite several conferences between counsel in which this information was requested, Defendants have flatly refused to provide Class Counsel with *any* names of the class members who have contracted COVID-19 in contravention of Sections E and G of Order #1.

Finally, with respect to paragraph G of Order #1, Defendant has provided Class Counsel with a daily update of new active inmate COVID-19 cases, but has failed to provide each inmate's contact information, as required by paragraph G. *Id.* at 4.  Class Counsel seek this information forthwith so they can continue their diligent discovery efforts in this matter.

DATED: Honolulu, Hawai'i, August 9, 2021.

/s/ Gina Szeto-Wong
ERIC A. SEITZ
GINA SZETO-WONG
KEVIN YOLKEN

Attorneys for Plaintiffs

69