IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTHONY CHATMAN, FRANCISCO ALVARADO, ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, individually and on behalf of all others similarly situated,<br><br>       Plaintiffs,<br><br>  vs.<br><br>MAX N. OTANI, Director of State of Hawai'i, Department of Public Safety, in his official capacity,<br><br>       Defendant. | CIVIL NO. 21-00268 JAO-KJM<br><br>ORDER DENYING DEFENDANT'S MOTION TO CLARIFY AND/OR MODIFY PRELIMINARY INJUNCTION |

**ORDER DENYING DEFENDANT'S MOTION TO CLARIFY AND/OR MODIFY PRELIMINARY INJUNCTION**

On July 13, 2021, the Court issued an Order (1) Granting Plaintiffs' Motion for Provisional Class Certification and (2) Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction and Temporary Restraining Order ("PI Order").  ECF No. 37; *see also Chatman v. Otani*, Civil No. 21-00268 JAO-KJM, 2021 WL 2941990 (D. Haw. July 13, 2021).  On July 29, 2021, Defendant Max Otani ("Defendant") filed a Motion to Clarify and/or Modify Preliminary Injunction ("Motion"), requesting the Court do the following:

- ▪ Clarify statements regarding vaccines in the PI Order.

- ▪ Modify the PI Order, clarifying that sections of the Response Plan not specifically referenced in the PI Order fall outside the scope of the injunction.

- ▪ Confirm that Defendant and DPS employees may enforce general rules and policies with respect to inmate grievances.

ECF No. 45 at 4.[1]  The Court elects to decide this Motion without a hearing pursuant to Rule 7.1(c) of the Local Rules of Practice for the U.S. District Court for the District of Hawaii.  For the following reasons, the Court DENIES the Motion.

## DISCUSSION

"'The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible,'" and when it "invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution[, it] has the continuing duty and responsibility to assess the efficacy and consequences of its order." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (citations omitted).  "'A party seeking modification . . . of an injunction bears the burden of establishing that a significant change in facts or law warrants revision . .

---

[1]  Defendant also initially requested an order requiring him to incorporate the vaccination policy, attached as Exhibit A, as Addendum 1 to the Department of Public Safety's ("DPS") Pandemic Response Plan ("Response Plan").  ECF No. 45 at 3.  He withdraws this request because a superseding version is presented in connection with his Second Motion to Modify Preliminary Injunction.  ECF No. 55 at 16 n.12.

. of the injunction.'" *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (quoting *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)) (other citation omitted). This "requirement presumes that the moving party could have appealed the grant of the injunction but chose not to do so, and thus that a subsequent challenge to the injunctive relief must rest on grounds that could not have been raised before." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted).

The Prison Litigation Reform Act ("PLRA") permits modification of prospective relief before the relief is terminable to the extent it "would otherwise be legally permissible." 18 U.S.C. § 3626(b)(4). Courts "shall promptly rule on any motion to modify . . . prospective relief in a civil action with respect to prison conditions." 18 U.S.C. § 3626(e)(1).

As a preliminary matter, Defendant has not established that a significant change in law or facts warrants revision of the injunction in the manner requested. Therefore, the Court DENIES the Motion to the extent it seeks modification of the PI Order. The Court confirms its rulings in the PI Order as detailed below.

## A.    Vaccination

### 1.    Statement Regarding Vaccines

Defendant asks the Court to clarify a statement in the PI Order regarding

vaccination — that there is "conflicting information about the length of protective immunity following COVID-19 infection and the efficacy of vaccines against the new variants." *Chatman*, 2021 WL 2941990, at *12 (footnote omitted). Defendant believes that this statement is contrary to available information and may contribute to vaccine hesitancy. ECF No. 45-1 at 6. A plain reading of the PI Order demonstrates otherwise.

