IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ANTHONY CHATMAN, FRANCISCO ALVARADO, ZACHARY GRANADOS, TYNDALE MOBLEY, and JOSEPH DEGUAIR, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>MAX N. OTANI, Director of the State of Hawaiʻi Department of Public Safety, in his official capacity,<br><br>        Defendant. | CIVIL NO. 21-00268 JAO-KJM |

## **SETTLEMENT AGREEMENT AND GENERAL RELEASE**

Whereas the parties agree that both the plaintiffs and the defendant are interested in resolving the present litigation and providing reasonable and appropriate measures for the health and safety of inmates and staff; and

Whereas, on March 23, 2020, the Centers for Disease Control and Prevention ("**CDC**") promulgated interim guidelines for the management of coronavirus disease 2019 ("**COVID-19**") in correctional and detention facilities ("**CDC guidelines**"), which it has periodically updated as additional information

1

EXHIBIT "A"

has become available;[1]

Whereas, on March 23, 2020, the State of Hawai'i Department of Public Safety ("**DPS**") adopted a Pandemic Response Plan ("**Response Plan**" or "**PRP**") based on a draft prepared by a private Kansas-based health care contractor and consulting firm called VitalCore Health Strategies and for the purpose of incorporating CDC guidance to assist DPS in its response to the COVID-19 pandemic;

Whereas, the CDC guidelines expressly state that "The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions";

Whereas, the parties acknowledge DPS's efforts to comply with the CDC guidelines and, where appropriate, to obtain clarification or guidance from the State of Hawai'i Department of Health ("**DOH**"); and

Whereas, DPS asserts that it has made significant efforts to combat COVID-19, including, but not limited to, increasing sanitation and hygiene, testing, vaccination of staff and inmates, and reduction of inmate populations through the release of eligible inmates safely and appropriately to the community; and

---

[1] *See* Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, June 9, 2021, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

Whereas, on July 13, 2021, the Honorable Jill A. Otake issued a preliminary injunction compelling DPS to take certain specified actions regarding its plans and efforts to combat COVID-19 in state correctional and detention facilities.

Now therefore, the parties agree to resolve their differences as follows:

## A.   CDC GUIDELINES AND DPS'S PANDEMIC RESPONSE PLAN ("PRP")

1.      DPS will make best efforts to implement the PRP and adapt it to the CDC guidelines based on best practices and recommendations from DOH, and based on the individual facilities' physical space, staffing, population, operations, and other resources and conditions.

## B.   MONITORING

2.      A five-person, independent Agreement Monitoring Panel ("**AMP**") shall be established.

3.      The AMP shall be formed and operational within two (2) weeks of the signing of this Agreement and consist of five persons with appropriate knowledge and expertise in correctional health care and managing infectious disease in a correctional setting or in the management of correctional systems.

4.      The panel shall be selected as follows: two people chosen by defendant, who may be employed by DPS, two people chosen by plaintiffs, and one person who does not currently work for DPS, who has significant expertise or

experience in the management of correctional systems, and is chosen by agreement of the parties. The individuals on the AMP (other than the DPS employees) will be paid as provided in this Agreement. The fees of the AMP panel members will be subject to approval by, and payment will be processed through, the Department of the Attorney General.  Approval and payment of the AMP panel members' costs (including the DPS employees), as well as for any staff and resources necessary to support the AMP, will be processed through the Department of the Attorney General. The total fees for the duration of the Agreement shall be capped at $75,000 per panel member unless the Agreement is extended pursuant to Section G, *infra*, in which case additional fees shall only be approved by mutual written agreement of the parties.  If a panel member becomes unavailable or is unable to continue as a member of the panel, the party that appointed that panel member will appoint a replacement panel member within 10 days.  If the panel member chosen by agreement of the parties becomes unavailable or is unable to continue as a member of the panel, a replacement will be chosen by agreement of the parties.