The subject statement was *not* a general pronouncement about vaccines. Critically, the Court made the statement in the *class certification* context to address Defendant's efforts to *exclude* from the proposed classes all inmates who are vaccinated and who contracted and recovered from COVID-19. Defendant argued:

> There is simply no scientific, medical, or other basis to include inmates who have either already contracted and recovered from COVID-19 or who have been fully vaccinated for COVID-19 as class members in this case. . . . As such, any class that includes "all present and future" inmates is overly broad and, if the Court is inclined to grant Plaintiffs' Motion, the class definition should be redrawn to exclude these inmates and consideration should be given as to whether a facility has achieved herd immunity.

ECF No. 28 at 19. In other words, Defendant contended, without adequate support, that inmates who are vaccinated and/or who previously contracted COVID-19 should not be part of the classes because they would unlikely be

affected by COVID-19.[2]  *Id.* at 18–19.  The Court's statement addressed that conclusory assumption.  It did not question the soundness of COVID-19 vaccination and in fact supports and encourages vaccination.  As noted in the PI Order, even the "Response Plan treats vaccinated individuals the same as unvaccinated individuals for the purposes of quarantine following exposure to someone with suspected or confirmed COVID-19, citing the 'turnover of inmates, higher risk of transmission, and challenges in maintaining recommended physical distancing in correctional settings.'"  *Chatman*, 2021 WL 2941990, at *12 n.11 (quoting ECF No. 22-12 at 45).

The Court maintains its rationale for including all inmates in the classes — regardless of vaccination status or prior COVID-19 infection — and new developments only further support it.  Recent updates from the Centers for Disease Control and Prevention ("CDC") reaffirm the efficacy of the vaccines against severe illness and death, even as to the Delta variant, but also confirm that fully vaccinated individuals (1) can become infected with and transmit the Delta variant[3]

---

[2]  At the hearing, defense counsel argued that vaccinated and previously infected inmates have little to no risk of contracting COVID-19.  This is inconsistent with the data cited below.

[3]  The CDC stated:

Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an

(continued . . .)

and (2) may not be protected if they have weakened immune systems, including those on immunosuppressive medications.  *See* https://www.cdc.gov/coronavirus/ 2019-ncov/vaccines/fully-vaccinated.html (last visited Aug. 12, 2021).  Moreover, the CDC is investigating the duration of vaccine immunity.  *See id.*  It also posted a study indicating that unvaccinated individuals who were previously infected with COVID-19 "are more than twice as likely to be reinfected with COVID-19 than those who were fully vaccinated after initially contracting the virus" and that "COVID-19 vaccines offer better protection than natural immunity alone and that vaccines, even after prior infection, help prevent reinfections."  https://www.cdc. gov/media/releases/2021/s0806-vaccination-protection.html (last visited Aug. 12,

---

(. . . continued)

> increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus. This finding is concerning and was a pivotal discovery leading to CDC's updated mask recommendation.  The masking recommendation was updated to ensure the vaccinated public would not unknowingly transmit virus to others, including their unvaccinated or immunocompromised loved ones.

https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last visited Aug. 12, 2021).  The CDC also posted a Morbidity and Mortality Weekly Report citing the recent Provincetown, Massachusetts COVID-19 outbreak, where 74% of the 469 the infected individuals in the study were vaccinated.  *See* https://www. cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w (last visited Aug. 12, 2021).  The Court *does not* cite this to criticize COVID-19 vaccines, but to demonstrate that Defendant incorrectly assumed and argued that vaccinated and previously-infected inmates have little to no risk of contracting of COVID-19.

2021).  While it is certainly true that vaccinated individuals are far less likely to contract COVID-19 and suffer serious illness, there remains some risk of infection[4] and transmission of the Delta variant.  *See, e.g.*, https://www.jhsph.edu/covid-19/ articles/new-data-on-covid-19-transmission-by-vaccinated-individuals.html (last visited Aug. 12, 2021); https://www.cdc.gov/coronavirus/2019-ncov/vaccines/ fully-vaccinated.html (last visited Aug. 12, 2021).  This is especially true in a carceral setting, which compounds the problem for the unvaccinated in particular.