5.     The AMP is an advisory panel.  Its role is to provide non-binding, informed guidance and recommendations to aid DPS in its continuing effort to implement the PRP, as well as evolving public health guidance that may require a change to DPS's COVID-19 response. The AMP's areas of focus shall be limited to the following:

     a.    Quarantining/cohorting/isolation of inmates (including developing strategies and proposing guidelines to assist DPS in the identification and housing of inmates who are "high risk" due to age and/or underlying medical conditions as defined herein);

     b.    Sanitation/sanitization;

     c.    Social distancing strategies;

     d.    Testing (subject to the availability of resources and in coordination with DOH and/or Hawaiʻi National Guard);

     e.    Providing inmate information to DOH for contact tracing; and

     f.    Inmate vaccination and health hygiene education.

The AMP's recommendations shall not include measures related to the conditions of confinement unrelated to COVID-19 or matters beyond DPS' control, including mandatory release of inmates to alleviate overcrowding, moratoriums on arrests or pretrial detention of offenders, or mandatory structural improvements to DPS facilities such as the construction of additional facilities or housing units.

6.    The AMP shall devise procedures for the monitoring of this Agreement and the standards for developing its guidance and recommendations. In doing so, it shall apply professionally acceptable public health, epidemiological, and correctional healthcare and security standards for correctional facilities in responding to COVID-19, with the recognition that these will evolve over time.

7.     Upon seventy-two hours notice to DPS, the AMP should be given prompt access to DPS facilities to conduct onsite visits. Upon seventy-two hours notice, the AMP shall also have access to all DPS policies, procedures and records detailing its COVID-19 response, as well as access to all staff, inmates and consulting physicians and experts with respect to DPS's COVID-19 response. DPS shall direct all employees to cooperate fully with the AMP.  All non-public information obtained by the AMP shall be maintained in a confidential manner. The individuals on the AMP, as well as Plaintiffs' counsel and all members of any class certified by the Court, must sign a confidentiality agreement prior to being provided with any documents that implicate safety and security, or medical privacy, or any other confidential documents. The confidentiality agreement shall further prohibit re-dissemination of such documents and public comment on their work for the AMP. Furthermore, the parties agree to keep AMP reports confidential and not disseminate such reports to third parties, except as in accordance with a protective order.  The proceedings of the AMP shall be subject to the mediation privilege. *See* HRS § 658H-4.

8.     Other than in this lawsuit, information and documents obtained, as well as any reports issued by the AMP, shall not be admissible against the State, its agencies, and/or employees, in any proceeding for any reason, including in any subsequent litigation for damages.  In this lawsuit, the admissibility into evidence

of any information or documents provided to the AMP, or of any AMP reports, or portions thereof, shall be governed by the federal rules of evidence, and the parties reserve all rights to either seek admissibility or object to admissibility of those reports.  Reports shall be admitted into evidence only after entry of an appropriate protective order and the filing party shall seek leave to file any such report under seal in accordance with the Local Rules of Practice for the United States District Court for the District of Hawaiʻi.

9.      Unless such conflict is waived by the parties, the individuals on the AMP shall not accept employment or provide consulting services that would present a conflict of interest with their responsibilities under this Settlement Agreement, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees relating to DPS's COVID-19 response.

10.      The AMP shall provide the defendant and counsel for the parties with reports describing the steps taken by DPS to implement its PRP and/or the AMP's guidance or recommendations focusing on areas described in Paragraph 5.  The AMP shall issue reports every month, unless the parties agree otherwise, in a format to be agreed upon by the AMP and the parties provided, however, that the reports shall not include ultimate findings of fact or conclusions.  The reports

should address each facility's efforts to follow the PRP and identify areas needing improvement. If desired by the AMP, the reports may identify where members of the AMP are in disagreement. These may be reduced to quarterly reports upon mutual agreement of the parties and the AMP.

11. The AMP may not alter, amend or change the provisions of the Agreement, except as provided in Paragraph 27 of this Agreement.

C. **QUARANTINE AND ISOLATION**

12. DPS will screen and quarantine people newly admitted to a correctional facility as provided in the PRP, and subject to any conditions, modifications and/or exceptions set forth therein.