The resistance to vaccination by inmates and DPS staff[5] has contributed to the facilities' already heightened vulnerability to outbreaks.  Excluding vaccinated and previously infected inmates from the classes who may still be susceptible to contracting COVID-19 and becoming ill would unjustifiably deprive them of any relief awarded in this action.  While highly effective at preventing serious illness

---

[4]  Defendant points to the Court's observation in the PI Order that at least one Plaintiff (Tyndale Mobley) contracted COVID-19 post-vaccination as inconsistent with the efficacy of the vaccine.  ECF No. 45-1 at 6 n.7.  The Court offered the example to highlight that Defendant's efforts to disregard vaccinated inmates was unfounded, and the latest data confirms that more definitively.  Defendant also brushes off Mobley's illness, arguing that Mobley's declaration did not indicate what serious symptoms he experienced, if any.  *Id.*  Mobley represented that he suffered from several symptoms and is concerned about the long-term consequences.  ECF No. 26-10 ¶ 18.  Defendant's suggestion that only serious post-vaccination COVID-19 cases matter wholly ignores the larger and more pervasive issue of *infection and transmission* within DPS facilities.

[5]  The Court does not fault Defendant for the lower vaccination rates in some facilities, but he must nevertheless be prepared for and confront the impact to DPS facilities.

and death, vaccines do not guarantee protection from infection, nor illness or transmission.  The same is true of prior infection.  This is why, as the Court found before, *all* present and future inmates are entitled to the relief accorded in this action.

### 2.    Vaccine Addendum

Defendant initially requested an order requiring DPS to incorporate an addendum into the Response Plan regarding vaccination requirements for DPS staff, and to implement said policy.  In light of Governor Ige's Emergency Proclamation Related to the COVID-19 Response, issued on August 5, 2021, which contains a vaccination mandate for State employees, Defendant withdrew this request and it is moot in any event.  The Court informs Defendant that while it appreciates his efforts to obtain authorization to amend the Response Plan, he should not run to the Court for expedited relief with each proposed modification, as the Court's role is not to pre-approve or preliminarily endorse state policies. Defendant is not precluded from revising the Response Plan, particularly if modifications enhance COVID-19 mitigation measures in DPS facilities but he is cautioned that any modifications decreasing or eliminating *existing* safety measures in the Response Plan (May 28, 2021 Revision) may violate the PI Order. *See Chatman*, 2021 WL 2941990, at *24 & n.27 (citing ECF No. 22-12).

B.    **Scope of Injunction**

Defendant also requests clarification that the injunction only pertains to the specific sections listed in the PI Order and not the balance of the Response Plan. To support this restrictive interpretation of the PI Order, Defendant explains that: (1) the Response Plan was not designed to be scrutinized and enforced by courts and was never intended to carry the force of law; (2) because the Response Plan delineates vague or ambiguous standards, it would be difficult for Defendant, DPS staff, or counsel, to ascertain whether they are compliant; and (3) compliance with the Response Plan in full would be unduly burdensome and render the injunction overbroad, and would divert already limited staff time to ensure compliance.  ECF No. 45-1 at 11–13.

Defendant's contentions are not well taken.  Defendant tried to avoid the issuance of the injunction altogether by repeatedly highlighting his proactivity regarding the development and implementation of the Response Plan.  His present contention that the Response Plan is too vague or ambiguous to adhere to is contradictory, especially in view of his representations in Status Report No. 1 Regarding Compliance with the Preliminary Injunction that four facilities are in full compliance, three facilities are in full compliance except for section 3(a), and one facility is in full compliance except for sections 3(b), 10, and 13.  ECF No. 48.

In defense of DPS's conduct, Defendant previously argued that it adopted the Response Plan "in order to prevent, contain, and control the spread of COVID-19 at the State's correctional facilities" and that the Response Plan "is constantly reviewed and has been updated on several occasions as CDC guidelines and information have evolved."  ECF No. 22 at 14–15.  Defendant also represented that each facility has a response plan tailored to address its unique needs, and he identified nine categories of measures that were being *implemented*.  *Id.* at 15–20.  At the hearing, defense counsel repeatedly argued that that the Response Plan was being implemented at DPS facilities, and even argued that the Response Plan was working.  Nonetheless, Defendant now claims that "none of the affidavits [he] submitted . . . averred that [he] was already complying with *every provision* in the [Response Plan] across-the-board," ECF No. 45-1 at 14, as if partial compliance then[6] — when in the midst of a COVID-19 outbreak — justifies a narrowing of the injunction or incomplete compliance now.