13. Unless the AMP decides otherwise, DPS will immediately isolate those who exhibit COVID-19 symptoms and those who test positive for COVID-19 infection as medically appropriate and in accordance with the PRP. DPS will comply with this provision to the best of its ability taking into account available space, structural limitations, and staffing and other resources within each facility.

14. Placement in quarantine and medical isolation units shall not be punitive. Regarding inmates who have been medically isolated and subsequently cleared of COVID-19 according to the PRP and thus released from medical isolation, DPS will make best efforts to return such inmates to their pre-medical isolation facility unless there are safety and security concerns, or health concerns

with this return. DPS also will make best efforts to reinstate such inmates who previously held jobs or were in programs to these assignments, recognizing that this may not always be possible due to safety and security concerns, health concerns, available space, and other correctional management issues. Inmates in isolation and/or quarantine will be provided regular telephone calls in accordance with PSD policy COR.15.03 to their family members and attorneys and DPS will not unnecessarily delay any appearances in court or before the parole board, recognizing that this may not always be possible due to safety and security concerns, health concerns, and/or limitations with technology, infrastructure, or staffing. DPS will make best efforts to communicate to inmates this policy when moving inmates to medical isolation.

**D.    VACCINATION AND TESTING**

15.    Pursuant to the Emergency Proclamation Related to the COVID-19 Response signed by Governor David Y. Ige on August 5, 2021, DPS staff members must attest to their vaccination status and DPS staff who are not fully vaccinated must undergo regular COVID-19 testing.   Recognizing the need for DPS and individual DPS facilities to remain flexible and adaptable to developing health and security concerns, DPS will continue to screen staff and any others entering DPS facilities consistent with CDC guidelines and DOH recommendations.

16.    DPS will make COVID-19 vaccines available to every inmate and to

both promote and educate inmates and staff regarding COVID-19 vaccination.

17.   Defendant agrees to report to the AMP every week, with Plaintiffs' counsel copied, providing the number of prisoners at each facility who are tested for COVID-19 and those who test positive for COVID-19, those who are hospitalized due to COVID-19, and those who die as a result of COVID-19.

**E.   SANITATION**

18.   DPS will distribute soap to each person housed in a DPS facility ("**Facility**") as provided in the PRP.

19.   All common areas of the facilities, including but not limited to bathrooms, dayrooms, and showers, shall be cleaned as provided in the PRP.

20.   Prisoners will be provided reasonably sufficient non-alcohol cleaning agents and equipment for the purpose of cleaning their cells, cubicles, or sleeping areas, as provided in the PRP.

21.   All people in DPS custody shall be allowed to shower—in running water—no less than once every other day, regardless of COVID-19 symptoms, test results, or housing. This may be suspended when required for reasons consistent with Paragraph 14 above (*i.e.* security concerns, available space, correctional management issues, and staffing issues), for maintenance issues, or inmate refusals.

22.   DPS will provide reasonably sufficient cleaning supplies to allow all

836662_1.DOC

inmates in its custody in correctional facilities to wipe down phones before they use them.

23.   DPS will provide a minimum of two cloth or other appropriate face masks per person, as provided in the PRP.

24.   DPS will require staff to wear appropriate face masks where necessary within the correctional facilities as provided for in the PRP.

**F.   DIRECTIVE PROHIBITING RETALIATION**

25.   Within 10 days of the execution of this Agreement, Defendant will issue a formal directive prohibiting DPS staff from retaliating against any inmate or staff member for their participation in this lawsuit.

**G.   MODIFICATION OF THE AGREEMENT**

26.   This Agreement may be modified only by the mutual written agreement of all parties or as provided in Paragraph 27 of this Agreement.   The Court shall be notified in writing of all such modifications but need not approve such modifications.

**H.   TERMINATION OF THE AGREEMENT**

27.   The parties intend that this Agreement will remain in place until January 31, 2022, provided that upon the mutual consent of the parties or by written agreement of a majority of the AMP, it may be extended. However, the parties agree that any extension of this Agreement shall not extend beyond

March 31, 2022. The Agreement may also be terminated by mutual consent of the parties.