---

[6]  The Court never stated that Defendant claimed — through the many declarations submitted — wholesale compliance with the Response Plan.  *See Chatman*, 2021 WL 2941990, at *20 ("[T]he injunction would merely require DPS to do not only what it *should* be doing but what it claims it *has* been doing throughout the course of the pandemic.").  But Defendant certainly capitalized on that inference.  He repeatedly insisted that he proactively adopted and implemented measures to prevent and control the outbreaks and spread of COVID-19 at the facilities, except for "occasional lapses," if the declarations submitted by Plaintiffs were believed. ECF No. 22 at 29, 32–33, 36–38.

The Court is unmoved by Defendant's assertion that the interpretation of and adherence to the Response Plan — the creation and implementation of which was initially touted as evincing constitutional compliance — is suddenly too burdensome.  *See Ahlman v. Barnes*, No. 20-55568, 2020 WL 3547960, at *3 (9th Cir. June 17, 2020) ("Defendants' new position cannot be reconciled with Balicki's sworn statement in the district court, which represented not only that Defendants were willing and able to implement each of the specific measures requested by Plaintiffs (and later incorporated into the injunction), but that they had in fact *already implemented them*.  Nowhere in their papers have Defendants attempted to explain why the measures they assured the district court had already been taken have suddenly become impossible to carry out." (footnote omitted)).  It is unclear why Defendant would create a plan with which DPS is unable or unwilling to comply.  Notwithstanding his initial reliance on the Response Plan, Defendant currently likens it to the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, arguing that such a plan does not provide a workable plan according to the Ninth Circuit.[7]  ECF No. 45-1 at 12 (quoting *Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020)).  In *Roman v. Wolf*, the Ninth Circuit held:

---

[7]  According to Defendant, the CDC guidelines is a key document upon which the Response Plan is based.  ECF No. 45-1 at 12.

Second, although our court previously stayed the district court's preliminary injunction except to the extent it required compliance with the CDC's guidelines for correctional and detention facilities, we think developments since the stay have made clear that those guidelines do not provide a workable standard for a preliminary injunction. The guidance document spans 25 pages and makes hundreds of recommendations, many of which lack specificity.

977 F.3d at 946. The district court's preliminary injunction contained this reference to the CDC guidelines, one of 28 requirements imposed in its order:

13.   Respondents shall immediately put into effect at Adelanto all mandates, best practices, recommendations and guidelines issued by the United States Centers for Disease Control and Prevention, the State of California, and the San Bernardino County Department of Public Health for the prevention of the transmission of the coronavius [sic] and COVID-19.

*Roman v. Wolf*, Civil No. 20-00768 TJH-PVC, ECF No. 55 (Preliminary Injunction). There are material differences between the aforementioned paragraph in the *Roman* injunction and the PI Order. This Court did not order Defendant to comply with general guidelines issued by an independent organization with no knowledge of Hawaii's correctional facilities; it ordered Defendant to comply with DPS's *own* Response Plan.[8] Defendant's reliance on and incorporation of the CDC

---

[8]  In his Reply, Defendant emphasizes both the requirement that injunctions be "narrowly drawn, extend no further than necessary to correct the harm . . . and be the least intrusive means necessary to correct that harm," ECF No. 55 at 9 (emphases omitted) (quoting 18 U.S.C. § 3626(a)(2)), and the inquiry of whether a "'vindication of federal rights could have been achieved with less involvement by

(continued . . .)

guidelines was of his own volition and, based on his ardent promotion of the Response Plan, it is reasonable to assume that the incorporated provisions could be feasibly implemented at DPS facilities.  Otherwise, creating the Response Plan was merely an academic exercise.  As discussed above, the Court rejects Defendant's contradictory positions regarding the Response Plan.  Defendant previously pointed to the virtues of the Response Plan and claimed to have implemented it.  He cannot reverse course weeks later and characterize the Response Plan as an unenforceable guidance document, nor feign an inability to comply due to vague standards and/or scarce staff time.