28.    Upon termination, without the need for any further order of any state or federal court, all jurisdiction of any court to enforce this Agreement shall end except in the event any motions or proceedings are pending, in which case the Court shall retain jurisdiction to resolve or dismiss any such motions or proceedings.

## I.    GENERAL RELEASE OF CLAIMS

29.    The named plaintiffs, individually and on behalf of their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Agreement, release and forever discharge the Defendant, the State of Hawai'i, all agencies of the State of Hawai'i, all present and former officers, employees and agents of the State of Hawai'i, (including all current and former employees of the State of Hawai'i), in both their official and individual capacities, their heirs, successors and assigns, from all claims and liabilities of any kind which Plaintiffs or Defendant had, have, or may have for declaratory or injunctive relief or for attorneys' fees and costs arising from acts or omissions alleged in this lawsuit. Said liability includes such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Hawai'i, or any state or federal administrative agency. Furthermore, all class members as defined in the Order

entered in the District Court on July 13, 2021, individually and on behalf of the Class, their heirs, beneficiaries, successors and assigns, in consideration of the benefits of this Agreement, release and forever discharge the Defendant, the State of Hawaiʻi, all agencies of the State of Hawaiʻi, and all present and former officers, employees and agents of the State of Hawaiʻi (including all current and former employees of the State of Hawaiʻi), in both their official and individual capacities, their heirs, successors and assigns, from all claims and liabilities of any kind for declaratory or injunctive relief or for attorneys' fees and costs arising from acts or omissions alleged in this lawsuit, or from acts or omissions that could have been litigated by the class in this action. Said liability includes such actions as may have been or may in the future be brought in the federal courts, the courts of the State of Hawaiʻi, or any state or federal administrative agency. Notwithstanding the prior sentence, this release does not include criminal matters. This release does not apply to the ability of class members to seek and/or qualify for discretionary release due to COVID-19 under Defendant's discretionary authority or to seek release due to COVID-19 in criminal proceedings within the courts of the State of Hawaiʻi. This release does not apply to any habeas corpus petition seeking any relief due to the COVID-19 pandemic that is pending as of the date of this Agreement.

## J.   NO ADMISSION OF LIABILITY

30.   The parties represent and warrant to each other that the parties

specifically understand and agree that this Agreement is a settlement and compromise of their differences to resolve any and all claims for declaratory and injunctive relief that were raised in this action and is a compromise of disputed claims without any adjudication of the rights, claims and defenses of the parties.

31.     The existence of this Agreement shall not be construed as an admission of liability or of the truth of the allegations, claims, or contentions of any party. There are no covenants, promises, undertakings, or understandings between the parties outside of this Agreement except as specifically set forth herein.

32.     This Agreement is not a consent decree and shall not be incorporated into any judgment of the Court. To the contrary, this is a settlement agreement which the parties respectfully submit is a fair, reasonable and adequate resolution of this case.

33.     Defendant agrees not to contest this Settlement Agreement as non-compliant with 18 U.S.C. § 3626.

### K.     DISMISSAL

34.     Plaintiffs and Defendant shall jointly sign and submit to the Court a Fed. R. Civ. P. 41 Stipulated Dismissal of this action, with prejudice and without costs after final approval of this Agreement.  The parties will file a joint motion for

an order to give notice to the members of the two provisionally-certified classes, and for a fairness hearing, pursuant to Fed. R. Civ. P. 23(e), and Plaintiffs and Defendant shall immediately withdraw any pending motions in the appellate and district courts.  Upon final approval of the settlement and dismissal of this action, Defendant shall dismiss any appeals relating to the entry of the preliminary injunction and the denial of Defendant's motions to modify that injunction.

35.    Defendant shall provide notice of the proposed settlement to the appropriate federal and state officials as required by 28 U.S.C. § 1715.