The Court intended and expects Defendant to comply with the *entire* Response Plan.  *See Chatman*, 2021 WL 2941990, at *24 ("Based on the foregoing, the Court GRANTS the Injunction Motion and ORDERS Defendant to *fully comply* with the Response Plan[.]" (footnote omitted)).  Defendant's arguments do not support a different outcome.  If Defendant formulated the Response Plan to prevent the spread of COVID-19 in DPS facilities, as he claimed, the Court struggles to understand how partial compliance will achieve that.  Given

---

(. . . continued)
the court in directing the details of defendants' operations.'"  *Id.* (quoting *Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014)).  Considering that the Court's injunction merely requires Defendant to comply with DPS's Response Plan, which he *already* claimed to be doing, the foregoing are more than satisfied. In the simplest terms, Defendant was ordered to follow the plan he created and to do what he said he was doing.

the current COVID-19 surge in Hawai'i, with cases and positivity rates higher than they have ever been during the pandemic, it is imperative that Defendant take all necessary steps to mitigate spread within the facilities to protect inmates, staff, and the community at large.[9]

## C.   Inmate Grievances

Defendant seeks clarification that he may continue to enforce general procedures regarding frivolous or untimely inmate grievances, but he does not explain the practical effect that will have on COVID-19 grievances.[10]  He points to frivolous, abusive/threatening, and untimely grievances as necessitating the continued enforcement of its grievance rules.[11]  ECF No. 55 at 19–20.  The Court recognizes the importance of maintaining a grievance system and it did not enjoin Defendant from generally enforcing grievance rules and procedures.  But if

---

[9]  It is noteworthy that DPS is currently grappling with additional COVID-19 outbreaks at Kauai Community Correctional Center, Halawa Correctional Facility, Oahu Community Correctional Center, and Maui Community Correctional Center. https://dps.hawaii.gov/blog/2020/03/17/coronavirus-covid-19-information-and-resources/#gallery-2 (updated Aug. 11, 2021) (last visited Aug. 12, 2021).

[10]  Defendant improperly raises substantive arguments and presents legal authority for the first time in the Reply.  These arguments should have been raised in opposition to the motion for preliminary injunction.

[11]  It is unclear how COVID-related grievances would fall into the abusive/ threatening category, when Defendant defines this category to include grievances threatening staff, posing a substantial threat to security and discipline, or comprising a string of insults.  ECF No. 55 at 19 & n.21.

Defendant's enforcement of grievance procedures impairs an inmate's ability to obtain a grievance form or submit a grievance regarding COVID-19 issues, doing so violates the PI Order.[12]  *See Chatman*, 2021 WL 2941990, at *24 ("Prohibit[ing] DPS employees from restricting access to inmate grievance forms or from preventing the submission of grievances with respect to COVID-19 issues.").

## CONCLUSION

In accordance with the foregoing, the Court DENIES Plaintiffs' Motion to Clarify and/or Modify Preliminary Injunction.  ECF No. 45.

IT IS SO ORDERED.

DATED:      Honolulu, Hawai'i, August 12, 2021.



_____
Jill A. Otake
United States District Judge

Civil No. 21-00268 JAO-KJM, *Alvarado v. Otani*; ORDER DENYING DEFENDANT'S MOTION TO CLARIFY AND/OR MODIFY PRELIMINARY INJUNCTION

---

[12]  For example, Defendant cannot deny forms to an inmate then later deem a grievance untimely.  Nor can Defendant refuse to accept a grievance then claim a failure to exhaust under the PLRA.  *See Valentine v. Collier*, 590 U.S. __, 140 S. Ct. 1598, 1600 (2020) (statement of Sotomayor, J., joined by Ginsburg, J.) (explaining that the exhaustion requirement only pertains to "'available' judicial remedies." (quoting *Ross v. Blake*, 578 U.S. __, 136 S. Ct. 1850, 1858–59 (2016))); *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) ("When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies.").