36.    Throughout the duration of the Agreement, the parties agree to resolve disputes, and Plaintiffs may seek to enforce the Agreement, only pursuant to the procedures outlined in Section L of this Agreement ("Dispute Resolution"). The parties understand and agree that, if approved, and the Court consents, the Court will maintain jurisdiction of this action throughout the duration of the Agreement to resolve any disputes which cannot be amicably resolved between the parties pursuant to the Dispute Resolution procedures set forth in Section L. If the parties are unable to resolve any such disputes with the assistance of the Settlement Judge, despite the Stipulated Dismissal, the Court may retain jurisdiction to enforce the provisions of the Agreement and the Plaintiffs may seek specific performance of the Agreement.  As outlined in Section G, *supra*, if at the time of termination of the Agreement there are any pending motions or proceedings, the Court will maintain

jurisdiction to resolve or dismiss any such motions or proceedings.

37.     The parties also agree that, if the Court approves this Agreement, after Notice to the class, and a fairness hearing pursuant to Fed. R. Civ. P. Rule 23(e), the Court will order a dismissal with prejudice pursuant to Fed. R. Civ. P. Rule 41 (a). The Court will not incorporate this Agreement into any Order of Dismissal, but will nevertheless remain available to the parties to resolve disputes, and if necessary, to order specific performance, after all of the procedures of Section L have been exhausted.

## L.     DISPUTE RESOLUTION

38.     At any time, the parties may attempt an informal and private dispute resolution mediation with the Honorable Kenneth J. Mansfield, United States Magistrate Judge, or another available recall Magistrate Judge (**"Settlement Judge"**) to resolve any disputes that may arise under this Agreement.

39.     If, while this Agreement is in effect, Plaintiffs' counsel have reasonable grounds to believe that there is a systemic pattern or practice of non-compliance with this Agreement in one or more DPS Facilities, or if DPS proposes or enacts revisions or changes to its COVID-19 policies and procedures that are materially inconsistent with the Agreement and the CDC guidelines, and to the detriment of the class, Plaintiffs' counsel will provide

DPS and the Settlement Judge with a written detailed notice of potential noncompliance, setting forth the factual basis for such claim. This notice will identify, with particularity, the basis of the claim that DPS is not in compliance; why such facts constitute a systemic pattern or practice of non-compliance; and the specific material provision of the Agreement or CDC guidelines that is implicated.

40.    Within fifteen (15) calendar days of receipt of the notification, DPS shall provide a good faith written response to the Plaintiffs' notification to Plaintiffs' counsel and the Settlement Judge with a full factual explanation as to why DPS believes it is in compliance with the specified material provisions, an explanation of DPS's plans to achieve full compliance with the specified material provisions, or an explanation of the bona fide medical, security, or other reasons for the alleged non-compliance.

41.    It is understood between the parties that certain unforeseeable events or conditions, including but not limited to long-term lockdowns in DPS, and changes to established treatment practices and the standard of care for treatment of COVID-19 infection, may prevent compliance with this Agreement. If so, DPS shall notify Plaintiffs' counsel of the event or condition within seventy-two hours, and the parties shall enter into good-faith discussions to resolve the issues.

42.   If the parties are unable to resolve the dispute within ten calendar days of DPS's response, the parties shall notify the Settlement Judge. The Settlement Judge may, in the Court's discretion, establish such mediation procedures the Court deems appropriate.

43.   Plaintiffs' Counsel may seek intervention from the Court only after all efforts for resolving the dispute with the assistance of the Settlement Judge have been unsuccessful. They may do so by filing a motion for specific performance of the material provision identified. The Court may, after appropriate notice, filing of moving and opposing papers, submission of evidence and an evidentiary hearing, order specific performance of the material provision specified in the notice upon a showing of a systemic pattern or practice of non-compliance with this Agreement in one or more DPS facilities.

44.   Plaintiffs agree they shall not file a motion for contempt. The Court may not entertain a motion for contempt and the Court may not grant any remedial relief in the nature of a contempt of court finding against Defendant. If Plaintiffs prevail on their claim of non-compliance, the sole remedy shall be specific performance of this Agreement and such costs and fees as the Court may award.

45.   Other than in connection with a motion for specific performance as provided in Paragraph 43, the Plaintiffs agree not to seek any attorneys' fees

and/or costs for time spent in any other portion of dispute resolution, including, but not limited to, the drafting and sending of the notice of noncompliance, reviewing DPS's response, and dispute resolution with the Settlement Judge.

## M.   GENERAL PROVISIONS

46.   The provisions of this Agreement may be suspended or modified in part or in entirety at a specific DPS facility only if the Defendant or his designees determine that a "genuine emergency" exists at that DPS facility. Genuine emergency means any special circumstances under which it is reasonable to conclude that there is any actual or potential threat to the security of that DPS facility, or to the safety of the staff, prisoners or other persons within such facility. If a "genuine emergency" lasts longer than twenty-four hours, or occurs more than once in a one-week period, Defendant shall report to the AMP, with Plaintiffs' counsel copied, within forty-eight hours except for good cause, the date of the emergency, the nature of the emergency, and what provisions of this Agreement have been temporarily suspended.

47.   This Agreement constitutes the entire understanding of the parties on the subjects covered. The parties acknowledge that neither of them, nor their agents or attorneys, have made any promise, representation or warranty whatsoever, either express or implied, written or oral, which is not contained in this Agreement, for the purpose of inducing the other party to execute this

836662_1.DOC

Agreement, and the parties acknowledge that they have executed this Agreement in reliance only upon such promises, representations and warranties as are contained herein, and are executing this Agreement voluntarily and free of any duress or coercion.

48.    This Agreement shall be construed and the rights of the parties determined in accordance with the laws of the State of Hawaiʻi.

49.    If any term, provision or covenant of this Agreement is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining terms, provisions, and covenants of this Agreement shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

50.    In the event of any future action or proceedings relating to this Agreement none of the parties shall be considered to have drafted this Agreement for purposes of construing the intent of this Agreement. No ambiguity shall be construed against any party based upon a claim that the party drafted the ambiguous language.

51.    The Agreement may be executed and delivered by way of electronic signature and transmission or facsimile transmission, and may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than a

single counterpart containing the respective signatures of each of the parties.

52.     This Agreement shall not be construed to create rights in, or to grant remedies to, or delegate any duty, obligation or undertaking established herein to any third party as a beneficiary of this Agreement.

53.     The parties represent and warrant that they have the authority to agree to, and to execute, the terms specified herein.

## N.     ATTORNEYS' FEES

54.     Defendant agrees to pay counsel for the plaintiff classes the reasonable attorneys' fees and costs incurred in connection with this litigation in full and final settlement of this action. This sum shall include all claims of any kind for monetary payments of any kind for attorneys' fees, costs and expenses related to this litigation of any kind that could be claimed in this action, either now or in the future, including but not limited to attorneys' fees, costs and expenses.  If the parties are unable to stipulate and agree to an amount of attorneys' fees, the parties agree to follow the procedures set forth in LR54.2 of the Local Rules of Practice for the United States District Court for the District of Hawai'i.

55.     Except as provided in Sections K and L of this Agreement, Plaintiffs' counsel further agrees not to seek any prospective fees and/or costs for any time spent in any future work on this case of any kind.

DATED: Honolulu, Hawaiʻi, September 2, 2021.

CLARE E. CONNORS
 Attorney General of the State of Hawaiʻi
CARON M. INAGAKI
KENDALL J. MOSER
SKYLER G. CRUZ
 Deputy Attorneys General

Attorneys for Defendant MAX N. OTANI,
Director of the State of Hawaiʻi Department
of Public Safety, in his official capacity

DATED: Honolulu, Hawaiʻi, September 2, 2021.

ERIC A. SEITZ
GINA SZETO-WONG
JONATHAN M.F. LOO
KEVIN A. YOLKEN

Attorneys for Plaintiffs ANTHONY
CHATMAN, FRANCISCO ALVARADO,
ZACHARY GRANADOS, TYNDALE
MOBLEY, and JOSEPH DEGUAIR,
individually and on behalf of all other
similarly situated